UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :

UNITED STATES OF AMERICA             :
                                           :
         -v-                       :
                                           :     S2 11 Cr. 114 (MGC)

XING LIN,                                :
         a/k/a "Ding Pa,"           :
                                           :
                          Defendant.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - - - -x

# GOVERNMENT'S  CONSOLIDATED NOTICE OF ENTERPRISE EVIDENCE AND MOTION IN LIMINE

PREET BHARARA
United States Attorney
for the Southern District of New York
Attorney for the United States
        of America

JENNIFER E. BURNS
PETER M. SKINNER
Assistant United States Attorneys

    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :

UNITED STATES OF AMERICA           :

                                   :

         -v-                      :

                                   :     S2 11 Cr. 114 (MGC)

XING LIN,                        :
        a/k/a "Ding Pa,"            :

                                   :

                    Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - -x

## GOVERNMENT'S  CONSOLIDATED NOTICE OF ENTERPRISE EVIDENCE AND MOTION IN LIMINE

The Government respectfully submits this memorandum to advise the Court and defense counsel of acts committed by the defendant XING LIN, a/k/a "Ding Pa," and others, in furtherance of the charged racketeering enterprise led by LIN (the "Ding Pa Organization" or the "Organization") that it may offer as part of the evidence at trial.  The Government has filed two prior enterprise notices, one on December 21, 2012, and one on January 27, 2013.  This memorandum consolidates the prior notices into one notice covering all of the enterprise evidence the Government intends to introduce at trial.

In main part, the Government seeks to introduce evidence through the testimony of individuals who associated with members of the Organization, the testimony of witnesses to the charged conduct, the testimony of a cooperating witness, the testimony of law enforcement witnesses, and LIN's statements to law enforcement agents in November 2003.  The Government will also present a variety of crime scene evidence and documentary evidence.[1]

---

[1]  To the extent that before or during the trial the Government identifies additional acts or crimes that it will seek to introduce, the Government will provide prompt notice to the Court and defense counsel.

In addition to serving as notification to the Court and counsel of this proffered evidence, the Government moves in limine, to the extent such a motion is necessary, to admit this evidence during trial.  In short, all of the evidence proffered herein is admissible as either:  (1) direct evidence of the racketeering activity and enterprise charged in Indictment S2 11 Cr. 114 (MGC) (the "Indictment"); and/or (2) evidence of the background of the charged conspiracy and enterprise and the relationships among the co-conspirators and enterprise.

## Background

**A.     The Indictment – Racketeering and Racketeering Conspiracy**

Count One and Count Two of the Indictment charge LIN and co-defendant HAO CHAO, a/k/a "Little Beijing," with participating and agreeing to participate in the affairs of a racketeering enterprise, from at least in or about 1996 up to and including in or about December 2009, in violation of 18 U.S.C. §§ 1962(c) and (d).  The charged racketeering enterprise is the Ding Pa Organization.  Counts One and Two charge that LIN and his co-conspirators participated and agreed to conduct and participate in the affairs of the Ding Pa Organization through a pattern of racketeering activity comprised of multiple state and federal law violations.  Specifically, the Indictment charges state law violations of murder, conspiracy to commit murder, extortion, and operation of illegal gambling businesses.  The charged federal law violations include murder, extortion, conspiracy to commit extortion, illegal gambling operations, and extortionate collection of credit.

**B.     Factual Background and the Pattern of Racketeering Activity**

The Government will prove that LIN was the leader of the Ding Pa Organization.  The evidence will show that in the mid-1990s and early 2000s, the enterprise was led by LIN and was

based primarily in the Chinatown neighborhood of Manhattan in New York City. During this early period, LIN was the "Dai Lo" — a Fuzhou term that literally translates as "Big Brother," but commonly refers to the boss of a criminal gang — of the Organization, which was comprised of roughly one dozen members, who were also referred to as "followers," "kids" and "gang kids." The Organization engaged in a number of criminal ventures, including the operation of high-stakes illegal gambling parlors in the Chinatown neighborhood of Manhattan; the extortion of business owners; the assault of gambling debtors, rival gang members, and other foes of the gang; and weapons possession.

