Da6lin1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                             11 CR 114 (MGC)

 5    XING LIN,

 6              Defendant.                     JURY TRIAL

 7    ------------------------------x

 8                                             New York, N.Y.
                                               April 10, 2013
 9                                             10:15 a.m.

10
      Before:
11
                      HON. MIRIAM GOLDMAN CEDARBAUM,
12
                                               District Judge
13

14                           APPEARANCES

15
      PREET BHARARA,
16         United States Attorney for the
           Southern District of New York
17    PETER M. SKINNER
      JENNIFER E. BURNS
18         Assistant United States Attorneys

19    JOEL S. COHEN
           Attorney for Defendant
20
      ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
21                    DANIEL YANG, Fuchow Interpreter
                      LILY LAU, Fuchow Interpreter
22                    JESSICA CHACE, Paralegal
                      TIMOTHY VARIAN, Special Agent, HSI
23                    JIAYING WANG, Legal Assistant

24

25
```

Da6lin1

1              (Trial resumed)

2              (In open court; jury not present)

3              THE COURT:  Good morning.  Please be seated.  Let's

4    get the jury in.

5              (In open court; jury present)

6              THE COURT:  Good morning, members of the jury.  Please

7    be seated.  I congratulate all of you for setting a good

8    standard for yourself for coming promptly and enjoying early

9    breakfast together.  Remember I told you yesterday that the

10   first thing that will happen is what we call opening

11   statements.  When the lawyers tell you what they hope to prove

12   during the course of the trial and because the government has

13   the burden of proof as I explained, the government

14   representative, the prosecutor, makes the first opening

15   statement.

16             Are you going to open, Mr. Skinner?

17             MR. SKINNER:  Yes, I am.

18             THE COURT:  Very well.  Go ahead.

19             MR. SKINNER:  Thank you.

20             In the early morning hours of July 30th, 2004 a group

21   men and women were in a karaoke club in Queens.  They were in a

22   private room having a good time.  One of the men in the group

23   was singing for everyone else when all of a sudden two other

24   men bust into that room.  One of those two men turned to the

25   other and said, Shoot him.  The other man pulled out a gun,

Da6lin1

aimed it at the singer and started firing.  The singer fell to
the ground.  That man had then walked over to the singer and
stood over him and emptied his gun into him.  The two men who
bust into that room then fled the room together.  The singer
was dead.  He had been shot six times.  Two women in that room
were also shot.  They both worked for the karaoke bar.  They
were both in that room when the firing started.  One of them
was hit in the head.  She died.  One was hit in the leg and she
survived.

          Ladies and gentlemen, this man, the defendant Xing Lin
is the man who gave the order to shoot that night.  You are
going to be hearing from two eyewitnesses during this trial,
two people who were in that karaoke room at the time of the
shooting and they are both going to tell you that Xing Lin
walked into that room, he turned to the other man and he said,
Shoot him.  Why did he do it?  Xing Lin was the head of a gang
and the singer had crossed that gang.  As you will learn during
the trial, he crossed them in more than one way.  So Lin
murdered him as a result.  He walked into that room with the
intent to kill the singer and he didn't leave until the job was
done.  Of course he didn't kill just the singer.  When the
bullets started flying in that small karaoke room that night,
two other people were hit, two women who worked for the bar,
innocent bystanders, people who were in the wrong place at the
wrong time.  One of those women died.  One of those women was

Da6lin1

1   murdered by this man.

2          Now, those murders in the karaoke room are a big part

3   of this trial, but they are not entire trial because this isn't

4   a trial just about those murders.  This is a trial about Lin's

5   gang and Lin's gang committed a lot of crimes.  As you will

6   hear during the course of this trial, they ran gambling

7   parlors, they extorted business people, they beat people, they

8   stabbed people, they shot people over the course of years.

9   Xing Lin was what you will hear -- he was what a term is Dai

10  Lo.  Dai Lo means big brother in Chinese.  It is a term for

11  leader of the gang.  The leaders of the gang are called

12  followers or kids and they are just that, young men who follow

13  their Dai Lo and does what he tells them to do, including

14  committing crimes.  What do the followers yet out of it?  I

15  place to live, spending money, a cut of the money of the crimes

16  committed by the gang.

17         You will learn during the trial that one of the ways

18  Lin's gang earns money was by running illegal gambling parlors

19  in Chinatown and elsewhere.  They were casual places.  They

20  were not high-end establishments.  We are talking about rooms

21  behind Chinatown storefronts.  A lot of money was bet in these

22  rooms.  Hundreds of thousands of dollars of money a night and

23  Lin's gang took a cut every day.  You will learn that another

24  way Lin and his gang made money is by extorting business people

25  by scaring them into giving them money.  One of the people

Da6lin1

1    Lin's gang extorted was a businessman named Chen who owned a

2    bus company.  You will see as the evidence in this trial

3    unfolds that the extortion of Chen led to those murders in the

4    karaoke room that I just told you about.

5            So let's talk for a moment about Chen.  Chen's bus

6    company started small.  In 2001 he and a partner bought a van

7    and started driving people from New York City to Charlotte,

8    North Carolina and back.  In 2002 soon after they started that

9    bus company, they learned that a bigger bus company was

10   planning to run buses on the same route, the one from Chinatown

11   to Manhattan to North Carolina.  Chen was worried that it would

12   put him out of business so he turned to Lin for help.  He knew

13   what Lin was.  He knew that Lin was a Dai Lo and he hoped that

14   Lin would scare this rival company away.  So he offered Lin

15   one-third of his company in exchange for Lin's help and Lin

16   agreed to help and lo and behold what happened?  The

17   competition went away.  No buses were run on that route from

18   Chinatown to New York to North Carolina other than the ones

19   from Chen's bus company.

20           What did Chen do?  He made good on his promise and he

21   started paying Lin one-third of his profits in cash every

22   month.  Chen is going to testify that he now viewed Lin as his

23   Dai Lo, someone to whom he owed respect.  So when he heard in

24   about 2002 that Lin was in the hospital, he went to him to pay

25   a visit and Lin told Chen that he had ended up in the hospital

Da6lin1

because he was stabbed by a rival Dai Lo, another leader of a

Chinatown gang.  Lin explained that he and his followers had

shot up to that Dai Lo gambling parlor and later the rival

followers tracked Lin down and stabbed him.

Now, after the stabbing, Lin left.  He moved from New

York and he shifted his gang to Atlanta, but he left some of

his followers in New York and he came back up to New York a

lot.  He came back up to collect money.  He came back up to try

to exact revenge on this rival who had stabbed him.

Now, the Chen the bus company owner was one of the

people who kept paying Lin every month even after Lin had left

and gone to Atlanta one-third of his profits in cash every

month, but you are going to learn one-third of that bus company

wasn't enough for Lin.  In the summer of 2003, about a year

before the murders in the karaoke bar, Lin demanded more from

Chen.  He wanted a bigger share of the bus company.  He said he

needed more money to cover the expenses of supporting all of

his followers.  Chen refused.  He thought one-third was enough.

Lin was anxious.  Lin went to Chen's partner and tried to get

Chen's partner to agree to force Chen out of the company.  So

at this point Chen turned to a man named Yi Qun for help.  Yi

Qun was his nickname.

I should note as well you will hear during the trial

that Defendant Lin is often referred to as Ding Pa, which is

his nickname.

Da6lin1

1              In any event, Chen turns to Yi Qun for help.  Yi Qun

2     was a businessman.  He wasn't a Dai Lo, but he was friendly

3     with a lot of Dai Los.  In fact, he was close friends with

4     Lin's rival, the Dai Lo who had stabbed him   Yi Qun had power

5     and respect in Chinatown, which is referred to as "face" in

6     Chinatown.  After Chen went to Yi Qun for help lo and behold

7     his partner changed his mind and decided that he was not going

8     to side with Lin to kick Chen out of the company.  So now Lin

9     was really angry.  You will learn that he called Chen and he

10    demanded that they meet face-to-face and then met him the next

11    day.  He went to a park in Queens and met Lin.  Chen was alone.

12    Lin was with his followers and Lin's followers were carrying

13    guns.  Lin told Chen that he was losing face in Chinatown, that

14    Chen wasn't giving him the respect he needed and he demanded to

15    be paid more than what he was currently being paid.  Chen was

16    afraid.  He was afraid for his life and he agreed to start

17    paying an additional $22,000 every month on top of the

18    one-third profits that he was already paying.

19             Around the same time in the spring of 2003 Chen had

20    sold some of his remaining shares in that bus company to Yi

21    Qun, the man he had gone to for help and try to force Chen out

22    of the company.  Yi Qun didn't learn about those $2,000

23    payments at first however.  He didn't learn about them until

24    the following year until about 2004.  When he found out about

25    an extra $2,000 to the bus company money was going to Lin, he

Da6lin1

told Chen to stop.  So Chen called Lin and told Lin that

another shareholder in the company has said I had to stop the

extra payments.  Once again Lin was angry.  He said he knew who

this other shareholder was and he threatened the other

shareholder.  Nevertheless, in July of 2004 Chen stopped paying

that extra money to Lin.

This brings us back to the murders in the karaoke room

on July 30th, 2004.  The singer in the karaoke room, the man

who was shot six times and died, that man was Yi Qun, the man

who was close friend with the rival gangster who had stabbed

Lin, the man who ordered Chen to stop paying Lin that extra

money every month.

Now, as I told you at the beginning of my opening

statement, the evidence will show that Lin ordered the killing

of Yi Qun.  He went into Yi Qun's karaoke room.  He ordered the

shooter to shoot Yi Qun.  He watched as the shooter executed Yi

Qun.  He watched as two other women were struck in the

crossfire and then he fled alongside the shooter.

Ladies and gentlemen, that is not end of the evidence

that you will be hearing in this trial.  You will learn during

this trial that a few days after the shooting Lin called Chen

on the phone.  He didn't tell Chen where he was, but he told

Chen that he still had followers in New York.  Chen will

testify that he viewed this as a clear threat that he could

still be reached by Lin.  Lin told Chen to keep making those

one-third payments every month, but he told him to give the

money to his wife.

Chen also asked Lin what happened.  He said, What

happened the night of the shooting, because he heard about it

in the meantime.  Lin admitted during this phone call that he

told the shooter, Get rid of him, but he said that he meant

shoot him in the arm or leg even though he said, Get him.

Following the shooting Chen did as he was told.

Although Lin was gone and he was afraid of him and he kept

making those payments every month in cash and now he gave the

money to Lin's wife.  You will learn that after these shootings

Lin relocated.  He went to Canada.  He ended up in Toronto.  He

set up the same gang up there and he went back to doing what he

knew best, running gambling parlors and using force to gain

advantage.

So how are we going to prove all this?  You will hear

testimony from witnesses, you will see forensic evidence and

you will see records from phone companies and banks.  A number

of different witnesses are going to testify that Lin was a Dai

Lo.  You will hear testimony from witnesses who knew Lin,

testimony from witnesses who knew Lin's followers and they will

tell you that they heard Lin giving his followers instructions.

They will testify that he heard his followers saying that they

followed Lin.  You will hear from one of Lin's followers, a

young man who was a member of the gang shortly in the time

Da6lin1

1    period preceding the murders that happened in 2004 and he is

2    going to tell you what it was like to be a part of Lin's gang.

3    He is going to tell you that he followed Lin's orders and he

4    did what Lin told him to do.  You will also hear testimony from

5    a number of witnesses about a gambling parlor here in Manhattan

6    and in Atlanta and Toronto.  You will hear from Chen.  He is

7    going to explain to you how he went to Lin for help but ended

8    up being victimized by Lin as well.

9            With regard to the karaoke room shooting, there is

10   quite a bit of evidence.  As I mentioned earlier, you will hear

11   testimony from two people who were in that room.  They will

12   tell you what they saw and what they heard that night.  They

13   will tell you how two men came into the room and Line was one

14   of those men and how Lin ordered the shooting of Yi Qun.  You

15   will also hear from a witness who saw Lin and the shooter in

16   the hallway outside the karaoke room just before the shooting.

17   This witness knew Lin and he will testify that he tried to say

18   hello to him, but Lin and the shooter rushed by him and didn't

19   stop to give him the time of day.  They pushed right into that

20   karaoke room, they slashed the door behind him and the next

21   thing he realized he was hearing bangs and seeing flashes

22   through the window of the karaoke room.  He will testify how he

23   ran into the common area of the bar for help and turned around

24   in time to see Lin and another man running down the hallway in

25   the direction of a door that let out of the club.

Da6lin1

1          The bouncer who worked in the karaoke club that night

2    is going to testify that.  A detective will testify.  An EMS

3    paramedic will testify.  You will see ballistics evidence.  You

4    will see diagrams of the floor plan.  You will see photos of

5    the crime scene.  You will also see photos of an Infinity SUV

6    that the New York City Police Department found parked near that

7    club right on the street outside.  You will see Lin's driver's

8    license and checkbook and other documents with his name on them

9    that the NYPD found inside that SUV.

10          You will also hear from a livery cab driver.  This

11   driver will explain that Lin called him about 6:00 in the

12   morning on July 30th of 2004 and asked the driver to meet him

13   in Queens.  He said he needed to go pick up his car, that he

14   left it out on the street the night before.  The driver will

15   explain that he agreed to meet Lin, but Lin didn't show up.

16   Instead when two of Lin's followers showed up and they got into

17   the car and they said they needed to go to the karaoke bar to

18   pick up Lin's car; but when they got there, they found police

19   all over the place and they refused to get out of the car and

20   they drove away.

21          In short, during this trial you are going see and hear

22   many different types of evidence and by the end of this trial

23   when you've heard and seen all of the evidence and testimony

24   that evidence and testimony is going to prove to you beyond any

25   reasonable doubt that Lin is guilty of the crimes charged.  He

Da6lin1

1    is guilty of racketeering, for running a gang, he is guilty of

2    extortion and he is guilty of murder.

3          Thank you.

4          MR. COHEN:  May I, Judge?

5          THE COURT:  Please.

6          MR. COHEN:  Good morning.  May it please, your Honor,

7    government counsel, agents, members of the jury, Mr. Lin,

8    Mr. Lin's family, even though none of you have heard any of the

9    evidence yet in this case, everybody sitting here understands

10   and knows it is a very serious case.  It is serious for the

11   government.  It's serious for Mr. Lin.  It's serious for his

12   family.

13         Mr. Skinner very adeptly laid out for you a scenario.

14   He told you in detail what the evidence in this case is going

15   to prove to you, but just like Judge Cedarbaum told you

16   yesterday, Pete Skinner was not a witness to any of these

17   events, Jen Burns wasn't and I wasn't.  None of us were there

18   because you need to know that it is not the prosecutors or me

19   or even Judge Cedarbaum that is going to decide who is telling

20   the truth in this courtroom.  It is going to be up each and

21   every one of you 12 good citizens who eventually go to

22   deliberate on this case.

23         Again, my name is Joel Cohen and my job and

24   responsibility and privilege here is to represent Mr. Lin who

25   sits next to me.  The evidence that you will hear during this

Da6lin1

trial will not prove -- will not prove -- to you and will not

come close to proving to you beyond a reasonable doubt that you

are to return a guilty verdict in this case.  The government's

witnesses will testify.  They may create speculation, they may

create suspicion, they may create smoke, but you are going to

learn when you hear the instructions from Judge Cedarbaum that

in a federal criminal trial the presence of smoke doesn't

necessarily mean the presence of fire.

        The evidence will show you as you listen, as you hear

the witnesses testify that those witnesses cannot be trusted.

They cannot be trusted and you will understand why as the trial

progresses.  And if the witnesses cannot be trusted, the case

cannot be trusted.  You can have one witness, five witnesses,

10 witnesses testify for the government and if each one of them

individually is unreliable, is not credible, is not believable

and has proveable reasons to lie, the fact that it is one, five

or 10 worth is nothing.  10 times zero is still zero.

        In cases like this it is very often so that witnesses

who are cooperating with the government are sitting in jail and

they are waiting to testify because they are hoping for

leniency and because they understand and they hope that their

testimony is the price for their freedom.  The evidence here is

going to be a little bit different and it is going to show you

something different.  One of the government's witnesses has

already bought his freedom by testifying at another trial and

Da6lin1

1   instead of serving a 70-year sentence that he face instead

2   walked out of the courtroom.  He is in the United States

3   illegally.  He should have been deported, but he is still here.

4   I think all of the government witnesses that you hear from have

5   been ordered to be deported from the United States years and

6   years ago and you will understand why they are still here.

7   Okay, because trying to please the government, trying to give

8   the government what they think it wants is the price for them

9   to stay in the United States.

10          The evidence will show you that it is not an accident,

11  it is not a mistake, it is not an error that has kept them in

12  the United States.  You will understand immigration judges have

13  ordered that these people be removed.  They have ordered that

14  they be sent back to China, but they are all desperate to stay

15  here and in fact they are all still here.  Not a coincidence.

16  These people are here because they are producing for the

17  government.  They are producing for the government by their

18  testimony here.  They are producing some of them for the

19  government by working as informants in the street and the price

20  of their ability to stay here is the services that they render

21  to the government.

22          The evidence will show you that the mere presence of

23  these people in the United States after they have been ordered

24  to leave is the reward that they have received last month, last

25  week, today, tomorrow, next week and it's a reward that they

Da6lin1

desperately want.  You will see and hear some of the outrageous
lies these people have told to agents and immigration services.
Agent Varian is an agent of the United States Customs and
Immigration Enforcement Service.  It used to be called, ICE,
Immigration, Homeland Security.  You will learn that these
witnesses have lied maybe to him, maybe not to him, but to
other ICE agents and they are all still here.  Can you trust
folks like to?  You will have to decide that.

          You will learn that from the evidence and from the
lack of believable, reliable and credible evidence that the
government will not prove these charges to your satisfaction
beyond a reasonable doubt because they will not present any
witnesses that are consistent, credible or unbiased and it
doesn't have a great deal to gain from giving the government
what they think the government wants and what they want right
now, the government wants in this courtroom, is Mr. Lin.

          You will learn that there are two different kinds of
biases that these witnesses have.  One is that many of them
don't like Mr. Lin very much.  Frankly, I wouldn't be candid
with you if I didn't tell you that Mr. Lin isn't the nicest guy
around.  He wasn't.  He wasn't.  He made enemies.  You are
going to meet some of these enemies because they are going be
sitting on the witness stand over the next few days of this
trial.  That is a bias.  Of course the other big bias that they
have is they really need to stay in the United States.  Nobody

Da6lin1

1    wants to go back to China.

2            The government will call a number of witnesses in the

3    next few days.  I will tell you now I may not call any.  So I

4    am going to ask each of you as you sit here throughout the

5    trial to honor the instructions that Judge Cedarbaum gave you

6    and that she will repeat to you in much, much greater detail at

7    the end of the case.  The government, the government right

8    here, the folks at this table have the burden of proof beyond a

9    reasonable doubt.  That when it comes to witnesses, it is the

10   quality of the witnesses that testify, the believability of the

11   witnesses that testify and not the number of witnesses that

12   testify that matter.

13           Please remember I do not have to prove or present any

14   evidence that Mr. Lin is not guilty.  The government has to try

15   to prove that he is.  So to wrap things up for you, the trial

16   is not a referendum on whether or not you like Mr. Lin or

17   approve of the lifestyle that he lived.  You may not.  Maybe he

18   wasn't a nice guy.  In the indictment nowhere is he charged

19   with not being a nice guy.  That is not what he is charged

20   with.  He is charged with specific federal crimes.  Those

21   specific federal crimes must be proven if they can be by the

22   witnesses to testify.

23           Mr. Lin drank too much, Mr. Lin gambled a lot and he

24   got into a lot of fights.  All true.  You know what?  He was

25   pretty unpopular with a lot of people in Chinatown.  Then he

Da6lin1

1    made the mistake of investing in one of the most competitive

2    businesses in the city and that is the Chinese bus business.

3    Some of the witnesses who testified here will be people who

4    competed with Mr. Lin in the business.  Other people will

5    testify, particularly those who were present on the night of

6    the horrendous shootings at the karaoke were friends of Yi Qun,

7    the man who was killed, who the government tells you is a

8    businessman.  The evidence may show different, but that is what

9    they say.

10           You know, nobody can ever say that a criminal trial is

11   a popularity contest, certainly not a trial where somebody is

12   charged with murder and particularly charged with murder where

13   innocent folks were hurt or killed.  But as I said you will not

14   only probably not like the way Mr. Lin lived his life, you may

15   not like many of the government witnesses either.  The issue,

16   though, isn't who is likeable.  It is not whether you like

17   them.  It is not whether you approve of them.  It is whether or

18   not you can believe them, believe them beyond a reasonable

19   doubt.  So please, please, please listen carefully to the

20   witness who testify.  Listen not only to the direct examination

21   because it is easy to tell a story, okay.  I can put a witness

22   on the stand, Mr. Skinner can put a witness on the stand and

23   ask them to tell what happened.  You have to listen to the

24   cross-examination, okay, to see whether or not that story that

25   they have told is consistent with stories they have told in the

Da6lin1

1    past, it is consistent with what other witnesses have told you,

2    it is a story that makes sense and is coming from uninterested

3    people that don't have an interest in the outcome of the case.

4         Most important and finally resist the temptation --

5    because we all have a temptation.  It is natural.  You hear

6    something, you form an opinion.  Wow, that was a terrible

7    thing, and it was a terrible thing, you have an opinion.

8    Please resist the temptation to form opinions and to make

9    decisions until you have heard all of the evidence.  And not

10   even until you have heard all of the evidence, wait until Judge

11   Cedarbaum instructs you on the law.  But then heard all of the

12   evidence and her instructions, go into the jury room with open

13   minds, sit down amongst yourselves, talk to each other, talk

14   about the witnesses, do you believe this one, that one, was

15   this one any more believable because this one was not

16   believable, and reach a decision.

17        I will speak to you again when the evidence is over

18   and the government will speak to you again.  I am going to ask

19   you to return a verdict, which is the only evidence supported

20   by the evidence, a lack of evidence.

21        Now, Judge Cedarbaum said something yesterday that

22   sums up our whole system of justice.  She said, The public is

23   served on whatever verdict is supported by the evidence.  That

24   is it in a nutshell.  In 35 years that I practiced law on both

25   sides of the courtroom, I don't think I ever heard a judge

Da6lin1

```
1    express so properly and succinctly what our system of justice

2    is about.  So after you hear all of the evidence and her

3    instructions on the law and you have deliberated, you will know

4    what the verdict ought to be.

