D4B6LIN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                         11 CR 114 (MGC)

5   XING LIN,

6              Defendant.                 JURY TRIAL

7   ------------------------------x

8                                         New York, N.Y.
                                          April 11, 2013
9                                         12:15 p.m.

10

    Before:
11
                    HON. MIRIAM GOLDMAN CEDARBAUM,
12
                                            District Judge
13

14                         APPEARANCES

15

    PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17  PETER M. SKINNER
    JENNIFER E. BURNS
18       Assistant United States Attorneys

19  JOEL S. COHEN
         Attorney for Defendant
20

    ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
21                  DANIEL YANG, Fuchow Interpreter
                    LILY LAU, Fuchow Interpreter
22                  DANIEL CHAN, Fuchow Interpreter
                    JESSICA CHACE, Paralegal
23                  TIMOTHY VARIAN, Special Agent, HSI
                    JIAYING WANG, Legal Assistant
24

25

D4B6LIN1

1         (Trial resumed)

2         (In open court; jury not present)

3         THE COURT:  Is everybody now ready for the jury?

4         MR. SKINNER:  Yes, your Honor.  Thank you.

5         THE COURT:  Good.

6         (Jury present)

7         THE COURT:  Please be seated.

8         Good morning, members of the jury.  I appreciate your

9  conscientious treatment of time and we will proceed with two

10 witnesses who are going to be heard before the

11 cross-examination of the witness you heard last yesterday.

12        You may proceed, Ms. Burns.

13        MS. BURNS:  Thank you, your Honor.  The government

14 calls Vincent Tranchida.

15        THE DEPUTY CLERK:  Please raise your right hand.

16  VINCENT TRANCHIDA,

17      called as a witness by the Government,

18      having been duly sworn, testified as follows:

19 DIRECT EXAMINATION

20 BY MS. BURNS:

21 Q.  Dr. Tranchida, where do you work?

22 A.  I am currently employed as a the chief medical examiner of

23 Dane County, Wisconsin.

24 Q.  How long have you worked as chief at Dane County?

25 A.  I have been appointed the chief medical examiner of Dane

D4B6LIN1                    Tranchida – direct

1   County since January 1st of 2011.

2   Q.  What are your current duties and responsibilities?

3   A.  As the chief medical examiner I have administrative duties

4   as well as I perform the typical duties of a medical examiner.

5   That is, I investigate the cause and manner of death in cases

6   where there is a threat to public safety, whether it is

7   criminal activities, civil suits or a threat to public safety

8   from communicable decease.

9   Q.  What was your last position prior to Dane County?

10  A.  Prior to coming to Dane County, I was a senior medical

11  examiner with the Office of Chief Medical Examiner of New York.

12  Q.  How long were you there?

13  A.  I was employed there since June 1st of 2003.

14  Q.  Were your duties there similar or different than what you

15  do now?

16  A.  Similar.  I have fewer administrative duties, but

17  essentially I perform investigations into the cause and manner

18  of death.

19  Q.  Can you describe your education background for us?

20  A.  Of course.  I did my premedical school training and

21  undergraduate at the University of Michigan in Ann Arbor,

22  Michigan.  I did my medical school training at Wayne State

23  University in Detroit, Michigan.  I did combined anatomic and

24  clinical pathology residency at the University of Michigan

25  Medical Center.  I then decided to specialize in forensic

D4B6LIN1                    Tranchida - direct

 1   pathology at the Office of the Chief Medical Examiner of the

 2   City of New York.  While there I further subspecialized

 3   forensic and cardiac pathology and forensic neuropathology.

 4   Q.  Doctor, What is pathology?

 5   A.  Pathology is the subspecialty of medicine like pediatrics

 6   or radiology.  It comes from two latin words, pathos and logos.

 7            THE COURT:  It is actually Greek.

 8            THE WITNESS:  Very good.

 9   A.  Pathos means pain and suffering and logos means knowledge

10   or study.  So literally it means the knowledge or study of

11   suffering.  It is a subspecialty of medicine that focuses on

12   the diagnosis and interpretation of injuries and illnesses.

13   Q.  What then is forensic pathology?

14   A.  Forensic pathology comes from the forensis, which means of

15   the public.  It applies to diseases, injuries and illnesses

16   that affect the public at large.

17   Q.  What is an autopsy?

18   A.  An autopsy comes from two words as well.  Auto and opsy.

19   Auto means for oneself and opsy means to see.  It is an

20   examination of decedent both externally and internally to

21   determine what injuries and illnesses are present, whether they

22   are consistent with the clinical history that we have, and

23   whether there is any information that can be learned that may

24   help in the prosecution and investigation of these cases.

25   Q.  Approximately how many autopsies have you performed?

D4B6LIN1                        Tranchida - direct

1  A.  At this point several thousand.

2  Q.  Have you testified previously in court regarding these

3  autopsies?

4  A.  Yes, I have.

5  Q.  Have you testified previously as an expert witness?

6  A.  Yes, I have.

7  Q.  How many times have you testified as an expert witness?

8  A.  At this point well over 100.

9  Q.  In what courts have you testified as an expert witness?

10  A.  I testified predominately in New York, in Manhattan, in

11  Brooklyn, in Queens.  I have also testified several times in

12  Wisconsin as well.

13         MS. BURNS:  Your Honor, the government offers

14  Dr. Tranchida in the field of forensic pathology.

15         THE COURT:  We don't do that.  You may proceed.

16  Q.  Dr. Tranchida, can you describe in more detail the steps

17  that you follow when you perform an autopsy?

18  A.  Of course.  All throughout the night our office

19  investigators receive information about cases.  They are called

20  in by detectives, by emergency room staff.  Our investigators

21  collect information and throughout the night they generate

22  files for the cases.  The following morning the medical

23  examiners on duty review these files, divide up the work

24  equally and we determine which preliminary testing needs to be

25  done.  In other words, before the autopsy has even begun we can

D4B6LIN1                    Tranchida – direct

1   begin to order testing, such as X rays, toxicology, etc.  Once

2   these tests are done, we then go in and do our external

3   examination of the body.  We're examining the body as is as it

4   is received looking for things like trace evidence, documenting

5   any external injuries, documenting the presence of any

6   identifying features such as scars or tattoos.  We also collect

7   trace evidence at the time and we'll begin to collect the

8   toxicology evidence at this time as well.

9   Q.  Do you conduct any other type of examination?

10  A.  We do.  After this is done we then proceed to the internal

11  portion of the examination, which is what most people think

12  about when they think of an autopsy.  It is the surgical

13  examination of the interior aspect of the body to look for

14  injuries or deceases.

15  Q.  Doctor, directing your attention now to July 31st, 2004.

16  Did you perform an autopsy on that day?

17  A.  Yes, I did.

18  Q.  Did you prepare any reports in connection with that

19  autopsy?

20  A.  Yes, I did.

21  Q.  What did you prepare?

22  A.  I prepared an autopsy report, which is a standard report

23  that is generated at the completion of every autopsy that we

24  perform at the Office of Chief Medical Examiner.

25  Q.  What is the purpose of preparing such a report?

D4B6LIN1                        Tranchida – direct

1    A.  The purpose of these reports is so that we have a written

2    observation of what was seen at the time of the autopsy.  In

3    other words, we have written testimony so that if the medical

4    examiner who performed the case should happen to get sick,

5    become incapacitated, pass away there is still a written

6    documentation of what was observed, the testimony of what was

7    seen at the time the autopsy.

8    Q.  Is the report prepared at or near the time that you perform

9    the autopsy?

10   A.  It is.

11        MS. BURNS:  May I approach, your Honor?

12   Q.  Doctor, I just handed you what is marked as Government

13   Exhibit 12 for identification.  Do you recognize it?

14   A.  I do.

15   Q.  What is it?

16   A.  This is a copy of the file that was generated on the case

17   of Mei Ying Li.

18   Q.  Did you prepare that?

19   A.  Yes, I did.  Portions of it.

20   Q.  Does it contain your signature?

21   A.  It does.  On page 5 of the autopsy report.

22   Q.  Does Government Exhibit 12 reflect a true and correct copy

23   of your autopsy report?

24   A.  Yes, it does.

25        MS. BURNS:  Government offers Government Exhibit 12.

D4B6LIN1                        Tranchida - direct

1          MR. COHEN:  No objection.

2          THE COURT:  Very well.  Government Exhibit 12 is

3    received in evidence.

4          (Government's Exhibit 12 received in evidence)

5    BY MS. BURNS:

6    Q.  Dr. Tranchida, can you remind us who this report indicates

7    the autopsy was performed on?

8    A.  This autopsy was performed on decedent Mei Ying Li.

9    Q.  What were your significant findings in this autopsy?

10   A.  Significantly the most prominent finding that I found of

11   this autopsy was a penetrating gunshot wound of the head.

12   Q.  What do you mean by "penetrating gunshot wound"?

13   A.  When we describe gunshot wounds, we describe them either as

14   penetrating or perforating.  When the projectile goes into the

15   body and stays in the body, we describe that as penetrating.

16   When the projectile goes through the body, through an arm in

17   and out, we describe that as perforating.

18   Q.  Where did this injury occur specifically on the head?

19   A.  Specifically Ms. Li had a penetrating gunshot wound that

20   had struck the front of her head right near the right side of

21   her frontal bone of the skull.

22   Q.  What injuries were caused by this gunshot?

23   A.  They were quite devastating injuries of the head.  She had

24   fragmentation or breakage of the frontal bone of the skull, the

25   parietal bones, which are the bones at the side of the skull,

D4B6LIN1                    Tranchida - direct

1    and the anterior aspect the base of skull were broken as a

2    result of this gunshot.  In addition, a portion of the bullet

3    penetrated into the brain going through the right frontal lobe

4    into the left frontal lobe and lodging in the back of the left

5    side of the brain.

6    Q.  Did you recover that bullet from her brain?

7    A.  Yes, I did.

8    Q.  What did you do with it?

9    A.  The bullet was examined, a mark was placed on the base of

10   the bullet to identify it and it was submitted as ballistics

11   evidence.

12   Q.  From your examination can you determine the direction from

13   which the bullet was fired?

14   A.  I can determine the direction that the bullet traveled

15   through the body.

16   Q.  What was that?

17   A.  The bullet traveled from front to back, right to left, and

18   slightly downwards.

19   Q.  From your examination can you determine from how far away

20   the gun would have discharged that bullet?

21   A.  I can say that the gunshot wound appeared consistent with

22   having been fired from more than 3 feet away.

23   Q.  Why is 3 feet the benchmark?

24   A.  3 feet is a loose benchmark.  From a distance of less than

25   3 feet, we may have other features besides bullets deposited on

D4B6LIN1                          Tranchida - direct

1   the skin surface.  In addition to the bullet being fired out of

2   the muzzle of a gun, you also have very hot gas which can seer

3   the skin and then you have burnt and unburnt gunpowder.  Burnt

4   gunpowder is sometimes called fouling and it will look like

5   black ash being deposited on the skin surface.  Unburnt

6   gunpowder are small hot pellets of gunpowder that are fired out

7   and these can cause little pinprick like abrasions on the skin

8   surface as well.

9            When the gun is fired, the bullet will come out, this

10  hot gas will come out, the burnt gunpowder will come out and

11  the unburnt gunpowder will come out.  Passed the distance of

12  about 3 feet, the only thing that strikes the decedent is the

13  bullet.  Less than 3 feet you will see this burnt gun powder,

14  this unburnt un power and sometimes even seeing on the skin

15  surface.

16  Q.  Doctor, in your field what does cause of death mean?

17  A.  The cause of death is the mechanism by which a person dies.

18  Q.  Based on your autopsy findings, do you have an opinion to a

19  reasonable degree of medical certainty as to the cause of death

20  of Mei Ying Li?

21  A.  Yes, I do.

22  Q.  What is it?

23  A.  To a reasonable degree medical certainty, I believe that

24  the cause of death for Mei Ying Li is a penetrating gunshot

25  wound of head with skull fractures and brain injuries.

D4B6LIN1                         Tranchida - direct

1    Q.   In your field what does manner of death mean?

2    A.   Manner of death is the category under which the cause

3    falls.  For example, a gunshot wound to the head can be

4    homicidal, can be suicidal, can be accidental, and the matter

5    tells you which category this falls into.  In this case, this

6    was considered a homicidal manner of death.

7    Q.   What does that mean?

8    A.   This was death at the hands of another person.

9              MS. BURNS:  No further questions.

10             MR. COHEN:  Your Honor, I have no questions I don't

11   think, but I would like to approach for a moment before the

12   witness leaves the stand.

13             THE COURT:  Very well.

14             MR. COHEN:  Thank you.

15             THE COURT:  You should ask how he diagnoses

16   accidental.

17             MS. BURNS:  Okay.

18             MR. COHEN:  Judge, I just took another quick look at

19   the autopsy report and as I indicated I have no objection to it

20   being introduced, but there are portions of it that contain

21   hearsay.

22             THE COURT:  Those should be excised.

23             MR. COHEN:  Yeah.

24             MS. BURNS:  We have no objection.  Mr. Cohen can

25   advise us and we can discuss and prepare something before it

D4B6LIN1                       Tranchida - direct

1   goes to the jury.

2              THE COURT:  Very well.

3              MR. SKINNER:  We're not going to show it to the jury

4   right now.

5              MR. COHEN:  Fine.

6              THE COURT:  Fine.

7   BY MS. BURNS:

8   Q.  Dr. Tranchida, returning to the manner of death.  How do

9   you distinguish between accidental or homicidal when it comes

10  to a gunshot wound?

11  A.  When it comes to a gunshot wound, there are features of a

12  gunshot wound which can give you an indication as to whether

13  this could have been an accidental gunshot wound or intentional

14  gunshot wound.  Well, let me remedy that.  We don't say.

15             THE COURT:  You cannot tell that.

16             THE WITNESS:  Exactly.  Intent is beyond our scope.

17  To be maybe more clear, whether this is an accidental death, at

18  the hands of one's self versus a homicidal death, at the hands

19  of another.

20             THE COURT:  That is what suicidal means, doesn't it?

21             THE WITNESS:  Suicidal implies intent.  Suicide we do

22  have to read intent.  The burden of proof is on us to determine

23  whether there is suicidal idolization, whether there is a

24  suicidal history or other suicidal clues present.  The burden

25  of proof is quite heavy for a suicidal determination of manner.

D4B6LIN1                        Tranchida - direct

1            For an accidental manner with a gunshot, you want to

2       think of cases, for example, where somebody is cleaning a gun

3       and the gun goes off and it ends their own life.

4            THE COURT:  You can't tell that from looking at the

5       wound?

6            THE WITNESS:  Very often we can.

7            THE COURT:  Sometimes but not always.

8            THE WITNESS:  Not always, but that is why we do the

9       autopsy to try to make that determination.

10           THE COURT:  I thought the autopsy is to determine

11      whether the death was caused by the wound.

12           THE WITNESS:  Not only.  That is why we determine the

13      cause.  The manner becomes just as equally important.

14           THE COURT:  I understand, but it is much more

15      difficult to tell.

16           THE WITNESS:  Of course.

17           THE COURT:  To the extent that it contains any finding

18      with respect to intention it cannot.

19           THE WITNESS:  A suicide does.  A suicide, for example,

20      we will often find evidence of multiple modalities.  For

21      example, some people take a number of medications as well.  In

22      addition to the --

23           THE COURT:  Yes.  I was speaking only of gunshot

24      wounds.

25           THE WITNESS:  Even with a gunshot wounds, sometimes we

D4B6LIN1                      Tranchida - direct

1    will see incise wounds of the wrist.  Sometimes--

2              THE COURT:  That's not the gunshot wound.

3              THE WITNESS:  Other features of gunshot wounds, which

4    may clear the confusion, there are certain locations that are

5    very characteristic for gunshot wounds.  Underneath the chin,

6    intraoral, at the temple.  The location can become very

7    important.  Just as important and critically so is the range at

8    which the gun is fired.  If somebody is self-shooting

9    themselves by necessity, this implies a range of less than

10   3 feet because you are shooting yourself with your own hand.

11             THE COURT:  We're talking about how you can tell that

12   it is accidental.

13             THE WITNESS:  Exactly.  In this case if we have a

14   gunshot wound of further than 3 feet away, we know that this

15   hasn't been done by oneself to oneself.  This has been done at

16   the hands of somebody else.  This is a long distance gunshot

17   wound.  This was death at the hands of another person and

18   therefore by our medical definition this is a homicide.  By

19   criminal definition, we cannot imply intent.

20             THE COURT:  That's correct.

21             THE WITNESS:  That is the distinction.

22             THE COURT:  Right.  Your views of homicidal has

23   nothing to do with the criminal aspect?

24             THE WITNESS:  Absolutely.  I think we're in full

25   agreement.

1          MS. BURNS:  No further questions.

2          THE WITNESS:  Thank you.

3          THE COURT:  Mr. Cohen, you may cross-examine.

4          MR. COHEN:  I have no questions, your Honor.

5          THE COURT:  Very well.  Thank you.  You may step down.

6          THE WITNESS:  Thank you very much.  It has been a

7    pleasure.

8          (Witness excused)

9          MR. SKINNER:  Your Honor, the government calls

10   Dr. Henry Nields.

11         THE COURT:  Very well.

12         THE DEPUTY CLERK:  Step up.  Raise your right hand.

13    HENRY NIELDS,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. SKINNER:

18   Q.  Good afternoon, Dr. Nields.

19   A.  Good afternoon.

20   Q.  Dr. Nields, where do you work?

21   A.  I work at the medical examiner's office in Massachusetts.

22   Q.  What is your position at that medical examiner's office?

23   A.  I am currently chief medical examiner.

24   Q.  Generally speaking what are your duties and

25   responsibilities there?

D4B6LIN1                    Nields - direct

1  A.  Well, my responsibilities as medical examiner is to, among

2  other things, perform autopsies to determine cause and manner

3  of death and sudden violent or unexpected deaths and then I

4  have additional administrative responsibilities to oversee the

5  main office in Boston and satellite offices in Worcester and on

6  the Cape.

7  Q.  How long have you worked for chief medical examiner's

8  office in Massachusetts?

9  A.  I began working at the medical examiner's office in

10  Massachusetts in 1995.  I worked there from 1995 until 1998.

11  And then I worked as a medical examiner in New York City from

12  1998 to 2006.  And then as a medical examiner back in

13  Massachusetts since July of 2006.

14  Q.  For how long have you been the chief medical examiner?

15  A.  My official appointment was in October of 2009.  I was

16  acting chief for a couple years before that.

17  Q.  What was your position when you were with the medical

18  examiner's office in New York City?