As described in greater detail below, in or about 2000, LIN was involved in a dispute with a rival Dai Lo known as Yi Feng and was stabbed by followers of Yi Feng. After LIN recovered, he relocated to Atlanta, Georgia. LIN established the Ding Pa Organization in Atlanta, particularly through the operation of illegal gambling parlors. After relocating to Atlanta, LIN also continued to oversee the Organization's operations in New York City and to provide housing to followers in Manhattan and/or Queens. LIN returned regularly to New York City after relocating to Atlanta. On July 30, 2004, LIN and CHAO murdered two people in a karaoke club in Queens. LIN then fled and eventually settled in Toronto, Canada, where he continued the Organization's illegal gambling and extortion ventures. LIN participated in the Organization's illegal ventures until at least December 2009.

While he was a member of the Organization, as explained in greater detail below, LIN committed a variety of crimes with other members, including operating illegal gambling parlors, extorting business owners, assaulting rivals, and committing murder. LIN also provided housing at various times to his followers. In addition, throughout his membership in the Organization,

LIN regularly went to nightclubs and gambling parlors with other members of the Organization as a show of force.  LIN and other members of the Organization also brandished firearms and other weapons and threatened those who crossed the Organization.

The pattern of racketeering activity discussed in this memorandum covers racketeering conduct in which LIN himself directly participated, as well as racketeering activity in New York City and elsewhere that was ordered by LIN and demonstrates the history of the Organization, and its means and methods of maintaining — and at times aggrandizing — its power and membership.  The Government includes acts in this notice that it <u>may</u> offer into evidence at trial. The Government takes this broad approach to provide comprehensive notice to defense counsel and because the trial proceedings are of course unpredictable.

### 1.    Extortion

Extortion and extortion conspiracy are charged as objects of the racketeering conspiracy charged in Count One of the Indictment, as Racketeering Act Two of the substantive racketeering charge contained in Count Two, and as stand-alone charges in Counts Four and Five. Specifically, as part of his participation in the charged enterprise, LIN extorted and conspired to extort the owners of a bus company operating in the Chinatown neighborhood of Manhattan. LIN received shares in the bus company as well as cash payments in exchange for threatening rival bus companies and keeping those rivals from competing with the bus company's routes. After the owners of the bus company, including Chan Qin Zhou, balked at LIN's demands for more money, LIN and CHAO murdered Zhou.  LIN then demanded continued payments from the other owners of the company and continued to collect those payments until December 2009, even after relocating to Toronto.

-4-

2. **Murder**

Murder is charged as an object of the racketeering conspiracy charged in Count One of the Indictment, as Racketeering Act One of Count Two, and as a stand-alone charge in Count Three.  As part of their participation in the charged enterprise, LIN and CHAO committed and conspired to commit the murder of Zhou in furtherance of LIN's extortion of the bus company. Zhou was singing in a private room in a karaoke club in Queens during the early morning hours of July 30, 2004.  LIN and CHAO forced their way into the room, and LIN told CHAO to shoot Zhou.  CHAO then shot Zhou six times.  One of the bullets went through Zhou and struck a waitress in the head, killing her.  Another bullet struck a second waitress in the leg, although she survived.  After the murder, LIN and CHAO fled the scene.  LIN eventually relocated to Toronto, Canada.

3. **Gambling Operations**

Gambling is charged in the Indictment as an object of the racketeering conspiracy charged in Count One and as Racketeering Acts Three, Four and Five of Count Two.  From the mid-1990s until the early 2000s, while based principally in New York City, the Organization opened and operated a series of illegal gambling parlors in and around the Chinatown neighborhood of Manhattan.  For example, LIN, along with other investors and several of his underlings, owned and operated two gambling parlors located on Madison Street and a gambling parlor located on Eldridge Street.  In or about 2000, when the Organization branched out to Atlanta, it began operating gambling parlors in the Atlanta area.  Likewise, from at least in or about 2006 until at least in or about 2008, when the Organization moved and was reconstituted in Toronto, Canada,

it opened and operated a series of gambling parlors located in and around the Toronto area.  LIN had ownership stakes in those gambling parlors and helped run them.