5            Thank you very much for your service and thank you for

6    listening to me.

7            THE COURT:  Before we call the first witness, I would

8    just like to see counsel at the bench for a moment.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Da6lin1

```
 1              (At the side bar)

 2              THE COURT:  Murder requires the intent to kill.

 3              MR. SKINNER:  Your Honor, when somebody goes in with

 4     the intent to kill one person and a bullet travels and strikes

 5     another person--

 6              THE COURT:  Accidently without any intention on the

 7     part of the shooter?

 8              MR. SKINNER:  Your Honor, I think that is incorrect.

 9              THE COURT:  I would like you to give me any case that

10     has ever held that an accidental shooting under any

11     circumstances is murder.

12              MR. SKINNER:  Well, we'll look for such case, your

13     Honor.

14              THE COURT:  Please, I think you should pay close

15     attention to what you said.

16              MR. SKINNER:  I will proffer to your Honor that I

17     intended to make a statement consistent with the law.  If I was

18     incorrect on the law, I am sure we can cure it with an

19     instruction to the jury.

20              THE COURT:  I would like to forget it.

21              MR. SKINNER:  Fair enough.

22              THE COURT:  Because I think it is misleading.

23              MR. COHEN:  Can we go off the record?

24              THE COURT:  Yes.

25              (Discussion off the record)
```

Da6lin1

```
 1              (In open court; jury present)
 2              THE COURT:  Very well.  Who is your first witness?
 3              MR. SKINNER:  Your Honor, the government calls John
 4    Filshie.
 5              THE DEPUTY CLERK:  Raise your right hand.
 6     JOHN FILSHIE,
 7         called as a witness by the Government,
 8         having been duly sworn, testified as follows:
 9    DIRECT EXAMINATION
10    BY MR. SKINNER:
11    Q.  Good morning, Detective Filshie.
12    A.  Good morning.
13    Q.  Where do you work?
14    A.  The 19 precinct detective squad.
15    Q.  How long have you worked there?
16    A.  Approximately 10 years.
17    Q.  The 19 precinct is that part the New York City Police
18    Department?
19    A.  Yes, it is.
20    Q.  How long have you been a detective?
21    A.  Approximately 10 years.
22    Q.  Were you working for the New York City Police Department in
23    July of 2004?
24    A.  Yes, I was.
25    Q.  What was your position back then?
```

Da6lin1                         Filshie - direct

1    A.   I was a police officer assigned to the detective squad.

2    Q.   Detective Filshie, were you working on the night of July

3    30th, 2004?

4    A.   Yes, I was.

5    Q.   Did you respond to a call for a shooting at a karaoke bar

6    located 4622 Casnio Boulevard?

7    A.   Yes, I did.

8    Q.   Can you just describe for us what you found when you got

9    there?

10   A.   The karaoke club was in the basement of the location.

11   When we responded to the scene, there was a front door --

12            THE COURT:   What do you mean it was in the basement?

13   What was on the main floor.

14            THE WITNESS:   It was a commercial location.   So there

15   were stores on the first floor, but this door that you went

16   into actually went down into a basement location.

17            THE COURT:   I see.

18            MR. SKINNER:   Your Honor, may I approach?

19            THE COURT:   Yes.

20   BY MR. SKINNER:

21   Q.   Detective Filshie, I put in front of you documents that we

22   previously marked as exhibits.   Can I ask you to turn first to

23   200 A and 200 B.

24   A.   Okay.

25   Q.   Have you seen these prior to testifying?

Da6lin1                          Filshie - direct

1    A.  Yes, I have.

2    Q.  Can you just describe for us what they are?

3    A.  They are a schematic or a drawing of the karaoke location.

4    Q.  The karaoke location you responded to that night on

5    July 30th?

6    A.  Yes.

7    Q.  Do you they accurately reflect the layout of the karaoke

8    club to the best of your recollection?

9    A.  Yes, they do.

10             MR. SKINNER:  Your Honor, the government offers 200 A

11   and 200 B.

12             THE COURT:  Have you given a copy to the other side?

13             MR. SKINNER:  Yes, your Honor.

14             THE COURT:  I would like the original exhibits handed

15   up to me first.

16             MR. SKINNER:  My apologies, your Honor.

17             THE COURT:  I find it cumbersome to leaf through the

18   books.

19             MR. COHEN:  I will confirm that I have been provided

20   with a copy of that document and I have no objection to it

21   being admit.

22             THE COURT:  Very well.  Thank you.

23             This was not drawn by you I take it?

24             THE WITNESS:  No, ma'am.

25             THE COURT:  But there is no objection to the receipt

Da6lin1                          Filshie – direct

```
 1    of Exhibit 200 A that you have offered?

 2              MR. SKINNER:  I offered A and B.

 3              THE COURT:  Both A and B.  Very well.  Government

 4    Exhibits 200 A and 200 B are received in evidence.

 5              (Government's Exhibits 200 A and 200 B received in

 6    evidence)

 7              MR. SKINNER:  May we publish 200 B first?

 8              THE COURT:  If that means show it to the jury, yes.

 9              MR. SKINNER:  Can we show it to the jury?

10              THE COURT:  I like to speak plain English.

11              MR. SKINNER:  I am a lawyer so that may be difficult,

12    but I will try.

13              THE COURT:  There are a lot of formalisms in the law

14    which we are gradually giving up.

15    BY MR. SKINNER:

16    Q.  Detective Filshie, can you see the screen up there?

17    A.  Yes, I can.

18    Q.  Do you have a hard copy of 200 B in front of you as well?

19    A.  Yes, I do.

20    Q.  There should be a pointer actually up there as well.  You

21    can use that to indicate spots on the screen.  Can you describe

22    for us where you first entered the club and what you found when

23    you got there?

24    A.  Okay.  These stairs right here lead from the street level.

25              MR. SKINNER:  Ms. Chase, can you zoom that back?  We
```

1    lost the stairs.

2    Q.  Please continue, Detective Filshie.

3    A.  Sure.  The front door of the location like I explained is

4    on street level.  When you walk in, the stairs lead down into

5    the basement and that these stairs right here.

6    Q.  And that L-shaped figure that is there, what does that

7    represent?

8    A.  That was the bar in the location.

9              THE COURT:  That is the basement, right?

10             THE WITNESS:  Correct.  The entire establishment takes

11   up the basement of the location.

12             THE COURT:  That is down those stairs?

13             THE WITNESS:  These stairs right here.

14   Q.  Do you see the opening there to the left of the bar?

15   A.  Yes.

16   Q.  What was that?

17   A.  That was a doorway into a separate hallway.  This is like a

18   common area in the location.  It had couches and a loveseat and

19   I believe a TV.  Then you walk through this door and there was

20   a separate hallway and then from this hallway there were

21   separate karaoke rooms where you would sit with your private

22   party.

23   Q.  Now, when you responded to the bar was anyone there injured

24   in any way?

25   A.  I don't recall if anyone was still there injured, but there

Da6lin1                        Filshie - direct

1   was definitely people in the location -- some patrons, numerous

2   police officers.  I do not recall if anyone was still there

3   injured.

4   Q.  Had a crime taken place there?

5   A.  Yes.

6   Q.  Where specifically in the club is the crime scene?

7   A.  This room at the end of the hallway here is where the

8   actual shooting took place.

9   Q.  Was that Room No. 3?

10  A.  Yes, it was.

11  Q.  From your investigation did you also identify a karaoke

12  room that was Room No. 8?

13  A.  Yes.  This room at other end of the hallway was Room No. 8.

14  Q.  There looks to be stairs near Room No. 8?

15  A.  Yes.

16  Q.  Where do those lead to?  Do they go up and down?

17  A.  Both.  I mean they go up to the street.  But depending on

18  which way they are going, they go up and down.

19  Q.  Do they lead to the street level or another level below?

20  A.  They go to the street level also.  There was a second exit

21  that went out to street level, but it wasn't marked with an

22  address or anything like that.

23  Q.  Detective Filshie, can I now ask you to look at some

24  photographs that were marked as Government Exhibits 3 A to 3 F?

25          MR. SKINNER:  Judge, I believe you have a copy in

Da6lin1                         Filshie – direct

1    front of you as well.  I left them up there.

2              THE COURT:  Thank you.

3              THE WITNESS:  I don't have them.  The judge has them.

4    Q.  Detective Filshie, have you reviewed these photographs

5    prior to testifying today?

6    A.  Yes, I have.

7    Q.  Are these photographs that were taken at the karaoke bar on

8    that night?

9    A.  Yes, they were.

10   Q.  Did you take the pictures yourself?

11   A.  No, I did not.

12   Q.  Do the photographs truly and accurately reflect the crime

13   scene as you found it the night that you responded to this

14   call?

15   A.  Yes I do.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

D4AVLIN2                    Filshie - direct

1            MR. SKINNER:  Your Honor, the government offers --

2            THE COURT:  I can understand -- well, you'll tell us

3    what these are pictures of.  Some of them are hard to tell.

4    Q.  Detective Filshie, without getting into the contents of the

5    pictures, and they aren't in evidence yet, is it accurate to

6    say these are all pictures of different parts of the karaoke

7    club taken on July 30th, 2004?

8    A.  Yes.

9            THE COURT:  Well, in any event, they reflect what you

10   saw, whether they were taken -- I take it you didn't take these

11   photographs, right?

12           THE WITNESS:  I did not take the photographs.

13           THE COURT:  Right.  So the only question you can

14   answer is whether they are fair and accurate representations of

15   what you saw when you entered the karaoke bar.

16   Q.  Is that correct, Detective?

17   A.  Yes, yes, they are.

18           MR. SKINNER:  Your Honor, the government offers 3A,

19   3B, 3C, 3D, 3E, and 3F.

20           THE COURT:  Well, I think we have to know exactly what

21   they are.  The first is a picture of an automobile, isn't that

22   right, or is this the front of the karaoke bar?

23   Q.  Detective, what's behind the automobile in 3A?

24           THE COURT:  That's what you are offering, not the car.

25           MR. SKINNER:  Correct, your Honor.

D4AVLIN2                    Filshie - direct

1   Q.  Can you just describe for us what's depicted behind the

2   automobile in 3A?

3   A.  Okay.  That's the street-level entrance to the karaoke

4   club.

5   Q.  And can you describe for us what's depicted in 3B?

6   A.  Okay.  That would be that second staircase that leads out

7   of Room No. 8.

8           THE COURT:  Is this the top or bottom?

9           THE WITNESS:  That's the top.

10          THE COURT:  Top of the staircase.

11          THE WITNESS:  Correct.  That's street-level.

12          THE COURT:  Which is depicted --

13          THE WITNESS:  Right there.

14          THE COURT:  -- on 3A as one of the karaoke rooms in

15  the back, No. 8; is that right?

16          MR. SKINNER:  Yes, your Honor.  The diagram is

17  actually 200B, but the photo -- well, I'll let Detective

18  Filshie testify as to what it depicts.

19  BY MR. SKINNER:

20  Q.  Is it correct, Detective Filshie, that that's a photograph

21  of the doorway at the top of the stairs that leads to Room 8 in

22  the karaoke club?

23  A.  Yes, it is.

24  Q.  Is 3C a photograph looking up from the bottom of those same

25  stairs from Room 8?

D4AVLIN2                    Filshie - direct

1   A.  Correct.  It would be basically a photo from that location

2   right there.

3   Q.  And is 3D a photograph of part of Room 3 where the crime

4   scene was when you responded to the club?

5   A.  Yes.

6   Q.  And is 3E the other part of that karaoke room that shows

7   the television?

8   A.  Correct.

9   Q.  And can you just indicate with your pointer what room are

10  we talking about on 200B?  That's the one on the far left of

11  the diagram?

12  A.  Correct.  That's Room No. 3.

13  Q.  And is 3F -- can you describe for us what these are?

14  A.  3F is a picture of Room No. 8.  And the crime scene -- our

15  crime scene unit had --

16          THE COURT:  Wait, wait.  I don't understand, what is

17  exactly here?  These just look like beer bottles.

18  Q.  Detective Filshie, can you describe where those beer

19  bottles were and what this is a photograph of?

20  A.  Okay.  Like I was alluding to, this is Room No. 8, and this

21  was all the beer bottles and glasses that were in that room.

22  And they were being processed --

23          THE COURT:  What do you mean all that were in that

24  room?  They were all gathered together in one place?

25          THE WITNESS:  Exactly how you see them --

D4AVLIN2                          Filshie - direct

1          THE COURT:  You didn't see them the way they were

2      originally; you saw them in this photograph.

3          THE WITNESS:  No, I saw beer bottles and glasses in

4      this room.

5          THE COURT:  I see.  And where did you see them?

6          THE WITNESS:  In the room.

7          THE COURT:  No, I understand.  But here they are

8      gathered together.

9      BY MR. SKINNER:

10     Q.  Detective Filshie, the beer bottles and glasses are all

11     gathered on the table, and they are all labeled with different

12     numbers; is that correct?

13     A.  Correct.

14     Q.  When you were in the karaoke club that night after the

15     crime scene unit had gone through, did you see all these beer

16     bottles and glasses gathered on the table?

17     A.  Yes, I did.

18     Q.  Is this a photograph --

19         THE COURT:  On one table?

20         THE WITNESS:  Well, this is all the bottles and

21     glasses that were in that room.  And when they gathered them

22     up --

23         THE COURT:  You don't know that.  Maybe you do.  Did

24     you watch them being gathered up or --

25         THE WITNESS:  Yes, I did.

1          THE COURT:  Oh, all right.

2          When you arrived, there were beer bottles and glasses

3  on different tables, is that right, and they were gathered

4  together on one --

5  Q.  Detective Filshie --

6          MR. SKINNER:  Your Honor, if I may.

7          THE COURT:  Please.

8  Q.  Did you accompany the crime scene unit as they went through

9  the club that night?

10  A.  I was there when the crime scene unit was there, yes.

11  Q.  Were you there when they gathered up glasses and bottles

12  and dusted those glasses and bottles for fingerprints?

13  A.  Yes, I was.

14          MR. COHEN:  Objection, Judge.

15          THE COURT:  Yes, I know.  The witness is the one who

16  should testify.

17          MR. COHEN:  That's my objection, your Honor.

18  Q.  Detective Filshie --

19          THE COURT:  Right.  Please let it come from him.

20  Q.  What did you observe the crime scene unit do in Room 8 with

21  the glasses and the beer bottles?

22  A.  Okay.  When the crime scene unit got there, there is only

23  one table in the room.  These are couches, and this is a TV.

24  There were bottles and glasses in the room that were on the

25  floor; the majority of them were on the table already.  But as

D4AVLIN2                          Filshie - direct

1    they processed them, they placed them on the table so that they

2    could keep a record of them.

3    Q.   How, if at all, did they label the bottles and the glasses?

4    A.   Well, you can see on the -- well, your Honor, you can see

5    on the picture that each bottle and the glass is labeled with a

6    number and a letter, coincides.

7    Q.   And after they've gathered the bottles --

8            THE COURT:  That is, these signs were put on by the

9    crime scene people; is that right?

10           THE WITNESS:  Yes.

11           THE COURT:  That was not in the room before.

12           THE WITNESS:  Correct.  The ones that say "NYPD" on

13   them --

14           THE COURT:  Yes.

15           THE WITNESS:  -- they were brought by our crime scene

16   unit.

17   Q.   After they had gathered the bottles and the glasses on the

18   beer table, did they take a photograph of them?

19   A.   Yes, they did.

20   Q.   Is that what we're seeing in Government's Exhibit 3F?

21   A.   Yes.

22   Q.   Based on your observations --

23           THE COURT:  Well, please, try to let it come from the

24   witness.

25   Q.   Based on your observation, where did the glasses and the

D4AVLIN2                         Filshie - direct

1   bottles in 3F come from?

2   A.  They were all the bottles and glasses that were in that

3   room, in Room No. 8.

4            THE COURT:  Right.  But did you see them before they

5   were gathered together?

6            THE WITNESS:  Yes.

7            THE COURT:  In different places.

8            THE WITNESS:  Just in that room, in Room No. 8.

9   Q.  So to be clear --

10           THE COURT:  Were they on a table or not?

11           THE WITNESS:  Some were, some weren't.

12           THE COURT:  I see.

13  Q.  But just so we're clear, while they may have been in

14  different places, they were all in Room 8; they didn't come

15  from elsewhere in the club?

16  A.  Correct.

17           MR. COHEN:  Judge, again, I object to the form of this

18  question.

19           THE COURT:  Yes.  Objection sustained.

20           Please let it come from the witness.  And we don't

21  have to sum up after every answer.

22  Q.  Detective Filshie, where did all of the bottles and glasses

23  in Photograph 3F come from?

24  A.  The photograph of these bottles and glasses, all these

25  glasses and bottles that are in this picture were in Room No.

1    8.   Whether they were on the table before they were

2    photographed and processed, or they were on the floor, or on a

3    couch, they were in that room.

4              MR. SKINNER:  Your Honor, the government again offers

5    3A, 3B, 3C, 3D, 3E, and 3F.