19  A.  City medical examiner.

20  Q.  Were your duties any different when you were in New York

21  City than they are in Massachusetts?

22  A.  No.  Other than I did not have the administrative

23  responsibilities that I have now.

24  Q.  Dr. Nields can you describe for us our educational

25  background?

D4B6LIN1                    Nields - direct

1    A.  I went to medical school at Boston University School of

2    Medicine.  I did residence training and general pathology at

3    Beth Israel Hospital in Boston and Boston University Medical

4    Center and I did the specialty fellowship training in forensic

5    pathology at the office of the chief medical examiner also in

6    Boston.

7    Q.  And, Dr. Nields, did you perform autopsies during your

8    career?

9    A.  Yes.

10   Q.  Roughly how many autopsies have you performed?

11   A.  Approximately 4300.

12   Q.  You have testified in court previously?

13   A.  Yes.

14   Q.  As an expert?

15   A.  Yes.

16   Q.  How many times have you testified as an expert?

17   A.  Approximately 50 times in New York City and 30 to 40 times

18   in Massachusetts.

19   Q.  Let me direct your attention back to July of 2004.  You

20   were working at that time for the office of the chief medical

21   examine in New York city?

22   A.  Yes.

23   Q.  July 30th of 2004, did you perform an autopsy on a man

24   identified as Jian King Zhou?

25   A.  Yes.

D4B6LIN1                          Nields - direct

1   Q.  Let me ask you to turn to a document that should be in

2   front of you that is marked as Government Exhibit 14.

3          Do you recognize that?

4   A.  Yes.

5   Q.  What is it?

6   A.  Excuse me.  This is a copy of the file from this case.

7   Q.  What is contained in the file?

8   A.  It has my autopsy report, diagrams that I created as part

9   of the autopsy.  It has a neuropathology report.  It has a

10  statement of identification.  It has a medical legal

11  investigator's report and I believe it has a toxicology.

12  Q.  Did you prepare the autopsy report?

13  A.  I prepared my autopsy report.

14  Q.  Is that what is on top?

15  A.  Yes.

16  Q.  Was your autopsy report based on your observations as well

17  as the information contained in some of the other reports that

18  are in that file?

19  A.  Yes.

20  Q.  Did you prepare the autopsy report around the same time

21  that you prepared the autopsy on Mr. Zhou?

22  A.  Yes.

23  Q.  When you performed the autopsy, do you take contemporaneous

24  notes?

25  A.  Yes.

D4B6LIN1                    Nields – direct

1   Q.  Did you use those notes in preparing your report?

2   A.  Yes.

3           MR. SKINNER:  The government offers Government Exhibit

4   14.

5           THE COURT:  What is attached to it has supplemental

6   case information that is not based on the findings of this man.

7           MR. SKINNER:  We can offer just the autopsy report.

8   That is the first eight pages.

9           THE COURT:  That's is what you do, is that right?

10          THE WITNESS:  Yes.

11          THE COURT:  This reflects what you do?

12          THE WITNESS:  Yes.

13          THE COURT:  The first eight pages?

14          THE WITNESS:  Yes.

15  BY MR. SKINNER:

16  Q.  Just to be clear, you prepared the first age pages of this

17  exhibit?

18  A.  Yes.  There are some notes as well that relate to those

19  first eight pages.

20  Q.  If we skip the ninth and tenth pages, that would be the

21  pages --

22          THE COURT:  The casework sheet?

23          THE WITNESS:  Casework sheet, autopsy notes.

24          MR. SKINNER:  Your Honor, we can modify the exhibit.

25          THE COURT:  Fine.  Just to limit to what Dr. Nields

1   observed.

2             MR. SKINNER:  To be clear for the record what we are

3   offering is the autopsy report prepared by Dr. Nields and

4   signed by Dr. Nields as well as the contemporaneous notes that

5   were prepared by Dr. Nields that follow the --

6             THE COURT:  Right.  As long as they reflect only what

7   you observed.

8             MR. COHEN:  Your Honor, I don't have any objection.  I

9   would however like to exclude page 10, which is the forensic

10  toxicology laboratory report.  I have some questions for

11  Dr. Nields about the findings.

12            THE COURT:  Just a moment.

13            MR. COHEN:  I don't know that it is number ten, but it

14  is the 10th page sequentially.

15            THE COURT:  You are talking about toxicology?

16            MR. COHEN:  Yes, ma'am.  The page at the top is

17  forensic toxicology laboratory.

18            THE COURT:  That didn't come from Dr. Nields.

19            MR. COHEN:  No.  But I think to the extent that he has

20  been qualified or is an expert and has indicated that

21  toxicology reports should be done in the course of performing

22  autopsy that there is information in here that is relevant and

23  I would like to ask him about it.  If he is unable to answer

24  the question, then they will not be answered, but I think he

25  probably can.

D4B6LIN1                          Nields - direct

1          THE COURT:  Dr. Nields, you are going to be asked to

2     comment on what some of these entries.

3          I take it that is what you are talking about?

4          MR. COHEN:  Yes.

5          THE COURT:  That he is qualified to interpret or

6     translate --

7          MR. COHEN:  Yes.

8          THE COURT:  -- some of these entries?

9          MR. COHEN:  Yes.

10          THE COURT:  You may ask him that.

11          MR. COHEN:  Thank you.

12          THE COURT:  Very well.

13          Government Exhibit 14 is received in evidence as we

14     discussed.

15          (Government's Exhibit 14 received in evidence)

16          MR. SKINNER:  What I will suggest and what we will do

17     is mark the toxicology reports 14 A and we offered 14 A I take

18     it without objection.

19          MR. COHEN:  Without objection, your Honor.

20          THE COURT:  Very well.

21     BY MR. SKINNER:

22     Q.  Dr. Nields, let me just ask you generally speaking what

23     were your significant findings as a result of the autopsy you

24     performed on Mr. Zhou?

25     A.  He was a young man, approximately five-foot, seven inches

1    tall, approximately 143 pounds.  He had multiple gunshot wounds

2    to his body.  With regard to one gunshot wound, the bullet

3    entered the right side.

4    Q.  Let me interrupt you for one moment, Dr. Nields.

5         How many gunshot wounds were there in total?

6    A.  There were six total gunshot wounds.  Some of them may have

7    been, and we can talk about later, reentry wounds.

8    Q.  We'll talk to them in detail.

9    A.  There were six total.

10   Q.  Why don't you now describe for us in general terms, using

11   lay term as much as possible, each of those gunshot wounds,

12   where it was and what your findings were as a result of those?

13   A.  Yes.  One bullet entered the right side of his chest.  It

14   perforated through the anterior part of his right fourth rib

15   then perforated through his right lung and perforated through

16   the lower edge of the posterior aspects of his right fifth rib

17   and lodged into the soft tissue of the right side of the back.

18        One bullet entered the left side of his abdomen,

19   perforated through five loops or segments of small intestine,

20   perforated through the right side, right lobe of his liver and

21   exited his right lower back.

22        One bullet entered the lower lateral left side of his

23   chess in the flank area, perforated through the left seventh

24   and intercostal space, which is a space between the seventh and

25   eighth ribs.  It then perforated through the lower portion of

D4B6LIN1                          Nields - direct

the left chest cavity perforating through the left side of the

diaphram, which is a layer of muscle that separates the chest

cavity from the abdominal cavity.  It then perforated through

the stomach, the left lobe of his liver through the -- it

perforated through the diaphram to the posterior aspect of his

heart, through the superior venacava, which is a big vein that

brings blood back to the heart from the upper part of the body.

It then perforated through the upper part of his right lung and

then exited the chest cavity through the second intercostal

space, the space between the second and third ribs on the right

and then exited the back of his right shoulder.

        One bullet entered the left side of his back,

perforated through the posterior part of his left sixth, fifth,

fourth, and third ribs and then penetrated to the lateral

aspect of the second vertebral body, second thoracic vertebral

body, the part of the thoracic spinal column and so doing

injury to the spinal cord, thoracic spinal cord.

        There was one bullet that entered the back of his left

hand, perforated through the skin and soft tissue of the hand

and exited the right hand or wrist on the side where the thumb

is.

        And then another gunshot wound entered the back of his

right forearm and then exited also the back of his right

forearm again on the side where the thumb is located.

Q.  Is that all of them?

D4B6LIN1                         Nields - direct

1   A.  Those are all the gunshot wounds.

2   Q.  But to summarize for us, how many times was Mr. Zhou struck

3   in the torso with a gunshot, with a bullet?

4   A.  He was struck four times in the torso.

5   Q.  How many times was he struck in the hand or the arm?

6   A.  Once in the left and once on the right.

7   Q.  Dr. Nields, could you tell from your examination of the

8   wounds on the torso whether the bullets had entered the front

9   of his body or the back of his body?

10  A.  Yes.  He had two bullets that entered the front his body,

11  one entered the side, and the other, the fourth one or the

12  other one, entered the back.

13  Q.  And can you just indicate generally speaking the two

14  bullets that entered the front where on the front of the body

15  they hit him?

16  A.  Approximately this location here.

17  Q.  On the chest?

18  A.  On the chest, right side of the chest.  And here, the left

19  side of the abdomen.

20  Q.  The one that hit him on side of the body, where did that

21  one enter?

22  A.  This location here.

23  Q.  The one that struck him in the back, it is hard to point to

24  your own back, but where on the back?

25  A.  The left side of the back.

D4B6LIN1                    Nields - direct

1    Q.  Upper back or lower back?

2    A.  Well, sort of I guess more upper than lower, but not really

3    upper.

4    Q.  Turning to the wounds to his arms and his hands, based on

5    your examination of those wounds, do you have an opinion to a

6    reasonable degree of medical certainty as to where Mr. Zhou's

7    arms may have been positioned at the time those wounds were

8    caused?

9    A.  I believe the most consistent with his arms being held

10   across one another.  His left arm forwards of the right and

11   forwards of the right forearm and at the approximate level of

12   the chest.

13   Q.  Dr. Nields, are you familiar with the term stippling?

14   A.  Yes.

15   Q.  Can you tell us what stippling means?

16   A.  Stippling is pinpoint abrasions that are caused by the

17   impact of gunpowder particles against the surface of the skin,

18   gunpowder particles coming out of muzzle of a gun when it is

19   fired.

20   Q.  Did you observe any stippling on Mr. Zhou?

21   A.  Yes.

22   Q.  Where did you observe the stippling on Mr. Zhou?

23   A.  I observed stippling to some degree around all of the

24   entrance wounds.  There was more on some than on others, but it

25   was present on all of the entrance wounds.

D4B6LIN1                         Nields - direct

1   Q.  What conclusions can you conclude, if any, from the

2   stippling that you observed?

3   A.  I can draw a general conclusion that they were relatively

4   close range.  We refer to gunshot wounds that have stippling as

5   intermediate range gunshot wounds.  In general with most

6   handgun ammunition, you see stippling out to about 18 inches.

7   There are many types of handguns and many different handgun

8   ammunition so it certainly is not a hard and fast number, but

9   it is relatively -- it is within that foot and a half, 2 feet.

10  Roughly that distance.

11  Q.  Just to be clear that suggests that the gun was fired about

12  a foot and a half to 2 feet away from the person who was hit?

13  A.  The muzzle of the gun was approximately that distance.

14  Q.  Now, Dr. Nields, there is a toxicology report that is

15  contained within the files, is that correct?

16  A.  Yes.

17  Q.  And I will refer to it as Government Exhibit 14 A, because

18  that is what we'll call it once we get the exhibits.

19          For the time being, can you turn to the toxicology

20  report?

21  A.  Yes.

22  Q.  Did you prepare this report?

23  A.  No.  I collected the samples that were tested, but I did

24  not do the testing myself.

25  Q.  Are you familiar with toxicology reports?

D4B6LIN1                          Nields - direct

1   A.   Yes.

2   Q.   What are toxicology reports?

3   A.   In this case they are used to measure levels of medications

4   and different drugs that may be present in the system at the

5   time of death.

6   Q.   Based on your review of this report, can you determine

7   whether a toxicology analysis was performed?

8           THE COURT:   I didn't hear you either.

9           MR. COHEN:   My fault, Judge, I was coughing.

10  Q.   Did you take specimens from Mr. Zhou during the autopsy and

11  send them for analysis for toxicology purposes?

12  A.   Yes.

13  Q.   Is this a report, an analysis of what was found as a result

14  of that toxicology?

15  A.   Yes.

16  Q.   And based on your review of the report, is there anything

17  significant contained in that report?

18  A.   Well, he had ethanal in his blood and he had a detectable

19  level but immeasurable level of ketamine in his blood.

20  Q.   What is the significance of the presence of ethanal in the

21  blood?

22  A.   It suggests that he was drinking alcohol --

23  Q.   What was the amount --

24  A.   -- at some point.

25  Q.   -- of ethanal found in his blood?

D4B6LIN1                              Nields - direct

1    A.  .09 grams percent.

2    Q.  Is that what sometimes is referred to in lay speak as

3    somebody's blood alcohol level?

4    A.  Yes.

5    Q.  Do you know based upon your work in Massachusetts what for

6    driving purposes the legal limit for drug alcohol level is?

7    A.  I believe it is .08 percent.

8    Q.  And is was .09?

9    A.  Yes.

10   Q.  You said that ketamine was detected, but not in a

11   significant amount; is that correct?

12   A.  They were not able to quantitate it.

13   Q.  Do you know what ketamine is?

14   A.  It is a -- it was developed as a preanesthetic and has been

15   in some areas become a drug of abuse.

16           MR. COHEN:  I am sorry?

17           THE WITNESS:  I drug of abuse.

18           MR. COHEN:  Thank you.

19           THE COURT:  Ketamine and norketamine are roughly the

20   same?

21           THE WITNESS:  Norketamine is a break down product.

22           THE COURT:  Which comes from ketimine?

23           THE WITNESS:  Yes.

24   BY MR. SKINNER:

25   Q.  Again, the toxicology lab report indicates that norketamine

D4B6LIN1                           Nields - direct

1    was detected ketimine --

2    A.  I am sorry?

3    Q.  Did the lab report, toxicology lab report indicate

4    norketamine in addition to ketimine was detected?

5    A.  Yes.  In the urine sample.

6    Q.  Again, just as detected.  Was any specific amount found?

7    A.  No.

8    Q.  Dr. Nields, do you have an opinion to a reasonable degree

9    of medical certainty as to the cause of death of Chan Qin Zhou?

10   A.  Yes.

11   Q.  What is that opinion?

12   A.  A gunshot wounds to his torso.

13   Q.  Do you have an opinion to a reasonable degree of medical

14   certainty as to the manner of death of Chan Qin Zhou?

15   A.  Yes.

16   Q.  What is that opinion?

17   A.  Homicide.

18   Q.  When you say homicide, is that the medical definition or

19   the legal definition?

20   A.  Well, it is the medical examiner definition, death at the

21   hands of another.

22   Q.  Just to be clear what is the medical examiner's definition

23   of homicide?

24   A.  It is essentially death at the hands of another.

25   Q.  As opposed to death at the hands of someone else?

D4B6LIN1                          Nields - direct

1    A.  Right.

2              MR. SKINNER:  We have no further questions of

3    Dr. Nields.

4              THE COURT:  You will doctor these exhibits?

5              MR. SKINNER:  Yes, your Honor.  I will consult with

6    defense counsel after we're finished.

7              THE COURT:  Government Exhibit 14 and 14 A are

8    received in evidence without objection.

9              (Government's Exhibits 14 and 14 A received in

10   evidence)

11   BY MR. COHEN:

12   Q.  Good afternoon, Dr. Nields.

13   A.  Good afternoon.

14   Q.  I think that either you or Dr. Tranchida before you

15   testified that part of performing an autopsy is to do an

16   external examination of the body; correct?

17   A.  Yes.

18   Q.  And in the course of performing the autopsy that you

19   performed here, did you do such an examination?

20   A.  Yes.

21   Q.  In doing that examination, did you make note in your notes

22   and ultimately in your report of the presence of any tattoos

23   that the deceased had?

24   A.  I am sorry.  Yes.

25   Q.  And can you tell the members of the jury whether or not he

D4B6LIN1                         Nields - direct

1   had any tattoos?

2   A.   Yes, he did.

3   Q.   How many?

4   A.   I counted two.

5   Q.   Can you describe the tattoos that he had?

6   A.   I can read from my report if that is okay.

7            THE COURT:  Of course.

8   A.   There is a tattoo of tiger over the right upper chest, the

9   right shoulder and the right upper back.  There is a tattoo of

10  a design banded around the right upper left arm.

11  Q.   The tattoo with the tiger, you said that he covered the

12  right upper chest, shoulder and upper back?

13  A.   Yes.

14  Q.   So would you describe it in relatively terms as a larger

15  tattoo?

16  A.   It is all relative.  It seems large to me.

17  Q.   The tattoo of the design branded around the upper left arm,

18  can you describe it in any greater detail?

19  A.   Not really.  It's a design that went around the arm.

20  Q.   Do you recall whether or not it was a tattoo of barbed

21  wire?

22  A.   I believe it was jagged barbed wire.

23  Q.   Have you ever seen a tattoo like that before?

24  A.   I have seen similar tattoos, yes.

25  Q.   Are you familiar with Chinese gang tattoos?

D4B6LIN1                          Nields - direct

1   A.   No.

2   Q.   You've never seen Chinese gang tattoos on any other

3   deceased person upon whom you performed an autopsy?

4   A.   I probably have.   I just don't recognize them as specific

5   for Chinese gangs.

6   Q.   Would you know the significance of a barbed wire tattoo?

7   A.   I don't, no.

8   Q.   Now, I think you had some findings, and these would be on

9   page 6 of your report, that indicated some injuries that were

10  not described in your direct testimony.   I am directing your

11  attention now to Items 2 and 3.

12  A.   Yes.

13  Q.   Can you tell us what Item 2 was?

14  A.   It is an abrasion to the right side of his forehead and

15  there was a contusion or a bruise to the upper part of his head

16  to the right of the midline.

17                (Continued on next page)

18

19

20

21

22

23

24

25

D4BVLIN2                         Nields - cross

1    Q.  And can you tell us what the difference is between an

2    abrasion and a contusion?

3    A.  Abrasion is another word for a scrape of the skin; and a

4    contusion is another word for a bruise.

5    Q.  And, in fact, did you describe those injuries, in general

6    terms, as blunt impact injuries to the head?

7    A.  Yes.

8    Q.  And with respect to the impact of the upper extremities,

9    did you describe those as blunt impact of upper extremities?

10   A.  Yes.

11   Q.  And do you believe that those were caused by the gunshot

12   wounds that he received?

13   A.  I do not believe they were caused directly by the gunshot

14   wounds.

15   Q.  Do you have an opinion as to whether they were caused

16   indirectly by the gunshot wounds, with a reasonable degree of

17   medical certainty?