### 4.     Extortionate Collection of Debt

The collection of debts through extortionate means is charged as an object of the racketeering conspiracy charged in Count One of the Indictment and as Racketeering Act Six of Count Two.  LIN and his followers used violence and threats of violence to collect debts from gambling debtors.  Specifically, in approximately 2001, LIN and seven to eight of his followers entered a gambling parlor in the Chinatown neighborhood of Manhattan.  They walked directly to a man who was gambling in the gambling parlor ("Victim-1") and beat Victim-1.  Victim-1 was beaten because Victim-1 owed LIN a gambling debt.  After beating Victim-1, LIN and his followers left.

### 5.     Other Criminal Conduct

a.     <u>1996 Restaurant Incident</u>:  In or about 1996, LIN and two followers entered a restaurant in the Chinatown neighborhood of Manhattan and approached a man who was eating in the restaurant ("Victim-2").  LIN picked up a soy sauce bottle and threatened to hit Victim-2 with the bottle because Victim-2 had spoken to LIN's wife.  Other restaurant patrons stepped between LIN and Victim-2 before LIN could hit Victim-2 with the bottle.  The Government intends to prove this conduct through testimony from Victim-2.

b.     <u>July 2000 Gambling Parlor Shooting</u>:  On or about July 16, 2000, LIN entered a gambling parlor located at 22 Orchard Street in the Chinatown neighborhood of Manhattan.  LIN approached the owner of the gambling parlor ("Victim-3") and put a gun to Victim-3's head.  LIN told Victim-3 that Victim-3 was not giving LIN "face" and that LIN was

going to kill Victim-3.  Victim-3 begged for his life, and LIN agreed not to kill him.  During his assault of the gambling parlor owner, LIN fired his gun once.  Shortly after the incident, the New York City Police responded to a call for assistance and found a bullet lodged in the ceiling of the Orchard Street gambling parlor.  The Government intends to prove this conduct through eye-witness testimony and forensic evidence, including the bullet recovered from the scene of the shooting by the NYPD.

        c.     <u>2000 Nightclub Incident</u>:  In or about 2000, LIN and four to five of LIN's followers entered a nightclub in the Flushing neighborhood of Queens, New York.  Victim-2 (the victim of the 1996 restaurant assault) and others were standing in the bar area of the club when LIN and his followers entered the club.  LIN pointed at a man who was talking to Victim-2 and said, "That's the guy."  LIN's followers then tried to attack the man who was talking to Victim-2.  Victim-2 and other patrons of the nightclub interceded and convinced LIN and his followers to leave before the man was harmed.  The Government intends to prove this conduct through testimony from Victim-2.

        d.     <u>2000 Restaurant Incident</u>:  In or about 2000, shortly after the incident at the nightclub, Victim-2 was eating at a restaurant located on Eighth Avenue in Brooklyn.  LIN entered the restaurant with six or seven followers.  LIN told the owner of the restaurant to close the front door.  Victim-2 was afraid that he was going to be assaulted by LIN and his followers, so he tried to exit the restaurant.  LIN grabbed Victim-2's collar as Victim-2 was trying to leave the restaurant, slapped Victim-2 across the face, and said, in sum and substance, "From now on, I don't want to see you in Chinatown."  The Government intends to prove this conduct through testimony from Victim-2.