6              MR. COHEN:  No objection, Judge.

7              THE COURT:  Very well.

8              Government Exhibits 3A, 3B, 3C, 3D, 3E, and 3F are

9    received in evidence.  Without objection.

10             (Government's Exhibits 3A, 3B, 3C, 3D, 3E, 3F received

11   in evidence)

12   Q.  Detective Filshie, I'm showing you another copy of two

13   photographs marked as Government Exhibits 4A and 4B.

14             MR. SKINNER:  Your Honor, you should have the

15   originals of 4A and 4B in front of you.

16             THE COURT:  Thank you.

17   Q.  Detective Filshie, have you looked at these photographs

18   before testifying today?

19   A.  Yes, I have.

20   Q.  And looking first at Exhibit 4A, can you describe for us

21   what this is a picture of?

22             THE COURT:  Well, wait, wait, wait.

23             When did you see this?

24             THE WITNESS:  Excuse me, your Honor?

25             THE COURT:  When did you see this photograph?

D4AVLIN2                    Filshie – direct

```
 1              THE WITNESS:  I was shown the photo by the district
 2    attorney.
 3              THE COURT:  I see.
 4              Then what is the question?
 5              MR. SKINNER:  Then I was asking what is the photograph
 6    of.
 7              THE COURT:  I don't think that's the appropriate
 8    question.
 9    BY MR. SKINNER:
10    Q.  Detective Filshie, did you take this photograph?
11    A.  No, I did not.
12    Q.  But you've looked at it?
13    A.  Yes, I have.
14    Q.  And does this photograph accurately reflect a portion of
15    the karaoke club based on your memory of what you saw on July
16    30th of 2004?
17              THE COURT:  Of the outside of the karaoke club; is
18    that right?
19              THE WITNESS:  Yes, your Honor.  It's the entrance from
20    the street level going down the stairs.
21    Q.  And this picture looks the way you remember the club
22    looking when you responded on that night?
23    A.  Yes.
24    Q.  Turning to --
25              THE COURT:  Was it dark when you responded?
```

1              THE WITNESS:  Yes, it was.

2              THE COURT:  So you couldn't see this as clearly.

3              THE WITNESS:  If I may go back to the original 3A.

4    It's basically a different angle of Picture 3A, which 3A is a

5    dark photo, and this is just a picture taken during the

6    daylight.

7    Q.  So it's during daylight --

8              THE COURT:  Well, they depict different signs.

9    Q.  Well, if we're looking at --

10             THE COURT:  Are these both the front of this karaoke

11   club?

12   Q.  Detective Filshie, can you just please describe for the

13   Court the difference in view of 3A and 4A?

14   A.  Absolutely.

15             The first picture in 3A is taken pretty much from a

16   straight-on angle, and it is dark out, it's still late evening,

17   coming into early morning.  And 4A is just taken from a little

18   further to the right, and on an angle looking at the same

19   entrance to the club/bar.

20             THE COURT:  You don't mean when it's taken; you

21   weren't there when it was taken, were you?  You mean that's

22   what it shows.

23             THE WITNESS:  It depicts a daylight picture, yes, yes,

24   your Honor.

25   Q.  And although it's daylight, is it fair to say that it

D4AVLIN2                    Filshie - direct

```
 1   accurately reflects your recollection of what the entrance to
 2   the club looked like?
 3   A.  Yes.
 4            MR. SKINNER:  Your Honor, the government offers 4A.
 5            MR. COHEN:  No objection.
 6            THE COURT:  Very well.  Government Exhibit 4A is
 7   received in evidence without objection.
 8            (Government's Exhibit 4A received in evidence)
 9   Q.  And looking at Government Exhibit 4B, is this another
10   photograph --
11            MR. COHEN:  Objection.
12            THE COURT:  Is this a fair representation of whatever
13   it's supposed to represent?
14            MR. COHEN:  Your Honor, respectfully, if the witness
15   can be asked whether he recognizes this and what he recognizes
16   it to be a photograph of.
17            THE COURT:  Yes.
18            Do you recognize Exhibit 4B?
19            THE WITNESS:  Yes, your Honor.
20            THE COURT:  And what do you recognize it to be?
21            THE WITNESS:  That is a picture of the bar of the
22   location that I had described looking back towards the entrance
23   that comes down from the street.
24            THE COURT:  And is the bar pink?
25            THE WITNESS:  I guess you can call it pink, yes.  The
```

D4AVLIN2                          Filshie - direct

1   bar is on the left-hand side of the picture, and the glass door

2   on the right is the entrance to the location with the steps in

3   the back.

4               THE COURT:  And is the whole area colored pink?

5               THE WITNESS:  I would guess you would call it pink.

6               THE COURT:  Don't guess.  We're only asking what you

7   saw.

8               THE WITNESS:  Yes, the picture -- it is pink in the

9   picture, your Honor.

10              THE COURT:  No, not what it is in the picture.  Did

11  you see a pink area?

12              THE WITNESS:  I don't recall what color it was, but if

13  I'm looking at the picture, yes, it was pink.

14  BY MR. SKINNER:

15  Q.  Detective Filshie, does the photograph accurately reflect

16  the way the bar looked the night that you responded, to the

17  best of your recollection?

18  A.  Yes, it does.

19              MR. SKINNER:  Your Honor, the government offers 4B.

20              MR. COHEN:  Judge, can I just have one or two voir

21  dire questions?

22              THE COURT:  Yes, go ahead.

23              MR. COHEN:  Thanks.

24  VOIR DIRE EXAMINATION

25  BY MR. COHEN:

D4AVLIN2                          Filshie - direct

1   Q.  Good morning, Detective.

2   A.  Good morning.

3   Q.  The photograph that is before you, Exhibit 4B, do you know

4   when that was taken?

5   A.  The day of the incident.

6   Q.  You said you responded to the scene at about what time?

7   A.  I would say approximately 5:30.

8   Q.  Okay.  And did you learn when you responded about what time

9   the --

10          THE COURT:  Excuse me.  You mean 5:30 in the morning;

11   is that right?

12          THE WITNESS:  A.m., yes.

13          THE COURT:  Okay.

14  Q.  Did you learn at that point when the alleged incident had

15  occurred?

16  A.  I don't recall if I was told the exact time of the

17  incident, no, I don't.

18  Q.  Okay.  Do you know whether or not when this photograph was

19  taken -- withdrawn.

20          MR. COHEN:  I have no objection, Judge.

21          THE COURT:  Very well.

22          Government Exhibits 4A and 4B are received in evidence

23  without objection.

24          (Government's Exhibits 4A, 4B received in evidence)

25          MR. SKINNER:  Your Honor, now that the photographs are

D4AVLIN2                        Filshie - direct

1   in evidence, I'd like to show them to the jury.

2              THE COURT:  Very well.

3              MR. SKINNER:  Can we start with 3A.

4              Ms. Chace, can you put that up on the screen.

5   BY MR. SKINNER:

6   Q.  And, Detective Filshie, I show -- we've already talked

7   about these photographs at length, but now that the jury can

8   see them, can you just describe for us again what we're looking

9   at here?

10  A.  Sure.

11             That entrance right there is the entrance to the

12  actual location.  There's a door here, it's on the street

13  level; and the steps go down into the location.

14  Q.  Do the steps kind of go down under that canopy portion --

15             THE COURT:  This is what you see from the street,

16  right?  So you don't see what's below, but that's where you

17  enter to go below.

18             THE WITNESS:  Correct.

19             THE COURT:  Okay.

20  Q.  And, Detective Filshie, do the stairs go down underneath

21  that canopy portion where it says club and bar?

22  A.  Correct.  The stairs are here, and they go straight down

23  into the location.

24  Q.  And when we're looking at the diagram, before you pointed

25  out a second set of stairs that led to Room 8; is that right?

D4AVLIN2                        Filshie - direct

1    A.  Correct.

2    Q.  Is there anything in this photograph relevant to that

3    stairwell?

4    A.  That stairwell --

5              THE COURT:  I don't know what that means.

6    Q.  Is that stairwell shown in any way in this photograph?

7    A.  Yes, sir.  This door right here is the stairs that lead

8    down into that Room 8.  It's also from street level, and the

9    stairs go down and they go directly into Room No. 8.

10             THE COURT:  Well, can you enter there?  Is there a

11   door there?

12             THE WITNESS:  This door right here, this glass door

13   leads right down into the karaoke club also --

14             THE COURT:  So there are the stairs that go down, go

15   down from that door?

16             THE WITNESS:  Correct.

17             THE COURT:  Very well.

18             MR. SKINNER:  Ms. Chace, can you quickly put 200B back

19   up again so we have the benefit of the diagram to see.

20   Q.  Detective Filshie, can you just show again where the stairs

21   were.

22   A.  Correct.  This is the main entrance underneath the canopy.

23   And that other glass door, these are the stairs that lead down

24   directly into Room No. 8.

25             MR. SKINNER:  Ms. Chace, can you now put up 3B please.

D4AVLIN2                    Filshie – direct

1   Q.  And, Detective Filshie, what are we looking at here?

2   A.  This is that glass door I was describing that these stairs

3   go down and lead directly into Karaoke Room No. 8.

4           MR. SKINNER:  Can we turn to 3C please.

5   Q.  What are we looking at now?

6   A.  This is the same set of stairs from downstairs looking up

7   to the street level that go into Room No. 8.

8   Q.  So would this be the vantage point from Room No. 8?

9   A.  Correct.

10          MR. SKINNER:  Can we now turn to 3D please.

11  Q.  What is this a photograph of?

12  A.  This is a photograph of the room where the shooting took

13  place.  This is Room No. 3.

14          THE COURT:  This witness can't testify as to where the

15  shooting took place; he wasn't there.

16  Q.  Detective Filshie, you testified earlier that you responded

17  to a crime scene; is that right?

18  A.  Yes.

19  Q.  And on the diagram you identified the crime scene as Room

20  3; is that right?

21  A.  Correct.

22  Q.  What is this a photograph of?

23  A.  This is a photograph of Room 3.

24  Q.  That's where the crime scene was?

25  A.  Yes.

D4AVLIN2                      Filshie - direct

1          MR. SKINNER:  Can we now look at 3E.

2   Q.  And what is this a photograph of?

3   A.  Also a picture of Room 3, just at a different angle.

4          MR. SKINNER:  Ms. Chace, can I ask you once again to

5   put 200B up so that I can now ask Detective Filshie to again

6   point out to us where Room 3 was.

7   A.  This is Room No. 3.

8   Q.  So am I correct then that the figure at the bottom of that

9   room, is that the television we just saw?

10  A.  Correct.  That's a photo of that TV right there.

11         THE COURT:  Right.  And when you say that's No. 3, was

12  there a "3" on the room?

13         THE WITNESS:  I do not recall if there were numbers on

14  the doors.

15         THE COURT:  What do you mean by "Room 3" or "Room 8"?

16         THE WITNESS:  That's what we were told by the owners

17  of the club; that was the room numbers of the rooms.

18         THE COURT:  But they have no designation on them?

19         THE WITNESS:  I don't recall if there was numbers on

20  the door.

21         MR. SKINNER:  And can we now look at 3F.

22  Q.  And what is this a photograph of?

23  A.  That's a photograph of the bottles and the glasses that

24  were processed in Room No. 8.

25         THE COURT:  Well, again, this is not -- you don't know

D4AVLIN2                        Filshie - direct

1    what that number comes from, right?  You didn't see a No. 8 or

2    a No. 3; is that correct?

3             THE WITNESS:  Correct.  There is no number on the

4    door.  We were informed that it's Room No. 8.

5    BY MR. SKINNER:

6    Q.  Detective Filshie, are you certain there was no number, or

7    are you testifying you just don't remember whether there was a

8    number?

9    A.  I do not recall if there were numbers on the door.

10             THE COURT:  You did not see a number; is that right?

11             THE WITNESS:  I don't remember if I saw a number or

12    not, your Honor.

13             THE COURT:  What's your best recollection?  That's

14    what all witnesses have to give, their best recollection.

15             THE WITNESS:  Like I said, it was eleven years ago; I

16    don't remember if there was a number on the door.

17             THE COURT:  Well, that's fine.  You have to just tell

18    what is the fact.

19             THE WITNESS:  The fact is I don't remember.

20             THE COURT:  That you don't remember one way or the

21    other.

22             THE WITNESS:  Correct.

23             THE COURT:  Very well.

24             Then why are we numbering them?  Is there somebody who

25    knows whether there were numbers on them?

D4AVLIN2                         Filshie - direct

1        MR. SKINNER:  Well, your Honor, I was going to try to
2   ask him another question about that.
3   Q.  Despite whether you remember whether there was a number on
4   the door or not, was it your understanding from --
5        THE COURT:  That's irrelevant.
6        MR. SKINNER:  Very well, your Honor.
7        We have nothing further of this witness, your Honor.
8        THE COURT:  Very well.
9        Is there any cross-examination?
10        MR. COHEN:  No.
11        THE COURT:  Very well.  Thank you.
12        You may step down.
13        THE WITNESS:  Thank you, your Honor.
14        MR. COHEN:  Oh, spoke too soon.
15        One or two questions.
16        THE COURT:  Very well.
17   CROSS-EXAMINATION
18   BY MR. COHEN:
19   Q.  Detective, my name is Joel Cohen.  I represent Mr. Lin.
20        When you arrived, I think you testified it was a
21   number of hours after the alleged offense took place?
22   A.  Correct.
23   Q.  Were there civilian witnesses there?
24   A.  I believe there were, yes.
25   Q.  Did you interview any of those witnesses?

D4AVLIN2                    Filshie - cross

1    A.  I did not.

2    Q.  Did you later participate in the interview of any witnesses

3    at the 109 squad?

4    A.  No, I did not.

5    Q.  And when you arrived, was there any music playing?

6    A.  Yes, there was.

7    Q.  And if you recall, in which room was the music playing?

8    A.  The bar area, there was music being played.

9    Q.  And do you recall, relatively speaking, what the volume was

10   of the music?

11   A.  A volume number or -- it was music playing.  I couldn't

12   tell you if it was loud, medium -- it was -- the music was on.

13   Q.  Okay.  What about in the individual rooms, do you recall if

14   there was music playing in any of those rooms?

15   A.  I don't recall.

16   Q.  Thanks.

17            MR. COHEN:  I have nothing further, your Honor.

18            THE COURT:  All right.  You may step down.

19            THE WITNESS:  Thank you.

20            (Witness excused)

21            MR. SKINNER:  Your Honor, the government calls George

22   Benedetto.

23    GEORGE BENEDETTO,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

D4AVLIN2                     Filshie - cross

1          THE DEPUTY CLERK:  Thank you.  Please be seated.

2          Please state your full name for the record and your

3    last name slowly.

4          THE WITNESS:  George P. Benedetto, Jr.

5          B, as in boy, E-N-E-D-E-T-T-O.

6          THE DEPUTY CLERK:  Thank you.

7    DIRECT EXAMINATION

8    BY MR. SKINNER:

9    Q.  Good morning, Mr. Benedetto.

10   A.  Good morning.

11   Q.  Mr. Benedetto, what do you do for work?

12   A.  I'm currently the director of simulation education at New

13   York Hospital-Queens in Flushing, New York.  I'm also a New

14   York State certified paramedic.

15   Q.  How long have you been a paramedic?

16   A.  I've been a paramedic since 1980/'81.

17   Q.  Were you working as a paramedic back in July of 2004?

18   A.  Yes, sir.

19   Q.  And where were you work as a paramedic in July of 2004?

20   A.  I was assigned to one of the New York Hospital-Queens

21   emergency medical service units assigned to the Flushing,

22   Queens area in New York City.

23   Q.  Now, during the early morning hours of July 30, 2004, did

24   you respond to a call from a shooting at a karaoke bar on

25   Kessina Boulevard?

D4AVLIN2                        Benedetto - direct

1      A.  Yes, sir.

2              MR. SKINNER:  I'm showing Mr. Benedetto a copy of

3      Government Exhibit 200B, which is already in evidence.

4      Q.  Mr. Benedetto, take a look at 200B, and just tell us what

5      that is.

6      A.  It's a diagram of the karaoke bar that we responded to that

7      night in question.

8      Q.  Does that accurately reflect your recollection of what the

9      bar looked like?

10     A.  Yes, sir.  Actually, the bar -- the area was downstairs,

11     like a basement-type environment.  So you're walking down a set

12     of stairs to get to the location.

13             MR. SKINNER:  Ms. Chace, can you please put 200B up on

14     the screen.

15     Q.  And, Mr. Benedetto, you should have a little pointer on

16     your desk there.  It's a laser pointer.  You can use that to

17     indicate where -- to indicate places on the diagram.

18             Now, can you just describe for us where you went when

19     you first got into the karaoke club that night?

20     A.  Okay.  When we first arrived, we parked our vehicle out

21     here.  There's a set of stairs.  I presume these are the

22     stairs.  We come down here.  These would be the stairs coming

23     down.  You walk in.  This was a bar with some stools over here,

24     and there were some tables and karaoke equipment over here.

25     Q.  What did you find when you got into the bar area?

D4AVLIN2                    Benedetto - direct

1    A.  When I first arrived, there was a young lady, Asian female,

2    sitting approximately right here, this location.  There were

3    some bottles of liquor.  There was an active karaoke scene, and

4    she was -- I was told she was hurt.  I looked at her, and she

5    had a gunshot wound to her lower leg.

6    Q.  How did you know it was a gunshot wound?

7    A.  36 years of paramedic, as a published educator, author, and

8    New York State faculty member, GSW.  It was a wound that had a

9    raised site, which is a gaseous hole.  And there was entry, and

10   blood was oozing out.

11   Q.  You said she was sitting.  Was she on the floor or was she

12   sitting on something?

13   A.  She was sitting on a bar stool in approximately right here,

14   this location right here.

15   Q.  Aside from the gunshot wound, how would you describe her

16   overall condition?

17   A.  Her condition, she was alert, oriented, able to answer some

18   basic questions, pain, and to respond.  Her mental status was

19   cognizant, alert and oriented, time, place, location.

20   Q.  Mr. Benedetto, I'll ask you just to slow down a little bit,

21   because the court reporter has to keep up with you.

22   A.  I'm sorry, sir.

23   Q.  It's all right.

24          What, if anything, did you do after you examined this

25   woman that you found in the bar there?

D4AVLIN2                        Benedetto - direct

1   A.   Initially, we examined her.  We checked her mental status,

2   make sure there's no exit wound.  Then we'd put a dry sterile

3   dressing and secure it.

4   Q.   What did you do after that?

5   A.   At that time I was notified by the police officer on the

6   scene there were additional people in a back room that needed

7   attention.

8   Q.   Where did you go?

9   A.   We were standing here.  We went through -- this was a

10  doorway into a hallway, and there are rooms over here, private

11  karaoke rooms.

12  Q.   Do you remember which room you went into that's depicted on

13  the diagram here?

14  A.   It's been a long time.  Like here or -- it's like a room

15  right over here, here or here.

16          MR. SKINNER:  Let me ask Ms. Chace to put up

17  Government Exhibit 3D.

18  Q.   And I think there's a hard copy in front of you,

19  Mr. Benedetto.  You're also able to see it on the screen.

20          Do you recognize that?

21  A.   One second please.

22  Q.   That's 3D.  It's up there on the screen.  And you can see

23  that.

24  A.   Yes.  This is a room, the karaoke room that I referred to.

25  Q.   Is this the room that you went to after the police officers

D4AVLIN2                        Benedetto - direct

1   told you there were other people who needed attention?

2   A.  Yes, sir.

3   Q.  Can you describe for us what you found when you got into

4   the room?

5   A.  Approximately right here -- if I'm looking at the picture,

6   I'm walking into the room, this would be a doorway, right.  I'm

7   not sure if the door was here or if the picture -- depending

8   direction of the picture, as you're standing, you see the room.