18   A.  I can't be.  It's certainly possible.  It's certainly

19   possible that after falling, after being shot, if he fell, he

20   could have bumped into something.  That's certainly possible.

21   Q.  Is it also possible that those blunt impact injuries could

22   have been caused by something else?

23   A.  Yes.

24           MR. COHEN:  I have no further questions.

25           THE COURT:  Very well.

D4BVLIN2                         Nields - cross

1          MR. SKINNER:  No further questions, your Honor.

2          THE COURT:  Thank you.  You may step down.

3          (Witness excused)

4          MR. COHEN:  Judge, before we resume with Mr. Zhou, can

5    we take a three-minute break?

6          THE COURT:  Very well.

7          MR. COHEN:  Thank you.

8          THE COURT:  Members of the jury, you may want to stand

9    up and stretch.

10         (Recess)

11         THE COURT:  Mr. Zhou, you may be seated.  And you

12   remain under the same oath that you took yesterday to tell the

13   truth, the whole truth, and nothing but the truth.

14         Very well.

15         Mr. Cohen, you may cross-examine.

16         MR. COHEN:  Thank you, your Honor.

17    GUANG YUN ZHOU, resumed.

18   CROSS-EXAMINATION (continued)

19   BY MR. COHEN:

20   Q.  Mr. Zhou, when you entered the United States in San

21   Francisco, did you have a passport with you?

22   A.  It was prepared for me by the snakehead.

23   Q.  Did you have a passport with you?

24   A.  No, I did not.

25   Q.  How is it that you were able to enter the United States if

D4BVLIN2                        G. Y. Zhou - cross

1   you had no passport with you?

2   A.  I don't know.  Everything was done by the snakehead.

3   Q.  Was the snakehead with you when you entered the United

4   States in San Francisco?

5   A.  No, I hire someone else to do it for me and paid him.

6   Q.  You hired someone else to do what for you?

7   A.  Help me to get to the United States.

8   Q.  And that was the snakehead; correct?

9   A.  Yes.

10  Q.  And one of the things the snakehead did to help you get to

11  the United States was he provided you with some documents;

12  correct?

13  A.  I don't know.  At the time he did everything for me.

14  Q.  Okay.  But did you fly from China to the United States?

15  A.  Yes.

16  Q.  To get on the airplane in China, did you have to show some

17  identification and a passport?

18  A.  I don't know.  Everything, including the documents, were

19  prepared by him.

20  Q.  I'm not asking you, Mr. Zhou, about who prepared the

21  documents.  I'm asking you whether or not you needed to have

22  those documents with you and present them to the airline to get

23  on the plane in China.

24          MS. BURNS:  Objection, your Honor.

25          We covered this yesterday.

D4BVLIN2                         G. Y. Zhou - cross

1              THE COURT:  Overruled.  Overruled.

2   A.  He brought me in.

3              THE COURT:  He brought you on the airplane?

4              THE WITNESS:  He walked in with me.

5   Q.  Into what?

6   A.  To get on the plane.

7   Q.  So he was on the airplane with you?

8   A.  When I was entering, he brought me in.

9   Q.  Entering the plane or entering the United States?

10  A.  When I got to San Francisco.

11  Q.  Okay.  So the snakehead flew with you from China to San

12  Francisco?

13  A.  From China to Japan, and transferred the flight, and then

14  to San Francisco.

15  Q.  And the snakehead accompanied you on both of those flights,

16  is that what you're telling us?

17  A.  There were other people, and I came in with them.

18  Q.  I'm going to ask you about the other people in a minute.

19  But right now I'm asking you whether or not the snakehead came

20  from China to Japan, and from Japan to San Francisco.

21  A.  Yes, one came with me.

22  Q.  One snakehead.

23  A.  I'm not sure whether he was a snakehead or not, but he was

24  just telling me and let me in.

25  Q.  Let you into what?

D4BVLIN2                          G. Y. Zhou - cross

1   A.  To the plane.

2   Q.  Did you say that there was a group of people who were

3   smuggled in at the same time with you?

4   A.  One by one.  And I was the first one to be brought in to

5   get on the plane.

6   Q.  Besides yourself, were there other people smuggled in on

7   the same airplane as you by that same snakehead?

8   A.  No.  Later on.  Just myself.

9   Q.  So a few moments ago when you told the jury that there were

10  other people that were smuggled in also, that wasn't quite

11  accurate?

12  A.  I do not know about this.

13  Q.  Well, you told the jury a few moments ago that you weren't

14  the only person that was smuggled in by the snakehead at that

15  time; correct?

16  A.  No, I did not.  I hired a snakehead, and so he could bring

17  me to the United States.

18  Q.  When you arrived in San Francisco, you got off the

19  airplane; correct?

20  A.  Yes.

21  Q.  At that time when you got off the airplane, you had to go

22  and see somebody in a uniform from the United States government

23  before you could actually enter the country; correct?

24  A.  A uniform -- what kind of uniform?

25  Q.  A United States government uniform, at customs or

D4BVLIN2                         G. Y. Zhou - cross

1   immigration.

2   A.  No, I was in my plainclothes.

3   Q.  No, sir.  I'm not asking you if you were wearing a uniform,

4   I'm asking whether or not before -- after getting off the plane

5   and before actually entering the United States, did you have to

6   speak to somebody from the U.S. government?

7   A.  I don't remember this.

8   Q.  Well, when you got off the airplane, were you alone or was

9   somebody with you?

10  A.  I went out by myself, and came out with me.

11  Q.  And what?

12  A.  Came out with me.

13  Q.  Who came out with you?

14  A.  I don't know.  A lady there brought me in.

15  Q.  Who was the lady that brought you in?

16  A.  I don't know.  She and I came in, and she brought me in.

17  Q.  Well, was she somebody who was being smuggled also or was

18  she a snakehead?

19  A.  Not someone who was trying to smuggle in.

20  Q.  You paid $40,000 to a snakehead to get smuggled into the

21  U.S., right?

22  A.  Yes.

23  Q.  And in return for that, you were given documents to help

24  you get here; correct?

25  A.  I don't know.  They just got me here, and then I gave them

D4BVLIN2                          G. Y. Zhou - cross

1   $40,000.

2   Q.  Didn't you look at whatever it was that they had prepared

3   for you to see what you were getting for your $40,000 to make

4   sure you got here?

5   A.  I just did not understand it.

6   Q.  Do you read Chinese?

7   A.  Chinese?  Yes, I can read a little.

8   Q.  Okay.  And did you have with you a Chinese passport with

9   your picture in it and somebody else's name?

10  A.  About this, I do not know.

11  Q.  You don't know.

12  A.  No, I do not know.

13  Q.  And so you also don't know how it is you are able to get on

14  an airplane in the United States and fly from San Francisco to

15  New York.

16  A.  He or she did it for me, including the purchasing of the

17  plane tickets.

18  Q.  Do you know somebody named Guo Guang?

19         MR. COHEN:  For the reporter, G-O-U, G-U-A-N-G.

20  Q.  Do you know somebody named Guo Guang?

21  A.  Who is that?

22  Q.  I'm asking you if you know somebody named Guo Guang.  Maybe

23  you know him as Chen Huo Guang.

24  A.  Guo Guang.  I do not know.

25  Q.  You don't know someone named Guo Guang?

D4BVLIN2                              G. Y. Zhou - cross

1    A.  I do not know the true name.  I don't know.

2    Q.  Well, do you know anybody who goes by the nickname Guo

3    Guang?

4    A.  Nickname?  I do not know about this.  If I do not see the

5    person, I just do not know.

6    Q.  Did you have lunch yesterday in Chinatown in a restaurant

7    in between the morning and afternoon sessions of this Court?

8              THE INTERPRETER:  I'm sorry?

9    Q.  Did you have lunch yesterday in a restaurant in Chinatown

10   between the morning and afternoon sessions of this Court?

11   A.  Yes.

12   Q.  And did you have lunch with two other men?

13   A.  Me?

14   Q.  You.

15   A.  No, I did not.

16   Q.  You didn't have lunch with two other men yesterday?

17   A.  Two other men were there eating, but I was just sitting

18   over there, but I did not eat.  And I came in later.

19   Q.  But you were with the two other men at the table; correct?

20   A.  I came in and there was no seat, so I just went out.

21   Q.  So you sat at a table with two other guys, you didn't know

22   who they were, you never seen them before.

23   A.  I know one of them.

24   Q.  Who was it?

25   A.  I later went to this place located on East Broadway to eat.

D4BVLIN2                                    G. Y. Zhou - cross

1    Q.  Who was the person that you knew?

2    A.  He or she used -- he used to be in the bus business.

3    Q.  What's his name?

4    A.  His name is Zheng Qian.

5    Q.  Zheng Qian?

6    A.  I was eating.  And then I went over because I cannot speak

7    English.  I thought maybe he could interpret or translate for

8    me.

9    Q.  Yesterday at the restaurant?

10   A.  No yesterday, no.  I went in and sat and went out.

11   Q.  Sir, isn't it true that yesterday you had lunch at a

12   restaurant in Chinatown with Guo Guang and Dong Jai?

13   A.  No, I did not eat.  I already ate over here.

14   Q.  Were you at a restaurant yesterday with Guo Guang and Dong

15   Jai?

16   A.  You are talking about when I was in the court here?

17   Q.  I'm talking about in between the morning session and the

18   afternoon session yesterday.

19   A.  I went down to eat with the person up here.

20   Q.  Which person up here?

21   A.  To have lunch.

22   Q.  Which person up here?

23   A.  He was also in business, and he and I know each other.

24   Q.  Is he going to be a witness in this trial?

25   A.  I do not know about this.

D4BVLIN2                          G. Y. Zhou - cross

1    Q.  Did you see that boy when you ate lunch yesterday?

2    A.  Yes, I went down from up here with him.

3    Q.  You waved at him, right?  He waved at you.

4    A.  Yes, he greeted me, yes.

5    Q.  And when he saw you in that restaurant, you were with two

6    other men?

7    A.  I went in there and I sat there.  And then you can ask this

8    little brother, and then I went out.

9    Q.  Say that again.

10   A.  I was eating over here.  As I went in, I went in, and then

11   I did not eat over there, and then I just left.

12   Q.  Did you ever hear of a bus company called Golden Dragon?

13   A.  Golden Dragon?  No, I haven't heard.

14   Q.  Did you ever work for a bus company that operated out of

15   Philadelphia?

16   A.  No.

17   Q.  Never?

18   A.  No, I did not.

19   Q.  What bus companies have you worked for or owned?

20   A.  I working for bus company?  I had a bus company myself and

21   I was responsible in ticket sales.

22   Q.  How long did you operate that company?

23   A.  Whoever was free, whoever had time, then just went there to

24   work.

25   Q.  How long a period of time did you operate that company?  A

D4BVLIN2                         G. Y. Zhou - cross

1  day, a week, a month, a year, two years, how long?

2  A.  Whoever was free at that time or the time the person would

3  be there working.

4  Q.  Mr. Zhou, when you were in China, did you use heroin?

5          THE INTERPRETER:  I'm sorry, counsel.

6  Q.  When you were in China, did you use heroin?

7  A.  No.

8  Q.  When you were in the United States, did you use ketamine or

9  ecstasy?

10  A.  I choose not to answer this question.

11          THE COURT:  You have to answer all questions.

12  A.  No, I did not.  About ketamine.

13  Q.  Excuse me?

14  A.  What about the ketamine?

15  Q.  What about it?  Have you used it?

16  A.  No, when I was -- when I went to dance, I just had takeeta,

17  takeeta.  So someone else gave me, I don't know.

18          MR. COHEN:  I wasn't able to hear what he said.

19          THE COURT:  Is that tequila?

20  A.  Tequila.

21  Q.  You know the difference between tequila and ketamine;

22  correct?

23  A.  I wanted to have a liquor, so I got the tequila myself.

24  Q.  Have you ever used ketamine, sir?

25  A.  I don't really remember.

D4BVLIN2                          G. Y. Zhou – cross

1    Q.  Have you ever used ecstasy?

2              MS. BURNS:  Your Honor, may we approach?

3              THE COURT:  Very well.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4BVLIN2                         G. Y. Zhou – cross

1              (At the side bar)

2              MS. BURNS:  Your Honor, can we get a proffer to the

3     relevance of this line of questioning?

4              THE COURT:  Just a minute.

5              MS. BURNS:  Sure.

6              THE COURT:  This is cross-examination.

7              MS. BURNS:  Understood.

8              THE COURT:  The jury is entitled to see the reaction

9     of the witness to questions.  And I take it you're asking

10    because of the findings of the toxicology report.

11             MR. COHEN:  In part, Judge.  But, in part, it's

12    because of his utter inability to remember anything relevant to

13    this case that he wasn't asked by the government.  And I think

14    I've been told by other witnesses, by other people, that he was

15    a heavy drug user in China in the United States.

16             THE COURT:  As long as he has a good-faith basis to

17    ask him.

18             MS. BURNS:  Did we get a time frame on these

19    questions?  "Since you've been in the United States," which

20    we've established has been 17 years now, I think these are just

21    very broad, general questions, not given any constructive time

22    frame or meaning.  It is very prejudicial.

23             THE COURT:  During the time that he was in this

24    country is what he's being asked.

25             MS. BURNS:  Seventeen years.

1          THE COURT:  I understand.  But you had him testify

2     about a lot of time, too.

3          MR. COHEN:  I bet a few years -- ketamine on the list,

4     17 years, you'd remember it.

5          MS. BURNS:  I'm not a witness, I'm not a drug user; so

6     let's not make this about me.

7          THE COURT:  The point is he has to have a good-faith

8     basis of what he's asking.

9          MR. SKINNER:  He has to find out.

10         THE COURT:  Of course he doesn't have to tell you his

11    good-faith basis, but he has to represent that there is a

12    good-faith basis.

13         MR. SKINNER:  And he has.  And I think for purposes of

14    this trial, which focuses on a time period from 1996 until

15    2009, and this witness has only testified to a smaller time

16    period within that, it would be helpful if Mr. Cohen could

17    focus his questions on the time period relevant to the case.

18    Because if he has memory issues from that time period, that's

19    one thing; but if he has drug use from a later period of time,

20    I don't see how it's relevant.

21         MR. COHEN:  I don't know when his memory issues began

22    or if he actually has memory issues or is just lying.  But

23    whether his memory issues pre- or post-date the homicide, the

24    fact that he has memory issues are relevant for this jury.

25         MR. SKINNER:  I think that his drug use would affect

D4BVLIN2                          G. Y. Zhou - cross

1    his ability to perceive something.  And if that's what we're

2    going at, then if you can try and put some time periods on it,

3    that would be helpful.

4             THE COURT:  I think it's always helpful to put time

5    periods.

6             MR. COHEN:  Of course, Judge.

7             THE COURT:  As best you can, absolutely.

8             MR. COHEN:  I have to start with broad questions and

9    then --

10            THE COURT:  I understand.

11            MR. COHEN:  -- move in.

12            THE COURT:  I understand.

13            Well, then you should break up the time.

14            MR. COHEN:  Okay.

15            THE COURT:  And you could ask him about particular

16   times.

17            MR. COHEN:  Okay.  Fair enough.

18            (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  You may proceed.

3          MR. COHEN:  Thank you.

4    BY MR. COHEN:

5    Q.  A few minutes ago I asked you whether you'd ever used

6    ketamine and ecstasy, and you said -- you asked whether you

7    have to answer those questions; correct?

8    A.  Yes, I said I don't know.  I don't understand.  I wanted to

9    know if it was necessary to answer the question.

10   Q.  Did you not want to answer the question?

11   A.  I don't like to answer questions like that.

12   Q.  Well, let me ask you first a very broad question, and then

13   I'm going to ask you a couple of specific questions.

14          Since you came to the United States, have you ever

15   used ketamine, yes or no?

16   A.  K, I never used K.

17   Q.  Since you came to the United States -- by the way, when you

18   say "K," that's the slang term for ketamine; correct?

19   A.  I don't know.  I never touch any of those things.  I hate

20   those things.

21   Q.  And my question then is about ecstasy.  Have you ever,

22   since you've been in the United States, used ecstasy?

23   A.  Ecstasy, it's been more than ten years.  I don't remember.

24   Q.  Well, are you saying that it's been more than ten years

25   since you've used ecstasy?

D4BVLIN2                              G. Y. Zhou - cross

1   A.  No, no, I don't know about that.  I never used it.

2   Q.  So you've never used ecstasy.

3   A.  Well, when I used to hang out, I don't know if I did that.

4   I don't remember.

5   Q.  When you invested in a gambling parlor -- you talked

6   yesterday about that you invested and became a shareholder in a

7   gambling parlor; correct?

8   A.  Yes.

9   Q.  How much did you invest to become a shareholder in that

10  gambling parlor?

11  A.  I was gambling there.

12  Q.  How much did you invest to become a shareholder in that

13  gambling parlor?

14  A.  $3,000.

15  Q.  Okay.  And is that the same period of time that you were

16  delivering orders on a bicycle?

17  A.  I did make food deliveries on a bike for a few months.

18  Q.  Where did you get the $3,000 to invest in the gambling

19  parlor?

20  A.  At the end of '96, I had money of my own from work.

21  Q.  From doing the bicycle deliveries?

22  A.  Yes.  I make some money from delivering food on a bike, and

23  I made some from gambling, and some I borrowed from others.

24  Q.  Now, yesterday you talked about the fact that you have

25  something called an A5 card.  Do you remember that?

D4BVLIN2                          G. Y. Zhou - cross

1   A.  I have an A5 card.

2   Q.  Okay.  And I think you also testified that your wife got

3   you an A5 card, right?

4   A.  My wife petitioned for me.

5   Q.  Okay.  Is that the same wife that you left behind in China

6   when you got smuggled in here?

7   A.  Yes.

8   Q.  When did she come to the United States?

9   A.  She's been here for more than ten years also.

10  Q.  Did she come with your children?

11  A.  She was smuggled here by herself.

12  Q.  Okay.  And you said she petitioned for you to get the card?

13  A.  I didn't have any legal status at the time.  She was

14  petitioning for our children, so she petitioned for me, as

15  well.  I was working elsewhere.

16  Q.  So, in other words, your wife, who was smuggled in after

17  you were, was able to obtain legal status in the United States

18  at the same time that you had been ordered removed from the

19  United States?

20  A.  I did not know about the removal order in the beginning.  I

21  was only told that I lost my case in court.

22  Q.  And you were told this by your lawyer?

23         THE INTERPRETER:  He said can you repeat that.

24  Q.  Were you told by your attorney that you lost your case in

25  court?