      e.     <u>2000 Incident at Gambling Parlor</u>:  In or about 2000, the day after the incident in the Brooklyn restaurant described above, Victim-2 was walking on Eldridge Street in the Chinatown neighborhood of Manhattan.  At the time, LIN owned and operated a gambling parlor that was located in the rear of a barber shop that was located on Eldridge Street.  As Victim-2 approached the vicinity of the barber shop, Victim-2 heard LIN shout from behind him, in sum and substance, "[Victim-2] came here."  LIN then grabbed Victim-2 from behind and started pulling Victim-2 into the barber shop.  Victim-2 held onto the door frame of the front door to prevent LIN from pulling him all the way into the barber shop.  Victim-2 saw a screwdriver jammed into the area between the front door and the door frame that was holding the front door open.  Victim-2 pulled out the screwdriver and stabbed LIN in the buttocks with the screwdriver.  LIN then released Victim-2, and Victim-2 ran away from the barber shop.  The Government intends to prove this conduct through testimony from Victim-2.

      f.     <u>September 2002 Gambling Parlor Shooting</u>:  In or about September 2002, LIN and at least one of his followers fired shots into a gambling parlor located at 109 East Broadway in the Chinatown area of Manhattan that was owned by Yi Feng, a rival gangster.  LIN and his follower fled.  Yi Feng's followers chased LIN and his follower down the street, caught them, and stabbed them both.  The Government intends to prove this conduct through testimony from a participant in the incident, testimony from a witness who observed LIN and his follower lying on the street after they were stabbed, and testimony from a witness who spoke to LIN about the stabbing.

      g.     <u>November 2003 Restaurant Shooting</u>:  On or about November 14, 2003, LIN and a group of his followers, were at a restaurant in Chinatown meeting with a rival gang to

resolve a dispute.  LIN got into an argument with someone in the restaurant ("Victim-4") and ordered his followers to stab Victim-4, which they did.  A member of the rival gang then pulled out a gun and began shooting in the direction of LIN and LIN's followers.  In the confusion that followed, LIN was shot in the buttocks as he tried to run out of the room.  The Government intends to prove this conduct through testimony from Victim-4, testimony from law enforcement officers who investigated the incident, testimony from a detective who interviewed LIN in the hospital after the shooting, and forensic evidence, including bullets recovered from the scene of the shooting and images from a security camera at the restaurant.

       i.      <u>2009 Extortion of Toronto Gambling Parlor Owner</u>:  In or about 2009, LIN and his followers attempted to extort the owner of a gambling parlor located in Toronto ("Victim-5").  LIN visited Victim-5's gambling parlor with his followers on at least two occasions, threw tables and chairs around the gambling parlor, and drove away the gambling parlor's clientele.  LIN demanded 50% of Victim-5's profits, or, in the alternative, a lump sum $20,000 payment.  LIN threatened harm to the gambling parlor's business if Victim-5 did not give LIN what he demanded.  Victim-5 refused to pay LIN the money that LIN had demanded. The Government intends to prove this conduct through testimony from Victim-5.

       j.      <u>December 2009 Assault of Gambling Parlor Owner</u>:  In or about December 2009, LIN and his followers assaulted Victim-5.  LIN and his followers came across Victim-5 in a night club.  LIN whispered in the ear of one of his followers, and the followers then proceeded to punch and kick Victim-5.  While he was being beaten, LIN stated that he was going to beat Victim-5 to death.  Security from the nightclub broke up the beating.  Victim-5 was badly beaten and needed multiple stitches to close a cut to his eye.  After he left the club, Victim-5 was

sitting in his friend's car.  LIN came up to the car and yelled "I want you dead" at Victim-5.

**Argument**

All of the evidence proffered above is admissible at trial for independent reasons.

**A.     Evidence Proffered in Background Sections B.1. through B.4. Prove the Predicate Offenses Charged in the Racketeering and Racketeering Conspiracy Counts**

The evidence proffered above in Background Sections B.1. through B.4. is admissible because it is direct proof of the racketeering activity charged in the Indictment.  Counts One and Two of the Indictment charge LIN with participating and conspiring to participate in a pattern of racketeering activity comprised of multiple state and federal law violations, including murder, conspiracy to commit murder, extortion, conspiracy to commit extortion, and the operation of illegal gambling businesses.  LIN's participation in and knowledge of the incidents covered by the evidence proffered in Background Sections B.1. through B.4. is directly relevant and admissible to prove the racketeering acts charged in the Indictment.