9   And there was a body, a gentleman, and a young female.

10  Q.  And just describe for us how you found the gentleman.

11  Standing?  Sitting?  Lying?

12  A.  He was semi -- like lying and crouched on the floor;

13  partially on the couch and on the floor.

14  Q.  What was his condition?

15  A.  He was nonresponsive, unconscious.  Based on our

16  assessment, which is a -- we do the vital signs, check for a

17  pulse, both in the carotid artery, which is in the neck, and in

18  the radial wrist, then listened with a stethoscope into the

19  heart.  There were no vital signs present; no signs, symptoms

20  of life.

21  Q.  And where was the female that you referred to?

22  A.  I'm sorry, it's hard for me to see without my glasses.

23          THE COURT:  What female are you talking about?  This

24  is not the female who was on the bar stool.

25          THE WITNESS:  No, ma'am.

D4AVLIN2                        Benedetto - direct

1              There was a young female that was in the room with the

2       Asian gentleman, another Asian female.  She's approximately in

3       this area, half over here by the table, over by the couch.  And

4       she was slumped down onto the couch.

5       Q.  Was she conscious?

6       A.  I don't remember if she was conscious, but I know when we

7       checked for vital signs, she had a viable pulse, because we

8       wound up identifying that she had a gunshot wound to the head,

9       entry wound.  We did not see any exit wound on examination or

10      evaluation.

11             At that time, I asked my partner to get me certain

12      equipment and to get a second team so we can stabilize her and

13      remove her to the hospital.

14      Q.  So of the two people you found when you got into that back

15      room, who did you devote your attention to first?

16      A.  Initially, the gentleman on the floor.  We checked his

17      vital signs to find that he did not have a pulse.  Then we went

18      to the next room.

19      Q.  And when you checked the vital signs of the defendant --

20      excuse me, of the man who was on the floor in that room, how

21      did you do that?

22      A.  You check the pulse in the neck.

23      Q.  You can move back from the microphone.

24      A.  I'm sorry.  Can you hear me?

25      Q.  Yeah.

1   A.  Basically --

2           MR. COHEN:  Your Honor, I think this was asked and

3   answered.

4   Q.  Well, did you move the body?

5           THE COURT:  Well, we've gone through the body of the

6   Asian gentleman which was on the floor.

7           MR. COHEN:  And that's what he's asking about again, I

8   believe.

9           THE COURT:  What is the question?

10  Q.  The question is any time you were in the room, did you move

11  the body of the male?

12  A.  Yes, we did.

13  Q.  Where did you move the body to?

14  A.  Excuse me, sir?

15  Q.  Where did you move it to?

16  A.  We put it on the floor, on the floor, basically, to an open

17  area, so that we can lay him out, log-roll him left, right,

18  forward, backward, right, and so that we can address any

19  medical issues that we need to critically.

20  Q.  And what, if anything, did you do with respect to the

21  female that you found in the room?

22  A.  The same thing.  She was in a semi-crouched position near

23  the couch between the table and the couch.  We had to move her

24  to be able to immobilize her on a backboard, which is a

25  standard medical apparatus, secure with straps, head

D4AVLIN2                    Benedetto - direct

1    immobilizer, to remove her to the hospital.

2    Q.  So after you and the other people got her on the backboard,

3    what, if anything, did you do with respect to the female that

4    you found in that room?

5    A.  The female was, again, secured to a backboard.  And she's

6    strapped at three locations:  Under the arms, the chest, the

7    legs.  The head is immobilized for cervical safety.  And then

8    she was put on oxygen and bandaged and transported to New York

9    Hospital-Queens, otherwise known as Hospital 31, in an urgent

10   manner.

11   Q.  And you described for us earlier a woman that you found in

12   the bar area when you first entered the club; is that right?

13   A.  Yes, sir.

14   Q.  And what, if anything, did you do with that woman after

15   you'd gone seen the people in this back room?

16   A.  After I pronounced the gentleman with no signs of life

17   presumed dead, all right, we stabilized a woman that was in the

18   room.  She was handed off to a second EMS team to transport her

19   up to the vehicle.  Then we went back to the woman that was at

20   the bar, and treated her leg and transported her to New York

21   Hospital-Queens.

22   Q.  So were you one of the people who took her to the hospital

23   in Queens?

24   A.  Yes, I transported the woman that was shot in the leg to

25   New York Hospital-Queens.

D4AVLIN2                      Benedetto - direct

1   Q.  And before you left for the hospital with the two women,

2   you say it was your opinion that the man was dead?

3   A.  Yes, he was dead, in my professional medical opinion.  I

4   have documented -- it would be on his ambulance call report

5   that he had no vital signs present.

6   Q.  And that was the man whom you described was found in this

7   back karaoke room?

8   A.  Yes, sir.

9   Q.  Now, after you got to the hospital, what did you do after

10  that?

11  A.  At the hospital, we -- they triaged, which means we see a

12  nurse and a doctor.  We explained the situation, the findings.

13  We handed off medical care with a signature to the nurse and

14  the physician.  And we proceeded to decontaminate our vehicle

15  for any type of blood matter.

16  Q.  Did you go back to the karaoke bar after that?

17  A.  Yes, sir, I was summoned back to the bar.

18  Q.  When you say you were summoned back, what do you mean?

19  A.  I had gotten a phone call from the EMS dispatcher telling

20  me that the unit on the scene --

21          MR. COHEN:  Objection.

22          Hearsay.

23  Q.  Who did you get the summons from?

24  A.  I was notified on the radio, the EMS radio, from the city

25  dispatcher to return to the scene to see the police department.

D4AVLIN2                    Benedetto - direct

1    Q.  Did you go back to the scene?

2    A.  Yes, sir.

3    Q.  Did you talk to the police?

4    A.  Yes, sir.

5          MR. SKINNER:  Your Honor, we have no further

6    questions.

7          Thank you.

8          THE COURT:  Very well.

9          Is there any cross-examination?

10         MR. COHEN:  Briefly, your Honor.

11   CROSS-EXAMINATION

12   BY MR. COHEN:

13   Q.  Good morning, Mr. Benedetto.

14   A.  Good morning, sir.

15   Q.  When you initially responded to the karaoke club and

16   entered the premises, were there police officers there?

17   A.  Yes, sir.

18   Q.  And do you recall roughly about how many police officers

19   were there when you got there?

20   A.  Several.  Three, four that I recall, uniformed officers.

21   Q.  Did you happen to know any of those gentlemen or ladies

22   from your work in the neighborhood?

23   A.  Just from sight, you know, say hello, bye.  Don't know the

24   names personally.

25   Q.  Okay.  And upon arriving at the scene, who was the first

D4AVLIN2                      Benedetto - cross

1   person that you spoke to?

2   A.   One of the officers on the scene.

3   Q.   Okay.  And did that officer tell you that there were people

4   seriously wounded in another room?

5   A.   I came down the stairs.  Typical nice day would be, What do

6   you have?  What's up?

7          He says, You have a girl here.  Looked at her.  She's

8   shot in the leg.  Then I was looking at the leg, and he said,

9   Come in the back.  We have some more people in the back.

10  Q.   I think you testified you did a vital signs assessment.

11  A.   On the patient in the back, yes.

12  Q.   Let me withdraw that.  I think I actually used the wrong

13  words.

14         That when you initially saw the Asian female with the

15  gunshot wound in the leg sitting on the bar stool, you made

16  some determination as to her physical and mental condition?

17  A.   Yes, sir.

18  Q.   And you did that both by observing her injury, as well as

19  by speaking with her and asking her questions?

20  A.   Yes, sir.

21  Q.   And I think you testified that you were able to determine

22  from the questions that you asked that she was cognizant as to

23  time, date, place, and things of that nature?

24  A.   Yes, sir.

25  Q.   About how long did that conversation take with this female

D4AVLIN2                         Benedetto - cross

1    sitting on the bar stool?

2    A.   Approximately 35 -- 30 to 45 seconds.

3    Q.   Okay.  And was it at the end of that 30 to 45 seconds that

4    you were advised that there were other people that were perhaps

5    more seriously injured in another location?

6    A.   Approximately within a minute or two of establishing

7    contact with the first victim, I was notified that there are

8    additional people in the back room, best of my recollection.

9    Q.   Okay.  And at that point, you responded to the other room?

10   A.   I followed the officers into the hallway, and they showed

11   me the room.

12   Q.   Okay.  And I think you testified you tended to the male

13   victim first?

14   A.   Yes.

15   Q.   And about how long did you spend tending to the male victim

16   before you made the determination that he was deceased?

17   A.   Probably about half a minute to a minute.  We checked his

18   pulse.  And if you don't find a pulse, you check both sides of

19   the carotid.  I personally check the carotid, which is the

20   pulse in the neck.  And I check for the rail at the same time

21   to see if I have bilateral pulses or present pulses.  And also

22   I could feel temperature, and I could feel moisture.  And then

23   I also move the individual to see if there's any kind of

24   response or shake or a movement or painful stimulus.

25   Q.   And I think you testified that you were working with a

D4AVLIN2                         Benedetto - cross

1   partner that day?

2   A.  Yes, sir.

3   Q.  And while you were checking the vitals on the male, what

4   was your partner doing?

5   A.  He was bringing equipment down.

6   Q.  Okay.  So after you did your assessment of the lady sitting

7   on the bar stool, and then you determined that the male was

8   deceased in the room, you began to make an assessment of the

9   female?

10  A.  Yes, sir.

11  Q.  And at that point she still had a pulse?

12  A.  At that time she still had a carotid pulse.

13  Q.  She wasn't responsive in any way; you couldn't speak to

14  her, but she did have signs of life?

15  A.  Well, I -- and I don't know if other individuals do, but I

16  always speak to someone, see if there's a verbal stimuli.  I

17  don't remember if there was a verbal stimuli.  I do not

18  remember she had any type of sounds response.  But based on the

19  color of the body, their tissue, the warmth or the temperature,

20  which is a warm to touch, and a palpable pulse in the neck,

21  that's enough for us to say initiate, there's life.  Stabilize,

22  treat and transport to the nearest trauma center.

23  Q.  And do you know if she passed away at the scene, en route

24  to the hospital, or later at the hospital?

25  A.  She arrived at the hospital in the same condition that we

D4AVLIN2                      Benedetto - cross

1   found her.  She was evaluated.  I do not know if she passed

2   away.  I didn't follow the case.

3   Q.  So you weren't the one that pronounced her?

4   A.  Pronounced her?

5   Q.  Yes.

6   A.  No, she was brought to the hospital.  That would then

7   belong to a physician to make that determination.  We exist in

8   the pre-hospital world only.

9   Q.  And when I say "pronounced," I mean pronounced dead.

10  A.  Right.  If she was to -- if she became deceased, once she's

11  in the hospital, she is signed off legally to a hospital

12  physician or a nurse, and then we're outside of that realm of

13  control.

14  Q.  Thanks very much.  I have no further questions.

15          MR. SKINNER:  No questions, your Honor.

16          THE COURT:  Very well.  You may step down.

17          Thank you.

18          (Witness excused)

19          THE COURT:  Who's your next witness?

20          MS. BURNS:  Your Honor, the government calls Guang Yun

21  Zhou.

22          Your Honor, may we approach briefly?

23          THE COURT:  Very well.

24          (Continued on next page)

25

D4AVLIN2                        Benedetto - cross

 1              (At the side bar)

 2              MS. BURNS:  Potentially we have cross that we think is

 3    not permissible.  Mr. Zhou has a prior conviction for a

 4    misdemeanor offense from 2001.

 5              THE COURT:  What was the offense?

 6              MS. BURNS:  He pled guilty to menacing in the second

 7    degree.  That was in New York State court.

 8              THE COURT:  When was that?

 9              MS. BURNS:  In 2001.  Under Rule 609, it's not

10    permitted.  It's not a felony.

11              THE COURT:  It's not "it's not permitted."  It's not

12    explicitly authorized.

13              MS. BURNS:  I misspoke, your Honor.

14              Also, it is not an offense that has any element that

15    goes to truthfulness or honesty.  And in cross-examination by

16    Mr. Cohen, it would be impermissible regarding this offense.

17    So we just wanted to clarify that before the witness gets on

18    the stand.

19              THE COURT:  That is, you would like me to preclude Mr.

20    Cohen from mentioning this.

21              MS. BURNS:  Yes.

22              MR. COHEN:  Your Honor, as I told the government last

23    night, I agree that cross-examination impeachment by

24    misdemeanor conviction from a remote point in time is

25    impermissible.  But I think that he was arrested for a robbery,

D4AVLIN2                        Benedetto - cross

1   and either an armed robbery or a second-degree robbery.  I

2   think I have the right to inquire into the underlying fact he

3   spent four months in jail and then was permitted to plead

4   guilty to a misdemeanor.

5          THE COURT:  The original charge was?

6          MR. COHEN:  Was robbery, yeah.  And I think that had

7   he led an unblemished life since then, it would be improper for

8   me to impeach him by something he did such a long time ago.

9   But I think the direct evidence will show that he continued to

10  commit crimes, and that I ought to be allowed to inquire into

11  the underlying facts of that incident.

12         MS. BURNS:  Your Honor, we're talking about an

13  incident --

14         THE COURT:  Wait just one moment.

15         What do you mean he continued to commit crimes?

16         MR. COHEN:  I think that this gentleman continued to

17  associate with people that were guilty of gambling and

18  extortion and assaults and stabbings.

19         THE COURT:  Aren't you going to bring that out?

20         MR. COHEN:  Yes.

21         MS. BURNS:  That doesn't make him guilty of a crime.

22  And he has no other convictions.  And characterizing it as a

23  conviction or being guilty of a crime is improper.

24         THE COURT:  That's a different issue.  That's not what

25  you're raising.

D4AVLIN2                        Benedetto - cross

1              MS. BURNS:  I want to object to both points from Mr.

2       Cohen now.

3              THE COURT:  Well, he certainly can elicit that he

4       continued to participate in illegal gambling.

5              MS. BURNS:  Participation and being guilty --

6              MR. SKINNER:  Your Honor, he wants to impeach improper

7       acts under 608.  608 says you can impeach for acts that go to

8       your character for truthfulness or untruthfulness.  Robbery has

9       nothing to do with your character for truthfulness or

10      untruthfulness.

11             MS. BURNS:  There's nothing about that offense that

12      goes -- there's no element.

13             THE COURT:  I would like to see a case that holds that

14      you cannot impeach for robbery because robbery doesn't involve

15      dishonesty.

16             MS. BURNS:  Your Honor, frankly, the burden here is on

17      Mr. Cohen.

18             THE COURT:  But, look, let's stay with the one

19      problem --

20             MS. BURNS:  Okay.

21             THE COURT:  -- that you've raised, which is whether he

22      can impeach with a misdemeanor.  You can ask him about prior

23      conduct that displays dishonesty, but you cannot use it as a

24      conviction.

25             MR. COHEN:  I started, your Honor, by saying I would

D4AVLIN2                    Benedetto - cross

```
 1    not ask him about whether he'd been convicted.  I agreed with
 2    the government's view that it would be improper to ask him if
 3    he'd been convicted of that crime.  But I do think I have the
 4    right to ask him about the conduct that led to the conviction.
 5    I'm not even going to ask him if he was arrested.
 6              THE COURT:  What is the conduct we're talking about?
 7              MR. COHEN:  That he and another person robbed
 8    somebody.
 9              THE COURT:  But that was not established.
10              MR. COHEN:  Well, he --
11              THE COURT:  You want to ask him whether he did?
12              MR. COHEN:  I believe he was indicted for the offense.
13              THE COURT:  That's different.  There's probable cause.
14              MR. COHEN:  Yeah.  And he pleaded guilty to a
15    misdemeanor.
16              THE COURT:  He was actually indicted for robbery?
17              MR. COHEN:  I think he was.
18              THE COURT:  Well, I think you have to know that.
19              MS. BURNS:  It has to be established.
20              THE COURT:  If he was indicted for robbery, that he's
21    entitled to show; because an indictment is probable cause.  We
22    have it every day.  You always argue it to me.
23              MS. BURNS:  I agree.
24              THE COURT:  There's probable cause for believing --
25              MR. SKINNER:  If he couldn't show actual conviction,
```

D4AVLIN2                        Benedetto - cross

1    how is it proper to show the actual indictment?

2              MR. COHEN:  I'm not seeking to show the indictment

3    either.  I'm simply saying I think it establishes probable

4    cause that he committed the underlying acts.  And because of

5    the way plea bargaining works in state court, he caught a big

6    break.

7              MS. BURNS:  Obviously, none of that is being presented

8    to the jury.  I don't think there's anything you've represented

9    in the facts that go to honesty or truthfulness.

10             THE COURT:  I see.  You think robbery has nothing to

11   do with honesty.

12             MS. BURNS:  There's no proffer from defense counsel as

13   to how it does.  We're not talking about some sort of stealth

14   or other act.  I mean we don't even know what kind of conduct

15   Mr. Cohen is speaking about.  I think we need a proffer from

16   the facts.

17             THE COURT:  I don't know.  What was the conduct?

18             MR. COHEN:  Instead of belaboring this point, let's

19   see how the cross goes; let's see how the direct goes.

20             THE COURT:  I think, right, unless there's something

21   in the direct that really draws it, we should not get into it.

22             MR. SKINNER:  Your Honor, I think the point is we

23   don't intend to elicit what we think is improper.

24             THE COURT:  I understand exactly.  And I've ruled that

25   if there's nothing in the examination that raises anything

D4AVLIN2                    Benedetto - cross

1    related to it, then he won't go into it.

2                MR. SKINNER:  Very well.  If that's the ruling, that's

3    fine.  Thank you, your Honor.

4                MR. COHEN:  Judge, can we take a ten-minute break now,

5    five or ten-minute break?

6                THE COURT:  Actually, we should give the jury a break.

7    What time is it?  I kept them longer than I usually do.

8                MR. SKINNER:  It is 10 of 12.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4AVLIN2                        Benedetto - cross

1              (In open court)

2              THE COURT:  Members of the jury, I kept you longer

3    than I usually do to mid-morning.  It's past mid-morning.  But

4    we're going to take a ten-minute recess at this time.  And then

5    we will continue to hear the evidence.

6              (Jury excused)

7              THE COURT:  We will all take a ten-minute recess.

8              MR. SKINNER:  Thank you, your Honor.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4AVLIN2                    Benedetto - cross

1              (In the robing room)

2              THE COURT:  Mr. Daniels was taking the jury back to

3    the jury room and Juror No. 9 told Anthony that she did not

4    recognize the name yesterday Benedetto, but that then she saw

5    him and she recognized him.  She knows him, who he is.  We

6    looked in our notes and she is a health care executive.  I just

7    want both sides to be aware of this and I will consider any

8    application anybody wants to make.

9              MR. COHEN:  I would only ask, your Honor, that your

10   Honor voir dire her as to whether she knows him personally and

11   if so how well and whether that would have any impact on her

12   ability to be fair and impartial.

13             MR. SKINNER:  We don't have any objection to that.

14             THE COURT:  Very well.  Let's get her in.

15             Ms. Brown, won't you sit down.  I wanted to find out a

16   little bit more about it.  How do you know him?

17             JUROR:  Well, New York Hospital Queens is one of our

18   hospitals.  I am there a lot.  I am there on Friday as long as

19   we don't have court because I am working with them on a big

20   project.  I also know George because he worked closely with my

21   colleague's husband Frank Minneo when he was also in EMS there.

22             THE COURT:  I see.

23             JUROR:  And my very dear friend is a security guard

24   there also in the emergency department.  So I didn't know that

25   it was New York Hospital Queens that was going be engaged.

D4AVLIN2                    Benedetto - cross

1          THE COURT:  Nor did I.

2          JUROR:  I am sorry.  Otherwise, I would have said

3    something and I just didn't recognize the name.