1   A.  Yes, I paid an attorney's office to do this.

2   Q.  Mr. Zhou, my question to you is not whether you paid an

3   attorney, but, rather, whether it was the attorney who told you

4   that you lost your case?

5   A.  Yes.

6   Q.  And did the attorney speak Chinese?

7   A.  The attorney speaks Chinese.

8   Q.  And when the attorney told you that you lost your case, did

9   he or she also explain that that meant that you had to leave

10  the country?

11  A.  He or she told me I wasn't aware of it.  I was very

12  disappointed when I heard that I lost, and I left.

13  Q.  What did it mean to you?  What was your understanding of

14  the fact that you lost your case in immigration court?

15  A.  I was very sad.

16  Q.  Because you understood that by losing your case, it meant

17  that you had to leave the United States; correct?

18  A.  I did not know about leaving the United States.  I didn't

19  pay attention to it.

20  Q.  Well, the case that we're talking about was a case where

21  you were asking for political asylum in the United States so

22  that you could be legally here; correct?

23  A.  What do you mean by that?

24  Q.  You told us yesterday that you asked the government for

25  political asylum because you were persecuted in China because

D4BVLIN2                          G. Y. Zhou – cross

1   of your participation in the pro-democracy movement, right?

2   A.  I participated in a student demonstration.

3   Q.  And you told us yesterday that you were being persecuted in

4   China because you violated the one-child policy; correct?

5   A.  Yes, I mentioned that yesterday.

6   Q.  Okay.  And because of those facts, didn't you ask the

7   United States government for permission to say here, because if

8   you went back to China, you would be persecuted again?

9   A.  Yes.  Correct.  Because I was told I lost, I went elsewhere

10  to work.

11  Q.  In other words, because you knew that you lost your case,

12  and you had no legal status, you ran and hid so that you

13  wouldn't be deported; correct?

14  A.  I went to work because I did not have any legal status.

15  Q.  Because what?

16          THE INTERPRETER:  Because I did not have any legal

17  status.

18  Q.  But didn't you say you went away -- you went someplace else

19  because you lost your case?

20  A.  I went to work.  I went to work because I have to support

21  my children.

22          MR. COHEN:  Judge, can I have the two answers ago read

23  back?  Maybe I misheard, but I'd like to hear it, and I'd like

24  the jury to hear it.

25          THE COURT:  He said "I went to work" in response to

D4BVLIN2                         G. Y. Zhou - cross

1   his losing the case.

2              MR. COHEN:  It was a few questions before that.

3              THE COURT:  Very well.

4              (Record read)

5   BY MR. COHEN:

6   Q.  So my question to you is you were told you lost, and you

7   went elsewhere to work because you didn't want to stay here

8   because you were afraid you would be kicked out of the country,

9   correct, and you went to hide someplace else.

10  A.  No, I have to go away to go to work.  I went away to go

11  elsewhere to work.

12  Q.  And did the fact that you went to work elsewhere have

13  anything to do with the fact that you lost your case for

14  asylum?

15  A.  No.  I had to go to work so that I can support my wife and

16  my family.

17  Q.  Were you working before you lost your immigration case?

18  A.  I mentioned earlier that I was making deliveries.

19  Q.  When was it that your wife came to the United States, what

20  year?

21  A.  She came more than ten years ago.  I do not remember which

22  year.

23  Q.  Were you still making food deliveries when your wife came

24  to the United States?

25  A.  I was not making food deliveries when my wife came; I was

D4BVLIN2                         G. Y. Zhou - cross

1   doing the bus.

2   Q.  Doing what?

3        THE INTERPRETER:  The bus.

4   Q.  Okay.  And when you were petitioning for asylum, were you

5   doing the bus or were you doing food deliveries?

6   A.  When I was petitioning, I was making food deliveries.  Who

7   was doing it for me?

8   Q.  What's that?

9   A.  Do you mean when my wife was petitioning for me or when I

10  went and petitioned to the government myself?

11  Q.  I'm going to move on.

12       The night of the shooting at the karaoke place in

13  Queens that you talked about, you were with some other people;

14  correct?

15  A.  Yes.  A few of us were in the room.

16  Q.  I'm not talking about -- let's talk about earlier in the

17  evening.

18       You said, I think, you had dinner in Chinatown with

19  some people to talk about your niece's wedding?

20  A.  Yes, my niece was getting married.

21  Q.  And tell us who was at the dinner.

22  A.  You want me to give each person's name?

23  Q.  Please.

24  A.  Madan, Mayong, Yita, No. 4, Cai Xiang, Yiqun, and myself.

25  Then my sister came at a later time.

D4BVLIN2                          G. Y. Zhou - cross

1   Q.  Cai Xiang, does he have a nickname?

2   A.  I only know him as Cai Xiang.

3   Q.  And how do you know him?

4   A.  After I came to the United States, I met him while I was

5   hanging out.  I don't remember exactly how I met him, but he

6   was also introduced to me by somebody else.

7   Q.  And Yiqun was at the dinner, was the person who eventually

8   was shot later on that evening; correct?

9   A.  Yes.

10  Q.  And he's the person who you met at a barbershop that later

11  was in a relationship with your sister?

12  A.  Yes, he became my sister's boyfriend.

13  Q.  And that whole group of -- by the way, you said somebody

14  there was called No. 4?

15  A.  Yes.

16  Q.  That's his name or nickname, "No. 4"?

17  A.  I only know him as No. 4.  I don't know his exact name.

18  Q.  And then you went from the Chinatown restaurant to Scent of

19  a Woman for a while?

20  A.  I went in for about 10 to 20 minutes, about 15 minutes.

21  Q.  You had something to drink there?

22  A.  No, I opened a beer, but I didn't drink it.  Then I paid

23  $50, and we left.

24  Q.  And then you went to the karaoke club, right?

25  A.  Yes.

D4BVLIN2                          G. Y. Zhou - cross

1   Q.  How did you get from Scent of a Woman to the karaoke club?

2   A.  How did I get to the other place?

3   Q.  Mm-hmm.

4   A.  By car.  I think we were in a car, but it's been a while.

5   I believe it was in a car.

6   Q.  Okay.  And all the men whose names that you just gave us

7   that were at the dinner, did they all go to the karaoke club?

8   A.  Yes.

9   Q.  And when you all got to the karaoke club, did you open a

10  room?  In other words, get an empty room that you guys then

11  occupied?

12  A.  Yes, it was our individual room.

13  Q.  And when you got there, what did you do?

14  A.  I went into the room.  We sat in the room.  I at one point

15  went into the general area, and I stood there for a while, and

16  then sat in the room after that.

17  Q.  What were people doing?

18  A.  Singing, talking.

19  Q.  And generally that's what a karaoke club is for, right,

20  it's to go and sing and play?

21  A.  Yes.  And there were two hostesses that came in.  Then we

22  all sat around playing, drinking, talking.

23  Q.  Okay.  And the lighting conditions in the room, in the

24  karaoke that evening, were they as bright as the courtroom that

25  we're in now?

D4BVLIN2                          G. Y. Zhou – cross

1    A.  No, no, it's not as bright.

2    Q.  In fact, it was quite dark; correct?

3    A.  It was okay.  It was not that dark.  We just gotten in not

4    that long ago.

5    Q.  Well, what does the fact that you had just gotten in have

6    to do with how light or dark it was?

7    A.  Doesn't have any -- doesn't make any difference.

8    Q.  Okay.  So is it a fair statement that at the karaoke club

9    that night the lights were pretty dim?

10   A.  It wasn't very dark.

11   Q.  I'm sorry?

12          THE INTERPRETER:  It was not very dark.

13   Q.  It wasn't very dark.

14          How long at that point, the night that you went out to

15   the dinner and then to the karaoke, how long had you known

16   Yiqun?

17   A.  I met him at the end of '96.

18   Q.  Okay.  So if this incident happened in '04, you'd known him

19   for seven or eight years at that point?

20   A.  I had known him for many years.

21   Q.  And were you close to him?

22   A.  He and I was normal.  He was my sister's boyfriend.

23   Q.  Did you ever refer to him as your brother-in-law?

24   A.  I just call him by his name.

25   Q.  Call him what?

D4BVLIN2                          G. Y. Zhou - cross

1            THE INTERPRETER:  I just call him by his name.

2   Q.  But when speaking about him to other people, did you ever

3   refer to him as your brother-in-law?

4   A.  No.

5   Q.  Never?

6   A.  No, I did not.  I just call him by his name.

7   Q.  Okay.  Now, was he a wealthy man?

8   A.  I don't know whether he's a wealthy man or not.

9   Q.  Well, did he appear to have money with him most of the

10  time, large amounts of money?

11           THE INTERPRETER:  I'm sorry, can you repeat the latter

12  part?

13  Q.  Did you know him to carry large amounts of cash with him?

14  A.  I couldn't have known.  It's been such a long time.

15  Q.  Was he somebody who was well-respected and powerful in

16  Chinatown?

17  A.  I don't know about that.

18  Q.  You were living in New York at that time, right?

19  A.  Yes.

20  Q.  And you don't know whether Yiqun was a powerful, respected,

21  wealthy person in China?

22  A.  I don't know about that.

23  Q.  During the seven or eight years that you knew Yiqun, was he

24  ever in prison?

25  A.  I don't think I'm aware of that.

1   Q.  Does that mean that he's never been in prison or you don't

2   know?

3            THE INTERPRETER:  I'm sorry, can you repeat the

4   question?

5   Q.  Does that mean that he was never in prison or that you

6   don't know whether he was in prison or not?

7   A.  I do not know about that.

8            MR. COHEN:  Judge, can we approach for a moment?

9            THE COURT:  Why don't you turn to something else, and

10   you'll come back to that.

11            MR. COHEN:  Okay.

12   Q.  You speak the Fuzhou dialect?

13   A.  Yes.

14   Q.  And that's -- you were born in Fuzhou; correct?

15   A.  I was born in the country, in the countryside.

16   Q.  You were born in Longqi, right?

17   A.  Yes.

18   Q.  Okay.  And Longqi is in Fujian Province, right?

19   A.  Yes.

20   Q.  And the provincial dialect spoken in Fujian Province is the

21   Fuzhou dialect or the Foochinese dialect; correct?

22            THE COURT:  It's not a dialect; it's a language.

23   A.  The Fuzhou dialect, the Fuzhou language was spoken.

24   Q.  Okay.  And in other provinces in China, people speak

25   different languages and dialects; correct?

D4BVLIN2                         G. Y. Zhou – cross

1    A.   I am Foochinese.   I understand some dialects or languages

2    from other provinces, and I don't understand some of the

3    others.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4B6LIN3                        G.Y. Zhou – cross

1   BY MR. COHEN:

2   Q.  My question was not what you understood.  My question was

3   whether or not in other provinces people speak languages?

4   A.  Yes.

5   Q.  For example, there is a province called Wenchou,

6   W-e-n-c-h-o-u, you have heard of Wenchou; correct?

7   A.  Yes.

8   Q.  People in Wenchou speak the Wenchounese dialect, correct?

9   A.  Yes.

10  Q.  And there is a province called Guangzhou,

11  G-u-a-n-g-z-h-o-u; correct?

12  A.  Yes.  There is a Guangzhou in China.

13  Q.  And people there speak Guangzhounese or Cantonese; correct?

14  A.  Yes.  I believe so.

15  Q.  There are many, many other provinces that have their own

16  languages, right?

17  A.  Yes.

18  Q.  Now, you speak Mandarin also, right?

19  A.  Mandarin, yes.

20  Q.  And is it true that all of the schools in China, regardless

21  of what province they are in, that all of the schools are

22  taught in Mandarin?

23  A.  I think so.

24  Q.  When you went to school in Foochow your teachers taught you

25  in Mandarin; correct?

D4B6LIN3                          G.Y. Zhou - cross

1    A.   Some were taught in the Foochowese dialect, some were

2    taught in Mandarin.

3    Q.   Is that how you learned to speak Mandarin by attending

4    primary school in China?

5    A.   I learned a little bit at the time.

6              MR. COHEN:  Judge, can we step up for a moment?

7              THE COURT:  Very well.

8              Actually, this is a good time for the jury to take a

9    10-minute recess.  I will excuse the jury, but I am going to

10   hang on to the lawyers.

11             (Jury excused)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D4B6LIN3                         G.Y. Zhou - cross

1           (In open court; jury not present)

2           MR. SKINNER:  Should we have the witness step down,

3    your Honor?

4           THE COURT:  Yes.  You may step down.

5           If everyone is really gone, I can hear you.

6           MR. COHEN:  Actually, it is a personal matter, Judge.

7    It doesn't need to be on the record.

8           THE COURT:  Then I will hear you at the bench.

9           (Continued on next page)

1              (At the side bar)

2              MR. COHEN:  I am diabetic and I am getting dizzy.

3              THE COURT:  You don't have anything with you?

4              MR. COHEN:  No.

5              THE COURT:  You go without insulin?

6              MR. COHEN:  The insulin -- I only take it -- like the

7    juror, the juror the other day, it is long-acting insulin.  I

8    take it at night.  I took it last night, but I haven't eaten.

9    So I need to do something to balance my sugar.

10             THE COURT:  Do you have someone who can go and get you

11   something.

12             MR. COHEN:  I just want to run to the cafeteria, 10

13   minutes.

14             THE COURT:  Very well.  Go ahead.

15             MR. COHEN:  That's why I wanted to break.

16             THE COURT:  That's fine.  We'll tall take a 15-minute

17   recess.

18             MR. COHEN:  Thank you.

19             (Recess)

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  You may proceed.

3  BY MR. COHEN:

4  Q.  At the karaoke that night, am I right that the way karaoke

5  works is that music is played and people sing along with the

6  music?

7  A.  Yes.  Some of them were singing.

8          THE COURT:  Some of the guests, is that right,

9  customers?

10          THE WITNESS:  Just a few of us in a room.

11  Q.  Just two?

12          THE COURT:  Those in the room with him.

13          MR. COHEN:  Right.

14  Q.  That night some people in the room were singing along with

15  music, right?

16  A.  Yes.  People were there singing.

17  Q.  And were they singing along to music that was being played

18  for from a CD or iPod or something like that over a sound

19  system?

20  A.  Yes.

21  Q.  How many people were singing, say, just before you say

22  Mr. Lin came into the room?  How many people were singing?

23  A.  People were talking, but for singing there was only one

24  microphone.

25  Q.  And just before you say Mr. Lin came into the room, who had

D4B6LIN3                          G.Y. Zhou - cross

1   the microphone?

2   A.  No.  I don't remember at this time.

3   Q.  You don't remember who was singing just before Mr. Lin came

4   into the room?

5   A.  It depends.  Not just one person there singing.

6   Q.  Well, how many people were singing just before you say

7   Mr. Lin came into the room?

8   A.  Some of them was singing.  Others drinking and talking.

9            THE COURT:  You are being asked how many were singing.

10  A.  Only one was there singing.

11  Q.  Say it again.

12  A.  Only one was there singing.

13  Q.  21?

14  A.  Only one.

15  Q.  Only one person was singing.  Who was that person?

16  A.  Yes.  Only one person singing.

17  Q.  Who?

18  A.  That night I am not sure who was sining, but it was Yita.

19  Q.  Yita?

20  A.  Yes.

21  Q.  You were paying attention to what was happening in the

22  room; correct?

23  A.  I was sitting in the corner.

24            MR. COHEN:  Can we get the picture of Room No. 8, I

25  think it was, back up on the screen, the photograph?

D4B6LIN3                              G.Y. Zhou - cross

1   Q.  I am going to ask you to take a look at the photograph up

2   there.  Do you recognize that room?

3   A.  Yes.  This is almost similar to when I was there that

4   night.

5   Q.  It is the same room; correct?

6   A.  The shape is like similar to this.

7   Q.  Can you see in that room where it was that you were

8   standing or seated?

9   A.  I was sitting in that corner.

10          MR. COHEN:  Your Honor, is there a pointer up there?

11          THE COURT:  There is.

12          MR. COHEN:  May I approach the witness, Judge?

13          THE COURT:  Yes.

14  Q.  This is a pointer and if you push this button, it lights

15  up.  Can you push that button and show where you were sitting?

16  A.  Right there.

17  Q.  Indicating what appears to be the far corner of the room.

18          I know that you can't see it in the photograph that is

19  up there, but can you describe where in relation to that the

20  door to the room would be?

21          THE COURT:  Where it was.

22          MR. COHEN:  Of course.  Where it was.  Sorry, your

23  Honor.

24  A.  The door is on this side.  I could see the door.

25  Q.  So is it fair to say then that you were sitting kind of

D4B6LIN3                          G.Y. Zhou – cross

1   opposite where the door is?

2   A.  I could see the door.  Yes.

3   Q.  I am asking you whether or not it is true that you were

4   sitting sort of opposite to where the door to the room was?

5   A.  No, not directly.  I was a little in and there was a door

6   like that.

7   Q.  Were there people standing between you and the door?

8   A.  Where?

9   Q.  Between you and the door were there people standing?

10  A.  A few of us were sitting over there.

11  Q.  And in between where the few of you were sitting and the

12  doorway where people came into the room were other people

13  standing and singing?

14  A.  As I mentioned earlier Yita was singing on this side.

15  Q.  Which side?

16  A.  The table, I was sitting over here and he was sitting over

17  here and there and there is a door.

18  Q.  Was he seated or standing when he was singing?

19  A.  I noticed he was standing.

20  Q.  Yita?

21  A.  Yes.

22  Q.  And you said there came a time that Mr. Lin and another

23  person came into the room, correct?

24  A.  Yes.

25  Q.  That night had you seen Mr. Lin and that other person

D4B6LIN3                          G.Y. Zhou - cross

1   before?

2   A.  No.

3   Q.  The person that came into the room with Mr. Lin, had you

4   ever seen him before?

5   A.  No.

6   Q.  What was the first thing that happened when Mr. Lin and

7   this other individual came into the room?

8   A.  The first thing I did is I stood up and I wanted to toast

9   him and to have a drink with him, but he told me to sit down.

10  Q.  That was Mr. Lin?

11  A.  And said it had nothing to do with me.

12  Q.  Mr. Lin said that?

13  A.  Yes.

14  Q.  Across the room?

15  A.  He was coming in through the door near the tea table.

16  Q.  He wasn't standing right in front of you?

17  A.  I was sitting more in.  He was just entered through the

18  door and just stood there.

19  Q.  When he came in Yita was still singing?

20  A.  When I stood up and I could hear the singing and I wanted

21  to toast him, to have a toast with him.

22  Q.  So Yita was still singing when Mr. Lin and this other

23  person walked in?

24  A.  I did not really take notice of it.  So I stood up and I

25  wanted to have a drink with him.  He told me I had nothing to

D4B6LIN3                          G.Y. Zhou - cross

1   do with it and I sat down and I felt very strange about it.