Further, the Second Circuit has held that, to prove that a defendant participated in a racketeering conspiracy, the Government need only show that the defendant agreed that either he or other co-conspirators would commit two or more underlying predicate acts:

> To establish a RICO conspiracy, the government must prove that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity. However, in <u>Salinas</u> v. <u>United States</u>, 522 U.S. 52 (1997) (alternate citations omitted), the Supreme Court made clear that to establish this pattern, the government need not prove that the defendant himself agreed that he would commit two or more predicate acts.  <u>See id.</u> at 64 (noting that, although the RICO statute "broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the government to prove [that] each conspirator agreed that he would be the one to commit two predicate acts.").  Indeed, <u>Salinas</u> held that to be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme.

-10-

United States v. Yannotti, 541 F.3d 112, 121-22 (2d Cir. 2008) (internal citations omitted).

Thus, the Government may prove a defendant's participation in a racketeering conspiracy either by proving (1) that the defendant himself participated in at least two predicate acts, or (2) that the defendant agreed that other co-conspirators would commit at least two predicate acts.  Here, all of the proffered evidence in Background Sections B.1. through B.4. goes to both of these points: the evidence shows that not only did LIN know that his co-conspirators would commit the specified predicate offenses, but that LIN himself directly participated in those crimes.

**B.      The Proffered Evidence in Background Sections B.5.e., B.5.f., B.5.i. and B.5.j. Prove the Predicate Offenses Charged in the Racketeering and Racketeering Conspiracy Counts**

The Proffered Evidence in Background Sections B.5.e., B.5.f., B.5.i. and B.5.j. is relevant to and direct proof of the racketeering activities charged in Counts One and Two.

As explained in greater detail above at Background Section B.5.e., Victim-2 is expected to testify that in or about 2000, LIN tried to pull Victim-2 into a barber shop located on Eldridge Street.  Other witnesses are expected to testify that during this same time period, LIN operated a gambling parlor in a room that was located behind a barber shop that was on Eldridge Street.  Victim-2's testimony placing LIN at the site of the gambling parlor is thus relevant to and direct proof of the racketeering charges contained in the Indictment; specifically, that LIN operated a gambling parlor on Eldridge Street in Manhattan, see Count One, Racketeering Acts (listing Operation of Illegal Gambling Businesses) and Count Two, Racketeering Act Five.

Likewise, the proffered evidence of the shooting and stabbing that occurred in or about September 2002 (see supra, Background Section B.5.e.), is relevant to the murder charged in Count One (Racketeering Acts), Count Two (Racketeering Act One), and Count Three.  The

-11-

Government expects witnesses to testify that LIN sought revenge against Yi Feng, the rival gangster, after Feng's followers stabbed LIN. Witnesses will further testify that Feng was hiding from LIN, that LIN stated that he was trying to "get to" someone close to Feng to flush Feng out, and that Feng was close friends with Zhou — the victim of the July 30, 2004 murder. The September 2002 shooting and stabbing is thus relevant to LIN's murder of Zhou as it provides a motive for the murder.

Further the extortion of Victim-5 described in Background Sections B.5.i. and B.5.j. is proof of the RICO conspiracy, as Count One alleges that extortion was one of the racketeering activities within the scope of the conspiracy.

For these reasons, all of the evidence proffered in Background Sections B.5.e., B.5.f., B.5.i. and B.5.j. is direct evidence of the predicate offenses alleged in the RICO counts. The shooting/stabbing described in Background Section B.5.e. is also relevant to the murder charged in Count Three.