4          THE COURT:  I understand.  The important question is

5    this:  Is the fact that you know him and that you work closely

6    with people from New York Hospital Queens, would that in any

7    way affect your ability to reach a verdict based solely on the

8    evidence in the case?

9          JUROR:  I -- my only caveat, and please he don't take

10   this personally, I just didn't feel comfortable, and I know

11   it's your job, when you were questioning his -- George's

12   ability if somebody had life signs, maybe I know how good these

13   people are in terms of trauma cases, so I don't know what

14   bearing that has on the case or not, but I can tell you that

15   that wasn't comfortable and I was just sitting on my hands

16   until I could tell you that I knew George.

17         THE COURT:  So that is what made you remember that you

18   in fact knew him?

19         JUROR:  When he walked in I knew.  I thought oh my

20   God, it is New York Hospital Queens.

21         THE COURT:  I appreciate your candor.  Thank you very

22   much.

23         JUROR:  Thank you.

24         MR. COHEN:  If she is not comfortable, I am not

25   comfortable.

D4AVLIN2                        Benedetto - cross

1          THE COURT:  That's a problem.  Not that he said

2     anything that matters.

3          MR. SKINNER:  I don't think she said I cannot be

4     impartial.  I think she said basically I don't like the

5     cross-examination.  A lot of people may not like the

6     cross-examination.

7          THE COURT:  I understand but we don't want her to take

8     her chagrin out on the defendant.

9          MR. SKINNER:  Of course.  We have five alternates so

10    if there is an application, we will not oppose it.

11          MR. COHEN:  There is an application.

12          THE COURT:  I will wait until lunch to excuse her.

13          MR. COHEN:  Thank you.

14          THE COURT:  I am not going to do anything about it

15    right now.

16          MR. SKINNER:  At this rate we may burn through our

17    jurors.

18          THE COURT:  Let's hope not.  We don't intend to, but I

19    was glad that we had five when I heard it.

20          THE COURT:  Let's continue.

21          (Continued on next page)

22

23

24

25

D4AVLIN2                          Benedetto - cross

1                    (In open court; jury not present)

2                    THE COURT:  Please be seated.

3                    Let's get the jury.

4                    (In open court; jury present)

5                    THE COURT:  Please be seated.

6                    You may proceed.

7                    THE DEPUTY CLERK:  Please stand and raise your right

8     hand.

9      GUANG YUN ZHU,

10          called as a witness by the Government,

11          having been duly sworn, testified as follows:

12    DIRECT EXAMINATION

13    BY MS. BURNS:

14    Q.  Good afternoon, Mr. Zhu.

15              Mr. Zhu, do you go by any other names or nicknames?

16    A.  My nickname is Yi Pei.

17    Q.  Can you spell it?

18    A.  Y-i, P-e-i.

19    Q.  What year were you born?

20    A.  '68.

21    Q.  Where were you born?

22    A.  In China.

23    Q.  When did you first try come to the United States?

24    A.  In '93, but then I got sent back.

25    Q.  Did you later again try to come to the United States?

D4A6LIN3                        Zhu - direct

1   A.  Yes.  I came in '96.

2   Q.  At that time did you come here legally or illegally?

3   A.  I got a visa to come here into San Francisco.

4   Q.  Have you been in the United States since 1996?

5   A.  Yes.

6   Q.  Are you a citizen of the United States?

7   A.  No.  I have a A5 card.

8   Q.  What is an A5 card?

9          THE COURT:  Is that we loosely call a green card?

10         THE WITNESS:  It is not a green card.

11         THE COURT:  I see.  What is it that it permits you to

12  do?

13         THE WITNESS:  It allows me to work in the United

14  States.

15  BY MS. BURNS:

16  Q.  Do you have an A5 that is current or has it expired?

17  A.  It had expired over a month ago.

18  Q.  How did you attain the A5 card?

19  A.  My wife applied for me.

20  Q.  Did you do that on your own or did you use a lawyer in some

21  way?

22  A.  My wife hired an attorney.  It was through an attorney.

23  Q.  How long does an A5 card last?

24  A.  The first time that it was issued was good for two years

25  and then thereafter it is just one year.

D4A6LIN3                         Zhu - direct

```
 1   Q.  To be clear you have applied multiple times for an A5 card?
 2   A.  Yes.  I have renewed my card many times.
 3   Q.  Those times that you renewed your card or make your initial
 4   application, did law enforcement in any way assist you with
 5   those applications?
 6   A.  No.  I paid the lawyers office to do it myself.
 7           THE COURT:  What is your occupation?
 8           THE WITNESS:  Presently I work in the restaurant.
 9           THE COURT:  You got a work permit for that?
10           THE WITNESS:  I work in the restaurants.  A5 card
11   would allow me to work in the restaurants.  It is more
12   convenient.
13           MR. COHEN:  I am sorry.  I didn't hear the last.
14           THE INTERPRETER:  It is more convenient.
15   BY MS. BURNS:
16   Q.  Mr. Zhu, has an order of deportation been entered against
17   you?
18           THE COURT:  We now call it "removal."
19   A.  It was --
20           THE COURT:  He has been ordered removed, is that what
21   you are saying?
22           THE WITNESS:  Yes.
23   Q.  Have any promises been made to you by anyone in the
24   government regarding your immigration status in connection with
25   your testimony here today?
```

D4A6LIN3                          Zhu - direct

1    A.  No.

2    Q.  You've just testified that you work in the restaurant

3    business.  Have you ever owned a business?

4    A.  Yes.  I had owned a business.

5    Q.  What kind of business did you own?

6    A.  I had a restaurant in Brooklyn and I had a restaurant in

7    Florida.

8    Q.  Have you ever at any time owned a bus business or part of a

9    bus business?

10   A.  I had.

11   Q.  When was that?

12   A.  It was about 10 years ago.

13   Q.  What was your role in that bus business?

14   A.  I was a shareholder.

15   Q.  What does it mean to be a shareholder in a bus business?

16   A.  I help with the work and I help send out the vehicle.

17   Q.  Did you receive a portion of the profits for being a

18   shareholder?

19   A.  Yes.

20            THE COURT:  Was this a corporation?

21            THE WITNESS:  Yes.

22   Q.  Do you know someone who goes by the name Ding Pa?

23   A.  I do.

24   Q.  Is that a true name or a nickname?

25            THE COURT:  Try to let it come from the witness.

D4A6LIN3                          Zhu - direct

 1   A.   That is what other people called him.   Ding Pa is the

 2   nickname.

 3   Q.   I am going to ask you to look around and let us know if you

 4   see the person you know as Ding Pa in the courtroom today.

 5   A.   Do I point with my hand or do I say it with words?

 6   Q.   If you can say it with words.

 7          First, do you see him?

 8   A.   I do.

 9   Q.   Tell us where he is and if you can describe what he is

10   wearing?

11   A.   He is straight ahead in front of me.

12          THE COURT:   Which table is he sitting at?

13          THE WITNESS:   From here it is the second one, the one

14   in the back.

15          MS. BURNS:   May the record reflect that he has

16   identified the defendant, your Honor?

17          THE COURT:   Yes.   But let's hear what he is wearing.

18          THE WITNESS:   The color, I can't really describe it

19   clearly.   It is gray.

20          THE COURT:   Close enough.   We call it khaki.

21          THE WITNESS:   Yeah.   It is like gray.

22   BY MS. BURNS:

23   Q.   When did you first meet this person that you know as Ding

24   Pa that is also called Mr. Lin?

25   A.   I met him while gambling.

D4A6LIN3                    Zhu - direct

1    Q.  Do you remember when you met him?

2            THE INTERPRETER:  Can you repeat the question?

3    Q.  Do you remember when you met him?

4    A.  When I was gambling.  It was end of '96.

5    Q.  Where were you gambling that you met Ding Pa?

6    A.  I was in Manhattan.  The corner of Madison Street and

7    Market Street.

8    Q.  Can you describe this location?

9    A.  The address?  I don't remember the address.

10   Q.  Can you describe what kind of building it was located in?

11   A.  It's a building on Madison and Market Streets.  It used to

12   be the Benda Company.

13   Q.  When you met Ding Pa were you both gambling?

14   A.  Yes.

15   Q.  What games were being played at this gambling parlor on

16   Madison Street?

17   A.  13 cards.

18           THE COURT:  Does it have a name, the game?

19           THE WITNESS:  That's 13 cards.  That's what it is

20   called.

21           THE COURT:  That's what you call it?

22           THE WITNESS:  Yes.

23   Q.  Did you see people working at this gambling parlor?

24   A.  Yes.

25   Q.  What did you see them doing?

D4A6LIN3                          Zhu - direct

1    A.   They were dealing cards, recording numbers and taking

2    commissions.

3    Q.   How many people did you see working there?

4    A.   There was a few.

5            THE COURT:   What do you mean taking commissions?

6            THE WITNESS:   For example for every $100 that was bet,

7    $5 would be taken out.

8    Q.   Who would take it out?

9            THE COURT:   As a fee, right?

10           THE WITNESS:   It was a commission.

11           THE COURT:   A commission for the owner of the gambling

12   parlor?

13           THE WITNESS:   Yes.

14           THE COURT:   You were paying to gamble, is that right?

15           THE WITNESS:   There would be commission taken out if

16   there was a winning.

17           THE COURT:   I see.  But only if there was a winning?

18           THE WITNESS:   Yes.

19           THE COURT:   I see.  How much was the commission?

20           THE WITNESS:   $5 -- 5 percent.

21           THE COURT:   $5 from 100, 5 percent commission?

22           THE WITNESS:   Yes.

23   BY MS. BURNS:

24   Q.   At Madison Street who was the owner taking these

25   commissions?

97

D4A6LIN3                          Zhu - direct

1   A.  The owner taking the commission was Ding Pa.

2   Q.  I think I just missed the answer.  How many workers did you

3   see there?

4   A.  There was a few.  Four, five, five or six workers.

5            MR. COHEN:  Your Honor, can we fix a time frame?

6            THE COURT:  Yes.  When was this?

7            THE WITNESS:  In '96.

8            THE COURT:  1996.

9   Q.  The people you saw working there were they all the same or

10  did they change?

11  A.  It varied.

12  Q.  How many people would be gambling when you were there on

13  average?

14           THE COURT:  Not would be but were?

15           MS. BURNS:  Thank you, your Honor.

16  Q.  How many people were gambling when you went?

17  A.  When there was a lot, it was between 20 to 30.  When there

18  was a few, it was between 10 to 20.

19           THE COURT:  So this was 17 years ago?

20           THE WITNESS:  Yes.

21  Q.  How often did you go to gamble at Madison Street?

22  A.  I used to go every two, three days.  Every so often.

23  Q.  For how long did you go there?

24  A.  I was gambling there for a pretty long time.

25           THE COURT:  How many years?

D4A6LIN3                          Zhu - direct

| | |
|---|---|
| 1 | THE WITNESS:  No.  It would be open for a period of |
| 2 | time here and there.  I was going there for about two, three |
| 3 | months.  And then after I lost my money, I stopped going. |
| 4 | Q.  Other than take commissions, did you see anything else that |
| 5 | made you believe that Ding Pa was running this gambling parlor? |
| 6 | A.  The shareholders would go to him.  Whoever wanted to become |
| 7 | a shareholder would have to give him the money. |
| 8 | MR. COHEN:  Objection and move to strike, your Honor. |
| 9 | There is no foundation. |
| 10 | THE COURT:  There is no foundation for what |
| 11 | shareholders would have to do.  Objection sustained. |
| 12 | Q.  What is a shareholder in a gambling parlor? |
| 13 | A.  People in the gambling parlor that gamble would get |
| 14 | recruited. |
| 15 | Q.  Recruited by whom? |
| 16 | A.  Ding Pa. |
| 17 | Q.  Were you a shareholder in this Madison Street gambling |
| 18 | parlor? |
| 19 | A.  Yes. |
| 20 | Q.  How many shareholders were there at the time that you were |
| 21 | a shareholder? |
| 22 | A.  There were approximately 20 to 30 people. |
| 23 | MR. COHEN:  I am sorry, 20 to 30? |
| 24 | THE COURT:  That's what he said. |
| 25 | MR. COHEN:  Thank you. |

D4A6LIN3                          Zhu - direct

1   Q.  What did you receive, if anything, for being a shareholder?

2   A.  If they made money, then their shareholder would get profit

3   of a few hundred dollars like every three days.

4   Q.  Did you ever receive any profits?

5        THE COURT:  You would get a few hundred dollars every

6   few days?

7        THE WITNESS:  If there was a winning.

8   Q.  Did you ever receive profits as a shareholder at the

9   Madison Street location?

10  A.  After I lost money gambling, I stopped.

11       MR. COHEN:  Move to strike as nonresponsive.

12       THE COURT:  What you were asked was:  Did you receive

13  money as a shareholder?

14       THE WITNESS:  What was that?  Can you ask the question

15  again?

16       THE COURT:  Were you a shareholder?

17       THE WITNESS:  Yes.

18       THE COURT:  While you were a shareholder, did you

19  receive any money?

20       THE WITNESS:  But I lost it in gambling.

21       THE COURT:  That's not the question.

22       THE WITNESS:  You asked if I made any money.  Yes, I

23  made money.

24  BY MS. BURNS:

25  Q.  Did you gamble at any other gambling parlors?

D4A6LIN3                          Zhu - direct

1           MR. COHEN:  I am sorry, Ms. Burns.

2           Ms. Lai, I didn't hear the last answer.

3           THE INTERPRETER:  Yes, I made money.

4           MR. COHEN:  Thank you.

5    Q.  Did you go to gamble at any other gambling parlors with

6    Ding Pa?

7    A.  Did I go where?

8    Q.  Did you ever go to gambling parlors other than on Madison

9    Street with Ding Pa?

10   A.  Yes.  I went to the one on 29th Eldridge Street.

11   Q.  Is that location in Manhattan?

12   A.  Yes.

13   Q.  When did you go there?

14   A.  It was also the end of '96, '97.  After he stopped in this

15   location, he moved over to the other location.

16   Q.  Who is the "he" you are referring to?

17   A.  Ding Pa.

18   Q.  Was Ding Pa the owner and operator of the Eldridge Street

19   location?

20   A.  Yes.

21   Q.  Were you a shareholder in the Eldridge Street location?

22   A.  I have shares too.

23   Q.  How many shareholders were in this location?

24   A.  It was also between 20 to 30 people.

25   Q.  How often did you go to the Eldridge Street location?

D4A6LIN3                          Zhu - direct

1    A.   I went occasionally.

2    Q.   What does "occasionally" mean?

3    A.   Sometimes I would go every two, three days, sometimes every

4    day, sometimes every day.  As a shareholder you have to go in

5    and work every day.

6    Q.   For how long were you a shareholder and gambler at the

7    Eldridge Street location?

8    A.   Not for that long.  After I gambled and lost money, I

9    stopped.

10   Q.   Is that after a period of weeks or months?

11   A.   I only do it for about three to four weeks.

12   Q.   Do you know how long Eldridge Street was in operation?

13   A.   I don't know exactly how long.  Approximately two to three

14   months.

15   Q.   What kind of games were played there?

16   A.   Also 13 cards.

17   Q.   Did you see people working there?

18   A.   Yes.

19   Q.   How many people did you see?

20   A.   People there, a few people they switched every hour.

21   Q.   What type of work were they doing?

22   A.   Some took information, other dealings cards.

23   Q.   How many people were gambling when you went to this

24   location?

25   A.   As many as 20 to 30 people, but if there weren't that many

D4A6LIN3                          Zhu - direct

1    people around 10 people.

2    Q.  How much would you bet?

3    A.  I bet a few hundred or sometimes if I bet more, over a

4    thousand dollars.

5    Q.  Directing your attention now to July 29th, 2004.  What were

6    you doing that evening?

7    A.  I was having dinner in Manhattan that night.

8    Q.  Who were you having dinner with?

9    A.  Yita Mayong, Number Four, Chi Xiang, Madan, and Yi Qun.

10             MR. COHEN:  M-a-d-a-n.

11             THE INTERPRETER:  M-a-d-a-n.

12   A.  Yi Qun and myself.  And later my older sister came.

13   Q.  Did you have any alcoholic drinks at dinner, like beer?

14   A.  During that night we were talking about my niece's wedding.

15   Q.  Did you drink any alcoholic drinks while you were at

16   dinner?

17   A.  Yes.  A bottle or two beers.

18   Q.  After dinner, did you go anywhere?

19   A.  I went to Flushing to the -- I went to a karaoke bar.

20   Q.  Do you remember the name of that karaoke bar?

21   A.  Scent of a Woman Karaoke Bar.

22             MR. COHEN:  I am sorry.

23             THE INTERPRETER:  Scent of a Woman.

24   Q.  Approximately what time did you arrive there?

25   A.  I don't exactly remember but around 11:00.

D4A6LIN3                          Zhu - direct

1   Q.   Who were you with?

2   A.   The people who I had dinner with.  My sister's dinner.

3   Q.   So the other names you mentioned at dinner, those were the

4   same people in your group at Scent of a Woman?

5   A.   Yes.

6   Q.   Did you stay for a long time or a short time at Scent of a

7   Woman?

8   A.   I lasted 15 minutes.  I open a beer and went to another

9   place.

10  Q.   What was the other place you went to?

11  A.   Heaven On Earth.

12  Q.   Where is that located?

13  A.   In Queens, Flushing.

14  Q.   What was the name of it?

15  A.   Heaven On Earth.

16  Q.   Had you been to Heaven On Earth before?

17  A.   Yes.

18  Q.   How many times?

19  A.   I had been there a few times.

20  Q.   What kind of place was it?

21  A.   It was in the basement.

22  Q.   What did you do there?

23  A.   Just to hang out.

24  Q.   Was this any type of club or was there particular activity

25  that you would do there?

D4A6LIN3                        Zhu - direct

1   A.  No.  We had dinner and all of us just went there to hang

2   out.

3              THE COURT:  You had dinner there?

4              THE WITNESS:  No.  We had dinner somewhere else and

5   then after that we went there to hang out.

6   Q.  To be clear you went to Heaven On Earth to hang out?

7   A.  Yes.  I had been hanging out at Heaven On Earth a few

8   times.

9   Q.  When you arrived that night at Heaven On Earth was there

10  security?

11  A.  Yes.

12  Q.  What kind of security was there?

13  A.  An American.

14  Q.  What was that person doing?

15  A.  When people go in, he would search people.

16  Q.  Was that search done with hands or with a device or both?

17  A.  Both.  Depends.  Sometimes he used his hand and sometimes

18  used a device.

19  Q.  Before you went there that night was there security on

20  those other occasions?

21  A.  Yes.

22  Q.  Who did you go to Heaven On Earth with?

23  A.  The night when the incident took place.?

24  Q.  Yes.

25  A.  The people I had dinner with.

D4A6LIN3                         Zhu - direct

1    Q.  One of those people you mentioned was Yi Qun, is that

2    correct?

3    A.  No.  When I was having the dinner in Chinatown, Yi Qun was

4    with me but my sister did not go.

5              MR. COHEN:  I am sorry?

6              THE INTERPRETER:  My sister did not go.

7    A.  My sister did not go.

8    Q.  Was Yi Qun in your group at Heaven On Earth?

9    A.  Yes.

10   Q.  Can you describe your relationship with Yi Qun?

11   A.  At the end of 1996 and he used to work in a barbershop.

12   Q.  Were you close with him?

13   A.  I met him in a barbershop and later we hang out and he

14   became my sister's boyfriend.

15   Q.  Turning back to Heaven On Earth.  Where did you go once you

16   got inside the club?