2          MR. COHEN:  Move to strike the last part of the

3   answer.

4          THE COURT:  Motion granted.

5   Q.  How long was it before you say you heard Mr. Lin say

6   something?

7   A.  As soon as he came in, he told me to sit down so I sat down

8   and I felt my heart, I felt strange.

9          MR. COHEN:  Move to strike.

10  A.  And he said, Shoot.

11  Q.  He said shoot?

12  A.  Yes.

13  Q.  And that was all he said was shoot?

14  A.  And very loud and someone took out a gun and bang, bang,

15  bang.

16  Q.  You heard him say shoot?

17  A.  Yes.

18  Q.  And in what dialect or language did he say shoot?

19  A.  He only said shoot.

20  Q.  In what language did he say shoot?

21         THE COURT:  Did he say it in Chinese?

22         THE WITNESS:  Shoot was probably Chinese, Foochow.

23  Q.  Probably Chinese Foochow?

24         THE COURT:  What was the word he used in Chinese?

25         THE WITNESS:  He just said shoot.

D4B6LIN3                          G.Y. Zhou - cross

 1          THE COURT:  What is the Chinese word?  Did he say it

 2   in English or Chinese?

 3          THE WITNESS:  In Chinese, shoot.

 4   Q.  What part of the Chinese language or what Chinese dialect

 5   did he say the word shoot in?

 6   A.  Chinese language.  Just shoot.

 7          THE COURT:  What is the word in Chinese?

 8          THE WITNESS:  That's what I heard, shoot.

 9          THE COURT:  He is not answering the question.  What is

10   the Chinese word he said?

11          THE WITNESS:  Xaing.

12   Q.  Xaing, That means shoot?

13   A.  Yes.

14   Q.  Is that in the Foochow dialect or Foochow language?

15   A.  Yes.  In Foochow, shoot.

16   Q.  That is what you remember him saying that night?

17   A.  Yes.

18   Q.  Now, after the shooting people left the room, correct?

19   A.  After the shooting both of them left first and we got

20   scared and then we stayed back and I went out and I touched a

21   dead person to see if there was any reaction.

22          THE COURT:  What do you mean you went out?

23          THE WITNESS:  I left the room.

24   Q.  Did you call the police?

25   A.  People at the store already reported to the police.

D4B6LIN3                          G.Y. Zhou - cross

1    Q.  Did you call the police?

2    A.  No, I did not.  I was scared.

3    Q.  Did you know that the police would come and want to speak

4    to the people who were there that had seen what happened?

5    A.  After I got -- I was scared so later I called so I also

6    told my sister about it.

7              MR. COHEN:  Move to strike that entire answer as

8    nonresponsive and I ask the witness be directed to listen to

9    the question asked and to answer that question.

10   Q.  This is a yes or no.  Did you know that the police would

11   come and would want to speak to the people who were in the room

12   when the shooting happened?

13   A.  Could you repeat?

14   Q.  Sure.  Did you know that the police would come and want to

15   speak to the people who were in the room when the shooting

16   happened?

17   A.  When I went out and others --

18             THE COURT:  No.  No.  Not when you went out.  You are

19   being asked did you know.

20   A.  About the reporting to the police?

21   Q.  Yes.  Did you know that the police would come and that they

22   would want to speak to the people who were there?

23   A.  Yes.

24   Q.  And did you know that you would be one of the people that

25   you would want to speak to?

D4B6LIN3                          G.Y. Zhou - cross

1    A.   I knew.

2              THE COURT:   The answer was yes.

3    Q.   But you left?

4    A.   I got scared so I ran to Chinatown by myself.

5    Q.   You ran from Queens to Chinatown?

6    A.   No.   I went there by Lincoln.

7              THE COURT:   Are you talking about a car?

8              THE WITNESS:   I called Lincoln.

9    Q.   A car service?

10   A.   Yes.

11   Q.   You called the car service?

12   A.   Yes.   I told my sister.

13   Q.   Did you call a car service from Queens to take you to

14   Manhattan?

15   A.   Yes.

16   Q.   And when the car service came, where were you?

17   A.   At that time I don't really remember.   At that time I got

18   nervous.   I just don't remember.

19   Q.   Were you close enough to the karaoke to be able to see it?

20   A.   That night I was nervous.   I did not really pay that much

21   attention.

22   Q.   Were you the only person that went from Queens to Manhattan

23   in the car service that you say you called?

24   A.   Yes.

25   Q.   Nobody else accompanied you?

D4B6LIN3                      G.Y. Zhou - cross

1   A.  I did not pay notice to that.  Long time ago.

2   Q.  Well, you knew at that time whether you were alone in the

3   car service or somebody came with you back to Manhattan, didn't

4   you?

5   A.  I was alone.

6   Q.  Do you recall being interviewed eventually within a few

7   days of the incident by a Chinese detective in Queens named

8   Detective Ng?

9   A.  After the incident I went to precinct 109.

10  Q.  Sir, this is a yes or no question.  Do you recall speaking

11  to a Chinese detective about what you said happened that night?

12  A.  Long time ago.  I don't really remember.  I did go to a

13  precinct for them to take notes.

14  Q.  When you spoke to the detective, he actually was writing

15  things down that you were saying; correct?

16  A.  He probably did.  I don't know.

17  Q.  You said you went there so that he could take notes.  He

18  was asking you questions.  Did you see him writing things down?

19  A.  Of course.  If he was investigating things like that of

20  course he had to write it down.

21  Q.  Do you remember telling him that you exited from the club

22  and called your sister but got the wrong number?

23          THE INTERPRETER:  Wrong number?

24  Q.  You called your sister but you got the wrong number?

25          THE INTERPRETER:  Wrong?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4B6LIN3                              G.Y. Zhou - cross

```
 1              MR. COHEN:  Wrong number.  Sorry.
 2   A.   What?
 3   Q.   Do you remember telling the detective that after the
 4   shooting you tried to call your sister on the telephone but you
 5   got the wrong number?
 6   A.   No.
 7   Q.   Do you remember telling the detective that after you got
 8   the wrong number that you and Jian Min Chen got into Ma Si's
 9   Lincoln car and went to 108 Madison Street in Chinatown?
10              Telling the detective after the shooting, you and Jian
11   Min Chen, J-i-a-n, M-i-n, C-h-e-n, got into Ma si's, M-a, S-i,
12   Lincoln car and went to 107 Madison Street in Chinatown, do you
13   remember telling the detective that?
14   A.   Jian Min, I don't know.  I don't remember.
15   Q.   Do you know somebody named Jian Min Chen?
16   A.   I do not know.  I do not know the name.
17   Q.   Do you know someone named Ma Si?
18   A.   Ma Si, I do not know.
19   Q.   You don't know someone named Ma Si?
20   A.   I do not know Ma Si.
21   Q.   So after you took this trip to Manhattan to 107 Madison
22   Street, what did you do?
23   A.   I was nervous and so I told my sister about Yi Qun being
24   shot.
25   Q.   And then what did you do?
```

1    A.  So I went down with my sister.

2    Q.  Where did you go with your sister?

3    A.  To Flushing.

4    Q.  Did you go back to where the club was?

5    A.  Yes.  It seems I did go there.

6    Q.  It seems that you were there or you were there?

7    A.  I went there.

8    Q.  With your sister?

9    A.  With my sister.

10   Q.  How did you get there?

11   A.  By car.

12   Q.  Whose car?

13   A.  This Lincoln.

14   Q.  Same Lincoln that drove you from Manhattan to Queens?

15   A.  I got another Lincoln.  Excuse me.  I got another vehicle.

16   Q.  When you arrived at the place where the shooting had been,

17   you saw a lot of police cars there; correct?

18   A.  Yes.

19   Q.  And that was in the early morning hours of July 30th or

20   29th?

21   A.  When it happened it was past midnight.

22   Q.  So July 30th; right?

23   A.  About the dates, it has been a long time ago.  I don't

24   remember.

25   Q.  The incident happened at about something like 1:00 or 2:00

D4B6LIN3                              G.Y. Zhou - cross

1   in the morning; right?

2              THE INTERPRETER:  I apologize.

3   Q.  The incident happened about 1:00 or 2:00 in the morning,

4   right?

5   A.  At the time I was scared so I did not really take a look at

6   the time.

7   Q.  How long after the shooting did you go to Manhattan?

8   A.  I was scared and then I went out and I told someone.

9   Q.  Mr. Zhou, are you having difficulty understanding the

10  interpreter?

11             MS. BURNS:  Objection.

12             THE COURT:  No objection.  I am wondering about that,

13  too.

14  Q.  Are you having difficulty understanding the interpreter?

15  A.  Just that I am here.  I am very nervous.

16  Q.  So you understand perfectly the interpreter's Foochowese?

17  A.  I understand.

18  Q.  So if I ask you a question, please answer the question that

19  I ask you, okay?

20  A.  Yes.

21  Q.  I am asking you this question:  How long was it from the

22  time of the shooting until you got to Manhattan?

23  A.  At nighttime if there is no traffic pretty quick.

24  Q.  And how long did you stay in Manhattan before you came back

25  to Queens with your sister?

D4B6LIN3                              G.Y. Zhou - cross

1    A.  As soon as I got there, I was scared so I told my sister

2    and we called a Lincoln right away.

3    Q.  How long did it take from the time that you got to your

4    sister's house until you arrived back in Queens?

5    A.  I don't remember the exact time.

6    Q.  I am not asking you for the exact time.  Give us your best

7    estimate of how long it took?

8    A.  From Chinatown to that place over there?

9    Q.  Yes.

10   A.  About 20 to 25 minutes.

11   Q.  Was it still dark out?  Was it still nighttime when you got

12   back to Queens?

13   A.  Queens, when I went there, there were police vehicles.

14        THE COURT:  You are being asked was it light out.

15   A.  It was nighttime.

16   Q.  When you saw the police vehicles there, did you walk over

17   to them and say, I saw what happened there, I was a witness, I

18   want to tell you what happened?

19   A.  At that time police did not allow you to approach.

20   Q.  Did you make an attempt to approach any police officer and

21   say, I was there, you should speak to me, I want to speak to

22   you?

23   A.  It seems I did not go over.  Long time ago.  I don't

24   remember.

25        (Continued on next page)

D4BVLIN4                    G. Y. Zhou - cross

1   BY MR. COHEN:

2   Q.   You did not approach the police that night; correct?

3   A.   That night, I think that I went in that night when this

4   happened, but it's been so long, I don't remember.

5   Q.   You saw a shooting; correct?

6   A.   Yes.

7   Q.   You didn't stick around; you went back to Manhattan.

8   Correct?

9   A.   Yes.

10  Q.   You picked up your sister and drove back to where the

11  shooting happened; correct?

12  A.   Yes.

13  Q.   You didn't speak to any police officer who was there when

14  you got back to the scene; correct?

15  A.   I'm not aware of it.  I can't remember myself.  I don't

16  know if I said it at a later time.  I don't remember.

17  Q.   Didn't you just tell the jury that you didn't speak to the

18  police when you went back there with your sister?

19  A.   No, I said I went down, but it's been such a long time, I

20  don't remember whether I said it or not.

21  Q.   After you went back to the karaoke place with your sister

22  and saw all the police that were there, what was the next thing

23  you did?

24  A.   What did I do?  I was scared.  I was --

25            THE COURT:  Not what you felt.

D4BVLIN4                      G. Y. Zhou - cross

1   A.  I was confused.  I didn't know what to do.  And my sister

2   was crying.

3            THE COURT:  Not what you felt.  What did you do?

4            THE WITNESS:  I didn't do anything at the time.

5   Q.  Well, did you stay there?

6   A.  I stood there, but the police wouldn't let anybody get

7   close.

8   Q.  And eventually did you leave?

9   A.  At the end -- I don't remember whether I went to the

10  precinct to give a statement that night or another time.

11  Q.  I'm not asking you that.  I'm asking you whether you left,

12  simply yes or no.  Did you leave from where you were?

13  A.  Did I leave the scene?

14  Q.  Yes.

15  A.  I did leave.

16  Q.  Who did you leave with?

17  A.  I don't remember.  It's been a long time.

18  Q.  Did you leave with your sister?

19  A.  I -- it's been such a long time, I don't know if my sister

20  stayed there or I brought her in to give a statement.

21  Q.  Well, you said your sister was crying and she was very

22  upset; correct?

23  A.  Yes.

24  Q.  Her boyfriend had just been killed?

25  A.  Yes.  On that night.

D4BVLIN4                        G. Y. Zhou - cross

1   Q.  And you don't remember whether you went back to her
2   apartment to comfort her or whether you parted company; you
3   don't remember what happened then?
4   A.  I did not say anything about being separated.  I did not go
5   to her apartment.
6   Q.  By the way, when you went back to the scene where the
7   karaoke was, did you see anybody else on the street that had
8   also been present during the shooting?
9   A.  The night that it happened.
10  Q.  When you went back with your sister to Queens on the night
11  it happened and there were police officers on the street, did
12  you see any other people on the street who were there when the
13  shooting happened?
14  A.  It's been such a long time, I'm not aware of it.  Plus the
15  fact that I was scared at the time.
16  Q.  Did you see Cai Xiang?
17  A.  It's been such a long time, I'm not aware of it.  I do not
18  remember.
19  Q.  So you don't remember whether or not you saw somebody else
20  who was an eyewitness to what happened; is that right?
21          THE INTERPRETER:  I'm sorry, can you repeat the
22  question again?
23  Q.  Are you telling the jury that because it was such a long
24  time ago and you were so scared, you don't remember if when you
25  went back to the scene you saw another person who had been a

D4BVLIN4                          G. Y. Zhou - cross

1   witness to the shooting?

2   A.  Can you repeat that?

3           THE INTERPRETER:  Your Honor, should I just repeat it

4   to him?

5           THE COURT:  Please.

6   A.  I don't know if the other people were scared, but I was

7   taking care of my sister at the time.

8   Q.  Okay.  How did you get to the precinct to speak to the

9   police when you eventually went there?

10  A.  I really do not remember how I got there that night.

11  Q.  Did you go by yourself or did you go with someone else?

12  A.  I don't remember whether I took a car or whether I walked

13  or whether my friend drove me there or something else.  I do

14  not know.  I do not remember now.

15  Q.  But the precinct you went to was in Flushing, right, the

16  109th precinct?

17  A.  Yes.

18  Q.  And the detective that you spoke to was a heavyset

19  gentleman who spoke Chinese; correct?

20  A.  I believe so.  I think the person spoke Chinese.

21  Q.  You didn't have a translator, right?  You just spoke

22  directly to the detective?

23  A.  I went to the precinct.  A few other people went to the

24  precinct, and we were all in different rooms giving statements.

25  Q.  Now, between the time of the shooting and the time that you

D4BVLIN4                        G. Y. Zhou - cross

1   spoke to the police, how many people did you speak to besides

2   your sister about what happened?

3   A.  I did not speak to others.

4   Q.  You remember that now?

5   A.  I took care of my sister at the time because she was very

6   upset.  That's why I couldn't talk to anybody else.

7   Q.  If I told you that it was about 22 hours from the time of

8   the shooting until you showed up at the 109th precinct, does

9   that sound about right?

10  A.  I do not remember right now.

11  Q.  How did you know to go to the 109th precinct?

12  A.  I don't remember who told me that night that the people

13  that were present have to go in and give a statement.

14  Q.  I'm sorry, somebody told you that the people who were

15  present had to go give a statement?

16  A.  I don't remember how it came about that I went in to give a

17  statement.  It's been a long time.  I don't remember.

18  Q.  Well, did you hear that the police were looking to speak to

19  you about what happened because they knew you had been there?

20  A.  I was told that people that were present have to go in to

21  give a statement.

22  Q.  Who told you that?

23  A.  I do not remember.

24  Q.  Was it one of the other people who was present who was also

25  being sought to be questioned by the police?

D4BVLIN4                          G. Y. Zhou – cross

1    A.  No, it was either the boss of the karaoke or somebody else.

2    It's been a long time.  I can't even remember that myself.

3    Q.  And when you spoke to the police, that was some time within

4    about 22 to 24 hours of what you had witnessed; correct?

5    A.  I don't know how much time had passed.  I did not keep

6    track of it.  I was not aware.

7              MR. COHEN:  Judge, can I speak to the government for a

8    moment?

9              THE COURT:  You may.

10             (Pause)

11             MR. COHEN:  Let me correct a mistake I made.  I was

12   reading this thing thinking it was military time.

13   BY MR. COHEN:

14   Q.  Is it a fair statement then that it was about 10 to 12

15   hours after the shooting that you spoke Detective Ng?

16   A.  I don't know.  I did not keep track of it.  I don't know

17   the time.

18   Q.  At the time that you spoke to Detective Ng, was your memory

19   of what had happened better than it is now?

20   A.  That night?

21   Q.  When you spoke to Detective Ng after the incident, after

22   the shooting, was your memory then of the shooting better than

23   it is as you sit here today?

24   A.  Yes.

25   Q.  And at that time, did you do your best to describe for

D4BVLIN4                          G. Y. Zhou - cross

1   Detective Ng exactly what you saw and heard?

2   A.  I just told the police what exactly happened.

3   Q.  Did you do your best, when telling the police what

4   happened, to tell them what you saw and what you heard?

5   A.  I told them everything that I saw.

6   Q.  When you got to the precinct, the 109th precinct, did you

7   see all the people there that had been present at the shooting?

8   A.  Everyone was in a separate room.

9   Q.  When you got to the 109th precinct, did you see people

10  there who had been present at the shooting?  Yes or no.

11  A.  I did.

12  Q.  Okay.  And where were they when you saw them?

13  A.  They were close -- they were in their own room.

14  Q.  Were all the interview rooms on the second floor?

15  A.  I didn't pay attention to that at the time.

16  Q.  Well, are you telling the jury that the doors to the

17  interview rooms were opened while witnesses were being

18  interviewed by detectives and that's how you could see who was

19  there?

20          THE INTERPRETER:  I'm sorry, can I just ask him to

21  clarify something?

22          THE COURT:  Sure.

23  A.  The doors were made of like these metal, like one strip,

24  you know, next to the other, so you kind of see through.  But

25  it's been so long, I don't really remember.

D4BVLIN4                      G. Y. Zhou - cross

1   Q.  Well, you told the jury that you knew that other people who

2   were witnesses were there because they were in other rooms

3   being interviewed; correct?

4   A.  They also went to give statements.  We went to the --

5   Q.  You went together to give the statements; correct?

6   A.  We did not go together.  I saw them when I went there.

7   Q.  And you saw them in the lobby waiting to go upstairs to the

8   detective squad; correct?

9   A.  I do not remember right now whether we were in the

10  neighboring rooms.