## C.     All of the Proffered Evidence Proves the Racketeering Enterprise

All of the proffered evidence is evidence of the nature and existence of the charged racketeering enterprise. First, it well established that "'proof of various racketeering acts may be relied on to establish the existence of the charged conspiracy.'" United States v. Applins, 637 F.3d 59, 73 (2d Cir. 2011) (quoting United States v. Coonan, 938 F.2d 1553, 1560 (2d Cir. 1991)). Thus, the evidence proffered in Background Sections 1-4 and B.5.e., B.5.f., B.5.i. and B.5.j., which is admissible to prove the racketeering acts charged in the Indictment, is also admissible to prove the existence of the enterprise charged in the Indictment — the Ding Pa Organization.

Second, to the extent that the above proffered evidence does not specifically constitute the charged racketeering activity (that is, Background Sections B.5.a. through B.5.d. and B.5.g.), the evidence is admissible to prove the existence, nature, background, and membership of, the charged enterprise.  As explained above, evidence of the racketeering acts may be used to prove the existence of the enterprise.  The Supreme Court has held, however, that an "association-in-fact enterprise" — such as the Ding Pa Organization — "must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages."  Boyle v. United States, 556 U.S. 938, 945 (2009) (internal quotation marks omitted).[2]  This structure must include at least three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose."  Id. at 946.

To prove the purpose of the enterprise and the relationships among its members, the Second Circuit has held that the Government may offer evidence of crimes committed by persons associated with the enterprise that are not specifically charged in the indictment.  See United States v. Diaz,176 F.3d 52, 79 (2d Cir. 1999); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997).  This rule applies to criminal acts committed by the charged defendants, as well as acts committed by other members of the enterprise.  United States v. Brady, 26 F.3d 282, 286-88 (2d

---

[2]     An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."  United States v. Turkette, 452 U.S. 576, 583 (1981).

Cir. 1994) (Section 1959 case); United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992); see also United States v. Basciano, 599 F.3d 184, 208 (2d Cir. 2010) (same).[3]

Thus, in United States v. Diaz, a racketeering case, the Second Circuit affirmed the district court's decision to admit testimony concerning uncharged crimes – including drug trafficking, the stockpiling of weapons to protect the gang's drug trade, and acts of violence committed on behalf of the gang – because "it tended to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering activity by each defendant-appellant." 176 F.3d at 79. Similarly, in United States v. Miller, the Second Circuit held that evidence "of numerous killings by" members of the racketeering enterprise was properly admitted "as proof of the existence of the RICO enterprise alleged in the indictment which used such acts of violence in furtherance of its narcotics conspiracy." 116 F.3d at 682.

In United States v. DiNome, the Second Circuit recognized the propriety of demonstrating the existence of a racketeering enterprise through its members' violent acts, regardless of whether those acts were expressly charged in the indictment. The Court stated:

---

[3]    In United States v. Applins, the Second Circuit held that "the establishment of an enterprise is not an element of [a] RICO conspiracy offense." 637 F.3d at 75. In this case, however, the Government has charged LIN both with a RICO conspiracy under Section 1962(d) (Count One) as well as a substantive RICO count under Section 1962(c) (Count Two). The Government must prove the existence of an enterprise to prove the substantive count. 18 U.S.C. § 1962(c); see also United States v. Applins, 637 F.3d at 73. Further, to prove the RICO conspiracy count, the Government must prove that LIN agreed that an enterprise would be established. United States v. Applins, 637 F.3d at 74. To prove an agreement to establish an enterprise, the Government may prove that the enterprise was in fact established. See id. at 77. In this case, the admission of enterprise evidence is thus proper both to prove the existence of the enterprise, which the Government must prove with respect to the substantive RICO charge in Count Two, as well as the existence of the agreement to establish an enterprise, which is an element of the RICO conspiracy charged in Count One.

> [E]vidence of numerous crimes, including the routine resort to vicious and deadly force to eliminate human obstacles, was relevant to the charges against each defendant because it tended to prove the existence and nature of the RICO enterprise . . . . Such evidence was also relevant to prove a pattern of racketeering activity by each defendant.

954 F.2d at 843.  Similarly, in United States v. Coonan, the Second Circuit stated that evidence of extreme acts of violence by members of a RICO enterprise "was certainly probative of the existence of the charged enterprise."  938 F.2d at 1561.