17             THE INTERPRETER:  I am sorry?

18   Q.  Where did you go once you got inside the club?

19   A.  Me, when I got to Heaven On Earth?

20   Q.  Yes.

21   A.  I went to a room and then I went out to the common area and

22   then I stood there for a while and then I went back to the

23   room.

24   Q.  What kind of room was this that you went back into?

25   A.  For example, from here to there.  The door is over there

D4A6LIN3                    Zhu - direct

1    and chairs and a sofa were over there.

2    Q.  Was this a private room for your group?

3    A.  Yes.

4    Q.  Was there more than one private room in the club?

5    A.  In the club there were many rooms, but we just had the room

6    to ourselves.

7    Q.  The room you had to yourselves, who was in that room that

8    night?

9                MR. COHEN:  Your Honor, can we fix a time?

10               THE COURT:  What time of night was this?

11               MR. COHEN:  No.  At what particular point is Ms. Burns

12   inquiring as to.

13               THE COURT:  When you first went to the room, who was

14   in the room?

15               MR. COHEN:  Thank you.

16               THE WITNESS:  When I first went in it was empty.

17               THE COURT:  Right.  But who went in with you?

18               THE WITNESS:  Yi Qun, Madan, Yita, Chi Xing, and

19   Mayong, Number Four, and myself.

20               THE COURT:  So there were five people altogether?

21               THE WITNESS:  Including myself, Madan, Number Four, Yi

22   Qun, Mayong, Chi Xing, myself.  Seven.

23   Q.  Those names you just listed are those all men?

24   A.  Yes.

25   Q.  Were there any other --

1   A.  And also later a hostess came.

2   Q.  One hostess or more than one hostess?

3   A.  Two hostesses.

4   Q.  Were those women paid to join you?

5   A.  Yes.

6   Q.  Inside the room where were you sitting or standing?

7   A.  I was sitting in the corner furthest in.

8   Q.  Were you facing toward the door or away from the door?

9   A.  I face the door.  Yes, facing the door.

10  Q.  Where was Yi Qun in the room?

11  A.  He was next to the entrance.  The door in the same row

12  where I was sitting, but he was more out.

13  Q.  What do you mean by "more out"?

14  A.  About three to four seats apart from me.

15  Q.  What was your group doing inside this private room?

16  A.  We were singing, drinking, talking.

17  Q.  Were you drinking any alcohol at this time?

18  A.  Yes.  We just started drinking beer, a few bottles.

19  Q.  How many did you have?

20  A.  Myself that night I had just a bottle or two.

21  Q.  Did there come a time when anybody else came into your

22  room?

23  A.  Yes.

24  Q.  Who came into the room?

25  A.  Ding Pa and another person.

D4A6LIN3                       Zhu - direct

1    Q.  Did you recognize the other person?

2    A.  I did not.

3    Q.  When Ding Pa came into the room was there music playing?

4    A.  Well, there were sounds of other people singing.

5    Q.  What was the volume in the room?

6    A.  Not really that loud.

7            THE COURT:  Not very loud.

8    Q.  What happened first when Ding Pa and the other man came

9    into the room?

10   A.  He came in and I stood up and I was about to have a drink

11   with him.  So he just told me to sit down.

12   Q.  What was your reaction to his saying that?

13           MR. COHEN:  Objection.

14           THE COURT:  Objection sustained.

15   Q.  How did you feel when Ding Pa said that to you?

16           THE COURT:  Objection sustained.

17   Q.  After Ding Pa told you to sit down, did he say anything

18   else to you?

19   A.  He said, Just sit down, it has nothing to do with me.  So

20   at time I get confused and I was scared.

21           THE COURT:  No.  That is not the question.

22   Q.  Other than telling you to sit down and saying this has

23   nothing to do with you, did Ding Pa say anything else to you at

24   this time?

25   A.  No.  I just heard "shoot."

D4A6LIN3                          Zhu - direct

1    Q.   Who said shoot?

2    A.   Ding Pa.

3    Q.   Who did Ding Pa say shoot to?

4    A.   The person in the next room.

5    Q.   What happened when Ding Pa said shoot to that man?

6    A.   And then a few shots were fired at Yi Qun.

7              THE COURT:  At a convenient point we're going to stop

8    for lunch.

9    Q.   Did you see where this person was aiming that gun?

10   A.   Aiming at Yi Qun.

11   Q.   Did you see him aim the gun at anyone else?

12   A.   At the time I did not really pay that much attention

13   because I was scared.

14   Q.   What happened to Yi Qun once the shots started being fired?

15   A.   A few shots had been fired and Ding Pa and him both ran

16   away.  I got scared and people went back and Yi Qun was lying

17   on the ground.

18             THE COURT:  At a convenient point we're going to

19   stop --

20             MS. BURNS:  This is a good point.

21             THE COURT:  -- for the midday recess.

22             Very well.  Members of the jury, we're going to recess

23   now for lunch and we'll reconvene.  Come back to the courtroom

24   at 20 after 2:00.  I am going to ask Ms. Brown to wait just a

25   moment.

D4A6LIN3                          Zhu – direct

1                   (Jury excused)

2                   THE COURT:  You may step down.

3                   (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4A6LIN3                          Zhu – direct

1              (In open court; jury not present)

2              THE COURT:  Ms. Brown, I am going to invite you up to

3    the side bar here with the lawyers.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4A6LIN3                    Zhu - direct

1           (At the side bar)

2           THE COURT:  You did not do anything improper.  Please

3      understand that.  Please understand that you did the right

4      thing as soon as you remembered what it was.  For complicated

5      reasons, which have nothing to do with any bad conduct on your

6      part, we're going to excuse you from the jury.

7           JUROR:  Okay.  Thank you.

8           THE COURT:  Thank you for your help.

9           JUROR:  Sorry.

10          MR. COHEN:  You do not have to apologize to me.  I am

11     grateful that you brought this to the Court.  You didn't do

12     anything.

13          JUROR:  Catholic school.

14          MR. COHEN:  From my point of view you should be

15     commended.

16          JUROR:  Thank you.  I didn't realize.

17          THE COURT:  I understand that.  This is no reflection

18     on you.  You should always come forward when you remember.  You

19     did the right thing.

20          MR. COHEN:  New York is a very small place.

21          THE COURT:  You are free from this case.  Have a

22     pleasant lunch anyhow.

23          JUROR:  That I will do.

24          (Luncheon recess)

25

D4AVLIN4                         G. Y. Zhou - direct

1                    A F T E R N O O N   S E S S I O N

2                              2:30 P.M.

3            THE COURT:  Good afternoon.

4            Please be seated.

5            MR. SKINNER:  Your Honor, before the jury comes in,

6    can we raise two housekeeping matters?

7            THE COURT:  Yes.

8            MR. SKINNER:  First, we've been informed by defense

9    counsel that he thinks his cross-examination of Mr. Zhou may be

10   quite lengthy.  And we have a witness in from out of town, from

11   Georgia, who we think will be pretty brief.  And we were going

12   to suggest, with the Court's permission --

13           THE COURT:  To interrupt.

14           MR. SKINNER:  Yeah, at the conclusion of direct, we'll

15   take Mr. Zhou off the stand, call the witness from Georgia,

16   then we'll put Mr. Zhou back on the stand for cross after that.

17           MR. COHEN:  I have no objection, Judge.

18           THE COURT:  Fine.

19           Will you be able to complete that today?

20           MR. SKINNER:  Oh, yes.  I think the witness from

21   Georgia I don't think will -- the government's direct is all of

22   ten minutes, and I don't anticipate lengthy cross.

23           MR. COHEN:  If I have cross at all, it will be maybe

24   three or four questions.

25           THE COURT:  Very well.

D4AVLIN4                              G. Y. Zhou - direct

 1                MR. SKINNER:  Thank you, your Honor.

 2                THE COURT:  Then let's get the jury.

 3                (Jury present)

 4                THE COURT:  We're going to continue with the same

 5     witness.

 6                You may proceed.

 7                MS. BURNS:  Thank you, your Honor.

 8     GUANG YUN ZHOU, resumed.

 9     BY MS. BURNS:

10     Q.  Mr. Zhou, before we broke, I believe you testified that

11     after the shooting stopped, Yiqun was on the ground in the

12     room; is that correct?

13     A.  Yes.

14     Q.  What happened next?

15     A.  After the shooting, after a few shots were fired, people

16     all ran out.

17     Q.  Who did you see run out?

18     A.  Ding Pa and another person.

19     Q.  What did you do at that time?

20     A.  The other people, they were --

21                THE COURT:  No, they did not ask about the other

22     people.  He's asked about himself.  What did you do?

23     A.  I went out.  I got scared.  I went out and told my sister.

24     Q.  What did you do, if anything, before you left the room?

25     A.  I went over to Yiqun, and touch his arm to see if there was

D4AVLIN4                         G. Y. Zhou - direct

1   any reaction.

2   Q.  Was there any reaction?

3   A.  There was no reaction.  I got scared.  So I called a car

4   and went to Chinatown.

5   Q.  And I think you said that Ding Pa ran out of the room with

6   someone else.  Who was that?

7   A.  He ran out after the gun went off a few times.

8   Q.  Did he go with anyone?

9   A.  Are you talking about Ding Pa?

10  Q.  Yeah.  Did Ding Pa leave with anyone?

11  A.  He ran out with the shooter.

12  Q.  You said you went to see your sister.  Where did you go?

13  A.  I went to Chinatown.

14  Q.  What happened next?

15  A.  I told my sister that Yiqun got shot a few times.

16  Q.  Did you speak with the police about what happened that

17  night in that karaoke room?

18  A.  I do not remember whether it was that night or the next

19  day.  I did go to the precinct.

20  Q.  What precinct did you go to?

21  A.  109.

22  Q.  When you were at the precinct, did you see other people who

23  had been at the karaoke club earlier that night?

24  A.  The people that were in the room?

25  Q.  Yes.

D4AVLIN4                          G. Y. Zhou - direct

1          THE COURT:  Well, wait just a moment.

2          Did you go to the precinct that night?

3          THE WITNESS:  I got scared.  I don't remember whether

4    it was that night or not.  I -- it's been a long time.

5    Q.  Did you go to the precinct within a day after the shooting

6    took place?

7    A.  Yes.

8    Q.  While you were at the precinct, did you see people who'd

9    been in the karaoke room during the shooting at the precinct?

10   A.  The shooter?

11         THE COURT:  No, that's not what you're being asked.

12   Q.  Did you see anyone else who had been in the room with you

13   that night at the precinct?

14   A.  Yes.

15   Q.  Did you see Ding Pa at the precinct?

16   A.  No.

17   Q.  Did you see the man who'd come into the room with Ding Pa?

18   A.  I did not.

19   Q.  Before you spoke to the police about -- before you spoke to

20   the police, did you speak with anyone else who was in the room

21   that night?

22   A.  I did not.  I only talked about why this happened in the

23   room.

24   Q.  When did you next see --

25         MR. COHEN:  I move to strike that as unresponsive.

D4AVLIN4                          G. Y. Zhou - direct

1          THE COURT:  I don't understand the answer.  It had
2  nothing to do with the question.
3  Q.  Did you speak to the police --
4          THE COURT:  I do grant the motion to strike.
5  Q.  While you were at the precinct, did you speak to the police
6  about what had happened in the karaoke room that night?
7          THE INTERPRETER:  I'm sorry, can you repeat the
8  question?
9          MS. BURNS:  Sure.
10 Q.  While you were at the precinct, did you speak to the police
11 about what happened in the karaoke room that night?
12 A.  Yes.
13 Q.  Before you did so, did you speak with anybody else who had
14 also been in the room that night?
15 A.  I did not.
16 Q.  When did you next see Ding Pa?
17 A.  Do you mean before the shooting or after the shooting?
18 Q.  After the shooting, when did you next see Ding Pa?
19 A.  I did not.
20         MS. BURNS:  No further questions.
21         MR. SKINNER:  Your Honor, as we discussed, at this
22 time we'd ask that the witness be permitted to step down so
23 that we could call a witness out of order.
24         THE COURT:  Very well.
25         MR. COHEN:  No objection.

D4AVLIN4                          G. Y. Zhou - direct

1              (Witness excused)

2              MR. SKINNER:  Your Honor, the government calls Andrew

3     Clark.

4      ANDREW CLARK,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7              THE DEPUTY CLERK:  Thank you.  Please be seated.

8              Please state your full name for the record.

9              THE WITNESS:  Detective A. W. Clark, Andrew W. Clark.

10             THE DEPUTY CLERK:  Spell your last name slowly.

11             THE WITNESS:  C-L-A-R-K.

12             THE DEPUTY CLERK:  Thank you.

13    DIRECT EXAMINATION

14    BY MR. SKINNER:

15    Q.  Mr. Clark, where do you work?

16    A.  For the City of Doraville Police Department, out of DeKalb

17    County, Georgia.

18    Q.  And how long have you worked for the Doraville Police

19    Department?

20    A.  Since January 28th, 1998.

21    Q.  What's your current position there?

22    A.  I'm a detective.

23    Q.  How long have you been a detective?

24    A.  Since 2002.

25    Q.  Could you just tell us where in Georgia Doraville is

D4AVLIN4                         Clark - direct

1   located?

2   A.   Yes.  We're located within metro Atlanta, the north end of

3   285/85 area.

4   Q.   Let me direct your attention back to July of 2004.

5            Were you a detective in the Doraville Police

6   Department at that time?

7   A.   Yes, sir, I was.

8   Q.   Were you working on July 16th of 2004?

9   A.   Yes, sir, I was.

10  Q.   Did you arrest anyone that day?

11  A.   I arrested five subjects, sir.

12  Q.   Where did those arrests take place?

13  A.   5150 Buford Highway, Asian Square.

14  Q.   What kind of building is located there?

15  A.   It's basically like a strip plaza or a strip mall.

16  Q.   How did you come to be there?

17  A.   I was doing an investigation at the time on electronic

18  gambling machines.

19  Q.   Did you go inside this address?

20  A.   Yes, sir, I did.

21  Q.   What did you find once you got inside?

22  A.   When I walked into the inside of the Hong Kong Employment

23  Agency, I located five individuals.  They were sitting around a

24  gambling table, and there was cash out on the table when they

25  were participating in gambling.

D4AVLIN4                         Clark - direct

1   Q.  What did you do after you went into this place?

2   A.  They seemed surprised to our police presence.  We had

3   marked up.  We detained the subjects over there, and eventually

4   arrested the subjects during our investigation.

5   Q.  When you were there, did you find any money?

6   A.  Yes, sir, we did.

7   Q.  How much money did you find?

8   A.  $4,500 approximately.

9   Q.  Did you find anything else related to gambling there?

10  A.  Yes, sir, we did.

11  Q.  What did you find?

12  A.  Electronic gambling machines.

13  Q.  When you say electronic gambling machine, what do you mean?

14  A.  They are basically like electronic video poker.  They're

15  called Skill Stop.  They have different names.

16  Q.  What happened after you placed these five individuals under

17  arrest?

18  A.  We had them transported to the Doraville Police Department.

19  Q.  What happened once you brought them back to the Doraville

20  Police Department?

21  A.  They were booked into the City of Doraville Jail for

22  commercial gambling.

23  Q.  Was one of the people you arrested a man named Xing Lin?

24  A.  Yes, sir, it was.

25  Q.  And did you talk to Mr. Lin that day?

D4AVLIN4                      Clark - direct

1    A.  Yes, sir, I did.

2    Q.  As part of the booking process, did you ask him basic

3    pedigree questions about where he was from?

4    A.  Yes, sir.

5    Q.  And did you ask him for a driver's license?

6    A.  Yes, sir, I did.

7         MR. SKINNER:  Your Honor, I'm showing the witness an

8    exhibit we've marked as Government Exhibit 51.

9    Q.  Detective Clark, can you take a look at 51 for me -- excuse

10   me -- 50.

11        MR. SKINNER:  For the record, to be clear, I'm showing

12   the witness an exhibit marked Government Exhibit 50.

13   Q.  Can you take a look at that for me please?

14   A.  Yes, sir.

15   Q.  Do you recognize this?

16   A.  Yes, sir, I do.

17   Q.  What is it?

18   A.  This is the State of Georgia limited permit that Mr. Lin

19   had on his person that presented.

20   Q.  This is the driver's license that he gave you on the date

21   of his arrest?

22   A.  That's correct, sir.

23        MR. SKINNER:  Your Honor, we offer Government Exhibit

24   50.

25        MR. COHEN:  No objection.

D4AVLIN4                    Clark - direct

1           THE COURT:  Very well.  Government Exhibit 50 is
2    received in evidence.
3           (Government's Exhibit 50 received in evidence)
4           MR. SKINNER:  Can you show Government Exhibit 50 to
5    the jury.
6           THE COURT:  Yes, you may.
7    Q.  And, Detective Clark, as part of the booking process, did
8    you ask Mr. Lin for his phone number?
9    A.  Yes, sir.
10   Q.  Did he give you a phone number?
11   A.  Yes, sir, he did.
12   Q.  What phone number did he give you?
13   A.  Off the top of my head, sir, I'm not positive.
14          MR. SKINNER:  Your Honor, I'm showing the witness a
15   document that's been marked as Government Exhibit 51 for
16   identification purposes.
17   Q.  Detective Clark, can I ask you, after having looked at this
18   document, if it helps refresh your recollection as to the phone
19   number that Mr. Lin gave you?
20   A.  Yes, it does, sir.
21   Q.  And what was that phone number?
22   A.  The telephone number was 646-996-3991.
23          MR. SKINNER:  Your Honor, no further questions.
24          MR. COHEN:  No questions, your Honor.
25          THE COURT:  Very well.  You may step down.

1              THE WITNESS:  Thank you, your Honor.

2              (Witness excused)

3              MR. SKINNER:  Your Honor, the government would recall

4     Mr. Zhou for the purposes of cross-examination.

5              THE COURT:  Very well.

6              What is the Chinese language that Mr. Zhou is

7     speaking?

8              THE INTERPRETER:  The Foochow dialect.

9              THE COURT:  This is Foochinese.

10             THE INTERPRETER:  Foochinese.

11             THE COURT:  Thank you.

12     GUANG YUN ZHOU, resumed.

13    CROSS-EXAMINATION

14    BY MR. COHEN:

15    Q.  Mr. Zhou, good afternoon.

16    A.  How are you?

17    Q.  Have you and I ever met?

18    A.  No.

19    Q.  And we've never had any conversations about this case;

20    correct?

21    A.  With who?

22    Q.  You and I.  We've never talked about what you've testified

23    to; correct?

24    A.  You mean with the prosecutor or with whom?

25             THE COURT:  The lawyer is now asking him questions.

D4AVLIN4                        Zhou - cross

1    A.  Oh, no.

2    Q.  Okay.  You mentioned conversations with the prosecutor.

3    Have you spoken to the prosecutors about your testimony?

4    A.  What do you mean?

5    Q.  I mean have you spoken with Mr. Skinner, Ms. Burns, Agent

6    Varian, or other people from the government about the testimony

7    that you would be giving today?

8    A.  The testimony?  Are you talking about the testimony?

9              THE COURT:  Yes.

10   A.  Yes, I did.

11   Q.  Okay.  About how many times would you say you've met with

12   people from the government to talk about what you would be

13   testifying about?

14   A.  I do not remember how many times.

15             THE COURT:  What's your best recollection?

16             MR. COHEN:  Thank you, your Honor.

17             THE WITNESS:  I do not remember clearly.  I can't be

18   exact.

19   Q.  When was the last time you met with them?

20   A.  I do not remember which day of the month, but it was a few

21   days ago.

22   Q.  Okay.  And would you say -- I know you say you don't recall

23   exactly how many times you met with them.  Would you say it was

24   probably somewhere between 10 times and 20 times?