11  Q.  When you were interviewed by Detective Ng in an office,

12  okay, isn't it so that he closed the door so that nobody could

13  see who he was interviewing?

14  A.  I do not remember the night that I gave the statement.

15  Q.  Now, the incident that we're talking about, the shooting,

16  happened in July of '04, which is about eight and-a-half years

17  ago, right?

18  A.  Yes.

19  Q.  And from that night, about eight and-a-half years ago, when

20  you spoke to Detective Ng, when was the next time you spoke to

21  somebody from law enforcement about what happened that night?

22  A.  After speaking to Ng and after speaking to law enforcement?

23  Q.  Yeah.  Well, let's be clear.  You spoke to Detective Ng

24  within a day or so of the shooting; correct?

25  A.  Yes, I went to speak to him at 109 precinct.

D4BVLIN4                         G. Y. Zhou - cross

1   Q.  Okay.  And after that night, when was the next time any

2   police officer or agent or prosecutor spoke to you about what

3   happened that night?

4   A.  You mean after the arrest this time?

5   Q.  I'm asking you about how long it was from your interview

6   with Detective Ng until you again spoke to a police officer,

7   agent, or prosecutor about the shooting.

8   A.  After a few years.

9   Q.  Several years; correct?

10  A.  Yes.  I don't remember exactly how many years.

11  Q.  If I told you it was on June 22nd of 2010, does that sound

12  about right?

13  A.  I do not remember.  I do not keep track of the time.

14  Q.  Who was the first person in law enforcement that you spoke

15  to after a few years?

16  A.  I don't speak English.

17  Q.  Do you see the people at this table?  Do you see these

18  folks?

19  A.  I did go in to give statements.

20  Q.  I'm asking you if you can see the people at this table.

21  A.  Yes, I can see them.

22  Q.  Were some of the people at this table or one of the people

23  at this table the next person you spoke to about the shooting

24  after you spoke to Detective Ng eight and-a-half years ago?

25  A.  You mean when I gave statements to the prosecutor?

D4BVLIN4                           G. Y. Zhou – cross

1   Q.  Yes, that's what I mean.

2   A.  Yes, I had given my statement.

3   Q.  Okay.  And how was it that you knew that you needed to go

4   and speak to the prosecutor and the agents?

5   A.  I heard that he was arrested, so I went in to give a

6   statement.

7   Q.  Well, how did you know where to go?

8   A.  The agent told me to go in to give a statement.

9   Q.  Oh, you were contacted by one of the agents?

10  A.  No.  Let me think about this.  Sorry.  The agent did tell

11  me to go in to give a statement.

12  Q.  Okay.  Was that Agent Varian who sits at the table?

13  A.  I don't know the name.

14  Q.  Is it this gentleman here with the short hair?

15  A.  Yes.

16  Q.  Okay.  And did he call you on the phone, did he come to

17  your house?  How did he contact you about coming in and give a

18  statement?

19  A.  I got an interpreter.

20  Q.  Did Agent Varian come and knock on your door and say, I'd

21  like to speak to you, or did he call you on the phone, or did

22  he send you a telegram?  How did you know that the government

23  wanted to speak with you?

24  A.  Give me a few minutes.

25          I went to look for the person responsible for this.

D4BVLIN4                         G. Y. Zhou - cross

1    Q.  You went to look for the person responsible?

2    A.  I heard that he was arrested.

3    Q.  You heard that Mr. Lin was arrested?

4    A.  Yes.  Correct.

5    Q.  Who did you hear it from?

6    A.  I heard from friends outside.  They all knew.

7    Q.  Friends of yours.

8    A.  People outside said that Ding Pa got arrested.

9    Q.  And the people that told you that were friends; correct?

10   A.  Yes.  I heard about it, so I found out.

11   Q.  Did one of your friends give you the telephone number of

12   Agent Varian?

13   A.  What do you mean?  Can you explain?

14   Q.  You heard from people on the outside that Mr. Lin was

15   arrested, that's what you told us; correct?

16   A.  Yes.

17   Q.  And when you heard that Mr. Lin was arrested, somehow you

18   got in touch with Special Agent Varian, right?

19   A.  I asked a friend to help me.

20   Q.  Which friend?

21   A.  I can't say the name properly, but it was through another

22   person.

23   Q.  Say the name improperly and we'll do the best we can.

24   A.  I asked somebody to look for this person, so I don't really

25   know the name.

D4BVLIN4                              G. Y. Zhou - cross

1          THE COURT:  Which person?

2          THE WITNESS:  It was a friend of mine, but he went

3    through his friend's friend.

4    Q.  Somehow through two or three different parties, you were

5    able to get the name and telephone number for Agent Varian?

6    A.  The telephone number, but I don't speak English.  So then

7    set a place for me to go to to wait for him, and I went there

8    and went to pick me up.  Someone came to pick me up, and then I

9    went in.

10   Q.  And the friend that set up this meeting, that person is an

11   informant for the immigration service; correct?

12   A.  I didn't know that.

13   Q.  I'm sorry?

14   A.  I did not know that.

15   Q.  Do you know it now?

16   A.  I did not know whether he was doing that or not.

17   Q.  Well, do you know anybody that has ever told you that

18   they're an informant for the immigration service?

19   A.  I don't know of them.

20   Q.  You don't know of anybody who's ever told you that?

21   A.  If he were an informant, he wouldn't tell me that.

22   Q.  You know Dong Jai, right?

23   A.  I didn't mention his name.  I don't know what he did or did

24   not do.

25   Q.  I'm asking you if you know Dong Jai.

D4BVLIN4                          G. Y. Zhou - cross

1   A.  I do know Dong Jai.  He's my sister's boyfriend.

2   Q.  And doesn't he go around Chinatown telling everybody he's a

3   snitch for immigration, and people do things that he wants them

4   to do because they're afraid of him?

5   A.  No, no, no, I don't know that.

6   Q.  Are you the only person in Chinatown that doesn't know

7   that?

8            MS. BURNS:  Objection.

9            THE COURT:  Objection sustained.

10  Q.  So eventually there came a time that you met and sat down

11  with Agent Varian and some of the other folks at this table,

12  right?

13  A.  I went to see the prosecutor to give my statement to talk

14  about what happened in the past, yes.

15  Q.  And would you say that was around June of 2010?

16  A.  I do not remember when that was.  I don't remember the

17  exact date.  Plus I went to work.

18  Q.  Plus what?

19  A.  Plus I went to work.

20           MR. SKINNER:  Your Honor, the parties will stipulate

21  that the first time Agent Varian met with the witness was on

22  June 22nd, 2010.

23           THE COURT:  Very well.

24           MR. COHEN:  Thank you.

25  Q.  Now, going back for a moment to 2004, when you met with

D4BVLIN4                           G. Y. Zhou - cross

1   Detective Ng, that was in an office in the 109th precinct;

2   correct?

3   A.  Yes, that was in office, yes, in office.

4   Q.  There were some chairs and a table in the office; correct?

5   A.  Yes.

6   Q.  And you sat at the table on one of the chairs, and you and

7   Detective Ng had a conversation, right?

8   A.  Yes, taking notes and giving statement the night -- what

9   happened during the night.

10  Q.  Okay.  And then years later, on June 22nd of 2010, when you

11  met with Agent Varian and some of the prosecutors, that was

12  also in an office close to here, right?

13  A.  Yes, I did, but I don't recall when.

14  Q.  Don't worry about the day.  We've agreed it was June 22nd,

15  2010.

16  A.  I don't remember this.

17          MS. BURNS:  To be clear, the stipulation was that the

18  first time he met with Agent Varian was June 22nd, 2010, not

19  with anybody else.

20          THE COURT:  Well, just let me understand.  You're not

21  representing that he met with someone else before that, are

22  you?

23          MS. BURNS:  No, but I think the question implied that

24  there were prosecutors present.  And I just want to be clear --

25          MR. COHEN:  Ms. Burns is absolutely correct.

D4BVLIN4                         G. Y. Zhou - cross

1   Absolutely correct.

2   Q.  The first time you met with Agent Varian and another agent,

3   Agent Lee, was on June 22nd of 2010, right?

4   A.  I don't remember.  I do not know the time.

5           THE COURT:  Well, it's been agreed.

6   A.  I don't remember.  I do not remember when.

7   Q.  I'm not asking you when.  I'm asking you who.

8   A.  The fact is I do not remember.

9   Q.  I know.  Everybody knows.

10          The question is the first meeting you had with

11  somebody from the federal government, it was with Special Agent

12  Varian and another special agent named Lee; correct?

13  A.  I don't know.  I do not know their names.

14  Q.  This gentleman, was he --

15  A.  I do not even know his name.

16  Q.  I didn't ask you his name.  I asked you if this

17  gentlemen -- and his name is Tim.  Is Tim the agent that you

18  met with?

19  A.  Yes, yes, he was taking notes, yes.

20  Q.  Okay.  And was there another agent there also besides Tim?

21  A.  Yes, two agents were there when I was giving the

22  statements.

23  Q.  Okay.  And there was also a translator there; correct?

24  A.  Yes, there was a translator or interpreter.

25  Q.  Okay.  And the translator who was there was somebody that

D4BVLIN4                        G. Y. Zhou - cross

1   spoke a language that you speak; correct?

2   A.  Yes.

3   Q.  And you had no difficulty understanding that translator;

4   correct?

5   A.  Yes.

6   Q.  And, in fact, do you recall telling Agent Varian and the

7   other agent that as soon as Ding Pa and the unknown male came

8   in, Ding Pa pointed to Yiqun and ordered the unknown male to

9   shoot him.  Do you remember saying that to Agent Varian?

10  A.  Could you repeat?

11  Q.  Yes.  You were interviewed by Agent Varian.  Do you

12  remember telling him that as soon as Ding Pa and the unknown

13  male came into the room, Ding Pa pointed to Yiqun and ordered

14  the unknown male to shoot him?

15  A.  Whatever I have said today, that's what I told the agent.

16  Q.  Well, that's what we're talking about, sir.  I'm asking you

17  whether or not you told Agent Varian the words that I just

18  spoke.

19  A.  I said when Ding Pa came in, I wanted to have a toast with

20  him.  And then he just told me to sit down.  And then I stood

21  there for a while.  And then few shots were fired, and then

22  just left.

23  Q.  That's what you told Agent Varian the first time you met

24  with him in June of 2010, right?

25  A.  Whatever happened that night, and later on, that's what I

1   told him.

2   Q.  So you're telling the jury now that on June 22nd of 2010,

3   you told Agent Varian exactly what you testified to today and

4   yesterday?

5   A.  Yes.

6   Q.  Isn't it true that you never told Agent Varian at that

7   first meeting that Ding Pa ever said to you, Sit down.  This

8   has nothing to do with you.  You never said that to Agent

9   Varian in the first meeting you had with him; isn't that true?

10  A.  But it happened so long ago, I will have to try to remember

11  it very slowly.

12  Q.  Take your time.

13  A.  It happened so long ago, so I have to remember one-by-one.

14          MR. COHEN:  Judge, maybe I can, in the way that I did

15  yesterday, try to refresh the witness's recollection with some

16  notes.

17          May I approach?

18          THE COURT:  Yes.

19          MR. COHEN:  3504-1.

20  A.  No, I don't remember.  I never said that.

21  Q.  You never said that?

22  A.  It have been so long ago, I have to try to remember it very

23  slowly.  I just -- I'll remember it slowly.  It's been ten

24  years.

25  Q.  No, it's actually been less than three years since you made

1  this statement.

2  A.  But it happened so long ago.  And I know this incident, but

3  I have to try to remember it slowly.

4           THE COURT:  You're being asked what you said to Agent

5  Varian, not what happened long ago.

6  A.  At that time I did not remember or I said something wrong.

7  Q.  So do you admit that you did not tell Agent Varian that, as

8  you told the jury, Ding Pa said, Sit down.  This has nothing to

9  do with you.  Do you admit that you did not say that to Agent

10  Varian on June 22nd?

11  A.  When I was giving a statement, I was trying to remember

12  very slowly.

13  Q.  Are you saying that you remember it better today than you

14  did three years ago when you spoke to Agent Varian?

15  A.  Yes, to remember it very slowly.  And the agent told me

16  when I'm in court I should not tell any lies.

17           THE COURT:  That's not the question.

18  A.  So I have to remember it very slowly.

19  Q.  Well, then let's take a trip back to the 109th precinct in

20  July of 2004.

21           Isn't it true that when you spoke to Detective Ng, you

22  said that you heard Ding Pa say in the Fuzhou dialect, Shoot

23  him.  And then heard bang, bang, bang, bang.  And that you

24  never told -- and you never told Detective Ng that Ding Pa

25  said, Sit down.  This has nothing to do with you.

D4BVLIN4                          G. Y. Zhou - cross

1        THE INTERPRETER:  Counsel, could you repeat the

2   question please?

3        MR. COHEN:  Could I ask the reporter to read it back.

4        (Record read)

5   A.  Yes, I said that, yes.  I said Ding Pa told me to sit down.

6   Q.  You told that to Detective Ng?

7   A.  I do not even know who this Detective Ng is.

8   Q.  Okay.  When you went to the precinct the day after the

9   shooting or later on the same day as the shooting, and you

10  spoke to the Chinese detective, sitting in an office where he

11  was taking notes, isn't it true that you never told him that

12  Ding Pa said to you, Sit down.  This has nothing to do with

13  you.

14  A.  A long time ago, after whatever happened at night.  It

15  happened so long ago, I don't remember whatever happened at the

16  beginning.

17  Q.  But we agree, sir, that your memory was better the day

18  after the shooting than it was today; correct?

19  A.  Memory at that time, yes.

20  Q.  Now, after the first meeting you had with Agent Varian and

21  the other agent, did there come a time about two months later

22  that you met with them again?

23  A.  When are you talking about, before 2004 or --

24  Q.  No, no, I'm talking about in 2010, June of 2010.  You said

25  somehow through somebody you got in touch with Special Agent

D4BVLIN4                          G. Y. Zhou – cross

1   Varian, and you went and had a meeting with him and another

2   agent.  Right?

3   A.  Yes.

4   Q.  Okay.  Now, about two months later, seven or eight weeks

5   later, you had another meeting that Agent Varian was present

6   at; correct?

7   A.  I don't exactly know when was the second meeting, but I did

8   see him.

9   Q.  But what?

10         THE INTERPRETER:  I do not exactly remember when

11   during the second meeting, but I did see him.

12         THE COURT:  You met him again?

13         THE WITNESS:  I don't remember, because at that time I

14   could not think.  And so I went there to ask something.  So I

15   wanted to give in more detail.  And that, of course, I should

16   not lie.

17   Q.  So you wanted to have that meeting because you wanted to

18   provide more details?

19   A.  Yes.

20   Q.  And you contacted them and said, I'd like to meet with you

21   again because I want to give you some more details?

22   A.  Yes.

23   Q.  How did you contact them?

24   A.  I knew -- I knew that.  And then somebody else interpreted

25   or translated for me.

D4B6LIN6                          G.Y. Zhou - cross

1    BY MR. COHEN:

2    Q.  So you had somebody reached out to Agent Varian and said

3    you wanted another meeting?

4    A.  My first time going there and during the second time I knew

5    where I should go to look for him.

6    Q.  Did you just show up unannounced and say, Here I am to talk

7    to you?

8    A.  Someone else made a phone call on my behalf.

9    Q.  Who?

10   A.  I told someone who speaks English.

11   Q.  Who?

12   A.  My friend.

13   Q.  Who?  What is his name?

14   A.  Name.

15   Q.  Name?

16   A.  Let me try to remember.  I told someone else to make a

17   phone call on my behalf.  Regarding the name, it is so long ago

18   I don't remember.  At that time I was working in a restaurant.

19   His name was in English so I do not know.  His name was

20   English.  I do not really know.

21            THE COURT:  What was the English name?

22            THE WITNESS:  He was working in the restaurant.  His

23   English name?  I do not remember his English name.

24   Q.  But you just asked this guy who had an English name who

25   spoken English call Agent Varian and set up a meeting?

D4B6LIN6                          G.Y. Zhou - cross

1  A.  To make a contact for me so I knew how to go there.

2  Q.  You were interested in having a meeting; correct?

3  A.  Yes.

4  Q.  At this meeting Agent Varian was there; right?

5  A.  Even until now I do not know his English name.  I just know

6  the prosecutor.  I just know the prosecutor.

7  Q.  Let's agree that this is Agent Varian.  This is Agent

8  Varian.  Do you know who he is?

9  A.  What is his name?

10 Q.  Agent Varian.

11 A.  No.

12 Q.  You know the prosecutors; right?

13 A.  Yes.

14 Q.  Do you know what her name is?

15 A.  I do not know.  I do not know English.

16 Q.  Do you know this gentleman?

17 A.  I went in.  I saw him.

18 Q.  So at the second meeting where Agent Varian was there, do

19 you remember Ms. Burns if she was there also?

20 A.  A long time ago.  I did not really pay that much attention

21 whether it was -- whether they were there or not.

22 Q.  Did you pay attention to the questions they were asking you

23 and the answers you were giving them?

24 A.  When I go into these places, I am very nervous and scared

25 so I listen to -- to what was said very slowly.

D4B6LIN6                              G.Y. Zhou - cross

1   Q.  Are you nervous and scared in a government building because

2   you know you should have been deported from the United States?

3   A.  No.  I am just scared to go into these places because I

4   don't speak English and other reasons.

5   Q.  Isn't there always an interpreter there when you met with

6   the prosecutors and with the agents who Foochowese?

7   A.  Yes.

8   Q.  And isn't it true that you never have difficulty

9   understanding the interpreters that are there?

10  A.  I understood.

11  Q.  Okay.  Isn't it true that at the meeting that you had, not

12  the first one you had with Agent Varian and his partners but

13  the first one you had with Agent Varian and Ms. Burns that when

14  you were asked basically what happened and you said Ding Pa saw

15  Yi Qun and said to the shooter, This is the guy?  Isn't that

16  what you told people at the meeting I am talking about now?

17  A.  I don't remember what I said.  It was so long ago.  I have

18  to think this through slowly.

19  Q.  I am trying to refresh his recollection with 3504-2.

20          Wait.

21          MR. COHEN:  Have you finished, Ms. Lau?

22          THE INTERPRETER:  Yes.

23  Q.  Now I have a question for you.  Does that refresh your

24  recollection that at the meeting you had with Ms. Burns and

25  Agent Varian that you said that Ding Pa saw Yi Qun and said to

1   the shooter, That is the guy, that you didn't know the name of

2   the shooter and that the shooter shot Yi Qun?  Does that

3   refresh your recollection that is what you told the prosecutors

4   and Agent Varian at that meeting?