In sum, evidence of uncharged acts is routinely admitted in racketeering trials in this Circuit.  See United States v. Thai, 29 F.3d 785, 812-13 (2d Cir. 1994) (uncharged acts admissible as evidence of "the existence and structure of the [RICO] enterprise"; such acts are not "other" crimes evidence governed by Fed. R. Evid. 404(b)); Coonan, 938 F.2d at 1561 (evidence of uncharged acts of extreme violence by members of a RICO enterprise "was certainly probative of the existence of the charged enterprise"); United States v. Kaplan, 886 F.2d 536, 543-44 (2d Cir. 1989) (continuity of a pattern of activity may be established by evidence of uncharged acts); United States v. Indelicato, 865 F.2d 1370, 1382-83 (2d Cir. 1989) (en banc) (where predicate acts are closely related in time, facts external to those acts may be offered to establish continuity requirement).

Here, evidence of the acts described in Background Section 5 will demonstrate the existence, membership, and structure of the charged racketeering enterprise and conspiracy.  For instance, the Government expects to introduce testimony that "face," or respect, is of profound importance for the leaders of criminal gangs in Chinatown such as LIN.  The conduct described in Background Sections B.5.a., B.5.b., B.5.d., B.5.e. and B.5.j. is relevant to LIN's leadership position in the Ding Pa Organization, as it demonstrates that he used violence to preserve "face,"

or his reputation, in the community and with his followers.  Similarly, the incidents described in
Background Sections B.5.c., B.5.d., B.5.f., B.5.g, B.5.i., and B.5.j. show how the Ding Pa
Organization was structured, as in each instance LIN told his followers what to do.  The same
incidents show how the Organization's members worked together to thwart rivals and to meet the
goals of the Organization — namely, to earn money through illegal gambling and extortion.  The
evidence will also show that the acts of racketeering charged — far from being aberrational —
were part of a longstanding, continuous pattern of criminal behavior on the part of LIN and his
co-conspirators and co-racketeers.  In short, since the purposes of the uncharged crimes were to
enrich the Organization and its members and associates and maintain cohesiveness among those
individuals, evidence of the uncharged crimes is admissible, under the cases cited above, to prove
the existence and nature of the enterprise.

**C.     All of the Proffered Evidence Proves the Background of the Conspiracy and the
        Relationships Between the Co-Conspirators**

        The proffered evidence is also independently admissible to "'inform the jury of the
background of the conspiracy charged,' 'to complete the story of the crimes charged,' and to
'help[] explain to the jury how the illegal relationship between [participants in the crime]
developed.'"  United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (quoting United
States v. Brennan, 798 F.2d 581, 589-90 (2d Cir. 1986), and United States v. Harris, 733 F.2d
994, 1006 (2d Cir. 1984); see also United States v. Baljit, 207 F. Supp. 2d 118, 1212-22
(S.D.N.Y. 2002); United States v. Greer, 631 F.3d 608, 614 (2d Cir. 2011); Diaz, 176 F.3d at 79-
80; United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other bad acts may be
admitted to provide the jury with the complete story of the crimes charged by demonstrating the

context of certain events relevant to the charged offense"); Coonan, 938 F.2d at 1561 ("'[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.'") (citations omitted). Indeed, the proffered evidence shows how LIN led the Organization over a period of time and continued the Organization's operations when he was located in Atlanta and Toronto.

**D.     Alternatively, the Other Criminal Act Evidence Contained in Background Section 5 Is Admissible Under Federal Rule of Evidence 404(b)**