25   A.  No.

D4AVLIN4                         Zhou - cross

1    Q.  Less than 10 or more than 20?

2    A.  I don't know how many times.

3    Q.  You said that you first came to the United States, I think,

4    in 1993?

5    A.  I said that the first time I was arrested, right after I

6    left China.  I was in the international water on a ship.

7    Q.  Okay.  So, in other words, you left China to try to be

8    smuggled into the U.S. and got arrested while you were at sea?

9    A.  Yes.

10   Q.  And was that by authorities from China or from the United

11   States or from some other country?

12   A.  That was in the international water.

13   Q.  Okay.  But, well, how long had you been at sea before you

14   got arrested?

15   A.  Between 10 to 20 days.  Their ship was broken down and we

16   were stuck there.

17   Q.  Okay.  And were you stopped in the middle of the water or

18   at some port?

19   A.  What to you mean?  Can you repeat that question?

20   Q.  Yes.  The ship was -- let me put it a different way.  You

21   said there came a time when you got arrested at sea; correct?

22   A.  Yes.

23   Q.  Was the ship that you were on stopped dead in the water or

24   were you at someplace of land at the time that you were

25   arrested?

D4AVLIN4                         Zhou - cross

1    A.  We were in the middle of the sea.

2    Q.  Okay.  And where were you taken after you were arrested on

3    that occasion?

4    A.  We were taken to some kind of military base.

5           THE INTERPRETER:  I'm sorry, your Honor, I just want

6    to clarify something.

7    A.  After we were arrested, all of us was taken to land.

8    Q.  And was that land in China or the United States or some

9    other place?

10   A.  I think it belonged to the U.S.

11   Q.  And when you got to the land, were the people who were at

12   the land people who spoke English?

13   A.  Yes.

14   Q.  Why did you leave China at that time?

15   A.  My family was persecuted.

16   Q.  Persecuted?

17   A.  Back at home, because of my child or my children being

18   born, because of family planning, that was the reason.

19   Q.  Who was persecuted?

20   A.  I was.  My wife and I were.  We could not stay home.

21   Q.  And that was because you had more than one child?

22   A.  Yes.

23   Q.  Was there a policy in China that said families could only

24   have one child?

25   A.  Yes, only one.

D4AVLIN4                        Zhou - cross

```
 1   Q.  And how many children do you have -- did you have at the
 2   time you left China?
 3   A.  One was already born, the other one was in her stomach.  I
 4   had to go into hiding in different places.
 5   Q.  And did your wife go into hiding with you?
 6   A.  Yes.
 7   Q.  And when you left China to come to the U.S., did your wife
 8   come with you?
 9   A.  No.
10   Q.  You left her behind?
11   A.  She was with her sister.
12   Q.  How were you persecuted?
13            MS. BURNS:  Objection.
14            Asked and answered.
15            THE COURT:  Overruled.
16   A.  The family planning people came to the house, fines were
17   levied, and also the house was wrecked.
18   Q.  The house was?
19   A.  Wrecked.
20   Q.  Okay.  And that was it?
21   A.  Yes.  And after the child was born, there was a fine.
22   Q.  Okay.  So your wife was not forced to undergo an abortion
23   when your second child was --
24            THE COURT:  Expected.
25   Q.  -- in-utero; correct?
```

D4AVLIN4                         Zhou - cross

1   A.  We did not have the child aborted; that's why we went into

2   hiding.

3   Q.  Okay.  And eventually the child was born and you paid a

4   fine; correct?

5   A.  Yes.

6   Q.  Okay.  And how long after your second child was born did

7   you leave China?

8   A.  About after the child was one year old.  I was still

9   carrying the child in my arms.

10  Q.  So it was about a year from the time that the child was

11  born until you left; correct?

12  A.  A little older than a year.

13  Q.  Okay.  And isn't it true, sir, that the reason you came to

14  the United States was so that you could provide a better living

15  for your wife and children that you left behind in China?

16  A.  No, because the family planning bureau was looking for me

17  all over the place.

18  Q.  You were on the run for a year in China?

19  A.  Is it possible not to answer these questions?

20          THE COURT:  No, not possible.

21  A.  Because it's been many years, and I don't remember some of

22  the things.

23  Q.  You were on the run for a year in China?

24  A.  Me?  I was running for over a year.

25  Q.  Where did you live?

D4AVLIN4                    Zhou - cross

1   A.  I rented a place elsewhere in Fuzhou.

2   Q.  You were from Fuzhou; correct?

3   A.  No, I was in the countryside.  Fuzhou is a city.  It's

4   different.

5   Q.  So Fuzhou --

6           THE COURT:  Fuzhou County.

7           MR. COHEN:  I am going to do it, Judge.

8   Q.  Fuzhou is a city in Fujian Province; correct?

9   A.  Fuzhou is a city.  I'm from Longqi.

10          THE COURT:  The question was that's in Fujian Province

11  also, right?

12  A.  Yes.

13  Q.  When you left China, there wasn't very much to do in Longqi

14  in terms of employment; correct?

15  A.  Longqi?  There were work to do in Longqi.

16  Q.  When you were arrested at sea and taken to wherever you

17  were taken to, did you ask for political asylum?

18  A.  After I was arrested, I was locked up for a few days, and

19  then I was sent back.  They didn't ask me questions like that.

20  Plus, I didn't speak English.

21  Q.  When you were arrested, was there anybody there able to

22  translate for you between English and Chinese?

23  A.  Chinese, there were people on the ship that speaks Chinese,

24  but I didn't speak English.  So if they were going to send

25  people back, they were going to send all of us back.

D4AVLIN4                          Zhou - cross

 1    Q.  Did you have a passport with you, a Chinese passport?

 2    A.  No.

 3    Q.  Where were you sent back to?

 4    A.  I was sent back to China.

 5    Q.  To where in China?

 6    A.  I was sent to Xiamen at the time.

 7    Q.  If you didn't speak English and couldn't communicate with

 8    any of the people that had you in custody and you had no

 9    passport, how is it that you were sent back to a particular

10    place in China?

11    A.  There were a lot of people on the ship.  There were a few

12    hundred people.  We were all sent back together.

13    Q.  What happened when you went back to Xiamen?

14    A.  I was sent to the public security bureau in Fuzhou.

15    Q.  Because you left China without permission; correct?

16    A.  It was illegal.

17    Q.  It was illegal for you to leave China without permission

18    from the government; correct?

19    A.  What do you mean leave China?

20    Q.  You left China to come to the United States on a smuggling

21    ship; correct?

22    A.  Yes.

23    Q.  That it was a violation of Chinese law to smuggle yourself

24    out of the country; correct?

25    A.  Yes.

D4AVLIN4                          Zhou - cross

1   Q.  And is it true, sir, that the reason you were taken to a

2   detention center was because you violated the law by leaving

3   China?

4   A.  Everybody was sent back, and everybody was sent over there.

5        MR. COHEN:  Your Honor, can I have my question read

6   back to the witness, and maybe we could get an answer?

7        THE COURT:  You may.

8        (Record read)

9   A.  No, the whole group of people that were sent back went

10  there.

11  Q.  And was the whole group sent there because they all

12  violated the law by leaving China illegally?

13        MS. BURNS:  Objection.

14        THE COURT:  Overruled.

15  A.  Other people was also illegal in doing that.

16  Q.  How long did you stay at the detention center?

17  A.  Which one, in China?

18  Q.  Yes.

19  A.  My sister lived in Fuzhou.  As soon as I got back, she went

20  to bail me out.

21  Q.  How long did you spend in the detention center?

22  A.  I was detained for two, three days.

23  Q.  And you were released on bail?

24  A.  As soon as my sister went there, as soon as there was a

25  bail, she came to bail me out.

D4AVLIN4                         Zhou - cross

1    Q.   And what happened after that to you in China?

2    A.   Then I was afraid to go back home to the country, where my

3    house was.

4    Q.   Well, when you got bailed out -- by the way, when you went

5    back to China, did they take your fingerprints to identify who

6    you were?

7    A.   In China, no, no fingerprinting.

8    Q.   Did you tell them who you were, where you were from?

9    A.   No, we were all sent there.  And once they were allowed to

10   be bail, then the bail amount was set, and people were bailed

11   out and released.

12   Q.   Okay.  But in order for your sister to bail you out and not

13   one of the hundreds of other people that were being held in

14   detention, did you have to provide them with your name?

15   A.   My name?  Are you talking about my name?

16   Q.   I'm talking about your name.

17   A.   Yes.

18   Q.   You gave them your name, right?

19   A.   What?  What do you mean?

20   Q.   Mr. Zhou, when you were taken to the detention center in

21   China, and you got there, and you were being processed in, did

22   anyone ask you what your name was?

23   A.   Yes, they did ask my name.

24   Q.   Did you tell them your name?

25   A.   I did.

D4AVLIN4                      Zhou - cross

1   Q.  And after you told them your name, were you able to

2   communicate with your sister?

3   A.  As long as I was able to get bailed out, so my sister came

4   and bail me out.

5   Q.  And when you were bailed out, was that in Fuzhou City or in

6   Xiamen?

7   A.  In Fuzhou City.

8   Q.  In Fuzhou City.

9        Okay.  And what happened after that?  What did you do?

10  A.  After a few days, after I was bailed out, and I stay in

11  Fuzhou to visit for a few days before I went to Shanghai to

12  work.

13  Q.  And how long was it before you again left China to come to

14  the United States?

15  A.  1996.

16  Q.  Okay.  So that was about three years after your first

17  attempt to enter this country illegally?

18  A.  Yes, three years.

19  Q.  And how did you come the second time?

20  A.  By visa.

21  Q.  Was the visa in your name?

22  A.  In China, the snakehead did it for people over in China.

23  Q.  When you say "snakehead," you mean somebody whose business

24  it is to smuggle people from China to the United States?

25  A.  Yes.

D4AVLIN4                          Zhou - cross

1   Q.  And when a snakehead did this visa for you, was the visa in

2   your own name or someone else's name?

3   A.  I'm not sure.  I didn't look at it.  I'm not sure whether

4   it was my name or someone else's.  He did everything, including

5   passport.

6   Q.  And how much did you pay the snakehead to get smuggled out

7   of China?

8   A.  40,000.

9   Q.  U.S. dollars?

10  A.  Yes.

11  Q.  Now, what happened when you arrived in the United States?

12  A.  What?  What happened to me when I got to the United States?

13  Q.  Yes.

14  A.  I came to San Francisco via visa, and then I came to New

15  York.

16  Q.  So this phony visa that you had, actually got you into the

17  United States?

18  A.  I'm not sure, because it was done by the snakehead.

19  Snakehead did it.  He did everything.

20  Q.  So you paid somebody $40,000 to smuggle you into the United

21  States; correct?

22  A.  Yes.

23  Q.  And that person, that snakehead, gave you a fake document;

24  correct?

25          MS. BURNS:  Objection.

1        THE COURT:  Overruled.

2   A.  I don't know.  After he did it, he just brought me into the

3   United States.

4   Q.  Well, did you have a visa that was issued by the United

5   States government by getting to the consulate and applying for

6   one?

7   A.  No, I did not.  Snakehead did it for me.

8   Q.  Okay.  So is it a fair statement that the fake visa that

9   you bought succeeded in getting you smuggled into the United

10  States?

11  A.  Snakehead did it for me.

12  Q.  Do you know is it --

13       THE COURT:  I think you should move on.  I think you

14  should move on.

15       MR. COHEN:  Very well, your Honor.

16  Q.  How did you get from San Francisco to New York?

17  A.  From San Francisco, by plane.

18  Q.  By plane.

19       And how did you get a ticket to get on an airplane?

20  A.  He did it for me.

21  Q.  "He" being the snakehead?

22  A.  I said also snakehead did it for me.

23  Q.  When you got to New York, did snakehead find you a place to

24  live and a job?

25  A.  No, I was staying with my older sister and my older

D4AVLIN4                        Zhou - cross

 1  brother.

 2  Q.  They were living in the United States?

 3  A.  After she got married, and then later she came to the

 4  United States.

 5  Q.  Were your sister and your brother living in the United

 6  States when you got here?

 7  A.  Yes.

 8  Q.  In New York City?

 9  A.  Yes.

10  Q.  And you came to live with them; correct?

11  A.  Yes.

12  Q.  And that was in 1996?

13  A.  Yes.

14  Q.  When did you first encounter or meet with any

15  representative of the United States government?

16  A.  What do you mean?

17  Q.  Did there come a time that you made some sort of

18  application to stay in the United States?

19  A.  When I came here?

20  Q.  Yes, sir.  When you came here in 1996, did you ask the

21  United States government permission to stay in the United

22  States?

23  A.  So you are talking about hearings?  Court hearings?

24  Q.  Sir, I'm asking you whether or not at any time you asked

25  the United States government for permission to stay in the

D4AVLIN4                    Zhou - cross

1    United States, yes or no.

2    A.   Yes, I went for a hearing.

3    Q.   You asked for political asylum; correct?

4    A.   Yes.

5    Q.   And when you asked for political asylum, you had to answer

6    questions from an asylum officer; correct?

7    A.   Political asylum, lawyer's office did it for me.

8             MR. COHEN:  Say again?

9             THE INTERPRETER:  A lawyer's office did it for me.

10   Q.   Well, I understood that a snakehead got you here, and the

11   lawyer's office did something else.  But did there come a time

12   that you had to answer questions from an asylum officer?

13            THE COURT:  I think "immigration officer" may be

14   clearer.

15            MR. COHEN:  Okay.

16   A.   Yes.

17   Q.   Okay.  And do you remember that interview?

18   A.   When I went for a hearing?

19   Q.   The first time that you went to see somebody at

20   immigration, was it an interview with an officer or was it a

21   hearing?

22   A.   Hearing.

23   Q.   You never had an interview with an immigration officer,

24   just in an office where he asked you questions about when you

25   left China and why and things of that nature?

D4AVLIN4                         Zhou - cross

1    A.  I did.

2    Q.  Did what?

3    A.  Yes, the judge was asking me questions, and the lawyer's

4    office brought me there.

5    Q.  And did you make false statements during that proceeding?

6    A.  No, I did not.

7    Q.  You made no false statements during that proceeding?

8    A.  No, I did not.  Lawyer's office did it for me.

9    Q.  Well, sir, at the hearing, was the judge asking questions

10   of you or asking questions of the lawyer's office?

11           THE INTERPRETER:  Counsel, could you repeat the

12   question?

13           MR. COHEN:  Yes.

14   Q.  At the hearing, was the judge asking questions of you or

15   asking questions of the lawyer's office?

16   A.  Yes.

17   Q.  Yes what?

18   A.  Could you repeat?

19           MR. COHEN:  Judge, I'm going to ask permission to

20   approach the witness.  I'm going to show him the document, ask

21   the translator to translate the highlighted portion, and see if

22   it refreshes his recollection about what happened at this

23   proceeding.

24           MS. BURNS:  Judge, I object.  There's been no absence

25   of memory here.  The witness has answered the questions.  And

1    I'd like to see the document.

2              MR. COHEN:  Your Honor, respectfully, there's been no

3    presence of memory.

4              THE COURT:  That's correct.

5              MS. BURNS:  I believe he's answered the questions.

6              THE COURT:  He has not answered the question.  His

7    answer was "the lawyer's office did it," when asked whether the

8    judge spoke to him.  That's not an answer.

9              MS. BURNS:  I don't want to put words in his mouth, he

10   may not be understanding the question, but there's nothing here

11   that says he hasn't remembered something that requires

12   refreshing recollection.

13             THE COURT:  I think you are incorrect.

14             MS. BURNS:  May I see the document, Mr. Cohen?

15             MR. COHEN:  Of course.

16             THE COURT:  You can ask him again.  You can ask him

17   again if he remembers whether the judge asked him anything.

18             MR. COHEN:  May I approach, Judge?

19             THE COURT:  Very well.

20             But before you do, do you remember the hearing?

21             THE WITNESS:  No, it's been a long time ago.  I do not

22   remember.

23             THE COURT:  Very well.

24             You may refresh the witness's recollection.

25             MR. COHEN:  Okay.  We'll just deem this as Defendant's

D4AVLIN4                    Zhou – cross

1   A for identification, I don't think I'm going to offer it.

2           THE COURT:  No, you're not going to offer it now.

3   It's only used for the purpose of refreshing recollection.

4           (Continued on next page)

D4a6lin5                    Zhou - cross

1          MR. COHEN:  May I ask the translator to translate for

2    him certain highlighted portions?

3          THE COURT:  You may.

4    BY MR. COHEN:

5    Q.  Mr. Zhu, now that the translator has translated for you

6    some words on the document, does that refresh your recollection

7    that you made statements or testified at some proceeding at the

8    immigration office?

9    A.  I do not remember.  Long time ago.  I don't remember it

10   clearly.

11   Q.  Do you remember telling immigration officers that you

12   assaulted two birth control officers after they recommended

13   that your wife be sterilized because she had already given

14   birth to your second child?

15   A.  They came to my home and they were saying that they were

16   going to destroy my home.

17         THE COURT:  Is that what you told the judge?

18         THE WITNESS:  Yes.

19         THE COURT:  Let's move on.

20   Q.  You told the judge that you assaulted them because they

21   recommended your wife be sterilized, correct?

22   A.  Long time ago.  I don't remember this.

23   Q.  Did you participate in the pro-democracy movement at

24   Tiananmen Square after June 4th of 1989, sir?

25   A.  June 4th?  No, I did not go Tiananmen Square.  I was in the

1    village area.

2    Q.  Did you tell U.S. immigration officials that you were

3    persecuted in China because of your support for the

4    pro-democracy movement?

5    A.  My lawyer translated for me.  I don't remember this.

6    Q.  Well, if false statements were made at this hearing, are

7    you saying they were made by your lawyer and not by you?

8    A.  False statements?  I submitted my own documents.

9    Q.  In those documents, sir, that you submitted didn't you tell

10   the U.S. immigration office that you were being persecuted for

11   your self-involvement in the pro-democracy movement?

12   A.  Yes.  At that time when my lawyer did it, but it's been so

13   long I don't remember at this time.

14   Q.  Did you participate in the pro-democracy movement, or is

15   that something that your lawyer made up?

16   A.  No.  I did it in the village area.

17   Q.  How did you participate in the pro-democracy movement?

18   A.  Demonstrations by students in school.

19   Q.  Isn't it true, sir, that this story was suggested to you by

20   the representatives at your lawyer's office?

21   A.  I don't remember.

22   Q.  Did you talk to other illegal immigrants at that time about

23   the fact that that story was the story everybody told in the

24   early '90s to get political asylum in the United States?

25   A.  No, I did not.  I don't remember.

1          THE COURT:  I think we should move on.

2     Q.  What was the result of your application for political

3     asylum in the United States?

4     A.  What now?

5     Q.  In 1996 you applied to be allowed to remain here because

6     you were persecuted in China, correct?

7     A.  Yes.

8     Q.  In fact in 1998 you were given a decision that said we

9     don't believe you and we're sending you back to China, correct?

10         MS. BURNS:  Objection.

11         THE COURT:  Overruled.

12    A.  I don't know.  I did not know English.

13    Q.  Did you think that you had permission to stay in the United

14    States since 1998 because you don't know English?

15    A.  My lawyer translated to me and said that I had lost.

16    Q.  So you knew that you lost, correct?

17    A.  My lawyer told me that I lost.

18    Q.  And did your lawyer tell you that you had an order to leave

19    the United States by a certain date?

20    A.  No.  I didn't pay notice to that.

21    Q.  You didn't take notice or pay notice to the fact that you

22    were ordered by this government to leave this country, correct?

23    A.  I was disappointed once I found out that I lost my case.

24    Q.  And because you were disappointed, you decided that you

25    were going to disregard an order from the United States

D4a6lin5                         Zhou - cross

1    government and just stay here, correct?