5   A.  I do not remember what I said before.  You asked me these

6   questions.  I am very confused now.

7   Q.  Are my questions confusing you, sir?

8   A.  Yes.  You are asking me these questions.  I don't know.  I

9   don't speak English.

10  Q.  I don't speak Fuchow, but I know Ms. Lau who stands next to

11  you speaks very well and you are having no trouble

12  understanding her, are you?

13          MS. BURNS:  Objection to the form of that, your Honor.

14          THE COURT:  Let's move on.

15  Q.  Are you having any difficulty understanding Ms. Lau?

16  A.  I understand, but when you ask this and that, I get very

17  confused in the head.  Plus I have to think back to things that

18  happened in the past.  I am more and more confused.

19          THE COURT:  At an appropriate time we're going to take

20  another recess.

21          MR. COHEN:  This will be such a time.

22          THE COURT:  We're going to take a 10-minute recess.

23          (Jury excused)

24

25

D4B6LIN6                          G.Y. Zhou - cross

 1              (In open court; jury not present)

 2              THE COURT:  How much more do you have?

 3              MR. COHEN:  I would say 15 minutes, but that could be

 4     an hour and a half.

 5              THE COURT:  We're coming down the home stretch; is

 6     that right?

 7              MR. COHEN:  I hope so.  I certainly thought I would

 8     have been done.

 9              THE COURT:  We don't need speeches, just information.

10              MR. SKINNER:  With the Court's permission can we offer

11     the witness a granola bar or something.  He has no water or

12     anything.

13              THE COURT:  I haven't prevented anybody from giving

14     anything.

15              MR. SKINNER:  We typically wouldn't speak to --

16              THE COURT:  It doesn't have to be you.  Deliver the

17     refreshment.

18              MS. BURNS:  We need an interpreter to speak to him.

19     We'll take care of that right now.

20              THE COURT:  You can have the interpreter ask him.

21              MR. SKINNER:  Better safe than sorry when a government

22     is speaking to a witness who is being cross-examined.

23              THE COURT:  You and Ms. Burns should not talk to him.

24     You don't need to in order to find out what he would like to

25     eat.

D4B6LIN6                       G.Y. Zhou – cross

1            MR. SKINNER:  We don't.  Somebody who helps the

2    government is still going to talk to him.

3            THE COURT:  Of course.  I understand.

4            MR. SKINNER:  Thank you, your Honor.

5            (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (In open court; jury present)

 2                    THE COURT:  Please be seated.

 3                    You may proceed.

 4                    MR. COHEN:  Thank you, your Honor.

 5     BY MR. COHEN:

 6     Q.  Mr. Zhou, we talked about one meeting you had with

 7     Detective Varian back in '04 at the 109th and then meeting you

 8     had with Agent Varian and then another meeting you had with

 9     Agent Varian and the prosecutors.  I wanted to bring you up to

10     a fourth meeting that you had which took place on December 5th

11     of 2011.

12                    Do you remember that after those meetings that I first

13     described that there came a time around December that you had

14     another meeting?

15     A.  I don't remember.

16     Q.  Well, the date is not that important, but do you remember

17     that there were several meetings that you had with the agents

18     and you mentioned the prosecutors?

19     A.  I don't know who is the prosecutor, but I did have

20     meetings.

21     Q.  Didn't you say earlier, maybe 20 minutes ago, that you knew

22     who the prosecutors were in the case?

23     A.  Those two in the front, are they the prosecutors?

24     Q.  Those folks, yes.  You remember them, right?

25     A.  Yes.

D4B6LIN6                         G.Y. Zhou - cross

1    Q.  When you met with them that was in an office near here?

2    A.  Here.

3    Q.  It was close to this building?

4    A.  Yes.

5    Q.  And there was a translator there, right?

6    A.  Yes.

7    Q.  And you remember on another occasion after the meetings

8    we've already talked about when they asked you what happened

9    that night, you said Ding Pa came in with someone and Ding Pa

10   said, Open fire, to the other man and the man opened fired,

11   pointed to Yi Qun.

12   A.  He came in.  I toasted him and he told me to sit down and

13   after I sat down shortly after that then the shooting started.

14          MR. COHEN:  Move to strike all that.  That is not what

15   I asked him.

16          THE COURT:  That is not the question.

17          THE WITNESS:  Sorry.

18   Q.  The question is not to tell us what happened that night.  I

19   am asking you whether on the fourth occasion that you met with

20   law enforcement you told them that Ding Pa came in the room

21   with someone and said open fire and the man opened fire.  Did

22   you tell that to the prosecutors?

23   A.  I do not remember.

24   Q.  Isn't it true --

25   A.  I had to think slowly about what I said.  I said Ding Pa

1   said to shoot and then the person next to him took the gun and

2   opened fire.

3   Q.  So you didn't tell the prosecutors that Ding Pa said open

4   fire, you only told him that he said shoot?

5   A.  That's what I told the prosecutors.  He came in.  I stood

6   up to have a drink with him --

7   Q.  Sir, excuse me.  That is not what I am asking you.  I am

8   asking you whether when you spoke to the prosecutors the fourth

9   time the words that you said that Ding Pa said was open fire?

10  A.  He said shoot, but I don't remember whether I said open

11  fire or shoot.

12          THE COURT:  Are they different words in Fuchowese.

13          THE INTERPRETER:  Yes, your Honor.

14          MR. COHEN:  May I approach witness, your Honor?

15          THE COURT:  Yes.  But what you have is in English.  So

16  you have to a approach the translator.

17          MR. COHEN:  May I approach the translator?

18          THE COURT:  Yes.  3504-4.

19  A.  Yes.  That's what happened.  As soon as he said shoot, this

20  man pointed at Yi Qun and started shooting at him.

21  Q.  Well, did Mr. Lin say shoot?  Did he say open fire?  Did he

22  say that is him?  Which did he say?

23  A.  He said, Shoot.

24  Q.  He didn't say open fire?

25  A.  Who said that?

D4B6LIN6                              G.Y. Zhou - cross

1   Q.  Did anybody say that?

2   A.  I do not know.  I don't remember.  I said shoot.

3   Q.  You said shoot?

4   A.  I said shoot, but who said this?

5   Q.  Did you ever tell the prosecutors that Mr. Lin said open

6   fire?

7   A.  Yes, correct.  He said shoot.  Shoot is open fire.

8   Q.  Well, did he say shoot or --

9           THE COURT:  That is why I asked you if they are

10  different words.

11          MS. BURNS:  I think this has been asked and answered.

12          THE INTERPRETER:  Your Honor, the words are different,

13  but I don't want to speculate but maybe he is thinking --

14          THE COURT:  I understand.  That is one of the problems

15  with using words that are translated into English from another

16  language.

17          MR. COHEN:  It depends on the translator, your Honor.

18          MS. BURNS:  Objection.

19          THE COURT:  It is more complicated than that.  It has

20  to do with the idioms of the language.  Let's move on.  We'll

21  discuss that later.

22  BY MR. COHEN:

23  Q.  Mr. Zhou, would you agree with me that the words "shoot

24  him" and the words "open fire" are different?

25  A.  Correct.  Shoot and open fire are different words.

D4B6LIN6                           G.Y. Zhou - cross

1   Q.   Right.

2   A.   But to the Fuchowese people it means the same thing.  To us

3   shooting and open fire it's the same thing.

4             THE COURT:  What is the word for shoot in Fuchowese?

5   Let's ask the witness what the word is?

6             THE WITNESS:  To shoot means you open fire.

7             THE COURT:  We're not speaking English now.  I want to

8   know the Fuchownese word from the witness for shoot.  He

9   testified about it this morning.

10  A.   To shoot it means to fire.

11            THE COURT:  No.  We're not asking that.  What is the

12  word in Fuchowese for shoot?

13            THE INTERPRETER:  Your Honor, once I translate that

14  then that is the word that he hears already.

15            THE COURT:  It has already been said earlier today?

16  Is there one word for shoot in Fuchowese?

17            THE INTERPRETER:  Yes.  That's more of a question to

18  me than him.  The word to shoot is (unintelligible) and open

19  fire is (unintelligible) two words or two sounds, two syllables

20  or two phonetics instead of one.  It is different.

21            THE COURT:  Let's move on.

22  BY MR. COHEN:

23  Q.   After that meeting that you had with the government, you

24  had another meeting with them in July of 2012 with both of the

25  prosecutors, Agent Varian and Ms. Lau translating, the lady

D4B6LIN6                          G.Y. Zhou - cross

1   standing next to you last summer; do you remember that?

2            THE INTERPRETER:  Can you give me the date again?

3            MR. COHEN:  July 2012.  July 18th, 2012.

4   A.  I remember.

5   Q.  Isn't it true that at that meeting for the first time ever

6   you told somebody in law enforcement that Mr. Lin said, Sit

7   down, this has nothing to do with you?  That was the first time

8   that you ever told anybody in law enforcement that Mr. Lin said

9   those words?

10  A.  Yes.  I said that.  He said sit down, this has nothing to

11  do with you.

12  Q.  Is it true, sir, that that was the first time that you ever

13  told anybody in law enforcement that Mr. Lin said those words,

14  that you never told anybody before that he said that when you

15  were asked to tell them what happened?

16  A.  That is because I have to slowly think back.

17           THE COURT:  We're not asking you why, but the question

18  is is that so?  Is that true that is the first time you said

19  it?

20           THE WITNESS:  That I said what?  That he told me to

21  sit down and that it has nothing to do with me?

22  Q.  Correct.

23  A.  I don't know whether it was the first time, but he did say

24  to me that night that you sit down, this has nothing to do with

25  you.

D4B6LIN6                            G.Y. Zhou - cross

1          MR. COHEN:  Judge, I move to strike everything after,

2     I don't know if it was the first time.

3          MS. BURNS:  Objection.

4          THE COURT:  Overruled.  The question was it the first

5     time and the answer was I don't know if it was the first time.

6     He has testified otherwise on that subject.  That was not the

7     question now as to what happened.  The question here was about

8     what he said and when.

9          Let's move on.

10    BY MR. COHEN:

11    Q.  Now, when you testified yesterday you were talking about

12    having some problems with the family planning people in China,

13    correct.

14    A.  Yesterday what happened.?

15          MS. BURNS:  Your Honor, we went over this at length.

16          MR. COHEN:  This is a little different, Judge.

17          THE COURT:  What is the question?  We don't need the

18    introduction.

19          MR. COHEN:  I have to lay a foundation.

20          THE COURT:  I will permit you because you have laid

21    the foundation before.

22          MR. COHEN:  Okay.

23          THE COURT:  What is the question?

24    Q.  Did the family planning people in China destroy your home?

25    A.  Yes.

D4B6LIN6                          G.Y. Zhou - cross

1   Q.  And you testified to that yesterday; correct?

2              THE COURT:  You don't have to go through that.  What

3   is next?

4   Q.  Did you also testify yesterday when I asked you about what

5   you told immigration officials here, did you also testify that

6   they came to my home and they were saying they were going to

7   destroy my home?

8              MS. BURNS:  The record speaks for itself as to what he

9   testified to.

10             THE COURT:  You want the stenographer to have to go

11  through yesterday's minutes?

12             MR. COHEN:  These are yesterday's minutes.

13             THE COURT:  You are reading them?

14             MR. COHEN:  I have the transcript, your Honor.  Thank

15  you.

16             THE COURT:  Very well.  Let's move on.  You will argue

17  that when the time comes.

18             MR. COHEN:  Well Judge, I have no further questions.

19             THE COURT:  Very well.

20             MS. BURNS:  We have no redirect, your Honor.

21             THE COURT:  Very well.  You may step down.

22             (Witness excused)

23             THE COURT:  Is there a short witness?

24             MR. SKINNER:  Your Honor, we have another witness who

25  has been testifying for quite some time.

D4B6LIN6                          G.Y. Zhou - cross

1              THE COURT:  Let's put him on.

2              MR. SKINNER:  The government calls Huo Guang Chen.

3              Let's see how he spells it.  I don't always spell it

4    the same way they do.

5              THE COURT:  I take it he speaks English?

6              MR. SKINNER:  No.  He speaks through an interpreter,

7    but I think he will be able to as the first witness did give a

8    spelling of his name.

9              THE COURT:  Thank you.

10             THE DEPUTY CLERK:  Raise your right hand.

11    CHEN HUO GUANG,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. SKINNER:

16    Q.  Good afternoon, Mr. Chen.  Where are you from?

17    A.  China.

18    Q.  When did you first come to the United States?

19    A.  March 1995.

20    Q.  Are you a citizen of the United States?

21    A.  No.

22    Q.  Are you here legally?

23    A.  Yes.

24    Q.  Mr. Chin, how were you notified to be in court today?

25    A.  I received a court subpoena.  A subpoena from court.

D4B6LIN6                         Chen - direct

1   Q.  Are you testifying here today under a court order called an

2   immunity order?

3   A.  Yes.

4   Q.  What do you understand that order to do?

5   A.  The order tells me that I have to be here to testify.

6            THE COURT:  No.  That is not what it tells you.

7            THE WITNESS:  That I refuse to answer questions.

8            THE COURT:  It tells you that you will not be

9   prosecuted for any answers that you give.  You may have a more

10  accurate description, but that is the effect.

11  Q.  Is it your understanding that because you received an

12  immunity order that you will not be prosecuted for the answers

13  that you give in response to my questions?

14  A.  Yes.

15  Q.  So if you were to admit to committing crimes while

16  testifying today, you couldn't be prosecuted using those

17  admissions?

18  A.  Yes.

19  Q.  Does the immunity order provide you with any protection if

20  you lie today?

21  A.  No.

22  Q.  Does the immunity order provide you for any protection

23  using evidence other than your testimony in court today?

24  A.  No.

25            (Continued on next page)

1   Q.  Mr. Chen, have you met with representatives of the United

2   States government a number of different times prior to

3   testifying today?

4   A.  Yes.

5   Q.  And during those meetings, did you tell people from the

6   government about crimes that you committed?

7   A.  Yes.

8   Q.  What crimes did you tell the government that you committed?

9   A.  I smoked marijuana.  I'm an illegal immigrant.

10  Q.  Did you also tell the government about statements that you

11  had made in an asylum application?

12  A.  Yes.

13  Q.  Did you admit that you made some false statements in an

14  asylum application?

15  A.  Yes.

16  Q.  With regard to your marijuana use, when is the last time

17  you used marijuana more or less?

18  A.  Last year, about a year and-a-half ago.

19  Q.  And has your previous marijuana use affected your memory in

20  any way?

21  A.  No.

22  Q.  With regard to your legal status in the country, has anyone

23  from the government made you any promises about your

24  immigration status going forward?

25  A.  No promise.

D4BVLIN6                           C. H. Guang - direct

1    Q.  Does your immigration status depend in any way upon your

2    testimony in this trial?

3    A.  No.

4    Q.  Now, you testified earlier that you're originally from

5    China; is that correct?

6    A.  Yes.

7    Q.  When did you first come to the United States?

8    A.  March 1995.

9    Q.  What did you do for work when you first came to the United

10   States?

11   A.  I was doing odd jobs in a restaurant.

12   Q.  How long did you work in restaurants?

13   A.  I work until November 2001.

14   Q.  What did you start doing for work after that?

15   A.  I purchased a van, so I drove restaurant workers from New

16   York to Charlotte, North Carolina.

17   Q.  How long did you work in this business of driving people

18   between Charlotte and New York?

19   A.  Until May/June 2011.

20   Q.  And what did you do for work after that?

21   A.  I was a manager also at another bus company.  I was working

22   there as a manager.

23   Q.  So you worked in the same industry, just a different job?

24   A.  Yes.

25   Q.  Up until 2011, did you own the company or were you one of

D4BVLIN6                              C. H. Guang - direct

1   the owners?

2   A.  Yes.

3   Q.  After 2011, were you working for someone else?

4   A.  Yes.

5   Q.  Now, a moment ago I asked you about an asylum application

6   you filed that contained some false statements.  Do you

7   remember that?

8   A.  Yes, I remember.

9   Q.  And when did you file this asylum application?

10  A.  Around June 2002.

11  Q.  And what was in the asylum application that wasn't true?

12  A.  That application was false.

13  Q.  Do you recall what parts of the application were false?

14  A.  My story about meeting this person.  Someone else told me

15  his or her story, and it was false.

16          MR. COHEN:  I'm sorry, and what?

17          THE INTERPRETER:  Someone else told me his or her

18  story, and it was false.

19          THE COURT:  What do you mean "his or her"?

20          THE WITNESS:  Her.

21          THE COURT:  Told you what story?

22          THE WITNESS:  She said that her leg was broken, and

23  that she got into an auto accident and broke her leg.  And then

24  she started to believe in Christianity.

25  Q.  And did you say after meeting this person you converted to

D4BVLIN6                         C. H. Guang – direct

1  Christianity?

2  A.  Yes.

3  Q.  And did you say that you converted to --

4          MR. COHEN:  I object to the leading, Judge.

5          THE COURT:  Try to let it come from the witness.

6          MR. SKINNER:  Yes, your Honor.

7  Q.  When did you say you had converted to Christianity?

8  A.  In 2002.

9  Q.  I know you said it in 2002, but when, according to the

10  application, had you first converted?

11 A.  2001.  I don't remember the month.

12 Q.  Did you say in the application that you converted to

13 Christianity while you were still living in China?

14 A.  Yes.

15 Q.  What, if anything, did you say in the application about

16 what happened to you in China as a result of your conversion to

17 Christianity?

18 A.  That I was arrested by police.

19 Q.  Now, was that true or was it false?

20 A.  False.

21         THE COURT:  There are many Christians in China, aren't

22 there?

23         THE WITNESS:  Yes.

24 Q.  Had you, in fact, converted to Christianity before you left

25 China?

1    A.  No, I did not believe in Christianity.

2    Q.  And had you, in fact, been persecuted in any way while you

3    were in China because you were Christian?

4    A.  The reason I was arrested, it was not because my practice

5    of Christianity.

6    Q.  So why did you say in the asylum application that you were

7    Christian and that you had been persecuted because you were

8    Christian?

9    A.  Because at that time I thought when I applied based on

10   religion, that the United States government would accept.

11   Q.  Did someone tell you to say that in your asylum

12   application?

13   A.  Yes, yes, that's what I thought, as well.

14   Q.  Is that why you did it, because someone told you to do it?

15   A.  At that time a lot of people were doing it in such way.

16   Q.  Now, was your asylum application granted?

17   A.  No.

18   Q.  Did you receive an order of removal from the United States

19   in approximately 2003?

20   A.  No, I did not, because I moved to North Carolina.

21   Q.  Did there ever come a time where you learned that there was

22   an order of removal for you to leave the country?