The evidence listed in Background Section 5 is admissible because it is direct proof of the charged RICO conspiracy, establishes the existence of the charged enterprise, and is necessary background information concerning the relationship of the parties.  See, e.g., Coonan, 938 F.2d at 1561 (determining admissibility of uncharged criminal act evidence in a RICO case without regard to Rule 404(b)).  Should the Court reject all three of the above bases, however, the evidence would also be admissible under Rule 404(b).  Pursuant to Federal Rule of Evidence 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith," but such evidence may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  The Second Circuit's "inclusionary interpretation" of Rule 404(b) "allows evidence of other wrongs to be admitted so long as it is relevant and it is not offered to prove criminal propensity."  United States v. Pipola, 83 F.3d 556, 565 (2d Cir. 1996). In United States v. Pitre, 960 F.2d 1112 (2d Cir. 1992), the Second Circuit set forth the standards for assessing the admissibility of evidence under Rule 404(b):

> First, the district court must determine if the evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal

-17-

propensity.  If the evidence is offered for a proper purpose, the district court must next determine if the evidence is relevant to an issue in the case, and, if relevant, whether its probative value is substantially outweighed by the danger of unfair prejudice.  Finally, upon request, the district court must give an appropriate limiting instruction to the jury.

960 F.2d at 1119 (internal citation omitted).

Here, all of the "other crimes" evidence is admissible under Rule 404(b).  The evidence of the assaults and the operation of the gambling businesses in Atlanta and Toronto establish LIN's intent, opportunity, knowledge, plan and modus operendi.  In each instance, the uncharged conduct shows that LIN was in control and in a leadership position, directing the actions of others purposefully and without accident or mistake.

**E.      Rule 403**

The proffered evidence is directly probative of the charged crimes, and will not be unduly prejudicial, confusing, or wasteful for purposes of Rule 403 of the Federal Rules of Evidence.  First, as discussed above, all of the proffered evidence goes directly to issues at the heart of the Indictment:  the fact that LIN conspired to participate in a racketeering enterprise; the specific nature of LIN's participation in the charged enterprise; LIN's own conduct constituting that participation; the nature, structure, and membership of the enterprise; and the relationships between LIN and his co-conspirators and co-racketeers.

In assessing the potential for undue prejudice under Rule 403, the Court should consider whether the proffered evidence of other acts is more or less inflammatory than the specifically charged crimes.  In United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000), the Second Circuit found that there was no undue prejudice where the evidence of certain prior acts was not more serious than the specifically charged conduct.  Similarly, in United States v. Pitre, the

-18-

Second Circuit found that the danger of unfair prejudice is lessened if "other acts" evidence involves crimes of equal or less seriousness than the charged crimes.  960 F.2d at 1119.  Here, the proffered evidence of other acts, such as LIN's operation of gambling parlors and assaults of rivals, is no more inflammatory than the specifically charged racketeering activities, such as the murder of Zhou, the extortion of the bus company owner, and the operation of three gambling parlors in the Chinatown neighborhood of Manhattan.

Moreover, the proffered evidence will not be confusing or wasteful in any way.  The proffered evidence will not be confusing because it relates to other incidents of criminal conduct by LIN and his followers that are not particularly complex or difficult to understand.  For the most part, the evidence of these uncharged crimes is simply the testimony of witnesses to the crimes, who will already be testifying at trial about other matters, and the testimony of a cooperating witness.

In sum, the evidence of the criminal acts, including both charged and uncharged conduct, is properly admissible in the Government's case in chief.  To the extent that the Government learns before or during the trial of additional conduct, the Government will provide prompt notice to the Court and defense counsel.

**Conclusion**

For the reasons set forth above, the Court should grant the Government's motion <u>in</u>

<u>limine</u> and issue a ruling permitting the introduction of evidence of criminal acts, including both

charged and uncharged conduct.

Dated:  New York, New York
        March 19, 2013

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                    By:    S/_____
                           Jennifer E. Burns
                           Peter M. Skinner
                           Assistant United States Attorneys
                           (212) 637-2315 / 2601

-20-

<u>AFFIRMATION OF SERVICE</u>

Peter Skinner affirms under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

That on March 19, 2013, I caused to be served by ECF and email one copy of the Government's Notice of Enterprise Evidence to be served on Joel Cohen, Esq., counsel for defendant XING LIN.

S/ _____
Peter M. Skinner
Assistant United States Attorney
(212) 637-2601