2    A.  I did not know.  He didn't say that.

3    Q.  Sir, you knew that you had been ordered to leave the United

4    States because you lost of your case, right?

5    A.  I don't remember.  I don't remember whether it was told to

6    me or not.

7    Q.  Well, did you think --

8              THE COURT:  I think we should move on.

9              MR. COHEN:  Judge, can we step up for a moment?

10             THE COURT:  No.  I would rather move on first.

11   Q.  When you first came to New York, did you have a job?

12   A.  Yes.

13   Q.  What was your job?

14   A.  Making deliveries by bicycle.

15   Q.  How long did you do that for?

16   A.  I worked for a few months.

17   Q.  And when was it that you started hanging around these

18   gambling parlors in Chinatown?

19   A.  What did you say?

20   Q.  I said, When was it that you started hanging around these

21   gambling parlors in Chinatown?

22   A.  1996.

23   Q.  That was the same year that you came here, correct?

24   A.  Yes.

25   Q.  That is when you were making deliveries on bicycles?

1    A.   Yes.

2    Q.   And you were making enough money for making deliveries on

3    bicycles to gamble hundreds of dollars?

4    A.   Sometimes.  If I lost my money, I would ask my brother and

5    my sister to lend me money.

6    Q.   Your sister is a money lender, isn't she?

7    A.   I am sorry.

8    Q.   Your sister is a money lender, isn't she?

9    A.   Yes.

10   Q.   She is a loan shark, isn't she?

11          MS. BURNS:  Objection.

12          THE COURT:  Sustained.

13   Q.   The sister that you are talking about that lent you money

14   as a money lender, is she the one who had a relationship with

15   Yi Qun?

16   A.   About this, because I have some brothers and sisters in the

17   United States, I don't really remember.

18   Q.   How many sisters do you have in the United States?

19   A.   In the United States?  Four.

20   Q.   Are they all in New York?

21   A.   Yes.

22   Q.   Are they all money lenders?

23   A.   No.  I am their younger brother.

24   Q.   Are they all money lenders?

25   A.   No.  No.  I ask my sister for money after I lost money

D4a6lin5                         Zhou - cross

1    gambling.

2    Q.  You are saying you don't remember if that is the sister

3    that had a relationship with Yi Qun?

4    A.  I don't remember which one.  I asked every one of them for

5    money, to lend me money.

6              THE COURT:  That is not the question.

7    Q.  How many of your sisters lent you money?

8    A.  I cannot answer those things.

9    Q.  You can't answer them or you don't want to answer them?

10   A.  When I worked I earned money and also I was a shareholder

11   and later I got in a bus business.

12   Q.  Who is taking care of your wife and children and China

13   while you were gambling hundreds of dollars a day in Chinatown?

14             MS. BURNS:  Objection.

15             THE COURT:  Overruled.

16   A.  I sent it back myself.

17   Q.  You sent money back to them?

18   A.  Yes.

19   Q.  What do you think spent more on, gambling in Chinatown or

20   spending money on your family?

21             THE COURT:  I think you should move on.

22   Q.  Do you know somebody named Dong Jain?

23             THE INTERPRETER:  Can I have a spelling?

24             MR. COHEN:  It is phonetic.

25   A.  Who is this Dong Jain.

D4a6lin5                          Zhou - cross

1   Q.  Do you know somebody by the nickname of Cash?

2   A.  Who is that?  I do not know the name.

3            THE COURT:  Do you know someone whose nickname is

4   Cash?

5            THE WITNESS:  A person's name?

6   Q.  Yes.

7   A.  Also my sister's boyfriend for a period of time.

8   Q.  That was Dong Jain, also known as Cash, correct?

9   A.  Yes.

10  Q.  He is a Dai Lo in Chinatown, right?

11  A.  That's other people's business.

12           May I chose not to answer those questions?

13  Q.  You may not.

14           MR. COHEN:  I am sorry.  It is not my job to tell him.

15           THE COURT:  Of course.  Let me explain to the witness

16  that you have sworn that you will tell the truth and answer

17  every question that is put to you.

18           THE WITNESS:  Yes.

19  Q.  So the answer, sir, yes, that Dong Jain is a Dai Lo in

20  Chinatown?

21  A.  I do not know anything about that.

22  Q.  Do you know of a bus company called Mingan?

23  A.  Mingan bus?

24  Q.  Yes.

25  A.  I know of one.

D4a6lin5                        Zhou - cross

1    Q.  Were you involved in that company in any way?

2    A.  Take the bus.

3    Q.  Okay.  Were you involved in Mingan in any way?

4    A.  I was not a shareholder.

5    Q.  Were you involved in any way with that company?

6    A.  No.

7    Q.  Were you ever employed by that company?

8    A.  No.

9    Q.  Did you ever sell tickets for that company?

10   A.  No.

11   Q.  What was the bus company that you started?

12   A.  I seem to remember it was called Tianma but it has been

13   many years.  It's called something.  It is at the tip of my

14   tongue and I can't seem to remember.

15   Q.  Do you still own that company?

16   A.  I don't anymore.  I had sold it many years ago.

17   Q.  When did you go into the restaurant business?

18   A.  Quite a few years ago.  Three, four years ago.

19   Q.  Is that the restaurant you own in Florida?

20   A.  No.  The one in Brooklyn.

21   Q.  You also say that you had a restaurant in Florida?

22   A.  Yes.

23   Q.  And the restaurant in Florida, by the way is that

24   restaurant in your name or your wife's name?

25   A.  Under my wife's name.

1   Q.  Why is it that it is not under your name?

2   A.  My status had expired at the time.

3   Q.  In other words you were not legally in the United States,

4   correct?

5   A.  I was legal but my status had expired, my A5 card.

6   Q.  What is an A5 card?  Can you explain that to the folks on

7   the jury?

8   A.  I don't really know about an A5 card.  My wife applied for

9   me.  It makes it easier for me to work in the United States.

10   Q.  You mean it makes it legal for you to work in the United

11   States, correct?

12   A.  It's easier to get around, take transportation to different

13   places with this card, with this status.

14   Q.  Because it has a picture of you on it and it is issued by

15   the United States government with your name?

16   A.  Yes.

17   Q.  And once that card expires, you are not good to go in the

18   United States anymore, correct?

19   A.  When it expired, I had to get it renewed.

20   Q.  Do you now have a valid A5 card?

21   A.  It has expired more than a month ago.  I have not renewed

22   it yet.

23   Q.  Aren't you required to have one in order to work legally?

24   A.  Every year when it expired, I can renew it at the law

25   office.

D4a6lin5                         Zhou - cross

```
 1   Q.   Now, you have an order from the United States government
 2   that orders you be removed from the United States, correct?
 3   A.   This was a long time ago.  I don't remember.
 4   Q.   Do you remember testifying two hours ago when the
 5   prosecutor was asking you questions and telling this jury that
 6   you had an A5 card, it expired a month ago and that you have no
 7   status in the United States and you have a removal order?  Do
 8   you remember telling this jury you have a removal order when
 9   the prosecutor asked you that question?
10   A.   You had asked me about that before.
11   Q.   The prosecutor asked you a couple hours ago whether you had
12   a removal order from United States and you said to the jury,
13   Yes, I do.  And he asked you if any promises had been made or
14   she had asked you if any promises had been made to you for your
15   return of your testimony today.  Now do you remember the
16   questions I am asking you about?
17             MS. BURNS:  Objection to form, your Honor.
18             THE COURT:  Overruled.  This is cross-examination.
19             MS. BURNS:  It is compound.  He also is testifying to
20   the witness's testimony.  We can have it read back what he
21   answered on direct.
22             MR. COHEN:  I am happy to have read back.
23             THE COURT:  He can ask questions his own way.  Thank
24   you.
25             This is a good time to take the midafternoon recess.
```

D4a6lin5                        Zhou - cross

1    We'll take a five-minute recess.

2              (Jury excused)

3              MR. SKINNER:  Your Honor, can I ask a quick question?

4    The next witness the government intends to call is one of the

5    witnesses that the Court signed an immunity order for.  He has

6    been here with his attorney all afternoon and before he

7    testifies we just need to handle the housekeeping matter of

8    having him invoke the Fifth Amendment so the order takes

9    effect.  When you come back and outside the presence of the

10   jury, can we have permission to call him for that purpose?

11             THE COURT:  Yes.  We'll take an even shorter recess

12   and try to expedite it.

13             MR. SKINNER:  Thank you, your Honor.

14             THE COURT:  Very well.

15             (Recess)

16

17

18

19

20

21

22

23

24

25

D4a6lin5                           Zhou - cross

1          (In the robing room)

2          MR. KRAKOW:  Good afternoon, your Honor.  I am Robert

3     Krakow and I represent Mr. Chen.

4          THE COURT:  Where are the questions?

5          MR. SKINNER:  They are written from my perspective,

6     your Honor.  Sorry.  They are not written from the Court's

7     perspective.  The last time I did this, I asked the questions.

8          THE COURT:  That is not the way it is usually done,

9     but that is all right.

10          Mr. Chen, have you been subpoenaed to testify in this

11     case today?

12          MS. BURNS:  Oh, we need an interpreter.

13          MR. COHEN:  For the record, I have told Mr. Skinner

14     that for sporadic marijuana use that is not contemporaneous

15     with events that is he going to testify about.  I have no

16     interest in asking him any questions about that at all.

17          THE COURT:  What are the questions for which this

18     witness seeks immunity, the issues?

19          MR. SKINNER:  Your Honor, prior to coming in today in

20     our meetings with Mr. Chen, he has advised us of his intention

21     to invoke the Fifth Amendment if questioned in connection with

22     his prior marijuana use and if questioned in connection with

23     the fact that he is in this country illegally.

24          Is that accurate, Mr. Krakow?

25          MR. KRAKOW:  That is correct.

D4a6lin5                    Zhou - cross

1              MR. SKINNER:  I have just been advised by defense

2      counsel that the marijuana is not an issue and he does not

3      intend to question him.

4              THE COURT:  Why don't you ask him the question he is

5      concerned about and he will tell me he will invoke privilege if

6      is he required to answer.

7              MR. SKINNER:  Very well.

8              Mr. Chen, have we met before?

9              MR. CHEN:  Yes.

10             MR. SKINNER:  Are you under subpoena it testify in

11     this case?

12             MR. CHEN:  Yes.

13             MR. SKINNER:  Have you told me that it is your

14     intention to invoke the Fifth Amendment.

15             THE COURT:  More important ask him the question and

16     let him invoke the privilege.

17             MR. SKINNER:  Very well.

18             Mr. Chen, are you here in the country illegally?

19             THE COURT:  Now you invoke your privilege.

20             MR. KRAKOW:  May I confer with Mr. Chen?

21             THE COURT:  Yes.

22             MR. KRAKOW:  Refuse to answer.

23             MR. CHEN:  I refuse to answer this question.

24             THE COURT:  Why?

25             MR. CHEN:  I refuse to make any statement that is

1    incriminating to me.

2              THE COURT:  You are invoking what we call your Fifth

3    Amendment privilege against self-incrimination, is that

4    correct?

5              MR. CHEN:  Yes.

6              THE COURT:  You will do that, do I understand, with

7    respect to any question about illegal activity?

8              MR. CHEN:  Illegal activities?

9              THE COURT:  But especially the likelihood is that you

10   will be asked whether you are in this country illegally and you

11   will invoke privilege, is that correct?

12             MR. CHEN:  Yes.

13             MR. COHEN:  Your Honor, respectfully I think it is

14   more than just the fact that he is here illegally.  His real

15   concern is probably all the false statements he has made to the

16   government in support of his asylum claims and things of those

17   natures.

18             THE COURT:  We understand that anything that has to do

19   with his presence in the United States he is going to invoke

20   privilege to.

21             Very well.  In view of the fact that he is invoking

22   privilege, my immunity order should be effectuated.

23             MR. SKINNER:  Thank you, your Honor.

24             THE COURT:  Very well.

25             Now, what is happening?  I don't understand what is

D4a6lin5                          Zhou - cross

 1   happening with the witness currently on the stand, but I think
 2   you better sort that out.  We will continue tomorrow morning.
 3            MR. COHEN:  Your Honor, noon tomorrow.
 4            THE COURT:  Yes.  I will tell the jury that.
 5            MR. COHEN:  Thank you.
 6            MR. SKINNER:  Yes, your Honor.  It is really not that
 7   complicated.
 8            MS. BURNS:  We can excuse Mr. Chen for this.
 9            MR. SKINNER:  We had a similar issue with Mr. Zhu when
10   we learned recently that he too had used marijuana in the past,
11   which would potentially expose him to criminal liability.  We
12   talked to Mr. Cohen last night about whether he was going to
13   cross-examine him on that.
14            THE COURT:  And he will not as I understood.
15            MR. SKINNER:  In the meantime we had him call and talk
16   to an attorney in case.  It came up and he needed
17   representation.  There really is not and issue with regard to
18   the cross because Mr. Cohen made the representation and that is
19   fine.  Nevertheless, Mr. Zhu did talk to the CJA lawyer on duty
20   to get advise with regard to his legal exposure so we need to
21   have a CJA lawyer appointed.
22            MS. BURNS:  It is real a formality.  At this point I
23   don't think the testimony is going to even --
24            THE COURT:  I am not going to have another lawyer
25   monitoring his answers.

1           MR. SKINNER:  Not for this witness.  It is for Mr. Zhu

2     who is on the stand right now.

3           THE COURT:  I am talking about Mr. Zhu who is in the

4     middle of his testimony.  This is a funny time to bring in a

5     lawyer for him.

6           MR. SKINNER:  We're not.  He talked to the lawyer this

7     morning.  It is purely for the formality of his getting CJA

8     appointment so he can be compensated for the half hour that he

9     talked to the witness this morning before he testified.

10          THE COURT:  All he has to do is submit to me a form

11    for compensation for that half hour and I will endorse it.

12          MR. SKINNER:  We will let him do that.  It is

13    confusing at this point.

14          THE COURT:  I just don't want him to think that he is

15    going to consult another lawyer on his testimony as we go

16    forward.

17          MR. COHEN:  When you say "him," the guy who is just

18    here?

19          THE COURT:  The witness whom you are cross-examining.

20          MS. BURNS:  With regard to the CJA panel, we wanted to

21    make sure we had done the proper paperwork to ensure he was

22    appointed and could be compensated.

23          THE COURT:  That is why you gave me the form.

24          MS. BURNS:  That is all that that was.  It is not to

25    interrupt the proceeding.  We tried not to interrupt the

D4a6lin5                        Zhou - cross

1    proceedings.  We tried to send them to magistrate court and

2    they told me, Judge Cedarbaum does these things first.

3              THE COURT:  They didn't understand what you were

4    talking about.  That's fine.  I have no trouble appointing him

5    on paper for the purpose only of that half hour.

6              MR. COHEN:  Judge, I have a quick application.

7              THE COURT:  Yes.

8              MR. COHEN:  Are you guys ordering the transcript?

9              MR. SKINNER:  Yes.

10             MR. COHEN:  My client is without further funds to pay

11   for a transcript.  I am retained in this case.

12             THE COURT:  You want funds.

13             MR. COHEN:  Minimally retained.

14             THE COURT:  You want me to appoint --

15             MR. COHEN:  Authorize the transcript?

16             THE COURT:  Right.

17             MR. COHEN:  I am not seeking appointment.  I just

18   would like if I could get copies at the same time that the

19   government does.

20             THE COURT:  Very well.  I will do that.

21             MR. COHEN:  I appreciate that.

22             THE COURT:  You will have to give me a paper to show

23   that.

24             MR. COHEN:  I will give you a CJA form.

25             THE COURT:  Just to authorization the cost of the

D4a6lin5                          Zhou - cross

 1   transcripts.

 2               MR. COHEN:  Can I fax it over to your Honor?

 3               THE COURT:  I don't know my fax number.  You will find

 4   out from my secretary.  You do need permission because we don't

 5   like to use the fax machine.  You can drop it off on your way

 6   to court.  I like to follow my rules as much as I can.

 7               MR. COHEN:  So do I.

 8               THE COURT:  Good.

 9               MR. SKINNER:  Are we going to continue with the

10   cross-examination?

11               THE COURT:  I think I am going to release the jury now

12   until tomorrow at noon.

13               MR. SKINNER:  Very well, your Honor, unless we're

14   really only five minutes.

15               MR. COHEN:  I have about 10 pages of cross-examination

16   and I am halfway through the second page.

17               THE COURT:  Try to avoid sarcasm.

18               MR. COHEN:  I have I guess --

19               THE COURT:  It is tempting.

20               MR. COHEN:  -- a lower frustration tolerance level

21   than I used to, but I will.

22               THE COURT:  You need to improve it.

23               MR. COHEN:  I will keep it in check, Judge.

24               THE COURT:  Good.  It is always good practice for

25   lawyers not to have emotional responses.

D4a6lin5                        Zhou — cross

1              MR. COHEN:  I absolutely agree.

2              THE COURT:  I will come in and tell the jury about

3    tomorrow.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4a6lin5                        Zhou - cross

```
 1              THE COURT:  Please be seated and let's get the jury.

 2              (In open court; jury present)

 3              THE COURT:  Please be seated.  Members of the jury,

 4    all of these people are standing in your honor.

 5              We're going to stop taking testimony now and tomorrow

 6    we are not going to convene until noon, 12:00.  Please have a

 7    very early brunch or whatever you want to call it before you

 8    come because we will start to take testimony at noon and we

 9    will probably stay later.  Be prepared if necessary to stay

10    until 6:00.  We will take a break.  It will not be continuous,

11    but you should not expect to have lunch during the taking of

12    testimony tomorrow.  It is just for tomorrow.  Then you

13    remember Friday you are off.  So Friday you can do anything

14    else you are interested in, but tomorrow we will convene at

15    noon and be prepared to go through to 6:00 with regular

16    recesses and we'll hear the remainder of this witness's

17    testimony tomorrow.

18              So have a pleasant evening and as you hear more and

19    more, do not be tempted to discuss it either among yourselves

20    or with anybody else because evidence comes in piece by piece

21    and bit by bit and you have to wait until you have heard it all

22    to begin to form opinions.  Have a pleasant evening and

23    morning.

24              (Jury excused)

25              (Continued on next page)
```

D4a6lin5                          Zhou - cross

1              (In open court; jury not present)

2              MR. COHEN:  Your Honor, I have the CJA form.  Should I

3    give it to the reporter or to your Honor directly?

4              THE COURT:  Let me take a look.  The reporter will

5    want to know that I have authorized it.

6              MR. COHEN:  Thank you very much, Judge.

7              THE COURT:  We'll be in recess until noon tomorrow.

8    You are all excused.

9              (Adjourned to April 11, 2013 at 12:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                          Page
 3   JOHN FILSHIE
 4   Direct By Mr. Skinner . . . . . . . . . . .39
 5   Cross By Mr. Cohen . . . . . . . . . . . . .64
 6   GEORGE BENEDETTO
 7   Direct By Mr. Skinner . . . . . . . . . . .66
 8   Cross By Mr. Cohen . . . . . . . . . . . . .75
 9   GUANG YUN ZHU
10   Direct By Ms. Burns . . . . . . . . . . . .90
11   ANDREW CLARK
12   Direct By Mr. Skinner . . . . . . . . . . 118
13   GUANG YUN ZHOU
14   Cross By Mr. Cohen . . . . . . . . . . . . 123
15                   GOVERNMENT EXHIBITS
16   Exhibit No.                          Received
17    200 A and 200 B  . . . . . . . . . . . . .42
18    3A, 3B, 3C, 3D, 3E, 3F . . . . . . . . . .53
19    4A    . . . . . . . . . . . . . . . . . .56
20    4A, 4B . . . . . . . . . . . . . . . . . .58
21    50    . . . . . . . . . . . . . . . . . 122
22
23
24
25
```