23   A.  Until I found out the 21st of last month, March.

24   Q.  That's just a couple weeks ago?

25   A.  Yes.

D4BVLIN6                    C. H. Guang - direct

1    Q.  So up to that point in time, you knew the asylum

2    application had been denied, but you didn't know about the

3    order; is that accurate?

4    A.  Yes.

5    Q.  Now, prior to March 21st, had you filed another asylum

6    application?

7    A.  Yes.

8    Q.  What was the basis of this second asylum application?

9    A.  That I opposed the Chinese --

10             THE COURT:  Dictatorship.

11             THE INTERPRETER:  May I clarify with the witness, your

12   Honor?

13             THE COURT:  Right.  One ruler.

14             THE WITNESS:  One governmental system of China.

15             THE COURT:  The governmental system that didn't permit

16   people to choose their leader is what we're saying.

17   BY MR. SKINNER:

18   Q.  Mr. Chen, is it fair to say that in the second asylum

19   application you claimed that you had been persecuted because of

20   your politics while you were in China?

21   A.  Yes.

22   Q.  Now, is it true that you were, in fact, persecuted because

23   of your politics while you were in China?

24   A.  Yes, I was arrested by police.

25   Q.  Now, you say you learned on March 21st of this year that

D4BVLIN6                           C. H. Guang - direct

1   there was an order requiring you to leave the country; is that

2   right?

3   A.  Yes.

4   Q.  And where were you when you learned this?

5   A.  I was at the INS when I was having an interview.

6   Q.  Physically where were you, what state?

7   A.  When I was having an interview in New Jersey in the

8   immigration office.

9   Q.  And who told you about the order of removal at this

10  immigration office in New Jersey?

11  A.  The immigration officer there told me.

12  Q.  What happened after that?

13  A.  Two immigration officers there took me to a detention

14  facility.

15  Q.  Did they arrest you?

16  A.  Yes.

17  Q.  And what did you do after they arrested you?

18  A.  I made a phone call to Agent Tim.

19  Q.  Would that be Agent Varian sitting at the table here?

20  A.  Yes.

21  Q.  And did you tell the immigration officers that you were

22  scheduled to testify at this trial?

23          MR. COHEN:  Leading, Judge.  Objection.

24          THE COURT:  I think you should try to let it come from

25  the witness.

1          MR. SKINNER:  I'm trying to shortcut a little bit, but

2     that's fine.

3          THE COURT:  I understand, but let's not...

4     Q.  What, if anything, did you tell the immigration officers

5     about any subpoenas you may have had?

6     A.  I said that I would be -- I would have to come to testify

7     as a witness on April 8th.

8     Q.  And what did the immigration officers do after you told

9     them that you had to testify at this trial?

10    A.  Immigration officers called the agent.  And whatever they

11    were saying, I did not understand.

12    Q.  What happened after they called the agent?

13    A.  Later I was given three pieces of paper, and I was

14    photographed and fingerprinted.  And I was told to go and

15    report, to report on April 22nd.

16    Q.  Where were you told to report?

17    A.  This No. 26, over here.

18    Q.  You mean 26 Federal Plaza?

19    A.  Yes.

20    Q.  The building across the street?

21    A.  Yes.

22    Q.  And after you were told to report there, were you released?

23    A.  No, they gave it to me and said that I must report on April

24    22nd.

25    Q.  And after that, did they let you go?

D4BVLIN6                          C. H. Guang - direct

1    A.  Yes.

2    Q.  Do you know what's going to happen to you when you report

3    on April 22nd?

4    A.  I don't know.  I could be arrested.

5    Q.  Mr. Chen, do you know a man who goes by the nickname "Ding

6    Pa"?

7    A.  Yes.

8    Q.  When did you first meet him?

9    A.  March/April of 2000.

10   Q.  Where did you first meet him?

11   A.  At a gambling parlor in Chinatown.

12   Q.  And how did you come to meet him at a gambling parlor in

13   Chinatown in 2000?

14   A.  He was introduced to me by one of my friends.

15   Q.  What was the name of your friend who introduced you?

16   A.  Pan Zhen Chao.

17   Q.  Mr. Chen, can I ask you if you see Ding Pa in the courtroom

18   here today?

19   A.  Yes.

20   Q.  What table do you see him sitting at?

21            THE INTERPRETER:  I'm sorry?

22   Q.  What table do you see him sitting at?

23   A.  When you count, it's the second table.

24   Q.  What's he wearing?

25   A.  He's wearing black.

1          MR. SKINNER:  Your Honor, can the record reflect the

2     witness has identified the defendant.

3          THE COURT:  Yes, the record may so reflect.

4     Q.  Now, Mr. Chen, you testified that you met the defendant at

5     a gambling parlor; is that right?

6     A.  Yes.

7     Q.  Did he own that gambling parlor?

8     A.  No, it did not belong to him.

9     Q.  Do you know if he owned any gambling parlors?

10    A.  Yes, he had.

11    Q.  How many gambling parlors do you know of that the defendant

12    owned?

13    A.  As far as I know, he had one gambling parlor.

14    Q.  Where was it located?

15    A.  21 Eldridge Street, first floor.

16    Q.  Did you go there yourself?

17    A.  I went there alone.

18    Q.  But you visited this place yourself?

19    A.  Yes.

20    Q.  Where on the first floor of 21 Eldridge Street was this

21    gambling parlor located?

22    A.  The front was a barbershop.  It was in the back.

23    Q.  So it was in a separate room behind the barbershop?

24    A.  Yes.

25    Q.  Could you see the gambling parlor from the street?

D4BVLIN6                           C. H. Guang - direct

1    A.   No.

2    Q.   Were there any signs advertising the gambling parlor on the

3    street?

4    A.   No.

5    Q.   What kind of gambling took place at 21 Eldridge Street in

6    this back room?

7    A.   13 cards.

8    Q.   Is a card game?

9    A.   Yes.

10   Q.   Is money bet on the game?

11   A.   Yes.

12   Q.   When you were there, how much money did you see being bet

13   on this game?

14   A.   Each hand you can go up or down about $10,000.

15   Q.   Is that $10,000 per hand you said?

16   A.   With four people gambling, you can go up or down about

17   $10,000.

18   Q.   And how many hands were played per night?

19   A.   Many hands.

20   Q.   So is it fair to say that hundreds of thousands of dollars

21   were gambled per night in this gambling parlor?

22   A.   That's a possibility.

23   Q.   Now, you said the defendant owned this gambling parlor; is

24   that right?

25   A.   Yes.

1    Q.  And how do you know the defendant owned this gambling

2    parlor?

3    A.  Because he told other people that he opened this gambling

4    parlor, and he had his followers working inside opening the

5    doors.

6    Q.  Did you see the defendant at the gambling parlor?

7    A.  Yes.

8    Q.  Did the defendant do anything while you were watching him

9    that indicated to you he owned the place or he ran it?

10   A.  Sometimes he would collect the money.

11   Q.  Would he tell other people what to do?

12   A.  Yes.

13   Q.  And was there a commission that was taken out of the bets

14   that were made at this gambling parlor?

15   A.  Yes.

16   Q.  How much was the commission?

17   A.  Generally at five percent.

18   Q.  Where did the commission go?

19   A.  The money goes to him.  He collects.  Collected it.

20   Q.  "Him" meaning the defendant?

21   A.  Yes.

22   Q.  What year was it when you first went to this gambling

23   parlor at 21 Eldridge Street?

24   A.  It was in 2001.

25   Q.  And what year is it the last time you went, same year or

1    later?

2    A.  Later.

3    Q.  2002, 2003, more or less?  When is the last time you went?

4    A.  Around October of 2002.

5    Q.  Now, you say that you saw people working at the gambling

6    parlor; correct?

7    A.  Yes.

8    Q.  How many people did you see working there at a time

9    typically?

10   A.  Six to seven.

11   Q.  Now, you called the people who worked there followers; is

12   that right?

13   A.  Yes.

14   Q.  What's a follower?

15   A.  Followers are people who do work for him.

16   Q.  Are you familiar with the term "dailo"?

17   A.  Yes, I am.

18   Q.  Was the defendant a dailo?

19   A.  Yes.

20   Q.  How do you know the defendant was a dailo?

21   A.  Because he had followers following him and doing work for

22   him.  And in a gang, when he had followers, he was the dailo.

23   Q.  Did you see him telling his followers what to do?

24   A.  Yes.  When people come in, they would open the door, he

25   would tell them to open the door.

1          THE COURT:  What is the difference between an employee

2     and a follower?

3          THE WITNESS:  Employee is when you earn a stable

4     salary per day or per month and you file taxes and there's a

5     legitimate shop there.  That's an employee.

6     Q.  And what's a follower then?

7     A.  Follower, it's when there's no stable job, you follow him

8     to go and play, to go out to eat, you help him fight.  It's

9     like a gang, an organization.

10         THE COURT:  What do you mean "help him fight"?  What

11    fighting goes on inside a gambling house?

12         THE WITNESS:  Sometimes with other people, when they

13    go out and they get upset and at other people, then they would

14    tell -- then they would help fight the other people that they

15    were ordered to fight.

16    BY MR. SKINNER:

17    Q.  Mr. Chen, did you see Ding Pa with his followers out in

18    Chinatown here in Manhattan in places other than the gambling

19    parlor on Eldridge Street?

20    A.  In Chinatown, yes.

21    Q.  Let me direct your attention, Mr. Chen, to July 16th of

22    2000.  Do you remember that night?

23    A.  I do.

24    Q.  Where were you that night?

25    A.  I was at a gambling parlor in 21 Orchard Street.

D4BVLIN6                           C. H. Guang - direct

1   Q.  Was that here in Manhattan?

2   A.  Yes.

3           MR. COHEN:  I'm sorry, 21 what?

4           THE COURT:  Orchard Street.

5           MR. COHEN:  Orchard.  Thank you, your Honor.

6   Q.  And who owned this gambling parlor?

7   A.  It was my friend, Pan Zhen Chao.

8   Q.  Is that the same man you testified a few minutes ago first

9   introduced you to the defendant Ding Pa?

10  A.  Yes.

11  Q.  Now, did there come a time that night at 21 Orchard Street

12  when you saw the defendant?

13  A.  Yes.

14  Q.  Where were you when you saw him?

15  A.  I was with my friend at 21 Orchard Street.  We were

16  talking.

17  Q.  This is the gambling parlor; correct?

18  A.  Yes.

19  Q.  So did there come a time when Ding Pa came into 21 Orchard

20  Street?

21  A.  Yes.

22  Q.  What happened after he came in?

23  A.  He came in, pulled out a gun, and pointed the gun at my

24  friend Pan Zhen Chao's head.

25  Q.  What happened after that?

D4BVLIN6                          C. H. Guang - direct

1   A.  Then he said, I'm going to kill you tonight.

2          Pan Zhen Chao pleaded with him to let him go.

3   Q.  Did Ding Pa say anything to Pan about face?

4   A.  Yes.  He said that Pan Zhen Chao did not give him face.

5   Q.  What does "face" mean to you?

6   A.  "Face" is when he make a request to somebody, and someone

7   had to agree with him.  You have to agree and not reject him;

8   otherwise, people won't listen to what he have to say.

9   Q.  Is it like respect?

10  A.  It doesn't really have to do with respect; but if I make a

11  request, you have to agree, whether it's reasonable or not.

12  Q.  Is it power?

13  A.  Yes.

14  Q.  What happened after Pan started begging for his life that

15  night?

16  A.  He said, I will let you go tonight, but you have to give me

17  face in the future.

18          Then he shot at the ground, fired one shot, and left.

19  Q.  After he left, after firing that shot, what happened after

20  that?

21  A.  Then Pan called the police and the police came.

22          MR. SKINNER:  Your Honor, at this point, the

23  government would like to read into evidence a stipulation

24  between the parties.

25          THE COURT:  Very well.

1          MR. SKINNER:  "It is hereby stipulated and agreed

2     between the parties that Government Exhibit 40 contains one

3     deformed bullet that was found on July 16th, 2000 by the New

4     York City Police Department at the scene of a shooting that

5     occurred at 21 Orchard Street, New York, New York.  The bullet

6     was found lodged in the ceiling at the scene of the shooting.

7          "It is further stipulated and agreed that this

8     stipulation and Government Exhibit 40 may be received in

9     evidence at trial."

10          The government now offers Exhibit 106 and Exhibit 40.

11          MR. COHEN:  No objection.

12          THE COURT:  Very well.

13          Government Exhibit 6 and Government Exhibit 40 are

14     received in evidence.

15          (Government's Exhibits 40, 106 received in evidence)

16          MR. COHEN:  Six or 106?

17          MR. SKINNER:  106, your Honor.

18          THE COURT:  Thank you.  106.

19     BY MR. SKINNER:

20     Q.  Mr. Chen, let me direct your attention to 2001.  I believe

21     you testified earlier that you started a business around this

22     time; is that right?

23     A.  Yes.

24     Q.  And when in 2001 did you start the business, the beginning

25     of the year, the end of the year?

1    A.  It was November 2001.

2    Q.  And just remind us please what kind of business this was?

3    A.  It was to drive the workers from the restaurants in New

4    York to Charlotte, North Carolina.

5    Q.  So was it a bus business?

6    A.  Yes.

7    Q.  When you first started, did you have a big bus or a smaller

8    vehicle?

9    A.  It was a small 15-passenger vehicle.

10           THE COURT:  You called it a van when you testified

11   about it before.

12           THE WITNESS:  Yes, it was a van.

13   Q.  How many vans did you have when you first started?

14   A.  I had two.

15   Q.  Did you start this business by yourself or with anyone

16   else?

17   A.  I did it with my friend who was the partner, Chen Jia

18   Chuan, C-H-E-N, J-I-A, C-H-U-A-N.

19           MR. COHEN:  I'm sorry, what was the first --

20           THE INTERPRETER:  I'm sorry, D-I-N-G, J-I-A,

21   C-H-U-A-N.

22           MR. COHEN:  Thank you.

23           THE INTERPRETER:  Sorry.

24   Q.  So your partner's name is Ding Chuan, is that right?

25   A.  Yeah, some people call him by that name.

D4BVLIN6                          C. H. Guang - direct

1    Q.  Is that his nickname?

2    A.  That is not his nickname.  That's his name.

3    Q.  So what did you and your partner each do at the bus

4    business or the van business, whatever it was, at this point in

5    time?

6    A.  We drove.

7    Q.  Drove the vans?

8    A.  Yes.

9    Q.  Now, did there come a time when the defendant, Ding Pa, got

10   involved in this business?

11   A.  Yes.

12   Q.  And when was that that Ding Pa got involved?

13   A.  It was around May/June of '02.

14   Q.  So a couple of months after you first started at the end of

15   '01?

16   A.  Yes, about half a year.

17   Q.  Now, how did the defendant come to get involved in your

18   business?

19   A.  Because I got news that a big bus company was going to go

20   the same route that I was driving.  And I was afraid that he

21   would be competition to my business.

22   Q.  At this point in time, did you know that the defendant was

23   a dailo?

24   A.  I did.

25   Q.  And this is after that incident with the gunshot at Orchard

D4BVLIN6                              C. H. Guang - direct

1   Street that you told us about before, right?

2   A.  Yes.

3   Q.  So after learning about this possible competition, what did

4   you do?

5   A.  My partner Ding Jia Chuan and the defendant had a very good

6   relationship.  So he approach him about talking to the other

7   boss about not coming in to compete.

8   Q.  Was this a joint decision of yours and your partner's to go

9   talk to the defendant?

10  A.  Yes.

11  Q.  And why did you choose the defendant to go?

12  A.  Because the other person in Chinatown also get a lot of

13  face from other people, and the owner of the other bus company

14  and him were good friends.  So that person would give him face.

15  Q.  What, if anything, did you think the defendant would be

16  able to do for you?

17  A.  He would be able to convince the boss of the other company

18  not to come in.

19  Q.  You wanted to scare the other boss away?

20          THE COURT:  That was not the testimony of the witness.

21  Please don't lead.  Let it come from the witness.

22          MR. SKINNER:  Sorry, your Honor.  I tried to put it in

23  a question.

24          THE COURT:  That doesn't make it less leading.

25          MR. SKINNER:  Fair enough.

D4BVLIN6                              C. H. Guang - direct

1   Q.  What, if anything, did you offer the defendant if he were

2   to help you?

3   A.  My partner and I discussed to give him one-third of the

4   share of the company.

5   Q.  Did you actually offer him one-third of your company?

6   A.  Yes.

7   Q.  And at the time you made this offer to him, why did you

8   think the defendant might be able to convince the rival bus

9   company to go away?

10          MR. COHEN:  Objection.

11          THE COURT:  Objection sustained.

12  Q.  At the time you made this offer, why did you make this

13  offer --

14          THE COURT:  Objection sustained.

15  Q.  What happened after you made this offer to the defendant?

16  A.  The other bus company agreed not to come in to compete.

17  Q.  Did the other bus company ever run any buses on the route

18  from Chinatown to North Carolina?

19  A.  No.

20          THE COURT:  I think this is an appropriate point at

21  which to adjourn for the day.

22          MR. SKINNER:  This is fine, your Honor.

23          THE COURT:  Very well.

24          Members of the jury, remember, we are not going to sit

25  tomorrow.  We will reconvene on Monday morning.  We will start

D4BVLIN6

1   taking testimony at 10 o'clock in the morning.  And those who

2   come by 9:30 will have coffee and muffins.

3            Have a pleasant weekend.  And as the more you hear,

4   the more you must resist the temptation to discuss what you see

5   and hear.

6            Have a pleasant weekend.

7            (Jury excused)

8            THE COURT:  Very well.

9            We will reconvene at 10 o'clock Monday morning.

10           MR. SKINNER:  Thank you, your Honor.

11           Have a pleasant weekend.

12           THE COURT:  Same to all of you.

13           MR. SKINNER:  Thanks for the long day.

14           THE COURT:  We accomplished something.

15           MS. BURNS:  Yes.

16           (Adjourned to April 15, 2013 at 10 o'clock a.m.)

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                   Page

VINCENT TRANCHIDA

Direct By Ms. Burns  . . . . . . . . . . . . . 164

HENRY NIELDS

Direct By Mr. Skinner  . . . . . . . . . . . 177

GUANG YUN ZHOU

Cross By Mr. Cohen . . . . . . . . . . . . . 196

CHEN HUO GUANG

Direct By Mr. Skinner  . . . . . . . . . . . 275

GOVERNMENT EXHIBITS

Exhibit No.                                Received

 12    . . . . . . . . . . . . . . . . . . 170

 14    . . . . . . . . . . . . . . . . . . 183

 14 and 14 A  . . . . . . . . . . . . . . . 192

 40, 106  . . . . . . . . . . . . . . . . . 293