D4FVLIN1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        11 CR 114 (MGC)

5  XING LIN,

6              Defendant.                JURY TRIAL

7  ------------------------------x

8                                  New York, N.Y.
                                   April 15, 2013
9                                  10:13 a.m.

10
   Before:
11
                    HON. MIRIAM GOLDMAN CEDARBAUM,
12
                                        District Judge
13

14                          APPEARANCES

15
   PREET BHARARA,
16      United States Attorney for the
        Southern District of New York
17 PETER M. SKINNER
   JENNIFER E. BURNS
18      Assistant United States Attorneys

19 JOEL S. COHEN
        Attorney for Defendant
20
   ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
21                 DANIEL YANG, Fuchow Interpreter
                   LILY LAU, Fuchow Interpreter
22                 DANIEL CHAN, Fuchow Interpreter
                   JESSICA CHACE, Paralegal
23                 TIMOTHY VARIAN, Special Agent, HSI
                   JIAYING WANG, Legal Assistant
24

25

D4FVLIN1

```
 1              (Trial resumed)

 2              (In open court; jury not present)

 3              THE COURT:  I assume the defense has gotten the letter

 4    from the government, which I just received.

 5              MR. COHEN:  Yes, your Honor, I just received it, as

 6    well.

 7              THE COURT:  What I would like to see is a case in

 8    which the only person murdered is a third person; that is, that

 9    the person who is aimed at is the one who was killed, although

10    by mistake.  This is an entirely different scenario.

11              MR. SKINNER:  Your Honor, *New York v. Diaz* is that

12    case.

13              THE COURT:  A bullet went through one into another?

14              MR. SKINNER:  No, that was -- I thought you said you

15    wanted a case where the only person murdered was that person.

16              THE COURT:  Was the third person that you referred to;

17    that is, where the person intended was killed, and by accident

18    the bullet hit someone else, in addition, not in substitution.

19              MR. SKINNER:  Your Honor, we can continue to search

20    for that case.

21              THE COURT:  I would like to see that because that's a

22    very different scenario.

23              MR. SKINNER:  Well, I think it's --

24              THE COURT:  I don't want to argue it at great length

25    now.
```

D4FVLIN1

1          MR. SKINNER:  Very well.

2          THE COURT:  But I consider that a different matter.

3          MR. SKINNER:  I, of course, looked for a factual

4     scenario identical to ours, and didn't find it.  But I will

5     continue to look for one.

6          THE COURT:  Please.  Because there is a big difference

7     between shooting the wrong person and having the bullet

8     accidentally go through the right person and hit another.

9     That's a different scenario.

10         MR. SKINNER:  It's a different scenario.

11         THE COURT:  I don't want to argue it at length now,

12    but I think it's not at all clear that these cases apply to

13    that.

14         So in those cases, whoever was shooting thought he was

15    shooting the right person.  Here, the right person was shot.

16         MR. SKINNER:  But, your Honor, there's plenty of

17    cases --

18         THE COURT:  I would like to see the closest factual

19    case that you -- factually most similar, because cases are not

20    collections of sentences; they are facts.

21         MR. SKINNER:  And there are cases, and I can get them

22    for your Honor, where the intended victim was also shot.  The

23    classic example is the drive-by shooting where the intended

24    victim is sitting on a porch, another person is sitting next to

25    him, and they are both shot.  And I know I read one case with

D4FVLIN1

1    those exact facts, and I'll get that for your Honor.  I don't

2    know if I'm going to find a case where the bullet went through

3    one person and hit another.

4              THE COURT:  I understand.  But I'm interested in where

5    the bullet hit the wrong person.

6              MR. SKINNER:  I will get you some more cases.

7              THE COURT:  Good.  Where the aim was at the right

8    person and -- well, in our case the right person was also shot.

9              MR. SKINNER:  And there's certainly cases where the

10   right person was shot and the wrong person.  And in those

11   scenarios --

12             THE COURT:  Well, I'd like to see those cases.

13             MR. SKINNER:  You can have it.  Okay.

14             THE COURT:  It's not such a common occurrence.

15             MR. SKINNER:  It's not common, but it certainly does

16   happen.

17             THE COURT:  But I would like to get as close as we

18   can --

19             MR. SKINNER:  Very well, your Honor.

20             THE COURT:  -- to the factual issue.

21             All right.  Let's get the jury in.

22             MR. COHEN:  Your Honor?

23             THE COURT:  Yes.

24             MR. COHEN:  I don't know if your Honor was made aware

25   that on Saturday, *The Times* carried an article about this

D4FVLIN1

1    trial.  And the article, which was in the A Section, I think on

2    Page A15, as well as on the online edition, was essentially

3    cut-and-pasted from the government's 404(b) motion.  It was

4    hardly a balanced article, and it presented in the guise of

5    news and fact --

6                THE COURT:  So you want me to instruct the jury not to

7    read the newspaper about anything relating to this case.

8                MR. COHEN:  I do.  But beyond that, your Honor,

9    because of the tone of the article and because it really was so

10   one-sided, I would ask that your Honor ask whether any of them

11   has read it, initially telling them that there's nothing wrong

12   if they had, but encouraging them to be candid.  And then if

13   anyone says they had, to individually question that juror as to

14   what, if any, impact it had on them.  And finally, your Honor,

15   to instruct --

16               THE COURT:  I would like to see the article.  I did

17   not --

18               MR. COHEN:  I'm sorry, I actually --

19               THE COURT:  I did not read the Saturday *Times* except

20   for a few specific things.

21               MR. COHEN:  I can pull it up on my laptop.  I emailed

22   it to Mr. Daniels.  But I can pull it up on my laptop.  He may

23   have it, I don't know.

24               THE COURT:  Do we have it?  All right.  Let me see it.

25               I cannot control the newspapers.  I would not try.

D4FVLIN1

1          MR. COHEN:  Of course, your Honor.  Nor would any of

2     us want to live in a country where you could.  But it's a

3     concern --

4          THE COURT:  I am sure that it is covered in the

5     Chinese press.  I don't know if you've read those articles, but

6     I've seen --

7          MR. COHEN:  I have read --

8          THE COURT:  -- reporters from the Chinese press in the

9     courtroom.

10          MR. COHEN:  I have read them and I have to say, this

11     is one of the rare instances where the Chinese press actually

12     got it right, more so than *The Times* did.

13          THE COURT:  Well, they understood the language of the

14     witnesses.

15          MR. SKINNER:  Your Honor, I think it's fair to say

16     that there's been press coverage in multiple venues about the

17     trial.

18          THE COURT:  I'm sure that's true.

19          MR. SKINNER:  And the Court instructed the jury not to

20     be reading outside sources.

21          THE COURT:  Right.  But I will remind them --

22          MR. SKINNER:  I think that's fair.

23          THE COURT:  -- that they are not to read anything they

24     see about this trial.

25          MR. COHEN:  And as I was saying, your Honor, because

D4FVLIN1

of the tone of the article, I would ask for an instruction that

anything that jurors may have seen in this article is not to be

taken as fact, and the government still has --

THE COURT:  Well, I will be happy to advise them

anyhow that anything they read or see outside of the courtroom

is not evidence, and they may not take it into consideration.

(Pause)

THE COURT:  I don't even know where this comes from.

It doesn't come from the trial.

MR. COHEN:  Your Honor, literally it's a cut-and-paste

of the government's 404(b) motion.

MR. SKINNER:  I think he's referring to our enterprise

motion.

MR. COHEN:  I'm sorry, their enterprise evidence

motion.

MR. SKINNER:  And I don't think that it's a

cut-and-paste, but the terminology "Victim 2" certainly comes

from that motion.

THE COURT:  That's not a good thing.

But I do not control -- nor do I seek to control --

the press.  But I do want the jury not to read how does the

press even know or believe that the prosecutor intends to call

somebody as a witness.

MR. COHEN:  It was in the enterprise motion, Judge.

MR. SKINNER:  You had asked us, your Honor, to proffer

D4FVLIN1

1   the basis for how we intended to prove the things included in

2   the enterprise motion.  And we said in the enterprise motion we

3   intend to call Victim 2.

4            THE COURT:  I see.

5            MR. SKINNER:  And, of course, that's on public docket,

6   which is how The Times got it.

7            THE COURT:  Of course.  Of course.  Everything that's

8   filed with the Court is -- unless it's sealed, is public

9   docket.

10           MR. COHEN:  Judge, I'm not criticizing anybody.  I'm

11  just acting out of concern that --

12           THE COURT:  Of course.

13           MR. COHEN:  -- my client have a fair trial.  I'm not

14  criticizing the government for filing the motion; I'm not

15  criticizing the paper for printing the article, although I

16  think it could have been a little more balanced.  I'm simply

17  looking to protect Mr. Lin's right to a fair trial.

18           THE COURT:  Is this somebody in the court press

19  office?  I'm not familiar with the name.

20           MR. SKINNER:  I don't believe he is, your Honor.

21           THE COURT:  I don't think so either, because I know

22  most of the reporters.

23           MR. SKINNER:  He's not The Times regular correspondent

24  stationed here.

25           THE COURT:  Right.  I don't recognize the name.

D4FVLIN1

```
1          MR. COHEN:  Although there has been a Times reporter
2     here every day.
3          THE COURT:  That's a different matter.  The Times has
4     people who are in this courthouse in the pressroom everyday.
5          MR. COHEN:  Right.
6          THE COURT:  That's what I'm asking, whether he's one
7     of those, because I'm not familiar with the man.
8          MR. SKINNER:  I don't believe he is.
9          THE COURT:  Very well.
10         Let's get the jury.
11         (Jury present)
12         THE COURT:  Before we start taking testimony, I would
13    just like to remind you that you should not read anything about
14    this trial outside of court.  And that means any newspaper
15    article, any magazine article, or any other writing about this
16    case.
17         Now, I'm told that -- and it doesn't surprise me,
18    newspapers always look for copy, they always want to write
19    about what is happening.
20         I would like to know if any of you has read any
21    article about this case.
22         Yes.
23         JUROR:  I did, in Saturday's Times.
24         THE COURT:  Saturday's Times.  Thank you.
25         Well, I now urge you -- and, indeed, I instruct you --
```

D4FVLIN1

1    that you may not read anything about this case in a newspaper.

2    That is not evidence.  That is not based on evidence.  It is

3    entirely outside of what you may consider in trying this case.

4    So you should resist.

5          If you see any reference to this trial in a newspaper,

6    you should turn away from that column throughout the trial.  It

7    may be tempting, but resist the temptation, because you are

8    then reading things that are not part of the evidence in this

9    case, and may not be considered by the jury in reaching a

10   verdict.

11         The opinion of reporters who do not know the evidence

12   and are not part of this case should never be considered.  But,

13   in any event, the best way to protect your minds from being

14   influenced in the slightest by anything outside this courtroom

15   and considering anything that is not evidence before you in the

16   case means that you have to consciously avoid reading any

17   newspaper article or magazine article that is about this case.

18         Very well.  We will proceed with the witness.

19         MR. SKINNER:  Thank you, your Honor.

20    CHEN HUO GUANG, resumed.

21   DIRECT EXAMINATION (continued)

22   BY MR. SKINNER:

23   Q.  Good morning, Mr. Chen.

24         Now, you last testified before this Court on Thursday

25   of last week, which I believe was April 11th; is that right?

1    A.  Yes.

2    Q.  Now, was April 11th the first day last week that you came

3    to this courthouse in connection with your subpoena to testify?

4    A.  My first day here was April 9th, but I did not testify.

5    Q.  Were you also here on April 10th?

6    A.  Yes.

7    Q.  And when you were here on April 10th, did you see a man

8    named Guang Zhou in the courthouse?

9    A.  I bump into him downstairs of this courthouse.

10   Q.  Did you know Mr. Zhou before coming to the courthouse that

11   day?

12   A.  I did.

13   Q.  How long have you known him?

14   A.  More than ten years.

15   Q.  How do you know him?

16   A.  Someone had introduced him to me in Chinatown.  I don't

17   exactly remember how I met him.

18   Q.  Before coming to court last week, did you know that

19   Mr. Zhou was going to be testifying as a witness in this case?

20   A.  I did not.

21   Q.  And when you were in court last week, did you talk to

22   Mr. Zhou about the testimony you were going to give in this

23   case?

24   A.  I did not.

25   Q.  Have you ever spoken to Mr. Zhou about the testimony that

D4FVLIN                              C. H. Guang – direct

1    you are going to give in this case?

2    A.  No.

3    Q.  Has he ever talked to you about the testimony that he was

4    going to give in this case?

5    A.  No.

6    Q.  Let me direct your attention back to April 10th of last

7    week, which was Wednesday.  You were in court that day waiting

8    to testify; is that right?

9    A.  Yes.

10   Q.  And did you go outside the courthouse for lunch that day?

11   A.  Yes.

12   Q.  Where did you go?

13   A.  I was in Chinatown.

14   Q.  Did you have lunch with anyone else?

15   A.  I went to lunch by myself.

16   Q.  Did you see anyone else during that lunch?

17   A.  Yes.

18   Q.  Who else did you see during the lunch?

19   A.  My boss, name Dan Jian.

20   Q.  Does he also go by the nickname "Cash"?

21   A.  Yes.

22   Q.  Who got there first, you or Cash?

23   A.  I got there first.  And then I called him on the phone.

24   Q.  And when Cash got there, did you talk about your testimony

25   in the case?

D4FVLIN                        C. H. Guang – direct

1   A.  No, I did not.  I spoke to him about the buses in his

2   company.

3   Q.  And did anybody else join you after Cash got there?

4   A.  Yes, a little while later, Zhou Guang Yun came.

5   Q.  That's the same Mr. Zhou that you ran into at the

6   courthouse?

7   A.  Yes.

8   Q.  Did you tell him to meet you for lunch?

9   A.  I did not.  But when he got there, I said, Why don't you

10  sit and have lunch.  That was just matter of courtesy.  He

11  answer, and said he ate already.

12  Q.  After he got there, did you talk to him about your

13  testimony in the case?

14  A.  No.

15  Q.  Did he talk to you about his testimony in the case?

16  A.  No.

17  Q.  Now, you say that Cash is your boss; is that right?

18  A.  Yes.

19  Q.  How long have you worked for him?

20  A.  Started in September of 2011.

21  Q.  And what do you do for him?

22  A.  I help him manage the drivers at the company, and also hire

23  people to fix the vehicles when it breaks down.

24  Q.  How long have you known Cash?

25  A.  Also for more than ten years.

D4FVLIN                        C. H. Guang – direct

1    Q.   Now, am I correct that you've met with people who worked

2    for the U.S. government prior to testifying today?

3    A.   Yes.

4    Q.   And did you meet with the government more than once?

5    A.   Yes.

6    Q.   And how were those meetings arranged?

7    A.   Sometimes, say for at today's meeting, we would make a day

8    for the next meeting.  Sometimes the agent will call Cash, and

9    Cash would notify me, because I don't speak English.

10   Q.   Am I right --

11           MR. COHEN:  I'm sorry, I didn't hear that last answer.

12           THE COURT:  The witness said that sometimes Cash would

13   tell him, because the agents would call Cash.

14           MR. COHEN:  Thank you.

15           THE COURT:  Because he does not speak English.  The

16   witness, that is, Mr. Chen.

17           MR. COHEN:  I understand.  Thank you.

18   BY MR. SKINNER:

19   Q.   Am I correct that the first time you met with the

20   prosecutors in this case was in approximately December of 2011?

21   A.   Yes, it was approximately that date.

22   Q.   And was Mr. Jian, or Cash, the intermediary between you and

23   the government in setting up that meeting?

24   A.   Yes.

25   Q.   Is Mr. Jian what's called an informant?

D4FVLIN                          C. H. Guang – direct

1    A.  That's what the people in Chinatown say.

2    Q.  Do you know that for certain?

3    A.  I am certain.

4    Q.  And did Mr. Jian ever tell you what you were supposed to

5    testify about?

6    A.  No.

7    Q.  Now, Mr. Chen, do you recall at the end of your testimony

8    on Thursday you were telling the jury about when you went to

9    the defendant for help with the competition that you were

10   facing on your route?

11   A.  Yes.

12   Q.  And am I correct that you testified that the defendant

13   agreed to help you?

14   A.  Yes.

15   Q.  And that the competition then went away?

16   A.  Yes.

17   Q.  I think you may have covered this on Thursday, can you just

18   remind us what, if anything, had you offered to the defendant

19   in exchange for his assistance?

20   A.  I agreed to give him one-third of the share of this

21   company.

22   Q.  And after your competition went away, what contact, if any,

23   did you have with the defendant after that?

24   A.  Every month when we split up the money, I would give him

25   the money, and he would call me when he needed money.

1    Q.  In what form would you give the money?

2    A.  Cash.

3    Q.  Where would you typically meet him and give him cash?

4    A.  At a bus stop where the bus takes off.

5    Q.  Where is that?

6    A.  On Allen Street, what used to be the Hong Kong Supermarket.

7    Q.  That's here in Manhattan?

8    A.  Yes, in Chinatown, Manhattan Chinatown.

9            THE COURT:  Not on South Street?

10           THE WITNESS:  Not on South Street.  This was the

11   intersection of East Broadway and Allen Street.

12   Q.  And how much money would you typically give the defendant,

13   more or less?

14   A.  Sometimes 3,000, sometimes $4,000, depends on the business.

15   If the business is good, then I give him more.

16           THE COURT:  Isn't Allen Street called Pike Slip where

17   it intersects with East Broadway?  Becomes Allen Street after

18   Division Street.

19           THE WITNESS:  Yes.

20           THE COURT:  So where you met him was at the

21   intersection of Pike Slip and East Broadway; is that right?

22           THE WITNESS:  Yes.

23   BY MR. SKINNER:

24   Q.  And that's here in the Chinatown neighborhood of Manhattan;

25   is that right?

D4FVLIN                          C. H. Guang – direct

1          THE INTERPRETER:  Could you repeat?

2          MR. SKINNER:  And is that here in the Chinatown

3     neighborhood of Manhattan?

4     A.  Yes.

5     Q.  So you would give the defendant a third share of your

6     company, am I understanding you correctly?

7     A.  Yes.

8     Q.  Did you enter into a contract with the defendant?

9     A.  No.

10    Q.  Did you give him shares on a piece of paper?

11    A.  No.

12    Q.  Did he pay you any money for his shares?

13    A.  No.

14    Q.  Aside from talking to your competition, did he do any work

15    at all for the bus company?

16    A.  Nothing else.

17    Q.  And what did you think would happen if you didn't pay the

18    defendant --

19          MR. COHEN:  Objection.

20          THE COURT:  Objection sustained.

21          MR. SKINNER:  Your Honor, can we approach for one

22    minute?

23          THE COURT:  Not right now.  Let's approach before this

24    witness's testimony is over.

25          MR. SKINNER:  Very well.

D4FVLIN                         C. H. Guang – direct

1   BY MR. SKINNER:

2   Q.  Mr. Chen, let me ask you, do you know a man named Yi Feng?

3   A.  I know.

4   Q.  And who is he?

5   A.  He was one of the dailos in the gang in Chinatown.

6   Q.  Was that in the early 2000s, during the period of time that

7   we've been talking about?

8   A.  No, not in the 2000s.

9   Q.  When was he a dailo in Chinatown?

10  A.  Around 2002 to 2003.

11  Q.  Did the defendant ever tell you about a dispute that he had

12  with Yi Feng?

13  A.  Yes.

14  Q.  Where were you the first time you talked to the defendant

15  about this dispute that he had with Yi Feng?

16  A.  When the defendant was in the hospital and I went there to

17  visit him.

18  Q.  And when was this, more or less?

19  A.  Around June or July of 2003.

20  Q.  2003?

21  A.  2002.  Around June or July of 2002.

22  Q.  And what did he tell you when you talked to him about this

23  dispute with Yi Feng?

24  A.  That he said Yi Feng owned similar type of gambling parlor

25  as his.  So a lot of gamblers went to gambler at Yi Feng's

D4FVLIN                          C. H. Guang - direct

1   gambling parlor.  So he went to Yi Feng's gambling parlor and

2   open -- and fired shots.  After he fired shots, and when we was

3   coming back from Yi Feng's, and then while he was coming back

4   in front of his own gambling parlor located on 21 Eldridge

5   Street, he was stabbed by Yi Feng's kids.

6   Q.  And "kid," is that another word for follower?

7   A.  Yes.

8   Q.  Is this stabbing, is that how Ding Pa ended up in the

9   hospital?

10  A.  Yes.

11  Q.  Now, why was it that you went to visit him in the hospital?

12  A.  Because I had to go there to see him.  It's a courtesy, and

13  also face.

14  Q.  Now, did there come a time when the defendant got out of

15  the hospital?

16  A.  As far as I remember, about three, four, or five days.

17  Q.  And did he stay in New York after he got out of the

18  hospital?

19  A.  Yes, he stay for a few months.

20  Q.  And after a few months, where, if anywhere, did he go?

21  A.  He moved to Atlanta, Georgia.

22  Q.  Now, after the defendant moved to Atlanta, did you continue

23  to see him in New York City?

24  A.  Yes, he came back to New York very often.

25  Q.  And did you continue to pay him one-third of the shares of

1   your profits after he moved to Atlanta?

2   A.  Yes.

3   Q.  Mr. Chen, do you know a man who goes by the name Yiqun?

4   A.  Yes.

5   Q.  How well do you know Yiqun?

6   A.  Pretty good friend.

7   Q.  Did Yiqun have any relationship with Yi Feng, the dailo

8   whose gambling parlor had been shot up by the defendant?

9   A.  He and Yi Feng were friends.

10  Q.  After the defendant got into this dispute with Yi Feng, did

11  he ever talk to you about Yiqun?

12  A.  He said Yiqun was almost beat up by him while he was in the

13  barbershop around East Broadway.

14  Q.  Did he say why he tried to beat up Yiqun?

15  A.  He said he will find a reason to beat up anyone who was in

16  good relationship with Yi Feng.

17  Q.  Mr. Chen, did there ever come a time when Ding Pa asked you

18  to get him a cell phone?

19  A.  Yes.

20  Q.  Was that before or after he moved to Atlanta?

21  A.  As far as I remember, after he moved.

22  Q.  And what did he say?

23  A.  He said he wanted me to help him to get a phone similar to

24  walkie-talkie.

25  Q.  What do you mean by "similar to walkie-talkie"?

D4FVLIN                         C. H. Guang - direct

A.  So you don't have to talk on the phone, all you have to do
is just push a button and talk to the other party.

Q.  Is that what's known sometimes as a push-to-connect
feature?

A.  Yes.

          THE COURT:  Or was that a different Chinese word?

          THE WITNESS:  In English, the name of the phone
company is Nextel.

          THE COURT:  But is it the same word for walkie-talkie
as -- what was the other word you used?

          MR. SKINNER:  Push-to-connect.

          THE COURT:  Push-to-connect.

          THE WITNESS:  It has two functions.  Also can use as a
phone and also --

          THE COURT:  No, no.  I want to know how you say it in
Chinese, "walkie-talkie."

          THE WITNESS:  Walkie-talkie.

          THE COURT:  I understand, Mr. Interpreter.  I'm trying
to understand what the push to --

          MR. SKINNER:  Push-to-connect.

          THE COURT:  -- to connect, how you say that in
Chinese.

          MR. SKINNER:  Perhaps we could ask the interpreter to
give us the exact Chinese word the witness is using.

          THE COURT:  Fine.

D4FVLIN                          C. H. Guang - direct

1          Are there two different words in Chinese, one for

2    walkie-talkie and one for push-to-connect?

3          THE INTERPRETER:  Yes, there are two different terms.

4          THE COURT:  Different words.

5          THE INTERPRETER:  Yes.

6          THE COURT:  Okay.  Thank you.

7    BY MR. SKINNER:

8    Q.  How do you know the company that provided this kind of a

9    phone was Nextel?

10   A.  Because I also used the same phone.

11   Q.  Did you use those phones with your bus drivers?

12   A.  Usually around that time period, drivers and business

13   people in Chinatown, 80 percent of them were using this.

14          THE COURT:  And which was that, which word?

15          THE WITNESS:  Using this walkie-talkie.

16   Q.  And what did you do after the defendant asked you for this

17   walkie-talkie phone?

18   A.  I told my ex-wife to add another phone --

19          MR. COHEN:  Objection.

20          THE COURT:  Objection sustained.  It's not responsive.

21   Q.  Did you get Ding Pa one of these phones?

22   A.  Yes.

23   Q.  Did you put it under your own name?

24   A.  No, under my ex-wife's name.

25   Q.  What's your ex-wife's name?

D4FVLIN                          C. H. Guang - direct

1  A.  Loh Kit Mun.

2  Q.  And who paid the bill for this phone?

3  A.  I deducted money every month from his one-third share.

4  Q.  So, Mr. Chen, can you just remind us when it was, more or

5  less, that you started paying the defendant one-third of the

6  profits from the company?

7  A.  Since May or June of 2002.

8  Q.  Did there come a time after that when the defendant

9  demanded a larger share of your business?

10 A.  Around June or July of 2003.

11 Q.  How did the defendant let you know he wanted a larger

12 share?

13 A.  He told me on the phone that he wanted an additional ten

14 percent.

15 Q.  Where were you when you got that phone call?

16 A.  I was in New York Chinatown.

17 Q.  What did the defendant say to you?

18 A.  He said he had to provide housing, food, for his followers,

19 entertainment, and he didn't have enough money.  And he

20 requested bus company to give him additional ten percent.

21 Q.  And how did you feel when he asked you --

22         MR. COHEN:  Objection.

23         THE COURT:  Objection sustained.

24         MR. SKINNER:  Again, I'd like to approach on this at

25 some point.

D4FVLIN                          C. H. Guang – direct

1          THE COURT:  This is a different one, but yes.

2          MR. SKINNER:  Same issue.

3          THE COURT:  Not really.  But, in any event, when you

4     finish this line of questioning, I will see you at the sidebar.

5          MR. SKINNER:  Thank you, your Honor.

6     BY MR. SKINNER:

7     Q.  What did you say when the defendant asked you for an extra

8     ten percent of the company?

9     A.  He said he already had had a discussion with another

10    shareholder.

11          MR. COHEN:  Objection.

12          THE COURT:  Objection sustained.

13    Q.  Mr. Chen, what did you say to the defendant?

14    A.  I expressed disagreement.

15    Q.  What happened after you expressed disagreement?

16    A.  He said that he did not want me to be part of the business

17    and part of the shareholders.

18    Q.  And what happened after he told you that he didn't want you

19    to be part of the business anymore?

20    A.  I went to Yiqun.  I told Yiqun to speak to my --

21          MR. COHEN:  Objection.

22          THE COURT:  Objection sustained.

23    Q.  So after the defendant said this, you went to Yiqun?

24    A.  Yes.

25    Q.  Did you go to Yiqun for help?

D4FVLIN                          C. H. Guang - direct

1    A.  Yes, I asked him for his help.

2    Q.  Now, I know Yiqun is a friend of yours, but who was he in

3    Chinatown?

4    A.  He had a very good relationship with people in Chinatown,

5    also with people at the gambling parlors.

6    Q.  Was he a dailo?

7    A.  As far as I know, at the time since when I started, first

8    started knowing him, I did not notice that he had followers.

9            THE COURT:  You didn't notice, is that what you said?

10   All right.

11   Q.  Well, to the best of your knowledge, was he a dailo with

12   followers or something else?

13   A.  Dailo is the leader of a gang.

14   Q.  Was he a dailo?

15   A.  No.

16   Q.  Was he friends with dailos?

17   A.  Yes.

18   Q.  He was friends with Yi Feng; correct?

19   A.  Yes.

20   Q.  Was he friends with other dailos in Chinatown?

21   A.  Yes, one or two, but I'm not so sure about this.

22   Q.  Now, what happened after you went to Yiqun for help?

23   A.  Yiqun made a phone call to my fellow -- my fellow

24   shareholders, and told them not to --

25           MR. COHEN:  Objection.

1        THE COURT:  Objection sustained.

2   Q.  Were you kicked out of the bus company after you went to

3   Yiqun for help?

4   A.  No.

5   Q.  Now, when is the next time after this that you saw Ding Pa?

6   A.  Next day in the morning.

7   Q.  And where did you see him?

8   A.  He called me and told me to go to Corona Park in Queens to

9   have a talk.

10  Q.  Did you go?

11  A.  Yes.

12  Q.  Were you with anyone else?

13  A.  I went there.  And Ding Pa was there, and there were about

14  two to three followers there.  Two followers.

15  Q.  What happened after you got there?

16  A.  At that time he told me that I did not agree to give him

17  the additional ten percent, that means I did not give him face;

18  and that his followers -- and his followers had guns with

19  themselves every day.  And also he told me that I must reply

20  today and to make him a decision.

21  Q.  So Ding Pa told you that his followers had guns, or you

22  knew in some other way that his followers had guns?

23  A.  He said it first.  And then later I also looked at his --

24  took a look at his followers.

25  Q.  And when you looked at the followers, what did you see?

1    A.   And his follower pulled his shirt.

2    Q.   Just describe --

3              THE COURT:  Are you talking about a follower?

4              THE WITNESS:  Yes.

5              THE COURT:  What follower?

6    BY THE WITNESS:

7    Q.   Did you know the name of this follower?

8    A.   I do not know.

9    Q.   And you testified that at this meeting in Corona Park, the

10   defendant was with two of his followers; is that right?

11   A.   Yes.

12   Q.   And one of these followers pulled his shirt?

13   A.   Yes.

14   Q.   Describe for us what you mean by pulling his shirt.

15   A.   My understanding was that the follower was trying to show

16   me that he had a gun.

17             MR. COHEN:  Move to strike, Judge.

18             THE COURT:  Excuse me?

19             MR. COHEN:  Move to strike.  His understanding --

20             THE COURT:  Yes, yes, yes.

21   Q.   Just describe for us what you saw what he did.

22             THE COURT:  Right.  I grant the motion to strike.

23             What is the question?

24             Why don't you show us what he did.

25             What did you see?

D4FVLIN                          C. H. Guang - direct

1          THE WITNESS:  Went like this.  And pressed over here

2     with his hand, like that.

3     Q.  So he pressed on his shirt in the area of his hip; is that

4     right?

5     A.  Yes.

6     Q.  And what happened after Ding Pa said you had to give him an

7     answer that day?

8     A.  So I call my partner, Ding Jia Quan, and to have a

9     discussion with him.

10    Q.  I jumped ahead a little, a little fast.  Forgot to ask you,

11    did you actually see a gun on Ding Pa's follower?

12    A.  No, I did not.

13    Q.  What did you tell Ding Pa after you talked to your partner?

14    A.  Both of us had a discussion, that we agreed to pay him

15    additional $2,000 a month.

16    Q.  So what did you say to Ding Pa?

17    A.  After a discussion, and I want to give you $2,000,

18    additional $2,000 per month, is that okay with you?

19    Q.  And what did Ding Pa say?

20    A.  He accepted it.

21    Q.  Around the time that all of this was happening, did you

22    sell shares in your company to anyone else?

23    A.  We -- Ding Jia Quan and I, we sold additional ten percent

24    each of our shares to Yiqun.

25    Q.  And that's the same man that you had gone to for help as

D4FVLIN                          C. H. Guang – direct

1   you explained a moment ago?

2   A.   Yes.

3   Q.   And what, if anything, did you tell Yiqun about the extra

4   $2,000 you agreed to pay Ding Pa?

5           MR. COHEN:   Objection.

6           THE COURT:   Objection sustained.

7           MR. SKINNER:   Your Honor I was going to move on to a

8   new topic at this point.  Can we get a sidebar?

9           THE COURT:   Yes.  I will see you at the sidebar.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4F6LIN2                          Chen - direct

1                (At the side bar)

2                THE COURT:  Generally speaking the operation of

3    witnesses is not admissible evidence.  What makes this

4    different?

5                MR. SKINNER:  Because the witness was extorted by the

6    defendant and the witness's subject of fear is one of the

7    elements of the offense and one of the things we'll have to

8    prove.

9                THE COURT:  You'll have to prove that what the

10   defendant told him would cause a person to be afraid, not that

11   this particular person was afraid.

12               MR. SKINNER:  Your Honor, I thought that we were

13   actually going to have to prove that particular defendant was

14   afraid and the best way to get that is from the witness

15   himself.

16               THE COURT:  I understand that is what you thought.  My

17   understanding of extortion is threaten something that would

18   frighten a person.

19               MR. SKINNER:  Your Honor, if the Court is going to be

20   instructing the jury that what we need to prove is that what

21   was said is the kind of thing that would have caused fear, then

22   I agree.

23               THE COURT:  Isn't the question whether the defendant

24   intended to frighten the person is he talking to, not whether

25   that person was in fact frightened because people have

D4F6LIN2                          Chen - direct

1   different fear thresholds?

2            MR. SKINNER:  I think the defendant's intent is

3   certainly at issue.  I also think the victim's subject of state

4   of mind is relevant and properly admissible where the issue is

5   whether or not he was actually afraid.

6            THE COURT:  I would like some authority on that.

7            MR. SKINNER:  It is part of the jury instructions that

8   we proposed.

9            THE COURT:  Well, it may be.  You may have proposed

10  it, but I need to know the source, the legal source of that

11  proposal.

12           MR. SKINNER:  We would have to go back to the

13  instruction.  I believe the legal source cites Sand and

14  additional cases.

15           THE COURT:  It is an authoritative case that I would

16  like, that it doesn't matter whether an ordinary person would

17  be caused to be afraid.  It only matters whether the person it

18  was said to became afraid.

19           MR. SKINNER:  I am just arguing that where we have the

20  victim of the extortion, the victim's subject state of mind is

21  relevant and admissible where the question is whether or not

22  the defendant caused fear.

23           THE COURT:  I would like to see a case on the

24  essential elements of extortion.

25           MR. SKINNER:  Very well, your Honor.  So we'll see if

1   I can find that.

2           THE COURT:  Unless you are prepared to agree.

3           MR. COHEN:  No, I don't agree at all.  In fact, the

4   witness's testimony was that they offered my client the shares

5   of the company in return for his assistance in dealing with a

6   purported competitor.  He has proffered to the government,

7   although it hasn't been brought out by Mr. Skinner, the reason

8   they went to him is because he had a good relationship with the

9   purported competitor and they thought they could work things

10  out.  Given all that it doesn't appear that we have an

11  extortionate situation here.

12          MR. SKINNER:  Well, I think putting aside that --

13          THE COURT:  Well, I am not hearing what a jury can

14  draw from the testimony.  I am interested only in the essential

15  elements of extortion.  You can have a hypersensitive person

16  who is fearful and that may or may not be extortion.  It's not

17  only extortion that requires putting someone in fear.  It is

18  true hyperbole as well and it is not normally an element as to

19  whether that particular thing put the who was spoken to in fear

20  but whether it was calculated to do so.

21          MR. SKINNER:  I think it is actually both whether it

22  was calculated to and whether it in fact did and we will look

23  for a case.

24          THE COURT:  It is your position that unless you can

25  show that the person to whom the demand was made was actually

D4F6LIN2                        Chen - direct

1    put in fear that it is not extortion.

2              MR. SKINNER:  I think the person needs to be in fear

3    and that needs to be why he turned over the money.

4              MS. BURNS:  I think it is objective and subjective.

5              THE COURT:  It's very important.

6              MS. BURNS:  It is.

7              THE COURT:  We're dealing with another language,

8    different words.

9              MR. SKINNER:  Fair enough.

10             THE COURT:  It is very difficult to sort out what is

11   really being said.

12             MR. SKINNER:  Put aside the previous witness, I think

13   this witness has been very clear and there hasn't been any

14   issues at all.

15             THE COURT:  He is answering much more directly if that

16   is what you are saying.  Yes and no comes more trippingly to

17   his tongue than the other witness.

18             MR. SKINNER:  Your Honor, we'll look for a case.

19             THE COURT:  Good.

20             MR. SKINNER:  If it is something properly before the

21   jury, we can address it before he is finished or we can recall

22   him and answer those question.

23             THE COURT:  Fine.

24             MR. SKINNER:  The only other thing I wanted to raise

25   was with regard to what he said to Yi Qun.  I am guessing the

D4F6LIN2                         Chen - direct

1    basis of the objection is hearsay.

2            THE COURT:  Sure it is.

3            MR. SKINNER:  We're not offering it for the truth of

4    what was said.

5            THE COURT:  What are you offering it for?

6            MR. SKINNER:  To show everyone's state of mind.  To

7    show Yi Qun's state of mind?

8            THE COURT:  How does it show Yi Qun's state of mind,

9    what he said to Yi Qun?

10           MR. SKINNER:  Certainly if he didn't tell Yi Qun about

11   the $2,000 then that explains why Yi Qun didn't say anything

12   until a year later when he found about it.

13           THE COURT:  Then what you would want to know is

14   whether he told Yi Qun about the $2,000.

15           MR. SKINNER:  That is what I was trying to ask.

16           THE COURT:  No.  You asked what he said.

17           MR. COHEN:  Judge, I would just ask that you speak to

18   the juror.

19           THE COURT:  I am going to do that.  I am going to

20   excuse the jury and if you stay around, I am going to ask that

21   juror to stay for a moment.

22           MR. COHEN:  Thank you.

23           (Continued on next page)

24

25

D4F6LIN2                        Chen - direct

1              (In open court; jury present)

2              THE COURT:  Members of the jury, this is a convenient

3    time to take a midmorning recess.  I will excuse all of you for

4    a midmorning recess.

5              I am going to ask Mr. Textly to stay.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (At the side bar)

 2              THE COURT:  I think I probably did not instruct

 3     specifically enough about staying away from newspapers, but I

 4     take it that you did read this on Saturday.

 5              JUROR:  I did, yes.

 6              THE COURT:  I know it is difficult to figure out what

 7     the impact was on your mind, but what kind of credence do you

 8     give to a newspaper article about something?

 9              JUROR:  It was just curiosity to read about the case

10     that I was involved with.

11              THE COURT:  I understand the temptation to read, but

12     after you read it --

13              JUROR:  Do I think it will affect my opinion in the

14     case?

15              THE COURT:  Well, that is hard to tell.  Really you

16     are the one who most knows what the impact was on you.

17              JUROR:  It had minor impact on me.  I don't think it

18     would have an impact on my decision in terms of the case.

19              THE COURT:  That is, can you put what that reporter

20     said out of your mind?

21              JUROR:  I believe so.

22              THE COURT:  Very well.  Do you have any questions?

23              MR. COHEN:  No.

24              MR. SKINNER:  No, your Honor.  Thank you.

25              THE COURT:  I am going to instruct you to please

D4F6LIN2                        Chen - direct

 1   resist.

 2                JUROR:  I will.  It is my weekend routine.

 3                THE COURT:  I understand and it is not easy to resist;

 4   but when you look at any newspaper if you see anything that

 5   refers to a trial, skip it even if it means throwing your net

 6   too widely --

 7                JUROR:  Okay.

 8                THE COURT:  -- during the course of this trial.

 9                JUROR:  Yes, your Honor.

10                THE COURT:  It is very important that it is only the

11   evidence in the courtroom that should be considered by you.

12                JUROR:  I understand.

13                MR. COHEN:  Your Honor, I am sure it goes without

14   saying, but can you instruct the juror not to discuss this with

15   any of the other jurors?

16                THE COURT:  Yes.  Please do not discuss with any other

17   juror our conversation.

18                JUROR:  Okay.

19                MR. COHEN:  Or anything about the article.

20                JUROR:  Okay.

21                THE COURT:  It is not easy I know and I know you don't

22   want to be discourteous to anybody, but you can tell them that

23   the Court instructed you not to discuss the article.

24                JUROR:  Yes.  Okay.

25                THE COURT:  Which is indeed what I am doing.

D4F6LIN2                          Chen – direct

1          JUROR:  Okay, your Honor.

2          THE COURT:  Very well.  Thank you.

3          MR. SKINNER:  Thank you, Judge.

4          THE COURT:  We'll all take a five-minute recess.

5          MR. SKINNER:  Can we have 10, Judge?

6          THE COURT:  Yes.  10 minutes.

7          (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4F6LIN2                        Chen - direct

1                    (In open court; jury present)

2                    THE COURT:  You pay proceed.

3                    MR. SKINNER:  Thank you, your Honor.

4      BY MR. SKINNER:

5      Q.  Mr. Chen, prior to this meeting in Corona Park, you had

6      been paying the defendant one-third of your profits, correct?

7      A.  Yes.

8      Q.  You were making those payments in cash?

9      A.  Yes.

10     Q.  How often were you paying him one-third of your profits?

11     A.  I did it every month.

12     Q.  Now, after the meeting in Corona Park, you agreed to give

13     him an additional $2,000, is that right?

14     A.  Yes.

15     Q.  Was that in addition to the one-third payment, one-third of

16     the profits?

17     A.  Yes.

18     Q.  So from that point on you would pay a third of the profits

19     plus $2,000?

20     A.  Yes.

21     Q.  Was that also in cash?

22     A.  Yes, they were.

23     Q.  How often did you make those payments after the meeting in

24     Corona Park?

25     A.  The next month.

D4F6LIN2                      Chen - direct

1   Q.  Every month?

2   A.  Every month.

3   Q.  Did you tell Yi Qun about the extra $2,000 payments?

4   A.  I did not tell him.

5   Q.  Why not?

6            MR. COHEN:  Objection.

7            THE COURT:  Objection sustained.

8   Q.  Mr. Chen, did there ever come a time when Yi Qun learned

9   about the payments to the defendant?

10  A.  He learned of it later on.

11  Q.  When did he learn about the extra $2,000 payments?

12  A.  In June of '04.

13  Q.  How did he learn about the extra $2,000 payments in June of

14  '04?

15  A.  Before that I told him that every month I set aside $2,000

16  for the company's cash flow.  At that time he asked me how much

17  money was set aside for the company's company flow.  Then I

18  told him that the $2,000 every month was paid to Ding Pa.

19  Q.  What happened after you told Yi Qun about the $2,000

20  payments to Ding Pa?

21  A.  Yi Qun said not to pay anymore, that he did not agree to do

22  that.  So I called him and told him that after I paid him for

23  June, I would not be making anymore payments to him afterwards

24  because the shareholder would not agree to do that.

25  Q.  You called who?

D4F6LIN2                    Chen - direct

1   A.  I called Ding Pa.

2   Q.  What was Ding Pa's reaction when you told him that you were

3   going to stop the extra $2,000 payments?

4   A.  He started yelling at me over the phone.  He said I know

5   who it is that did not agree to it.

6   Q.  What else did he say if anything?

7   A.  He said since there is no face here, there will be an

8   opportunity for me to find this person.  But he did not state

9   who this person was.

10  Q.  So he didn't say who the shareholder was?

11  A.  No.  He just said that he knew who this person was.

12  Q.  Did you pay Ding Pa the extra $2,000 in June of 2004?

13  A.  Yes.

14  Q.  Did you pay Ding Pa the extra $2,000 in July of 2004?

15  A.  No.

16  Q.  Did there come a time in July of 2004 when you learned that

17  Yi Qun was dead?

18  A.  Yes.

19  Q.  Where were you when you learned this piece of news?

20  A.  I was driving a truck from New York to North Carolina.  It

21  was 6:00 in the morning.

22  Q.  How soon after Yi Qun's death was it?

23  A.  I believe one to two hours later.

24  Q.  What did you do with that Nextel phone you got for Ding Pa

25  after you learned about Yi Qun's death?

D4F6LIN2                     Chen - direct

 1          THE INTERPRETER:  Can you repeat that?

 2   Q.  What did you do with the Nextel phone you had gotten for

 3   Ding Pa after you learned about Yi Qun's death?

 4   A.  I told my wife to stop service on that phone after one to

 5   two days.

 6   Q.  Did you speak with Ding Pa after you learned that Yi Qun

 7   was dead?

 8   A.  A few days later he made a phone call to me.

 9   Q.  A few days after what?

10   A.  It was around one week after Yi Qun's death.

11   Q.  And what is the first thing he said to you during this

12   phone call?

13   A.  He just said it is me.  You don't need to say the name.

14   Q.  Did you recognize the voice?

15   A.  I did.

16   Q.  Whose voice did you recognize it as?

17   A.  It was Ding Pa's voice.

18   Q.  Did it come through under a particular phone number?

19   A.  It didn't come through.

20   Q.  After Ding Pa said no names, what did he say after that?

21   A.  I asked him why he killed Yi Qun.

22   Q.  What did he say?

23   A.  He said the northerner misheard him, misunderstood his

24   meaning.

25   Q.  Did he say what he told the northerner?

D4F6LIN2                      Chen - direct

1   A.  He said to the northerner, Get rid of him.

2   Q.  Did he say what language he spoke to the northerner?

3   A.  He said to the northerner in a dialect or language, which

    he understood which was Mandarin.

5   Q.  Meaning he said he spoke Mandarin?

6   A.  Yes.

7   Q.  Did he say what he meant when he said, "Get rid of him"?

8           MR. COHEN:  Objection.

9           MR. SKINNER:  Did he say what he meant, your Honor.

10          MR. COHEN:  Withdrawn.

11  A.  When I asked him, he said that it was to shoot Yi Qun on

12  his arms or legs.

13  Q.  What did he say happened if he said?

14  A.  He said the northerner misheard or misunderstood him and

15  shot him on his body, shot Yi Qun on his body.

16  Q.  During this phone call with Ding Pa, did you talk about any

17  payments?

18  A.  Yes.  He said to pay his wife every month.

19  Q.  Did he say where he was?

20  A.  He did not.

21  Q.  Did he say anything during the phone call about whether he

22  still had followers in New York?

23  A.  Yes.  He said if there is anything just give them a call.

24  There is still a lot of kids, a lot of people that follow him

25  nearby.

D4F6LIN2                        Chen - direct

1   Q.  Did he tell you anything else during this phone call?

2   A.  Because we didn't talk on the phone for a long period of

3   time, I only asked him why he shot Yi Qun and then he talked

4   about paying the money to his wife every month.

5   Q.  After you got this phone call from Ding Pa, did you go to

6   the police?

7   A.  No.

8   Q.  Why not?

9   A.  Because I was afraid that he had not been arrested and he

10  still had a lot of followers nearby so I was afraid to go to

11  the police.

12  Q.  Eventually you did tell people from the government about

13  this phone call with Ding Pa, correct?

14  A.  Yes.

15  Q.  You told the prosecutors in this case about it in about

16  December of 2011, correct?

17  A.  Yes.

18  Q.  So what, if anything, changed between 2004 and 2011 that

19  caused you to tell the government about that phone call?

20  A.  Because around 2011 I read the newspaper and I learned that

21  he got arrested.

22  Q.  Now, you say that during this phone call with Ding Pa in

23  2004 he told you to keep making the payments to his wife, is

24  that right?

25  A.  Yes.

D4F6LIN2                        Chen - direct

1   Q.  Did you make the payments to his wife?

2   A.  Yes.

3   Q.  How often did you make payments to his wife?

4   A.  I paid every month.

5   Q.  How much did you pay?

6   A.  Sometimes 6,000.  Sometimes 7,000.  It depends on the

7   business.

8   Q.  Was it a third of the profits still?

9   A.  Yes.

10  Q.  For how long did you make these monthly payments of a third

11  of the profits?

12  A.  Until November of '09.

13  Q.  How would you pay the money to Ding Pa's wife?

14  A.  Sometimes I would put it into the bank account.  Sometimes

15  I would give it to the bus driver that drives from New York to

16  Atlanta.

17  Q.  Did you ever pay her yourself?

18  A.  Yes.  Sometimes I would go to Atlanta and I would bring the

19  money with me.

20  Q.  When you say you put it into the bank account, you mean you

21  deposited the money into a bank account?

22  A.  Yes.

23  Q.  How did you know what account to deposit the money into?

24  A.  His wife gave me the name of the account, number of the

25  account and her name.

D4F6LIN2                          Chen - direct

1    Q.  What was the bank that the account was at?

2    A.  Bank of America.

3    Q.  What was Ding Pa's wife's name?

4    A.   Xiu Juan Lin.

5             MR. SKINNER:  Your Honor, at this time I would like to

6    read a stipulation into the record.

7             THE COURT:  Very well.

8             MR. SKINNER:  The parties stipulate and agree that if

9    called as a witness a records custodian of a Bank of America

10   would testify as follows:  Government Exhibit 20, the printout

11   bank account records for Xiu Juan Lin 3146 Chandley Dunley

12   Road, Suite 206, Atlanta, Georgia, and Government Exhibit 20

13   was retrieved from the computer archive system of Bank of

14   America.  The records reflected on Government Exhibit 20 were

15   created by a person with knowledge of or created from

16   information transmitted by a person with knowledge of the

17   information shown or created at or near the time the

18   information became available to Bank of America and was created

19   and maintained by Bank of America as part of his regularly

20   conducted business activities.

21             Your Honor, the government would now offer Government

22   Exhibit 104 and Government Exhibit 20.

23             MR. COHEN:  No objection.

24             THE COURT:  Very well.  Government Exhibits 104 and 20

25   are received in evidence.

D4F6LIN2                      Chen - direct

1          (Government's Exhibits 104 and 20 received in

2     evidence)

3          MR. SKINNER:  Thank you, your Honor.  I would like to

4     show the jury one or two pages from Government Exhibit 20.

5          THE COURT:  You may.

6          MR. SKINNER:  Ms. Chace, can you please call up first

7     page 437.  Can we zoom in there on the bottom part of this

8     document?

9     BY MR. SKINNER:

10    Q.  Mr. Chen, can you describe for us when you would deposit

11    money into the bank account how you would go about doing it?

12    A.  Are you talking about this one?

13    Q.  Well, just the question first then we'll talk about what is

14    on the document.

15    A.  I bring the money to the bank, I fill out a deposit slip, I

16    give it to the teller, and tell the teller to deposit it into

17    that bank account.

18    Q.  Would you have to give your name and identifying

19    information?

20    A.  Yes.  The bank's requirement is that if it exceeds four,

21    $5,000 then they would ask me for my name and ID and then they

22    would write down the ID.

23          MR. SKINNER:  Ms. Chace, can you zoom back out so we

24    can see the full document first?

25    Q.  I am not sure if you can see this, Mr. Chen, but do you

D4F6LIN2                      Chen - direct

1   recognize what this is?

2   A.  That's my name and my license number.

3   Q.  What is the document itself?

4   A.  That's the deposit slip.

5   Q.  And just describe for us where your name and driver's

6   license number appear on the deposit slip?

7   A.  Under the bank account number 7900.

8            MR. SKINNER:  Your Honor, with the Court's permission

9   I am going to hand the witness a pointer.

10           THE COURT:  Yes, please.

11           Can you enlarge these numbers?

12           MR. SKINNER:  Yes.

13  Q.  Can you now using this pointer indicate where your name and

14  driver's license number are?

15  A.  That's the name.  That's the driver's license number.

16           MR. SKINNER:  Ms. Chace, can you zoom in on the

17  license number so it is easier for us to see.

18  A.  That's the license expiration date.  That's the deposit

19  date.

20  Q.  Where was your driver's license from at this point in time?

21  A.  North Carolina.

22           MR. SKINNER:  Ms. Chace, can you zoom back out again?

23  Q.  How much was the deposit for in this particular instance?

24  A.  7900.

25  Q.  $7,900?

D4F6LIN2                        Chen - direct

 1   A.  Yes.

 2   Q.  That was in cash?

 3   A.  They were always cash.

 4   Q.  Was that one in cash?

 5   A.  Sorry?

 6   Q.  Was this particular one in cash?

 7   A.  Yes.

 8           MR. SKINNER:  Ms. Chace, can you go to the next page?

 9   Can you zoom in on the left half of that deposit ticket?

10   Q.  Mr. Chen, do you see where it says -- I'll have it

11   translated for you -- Albemarle Road?

12   A.  Yes.

13   Q.  Do you recognize that name?

14   A.  I do.

15   Q.  Why is Albemarle Road?

16   A.  In Charlotte, North Carolina.

17           MR. SKINNER:  Ms. Chace, can we turn to page 422 of

18   the same Government Exhibit 20?

19           Try 443.  Can you zoom in on the whole ticket?

20   Q.  Mr. Chen, do you recognize this?

21   A.  Yes, I recognize.

22   Q.  What is it?

23   A.  This is a deposit slip.

24   Q.  Does your name appear anywhere on the deposit slip?

25   A.  Yes.

1   Q.  Can you just use the pointer and show us where your name

2   appears?

3            MR. SKINNER:  Ms. Chace, can you zoom in on that

4   portion of the document again?

5   Q.  Is that your name you are indicating right there?

6   A.  Yes.

7   Q.  What is underneath it?

8   A.  License number.

9   Q.  What is underneath that?

10  A.  Expiration date of the license.

11           MR. COHEN:  Ms. Chace, can you zoom back out again,

12  please?  Pull in on the whole deposit slip again.

13  Q.  What is the name on the account that you were making the

14  deposit into?

15  A.  Lin Xiu Juan.

16  Q.  Can you show us where that appears on the deposit slip?

17           Who again is Xiu Juan Lin.

18  A.  Ding Pa's wife.

19  Q.  How much is this deposit for?

20  A.  6,000.

21  Q.  What is the date of the deposit?

22  A.  May 27, 2009.

23           MR. SKINNER:  Ms. Chace, can you turn to 444?  Can you

24  zoom in on the entirety of the deposit slip?

25  Q.  Mr. Chen, is this another deposit slip for an account in

D4F6LIN2                          Chen - direct

 1    the name of Xiu Juan lin?

 2    A.   Yes.

 3    Q.   Do you see your name and identifying information anywhere

 4    on the deposit slip?

 5    A.   Yes.

 6    Q.   Can you show us where that is?

 7    A.   That's my name.  That's my license number.

 8    Q.   How much was this deposit for?

 9    A.   5,000.

10    Q.   When was this one made?

11    A.   July 22, 2009.

12              MR. SKINNER:  Ms. Chace, can you turn to 474, please.

13    Can we zoom in on this one again?

14    Q.   Is this another deposit slip to an account in the name of

15    Lin Xiu Juan?

16    A.   Yes.

17    Q.   Do you see your identifying information anywhere on this

18    deposit slip?

19    A.   Right there.

20    Q.   How much was this deposit for?

21    A.   7,000.

22    Q.   What was the date on this deposit?

23    A.   October 9th, 2009.

24    Q.   Mr. Chen, to the best of your recollection do you recall

25    making the deposits that correspond to the deposit slips that

D4F6LIN2                         Chen - direct

1    we have just looked at?

2    A.   What about the deposit?

3    Q.   Did you make these deposits?

4    A.   Yes.

5    Q.   Did you ever have anybody else make deposits into the

6    defendant's wife's bank account?

7    A.   Yes.  I told my wife Lon Kit Mun to deposit on my behalf.

8            MR. SKINNER:  Ms. Chace, can we turn to page 389?

9    Q.   Mr. Chen, do you see your wife's name and identifying

10   information anywhere on this deposit slip?

11   A.   Yes.

12   Q.   Can you point that out to us with a pointer?

13   A.   That's her name.  That's her license number.

14           MR. SKINNER:  Your Honor, I apologize for the

15   interruption, but can we a brief side bar?

16           THE COURT:  Very well.

17           (Continued on next page)

18

19

20

21

22

23

24

25

D4F6LIN2                         Chen - direct

1              (At the side bar)

2              MR. SKINNER:  Your Honor, while we were on the break,

3      we did some quick research on the issue we were discussing

4      before and we found one case that we think supports our

5      proposition.

6              THE COURT:  Why don't you hand it up and I will read

7      it.

8              MR. SKINNER:  I don't have the case itself.  I wanted

9      to ask that since we're nearing the end of our examination of

10     Mr. Chen with the Court's permission I will not ask anymore

11     questions about his subjective state of mind.  I have a feeling

12     Mr. Cohen's cross will bring us to lunch and then we can over

13     lunch get you copies of the cases and bring them with us and if

14     the Court is pursuaded then --

15             THE COURT:  I will give you an opportunity.

16             MR. SKINNER:  Thank you.

17             THE COURT:  Very well.

18             (Continued on next page)

19

20

21

22

23

24

25

D4F6LIN2                          Chen - direct

1                    (In open court; jury present)

2      BY MR. SKINNER:

3      Q.   Mr. Chen, after you talked to the defendant on the

4      telephone a week after Yi Qun's death, did you ever see him

5      again prior to coming to court in this case?

6      A.   No.

7      Q.   To the best of your knowledge during the period of time

8      that you continued to make these payments to the defendant's

9      wife was he ever in Chinatown, Manhattan?

10     A.   Who is in Chinatown?

11     Q.   Ding Pa?

12                   THE COURT:  The question is did you ever see him in

13     Chinatown.

14     Q.   Did you ever see him in Chinatown?

15     A.   No.

16     Q.   Was he doing work during this period of time for the bus

17     company?

18     A.   No.

19     Q.   Was his wife doing any work for the bus company?

20     A.   No.

21     Q.   Had Ding Pa done anything at all for the bus company after

22     he got rid of your competition?

23                   MR. COHEN:  Objection.

24                   THE COURT:  Objection sustained.

25     Q.   Did Ding Pa do any work?

D4F6LIN2                          Chen – direct

1          THE COURT:  Are you talking about his bus company?

2          MR. SKINNER:  Yes, your Honor.

3   Q.  Did Ding Pa do any work at all for your bus company after

4   2002?

5   A.  No.

6          MR. SKINNER:  No further questions, your Honor.

7          THE COURT:  Very well, you may cross-examine.

8   CROSS-EXAMINATION

9   BY MR. COHEN:

10  Q.  Is it Mr. Chen or is it Mr. Wong?

11  A.  Chen.

12  Q.  Okay.  Mr. Chen, good afternoon.

13          You and I have never met, have we?

14  A.  No.

15  Q.  We've never talked about this case on the telephone or in

16  any other way, correct?

17  A.  Yes.

18          (Continued on next page)

19

20

21

22

23

24

25

D4FVLIN3                          C. H. Guang - cross

1   Q.  Now, I think you indicated that you had met numerous times

2   with the prosecutors and people from the government, right?

3   A.  Yes.

4   Q.  And the first time that you met with those prosecutors,

5   that meeting was arranged by somebody named Dan Jian?

6   A.  Yes.

7   Q.  And Dan Jian was somebody you referred to as your boss;

8   correct?

9   A.  After October 2011, I started working for him.

10  Q.  Okay.  And when you testified a little while ago, you

11  referred to him as your boss; correct?

12  A.  Yes, yes, until now.

13  Q.  And I think you said for more than ten years.

14  A.  Yes.

15  Q.  And have you lived in or around the Chinatown area for many

16  years?

17  A.  When I first came to the United States, I lived in

18  Chinatown from 1995 until 2002.

19  Q.  And since then have you not lived in Chinatown?

20  A.  From 2002 until 2008, I moved to Charlotte, North Carolina.

21  Q.  Okay.  Are you back in New York now?  You don't have to

22  tell us where, but are you back in New York now?

23  A.  Yes.

24  Q.  And is it a fair statement that you're in frequent contact

25  with people in the Chinatown community?

D4FVLIN3                         C. H. Guang - cross

1   A.  Sometimes told them to come out to have dinner or parties.

2   Q.  Is it a fair statement, sir, that you are frequently in

3   contact with people in the Chinatown community, yes or no?

4   A.  Not having frequent contact.

5   Q.  You do not have frequent contact with people in the

6   Chinatown community; correct?

7   A.  Not that often.

8   Q.  Okay.  You've testified that since 2011, you worked for Dan

9   Jian.

10              THE INTERPRETER:  I'm sorry?

11  Q.  You testified that since 2011, you worked for Dan Jian;

12  correct?

13  A.  After October.

14  Q.  Of 2011?

15  A.  Yes.

16  Q.  And was that in New York City?

17  A.  Yes.

18  Q.  In Chinatown?

19  A.  Yes.

20  Q.  And how often would you work for Dan Jian?

21  A.  I work for him every day.

22  Q.  So since at least 2011, you've worked for Dan Jian every

23  day in Chinatown, but you're telling the jury that you're not

24  frequently in touch with people from the Chinatown community;

25  is that right?

D4FVLIN3                         C. H. Guang – cross

1   A.  I don't have any contact with him.

2            THE COURT:  I must have missed --

3   A.  If they have parties or dinners, then they would invite me.

4   I know those people from the association, but I just do not

5   have that much contact with them.

6            THE COURT:  Where do you live now?

7            THE WITNESS:  I live in Brooklyn.

8            THE COURT:  And is that since 2011?

9            THE WITNESS:  I started living in Brooklyn since 2010.

10           THE COURT:  Thank you.

11  Q.  Mr. Chen, are you having any difficulty understanding the

12  interpreter?

13  A.  No, no difficulties.

14  Q.  Are you having any difficulty understanding the question

15  that I'm asking you?

16  A.  Just that when you are asking about the community contact,

17  what aspect are you referring to?  To my understanding,

18  "community contact" means people from association and also from

19  people abroad.

20  Q.  I'm just talking about people who live in Chinatown, people

21  who work in Chinatown.

22  A.  But as far as I understand, the community contact is not

23  the people from Chinatown who live in Chinatown.

24  Q.  What do you understand "community" to mean?

25  A.  Community is area within Chinatown.

D4FVLIN3                          C. H. Guang - cross

1          THE COURT:  Is a particular area you think?

2          I think he's trying to explain he didn't understand

3   your question.

4   A.  To my understanding, the community contact is people in

5   Chinatown who are more -- who are well-known, and people who I

6   know.

7          MR. SKINNER:  Perhaps defense counsel can just ask if

8   he talks regularly to people who live in Chinatown so we don't

9   have that issue with the terminology.

10          MR. COHEN:  That's fine.  I'll adopt that question.

11          THE COURT:  I'm not sure the interpreter heard you.

12          THE INTERPRETER:  Could you repeat?

13   Q.  Do you speak regularly to people who live and work in

14   Chinatown?

15   A.  Chinatown?  Yes, that's my work.  They drive every day, so

16   I have to talk to them.  I'm responsible for ticket sales, so

17   many, many tens of numbers of people came to me and speak to

18   me.

19          THE COURT:  What you're being asked is are there

20   people in Chinatown who are friends of yours or whom you speak

21   to regularly?

22          THE WITNESS:  Yes.

23   Q.  Okay.  And is it a fair statement that Dan Jian, your boss,

24   is somebody who's well-known in that community?

25   A.  You can say that.

D4FVLIN3                          C. H. Guang - cross

1   Q.  It's not for me to say that.  I'm asking if you would say

2   that.

3   A.  Yes.

4   Q.  And what is his reputation in your community?

5   A.  To me, just that a lot of people know him.  He and I are

6   friends, and no one would talk in front of me about him.

7   Q.  Because he's a powerful person in Chinatown; correct?

8   A.  I think -- to me, I think cannot say this way, in this way.

9   I do not understand what you mean, in what aspect that you mean

10  "power."

11  Q.  He's somebody who has face in Chinatown; correct?

12  A.  Can say that.

13  Q.  Can you say that?

14  A.  Yes.

15  Q.  Would most people in Chinatown say that, in your opinion?

16  A.  I think he's a person who has face, but I cannot represent

17  that's what other people are thinking.

18  Q.  He's somebody who commands respect in Chinatown; correct?

19  A.  I can say it like this.

20  Q.  And he's somebody that you know to be an informant for the

21  immigration service; correct?

22  A.  Do not know.

23  Q.  Excuse me?

24  A.  Do not know.  I do not know.

25  Q.  You don't know?

D4FVLIN3                           C. H. Guang – cross

1          Didn't you tell the jury on direct examination that

2    you knew that Dan Jian was an informant for the immigration

3    service?

4    A.  He is an informant, but I just do not know that he is an

5    informant for immigration.

6    Q.  Oh, so you know that he's an informant, you just don't know

7    what government agency he informs to.

8    A.  Yes.

9    Q.  And he's told you that he's an informant; correct?

10   A.  No, he did not tell me.  But almost everyone in Chinatown

11   knows that he is an informant.  This is not a difficult

12   question to understand.

13   Q.  And everyone in Chinatown knows he's an informant because

14   he's told everybody that he's an informant; correct?

15   A.  I do not know.  I do not know whether he has told other

16   people.

17   Q.  So it was through this informant, Dan Jian, you first came

18   to have a meeting with the government; correct?

19   A.  Yes.

20   Q.  And when you went to meet with the government, you knew

21   that they were interested in speaking to you about Ding Pa;

22   correct?

23   A.  Yes.

24   Q.  And you knew that because Dan Jian told you that they

25   wanted to talk to you about Ding Pa; correct?

D4FVLIN3                         C. H. Guang - cross

1   A.   First time -- I may describe to you why the first time when

2   I decided to talk about this case.

3   Q.   I'm asking you, sir, did you know that they wanted to talk

4   to you about Mr. Lin because Dan Jian told you they wanted to

5   talk to you about Mr. Lin?  That's a yes or no, sir.

6   A.   But I think the question I'm going to answer is different

7   from when this -- when this thing happened.

8           MR. COHEN:  Your Honor, I ask the witness be directed

9   to answer the question that I ask him, not the question that he

10  would prefer to answer.

11          THE COURT:  Right.  Please.

12          MR. SKINNER:  Objection.

13          THE COURT:  Listen carefully to the interpreter.

14          MR. SKINNER:  I'd ask the defense counsel to give an

15  opportunity to answer before he interjects.

16          THE COURT:  We don't need speeches from either

17  counsel.

18  BY MR. COHEN:

19  Q.   I'll ask the question again, sir, and then I'm going to ask

20  you two questions:  First I'm going to ask you if you

21  understand the question, and then I'm going to ask you to

22  answer it.  Okay?

23          When you went to meet with the government, you knew

24  that they wanted to talk to you about Mr. Lin because Dan Jian

25  told you that.

1          Now, do you understand that question?

2    A.  Yes.

3    Q.  Now, can you answer that question?

4    A.  Yes.

5    Q.  Okay.  And you had conversations before you met with the

6    government with Dan Jian about Mr. Lin; correct?

7    A.  Yes.

8    Q.  And you had conversations with other people in Chinatown

9    about Mr. Lin before you went to meet with the government;

10   correct?

11   A.  No, they are not.

12   Q.  Never?

13   A.  No.

14   Q.  What was the name of the bus company that you owned that

15   you started, I think, in 2001 with the two vans?

16   A.  Hua Yun.

17   Q.  And does that have an English translation?

18          THE INTERPRETER:  Chinese Transportation.

19          MR. COHEN:  The interpreter answers that's what it

20   meant, Chinese Transportation?

21          THE INTERPRETER:  Yes.

22   Q.  Okay.  Now, eventually there came a time that you owned

23   other bus companies, too; correct?

24   A.  2004.

25   Q.  What was the name of that company?

D4FVLIN3                          C. H. Guang - cross

1    A.  Sky Express.

2    Q.  Sky Express.  You owned that company by yourself or with

3    other people?

4    A.  Four partners.

5    Q.  And was there a written partnership agreement?

6    A.  Yes.

7    Q.  And were you one of the people whose names was on that

8    agreement?

9    A.  No, my wife's name was on there.

10   Q.  And, in fact, the reason your wife's name was on it was

11   because you had no legal status in the United States; correct?

12   A.  Yes.

13   Q.  So in an effort to conceal the true ownership of the

14   company from the government, you had your wife sign instead of

15   yourself; correct?

16            MR. SKINNER:  Objection.

17            THE COURT:  Overruled.

18   A.  I do not understand.

19   Q.  The reason that you've put your shares of the company in

20   your wife's name was to conceal from the government the fact

21   that one of the owners was an illegal alien; correct?

22   A.  I was an illegal immigrant.

23   Q.  And that's the reason that you put the company in your

24   wife's name, because you wanted to conceal from the government

25   the fact that an illegal immigrant owned that company; correct?

D4FVLIN3                          C. H. Guang - cross

1   A.  I do not have any work card and I could not register.

2   Q.  And is it for those reasons, sir, that you put the company

3   in your wife's name?

4   A.  Yes.

5   Q.  How many people were killed in accidents in buses operated

6   by Sky Express while you owned it?

7           MR. SKINNER:  Objection, your Honor.

8           THE COURT:  Objection sustained.

9   Q.  While you owned Sky Express, were there fatal accidents

10  involving Sky Express?

11          MR. SKINNER:  Objection, your Honor.

12          THE COURT:  Objection sustained.

13          I have just sustained an objection to that, Mr. Cohen.

14          MR. COHEN:  I'll move on, Judge.

15  Q.  Is Sky Express still in business?

16  A.  No.

17  Q.  What happened?

18          MR. SKINNER:  Objection, your Honor.

19          THE COURT:  Overruled.

20  A.  There was an accident when the bus flipped in May of 2009.

21  Q.  And was it after that accident that the government shut the

22  company down?

23          THE COURT:  Objection sustained.

24          Let's move on.

25  Q.  When did you first come to the United States?

D4FVLIN3                          C. H. Guang - cross

1   A.  March 1995.

2   Q.  And how did you get here?

3   A.  Smuggled in.

4   Q.  Where did you enter the United States?

5   A.  California.

6   Q.  And did there come a time after you entered the United

7   States that you applied for political asylum?

8   A.  In 2002.

9   Q.  And, by the way, when you entered the United States, were

10  you carrying any identification documents with you?

11  A.  No.

12  Q.  Did you ever use the name Wu Han Min?

13  A.  No.

14  Q.  Your name is Huo Guang Chen; correct?

15  A.  Yes.

16  Q.  And you say that you've never used the name Han Min Wu?

17  A.  No.

18          MR. COHEN:  Your Honor, may I approach the witness?

19          THE COURT:  Very well.

20  Q.  Let me show you a document, 3503-11, ask you to take a look

21  at it, tell me if you recognize it.

22          MR. SKINNER:  Can I see it?

23          MR. COHEN:  Of course.

24  Q.  Now, I know you don't read English, but I'm going to show

25  you the entire document, ask you if you recognize it.

D4FVLIN3                          C. H. Guang - cross

1              Do you recognize that signature?

2    A.  That's my signature.

3    Q.  Recognize that photograph?

4    A.  Yes.

5    Q.  Okay.  I'm going to ask the interpreter to read this name

6    to you, and ask if it refreshes your recollection that you used

7    the name Wu Han Min.

8    A.  No, I never used it.

9    Q.  And you say that when you entered the United States, you

10   had no documents with you.

11   A.  Correct.

12   Q.  By the way, does it sound about right that you filed your

13   petition for asylum in April of 2002?

14   A.  2012?

15   Q.  Two, 2002.

16   A.  I don't remember whether it was in April or May of 2002.  I

17   did apply for one in California.

18   Q.  Okay.  And you told us, I think, that you came here in

19   when?

20   A.  March of '95.

21   Q.  Okay.  After you left China in March of '95, between then

22   and 2002, did you return to China?

23   A.  No.

24   Q.  So when you wrote on this document that you last entered

25   the United States on March 19th of 2002, that was a lie;

D4FVLIN3                           C. H. Guang - cross

1    correct?

2    A.  Yes.

3    Q.  Because, in fact, you left China seven years before that;

4    correct?

5    A.  Yes.

6    Q.  And when you wrote on this document that your religion was

7    Christianity, that was also a lie; correct?

8    A.  Yes.

9    Q.  Because you were not a Christian, were you?

10   A.  Yes.

11   Q.  And did someone help you prepare this document?

12   A.  At that time, I asked a law firm in California to help me

13   fill it out.

14   Q.  And were there people at the law firm that understood

15   Chinese?

16   A.  Yes.

17   Q.  By the way, what city were you born in in China?

18   A.  In Fuzhou.

19   Q.  Fuzhou City?

20   A.  Fuzhou City, Changle County.

21   Q.  And is it true that you filed a lengthy, several-pages

22   statement as to why you were seeking asylum in the United

23   States?

24   A.  Yes.

25   Q.  Now, in that statement, is it true that you told them that

D4FVLIN3                          C. H. Guang - cross

1   you were born in Chang Sha City in Hunan Province?

2   A.  That was on my fake document.

3   Q.  On what?

4   A.  On my fake document.

5   Q.  What fake documents were those, sir?

6   A.  My birthplace at Hunan Chang Sha.

7   Q.  What fake documents did you have that contained that

8   information?

9   A.  At that time, I had a friend that could help me obtain a

10  household registration account and identification from Hunan

11  City with a photo, and that's why I did that.

12  Q.  So you had documents in your possession that were

13  fraudulent; correct?

14  A.  Yes, a friend of mine gave it to me.

15  Q.  And what the friend of yours gave you were fraudulent

16  documents that had your pictures on them; correct?

17  A.  Yes.

18  Q.  Do you have those documents still?

19  A.  No, I submitted them all to immigration when I went to

20  court.

21  Q.  And what name was on those documents?

22  A.  It was my name.

23  Q.  It didn't have the name Han Min Wu on it?

24  A.  No.

25  Q.  So if that name wound up on your asylum application, you

1  wouldn't have any knowledge of how it got there; correct?

2  A.  Right.

3  Q.  Now, in your asylum application, you claimed that you had

4  been converted to Christianity in China, right?

5  A.  Yes.

6  Q.  And you told them in your application that you met a

7  wonderful young woman with an amazing story; correct?

8  A.  These were stories that I made up myself.

9  Q.  I understand that.  But I want you to tell the jury exactly

10  what the stories were that you made up, so that's why I'm

11  asking you these questions.

12       And, by the way, the reason you made these stories up

13  was because you wanted to get a benefit from the United States

14  government, right?

15  A.  If they accepted the stories, then they would accept my

16  political asylum application and allow me to stay in the United

17  States.

18  Q.  And the benefit that you wanted to get from the government

19  was the ability to stay in the United States; correct?

20  A.  Yes.

21  Q.  And it didn't matter to you what lies you told, as long as

22  you could stay in the United States; correct?

23  A.  Aside from this application, I did not make any lies or

24  tell any lies other than that to stay in the United States.

25  Q.  We're going to get to that.  But right now what I'm asking

1    you is whether you were willing to tell any lie in this

2    application that you thought would work as long as it helped

3    you stay in the United States, is that true, sir?

4    A.  Yes.

5    Q.  And you told the government in this application that this

6    wonderful young woman told you about how God saved human

7    beings; correct?  Right?

8    A.  I don't really remember the specific that was written in

9    there.

10   Q.  It was written for you.

11   A.  I was there with someone else to make up the story.

12   Q.  Well, didn't you just tell the jury that you made up the

13   story?

14   A.  More or less.  I was there with someone else.  I would say

15   it, and then the person would add to it.

16   Q.  So, in other words, you and another person got together to

17   make up this story?

18   A.  Yes.

19   Q.  And you don't remember quite all the details in this story

20   because it was all lies, right?

21   A.  Yes.

22              THE COURT:  We're going to stop at an appropriate

23   moment.

24              MR. COHEN:  I'm sorry, your Honor?

25              THE COURT:  We're going to stop for the lunch recess.

1            MR. COHEN:  Oh, okay.

2            THE COURT:  If this is an appropriate moment.

3            MR. COHEN:  This would be a fine time, Judge.

4            THE COURT:  Very well.

5            Members of the jury, we're going to take a break now

6    for lunch.  And we're going to come back at 2:15.

7            Have a pleasant lunch.

8            (Jury excused)

9            THE COURT:  We will all take a lunch recess at this

10   time and reconvene at 2:15.

11           MR. SKINNER:  Thank you, your Honor.

12           MR. COHEN:  Your Honor, may I again remain in the

13   courtroom to work?

14           THE COURT:  It was all right yesterday?

15           MR. COHEN:  Yes.

16           THE COURT:  Fine.

17           MR. COHEN:  Thank you.

18           THE COURT:  Although I really prefer that you use the

19   lawyer's lounge.  Very well.  You may stay in the courtroom.

20           MR. COHEN:  Thank you.

21           (Luncheon recess)

22           (Continued on next page)

23

24

25

D4f6lin4                        Chen - cross

1                    A F T E R N O O N   S E S S I O N

2                              2:15 p.m.

3          THE COURT:  Good afternoon.  Let's get the jury.

4          (In open court; jury present)

5          THE COURT:  You may all be seated.  Members of the

6    jury, we will continue with the testimony.

7          You may proceed, Mr. Cohen.

8          MR. COHEN:  Thank you, Judge.

9    BY MR. COHEN:

10   Q.  Mr. Chen, before we broke for lunch I was asking you some

11   questions about the first application you filed for political

12   asylum.  Do you remember that?

13   A.  I do.

14   Q.  I asked you a specific question and you said you didn't

15   quite recall what you had put into it, into the application,

16   correct?

17   A.  Yes.

18          MR.C:  I am going to, with your Honor's permission,

19   ask the interpreter to translate for him this document and then

20   I am going to ask him some questions.

21          THE COURT:  You are in effect showing him the document

22   to refresh his recollection, is that what you are doing?

23          MR. COHEN:  Yes, ma'am.

24          THE COURT:  Very well.

25   BY MR. COHEN:

D4f6lin4                        Chen - cross

1  Q.  Mr. Chen, having heard what Ms. Lau read to you?  Does that

2  refresh your recollection with regard to some of the story that

3  you told the government in your first asylum application?

4  A.  I remember a little bit.  It's more, less the content of

5  that.

6  Q.  Well, what Ms. Lau just read to you, that is the story you

7  told to the government in this document, correct?

8  A.  Yes.  I more, less have a recollection of that.

9  Q.  Well, you told them for example that you met this wonderful

10  young woman, correct?

11  A.  Yes.

12  Q.  And she told you that she believed in God and you told her

13  that you didn't, correct?

14  A.  Yes.  That's what is written on the story.

15  Q.  Is that your story that you and this other person concocted

16  together, correct?

17  A.  Yes.

18  Q.  And you said suddenly she lifted up the leg of her pants

19  and you were shocked to see that she had an artificial leg,

20  correct.

21  A.  Yes.

22  Q.  She told you it was God that saved her and gave her the

23  strength for life, correct?

24  A.  Yes.

25  Q.  Under her guidance you joined a youth fellowship and were

D4f6lin4                         Chen - cross

1   baptized and saved and that God brought new life to you,

2   correct?

3   A.  Yes.

4   Q.  Is one word of that true?

5   A.  From what I remember there wasn't any.

6   Q.  Is there any question in your mind that not a single word

7   of that was true?

8   A.  Correct.

9   Q.  You also told them that you became a member of a secret

10  church?

11  A.  Correct.  Yes.

12  Q.  And that you bought a desktop copier so you could make

13  copies of religious material to spread the gospel, correct?

14  A.  I do not remember that.

15          MR. COHEN:  Your Honor, may I approach again?

16          THE COURT:  Yes.

17  Q.  Mr. Chen, did what Ms. Lau just read you refresh your

18  recollection as to some of the other statements you made in

19  your asylum application in 2002?

20  A.  Yes.  Somewhat.

21  Q.  Well, do you remember saying that you bought a desktop

22  copier to copy Christian materials for the church?

23  A.  Yes.

24  Q.  And that you had secret meetings to spread the gospel among

25  youth?

D4f6lin4                        Chen - cross

1   A.  Yes.  I remember I wrote that.

2   Q.  And that you had to keep the meeting secret because the

3   Hunan police had been repressing secret religious groups?

4   A.  Yes.

5   Q.  On Christmas Eve of 2001 at such a meeting a new member who

6   was an undercover cop let the police in to ambush you; do you

7   remember saying that?

8   A.  If it was written there, then that is what I said.

9   Q.  And that you were arrested?

10  A.  Yes.

11  Q.  Every single word of that is a lie, correct?

12  A.  Yes.

13  Q.  You didn't even live in Hunan province, correct?

14  A.  I was not.

15  Q.  On Christmas Eve of 2001 you were in the United States and

16  not China, correct?

17  A.  Correct.

18  Q.  If I went through every single word on the second lengthy

19  page of this document, would there be anything in it that was

20  true?

21  A.  This was a story that I made up so there wasn't anything

22  that was true.

23  Q.  It was all lies, right?

24  A.  If I did not remember incorrectly then they were lies.

25  Q.  Because you remember that everything that you said was a

D4f6lin4                          Chen - cross

1    lie, correct?

2              MR. SKINNER:  Asked and answered, your Honor.

3              THE COURT:  Overruled.

4    A.  Can you repeat the question?

5    Q.  Because you remember that everything you put into that

6    story was a lie, correct?

7    A.  Yes.

8    Q.  Now, there came a time that you learned that your asylum

9    application had been turned down, had been rejected by the

10   government, correct?

11   A.  Yes.

12   Q.  When was that?

13   A.  It was around October of 2002.  I don't remember exactly

14   when.

15   Q.  And once you knew that your application had been turned

16   down, you knew you had to leave the United States, right?

17   A.  After it was turned down, I moved from California to New

18   York, hired an attorney to go to court but I did not go to

19   court at the end.

20   Q.  You hired an attorney to go to court to appeal the decision

21   that your application was rejected?

22   A.  Yes.

23   Q.  That attorney actually filed papers on your behalf in court

24   to appeal that decision, right?

25   A.  Yes.

D4f6lin4                    Chen - cross

1   Q.  Now, but you never went to court?

2   A.  Only when I first moved over here I went in to make an

3   appearance in court.

4   Q.  But you never went back after that?

5   A.  I did not go back.

6   Q.  Was that because if you went back you would be taken into

7   custody and sent back to China?

8   A.  At that time it was the attorney who told me I did not have

9   to go to court because the Court case was canceled.  I don't

10  know what it was about, but I did not go back to court.

11  Q.  The attorney told you that the Court case was canceled and

12  that it was over?

13  A.  At that time I did not understand what he meant.  He said

14  you lost your case.  You don't have to go back in.

15  Q.  You understood what you meant when he said you lost your

16  case, right?

17  A.  By guessing and by asking other people I knew what he

18  meant.

19  Q.  By what?

20  A.  By guessing and by asking other people I knew what he

21  meant.

22  Q.  And you knew that by guessing and asking other people you

23  knew that it meant that you had no status in the United States,

24  right?

25  A.  Yes.  I didn't have any legal status to begin with.

D4f6lin4                        Chen - cross

1   Q.  But you also didn't have any legal status after you made

2   this application for asylum and went to court and you lost,

3   correct?

4   A.  Correct.

5   Q.  And that is why when it came time to put shares of a bus

6   company onto a contract and put a name on the contract, you

7   used your wife's name because you didn't want anyone to find

8   you because you were here illegally, correct?

9   A.  Using my wife's name and the fact that I don't have legal

10  status is two different things.  Because I don't have a social

11  security number, I could not fill out the shareholders form.

12  Q.  Because you knew that you had no status and you were not

13  supposed to be in the United States, correct?

14  A.  Yes.

15  Q.  You knew you weren't supposed to be working and earning

16  money in the United States, correct?

17  A.  Yes.

18  Q.  Now, by the way eventually after you started this small

19  company and eventually became a shareholder in Sky Express,

20  there came a time that you and your parters owned 33 large

21  buses, correct?

22  A.  Yes.

23  Q.  And it was a successful business from which you made a lot

24  of money, correct?

25  A.  After I expanded it, I borrowed money to expand the

1  company.  Before I started making money, the vehicle flipped

2  over.

3  Q.  There came a time when with 33 buses running up and down

4  the east coast and elsewhere you were making a lot of money,

5  correct?

6  A.  I had not started making money.

7  Q.  Did you ever start making money, sir?

8  A.  I had not started making money.  The parters had just put

9  everything in place.  Just put in the money that was borrowed

10  and then their vehicle flipped over.  For each ticket from New

11  York to Charlotte, North Carolina it is a 12 hours ride.  The

12  bus ticket was only $30 each.  How could I make any money from

13  that?

14  Q.  Was the most money you made in any one year from your work

15  in the bus business?

16  A.  Without counting my own salary approximately $5,000 a

17  month.

18  Q.  With counting your own salary?

19  A.  My salary was one to $2,000 for answering the phone calls

20  inside.

21  Q.  A week?  A month?

22  A.  Per month.

23  Q.  So you were making roughly six, $7,000 a month?

24  A.  Yes.

25  Q.  You never made more than that?

1    A.   That's the average.   Sometimes when the business was bad I

2    didn't even make any money.

3    Q.   Did you file income tax returns?

4    A.   I filed personal income taxes for two to three years.

5    Q.   Two to three years?

6    A.   But I did not file it here.

7    Q.   Where did you file it?

8    A.   I filed it for the grocery store.

9    Q.   You owned a grocery store?

10   A.   I opened a grocery store with someone else in Charlotte.

11   Q.   In North Carolina?

12   A.   Yes.

13   Q.   So you paid taxes on the money that you made at the grocery

14   store?

15   A.   I didn't make any money from there.

16   Q.   Sir, did you ever pay any taxes on the money you made from

17   the bus company?

18   A.   From what I remember I did not pay taxes.

19   Q.   Did you file returns?

20   A.   No.

21   Q.   Now, in 2012 you filed another asylum application, right?

22   A.   Yes.

23   Q.   And I think you told us this morning that everything in

24   that 2012 application was true, is that right?

25   A.   Yes.

1  Q.  Are you sure about that?

2  A.  Yes.

3  Q.  Now, you testified last week or this morning that you are

4  testifying under a grant of immunity, right?

5  A.  Yes.

6  Q.  What is the reason that you wanted to have immunity before

7  you agreed to testify in this case?

8         MR. SKINNER:  Objection, your Honor.

9         THE COURT:  Overruled.

10  A.  Because I smoked marijuana and also this incident related

11  to the bus being flipped over.

12  Q.  Is it a fair statement that one of the reasons that you

13  wanted immunity was because you were afraid that you might be

14  prosecuted for some of the things you talk about when you

15  testify?

16  A.  Yes.

17  Q.  In fact, is it a fair statement that the false statements

18  you made on your immigration application were a much greater

19  concern to you than the fact that you smoked marijuana needing

20  an immunity agreement, correct?

21  A.  About this immigration matter I found out that I was

22  ordered to be deported on March 21, 2013.

23  Q.  That is not what I asked you.  I am asking you whether the

24  lies that you told on your application in 2002 was of greater

25  concern to you than the fact that you smoked marijuana when you

1   asked the government for an immunity agreement?

2   A.  At that time I did not just remember that I had immigration

3   case in 2002.  I only remember that I smoked marijuana a

4   year -- a little over a year ago.

5   Q.  So you didn't even remember that in 2002 you filled out

6   this lengthy elaborate application for political asylum?  You

7   didn't even remember that?

8   A.  I remembered, but I just did not know that I was ordered

9   deported.

10  Q.  Didn't you just say that you didn't remember filling out an

11  asylum application in 2002?

12  A.  But my understanding of remembering and whether I knew is

13  different.

14  Q.  How much marijuana have you smoked?

15          MR. SKINNER:  Objection, your Honor.

16          THE COURT:  Objection sustained.  That is stricken.

17  Q.  When you filled out this application in 2002, you knew that

18  all of it was fraudulent, right?

19  A.  Yes.

20  Q.  Did you know that you can go to federal prison for five

21  years for filing a fraudulent immigration application?

22          MR. SKINNER:  Objection to the tone of the question

23  and the beating on the podium.

24          THE COURT:  Just a moment.  Just a moment.  I think

25  you can just rephrase it.

1          MR. COHEN:  Of course.

2          THE COURT:  For how many years you go, but it is a

3   crime is what you are saying.

4   Q.  Do you know, sir, that it is a felony to make false

5   statements on an asylum application?

6   A.  I knew.

7   Q.  Do you know, sir, that once you've made false statements on

8   an asylum application, you can never get asylum in the United

9   States?

10  A.  Yes.

11  Q.  And then you filed this second asylum application, right?

12  A.  Yes.

13  Q.  Again you claim that you were being persecuted by the

14  Chinese government, correct?

15  A.  Yes.

16  Q.  But this time you didn't go with the Christianity story

17  because it didn't work the first time, correct?

18  A.  Because the story happened to me.

19  Q.  Well, is it true that when you used your persecution

20  because you are a Christian that it didn't work?

21  A.  When?

22  Q.  When?  In 2002.

23  A.  Which one are you talking about?

24  Q.  The application for the asylum when you said to the United

25  States, Please let me stay here.  I am a persecuted Christian

D4f6lin4                         Chen - cross

1   and I cannot go back to China.

2   A.  Yes.  That is what I wrote.

3   Q.  And it didn't work, right, because your application was

4   denied?

5   A.  Yes.

6   Q.  So in 2012 when you filed another application you came up

7   with a different reason for being persecuted, correct?

8   A.  Yes.

9   Q.  This time you said you were being persecuted because of

10  your belief in democracy and your support for the Chinese

11  Democratic Party, correct?

12  A.  Yes.

13  Q.  You didn't make any false statements on this application,

14  right?

15  A.  Yes.

16  Q.  Did someone help you fill this application out?

17  A.  Yes.  I hired people from the service agency to fill it out

18  for me.

19  Q.  The people you hired spoke Chinese, right?

20  A.  Yes.

21  Q.  Now, didn't you say in this document that you had never

22  been in any immigration proceedings before?

23  A.  No.  I did not include that in there.

24  Q.  Are you sure about that?

25  A.  Yes.  I said I did not have any hearing.

D4f6lin4                    Chen - cross

1   Q.  Somebody translated this for you, correct?

2   A.  Yes.

3           MR. COHEN:  Can I approach the witness, Judge?

4           THE COURT:  You may.

5   Q.  So do you remember now this form asks you whether you have

6   ever been in immigration court proceedings before?

7   A.  Yes.  I remember they asked.

8   Q.  In fact, you said you hadn't been in any immigration court

9   proceedings before, right?

10  A.  Yes.

11  Q.  That was a lie, wasn't it?

12  A.  Yes.

13  Q.  Didn't you say on this document that you never committed a

14  crime in the United States?

15  A.  Yes, I did.

16  Q.  That was a lie, wasn't it?

17  A.  If you consider the two 2002 case as a crime, then yes.

18  Q.  That isn't the only crime you committed, is it?

19  A.  No.  I did not commit any crime.

20  Q.  You didn't commit any other crime?

21  A.  No.

22  Q.  Not paying your income taxes, is that a crime, sir?

23  A.  According to this, yes, it's a crime.

24  Q.  Possessing and using drugs, is that a crime?

25  A.  Yes.  Smoking marijuana is a crime.

D4f6lin4                         Chen - cross

1   Q.  So when you said on this document just a year or two ago

2   that you never committed a crime in the United States, that was

3   a lie also, wasn't it?

4   A.  If you consider that then so this is also false.

5   Q.  And it asked you, didn't it, this document to provide

6   information about your employment during the last five years,

7   correct?

8   A.  Yes.

9   Q.  And you told them on this form that between 1995 and 2010

10  you were a ticket seller for Ming Ong Incorporated, correct?

11  A.  No.  They filled it out wrong.  Later I told them to change

12  it and they did.  The one, the original one was filled out.  It

13  was wrongly filled out.

14  Q.  So there is another one besides this one that was filled

15  out later?

16  A.  About this 95 to 2010 ticket sales I had told the service

17  agent people that they had filled it out wrong.

18  Q.  Okay.  Did you disclose on this document the fact that you

19  had been an owner or shareholder in several bus companies?

20  A.  No.

21  Q.  So by leaving that information out that was another lie,

22  correct?

23  A.  So then if the lawyer considers it, then it is a lie?

24  Q.  I am not asking what the lawyer considers.  I am asking

25  you, sir, whether by leaving out information about what you've

D4f6lin4                    Chen - cross

1   done for your employment, isn't that lying to the government?

2   A.  Yes.

3   Q.  Now, in this application you said that you couldn't go back

4   to China because you participated in the Chinese Democratic

5   Party, correct?

6   A.  Yes.

7   Q.  And that you had done that before you left to come to the

8   United States?

9   A.  Yes.

10  Q.  Is that true?

11  A.  Yes.

12  Q.  So, sir, my question is if you had a legitimate truthful

13  reason to seek political asylum in the United States in 2002,

14  why did you make up this entirely false story?

15  A.  Before 2002 I had not encountered the CDP and I did not

16  know about it.  I was working in a restaurant out of state.

17  Q.  Did you tell the United States Immigration Service that in

18  China in November 1994 you were distributing pro-democracy

19  flyers and you got arrested by the police?

20  A.  Yes.

21  Q.  And that you were held by the police and beaten and

22  tortured and forced to confess?

23  A.  Yes.

24  Q.  And that you promised you would never participate in

25  antigovernment activities again?

1   A.  Yes.

2   Q.  Well, if all of that was true, if in fact you were

3   persecuted in China because of your belief in democracy, why

4   didn't you just tell the truth in your application instead of

5   making up this elaborate set of lies?

6   A.  What lies?

7   Q.  All the lies you told in 2002 about preaching the gospel

8   and discovering God.

9   A.  In 2002 I did not even hear there was such organization as

10  China Democracy Party.

11  Q.  I didn't use the words Chinese Democracy Party in my

12  question, sir.  I am asking you whether it was true that in

13  1994 you got arrested in China for participating in a

14  democratic movement why didn't you just put that on your 2002

15  application?

16  A.  Because it had been to my own village or hometown and that

17  was the story I made up, but they did not connect with each

18  other.

19  Q.  My question that I am asking you, sir, is why if you had a

20  legitimate fear of persecution because of your political

21  activities you didn't just tell that to the United States in

22  2002?  Why did you make up a full set of pages and pages of

23  lies?

24  A.  I don't remember what I -- what was my thinking back then.

25  But at the time people around me such as friends and relatives,

D4f6lin4                          Chen - cross

1    they all had religion as a basis for asylum.  So it would be

2    easier for them to go to court to have asylum hearings so I

3    made up this story.

4    Q.  So it was because other people told you that you would have

5    a better chance if you lied that you made up this story?

6    A.  Not really telling me that it would be a high chance if I

7    told a lie.  It would be easier if I make up a religious claim

8    that the judge would easily accept my claim or taking sympathy

9    upon my situation.

10   Q.  In other words that lying to the government would get you

11   the ability to stay in the United States, correct?

12   A.  I do not understand.

13   Q.  Aren't you telling the jury that you believed that your

14   best way to stay in the country was to lie to the government?

15   A.  To make up a story hoping that a judge will be more

16   sympathetic to me.

17   Q.  Sir, this is a question that can be answered yes or no.  Is

18   it true that you thought that the best chance you had to stay

19   in the United States was to lie to the government?

20   A.  What do you mean the high chance in lying to the

21   government?  I never thought that to be this big.  I was only

22   trying to make up a story.

23            (Continued on next page)

24

25


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4FVLIN5                          C. H. Guang - cross

1   Q.  Right.  And the story you made up was a lie, right?

2   A.  Yes.

3   Q.  And you told that lie to the government in order to

4   convince them to let you stay in the United States; correct?

5   A.  Yes.

6   Q.  And I ask you again, because you haven't answered me, why

7   is it that if you had a legitimate fear of persecution in China

8   because of your politics, why did you go with a story that was

9   completely false?

10             MR. SKINNER:  Objection to the form of the question.

11             THE COURT:  The witness hasn't yet answered that

12   question.

13             MR. SKINNER:  I think he's tried to answer it a number

14   of times.

15             THE COURT:  Well, I think the questioner is entitled

16   to an answer to his question.

17   A.  Because at the time people around me, such as friends, they

18   told me that if I apply based on religion, it would be much

19   easier.  At the time I did not encounter this in the United

20   States, so I could not apply -- cannot apply based on this

21   democratic party persecution.

22   Q.  But you told the jury that you were persecuted in 1994

23   because you participated in some sort of democratic movement;

24   correct?

25   A.  Yes.

D4FVLIN5                          C. H. Guang – cross

1   Q.  And you're telling us now that that was the truth; correct?

2   A.  Yes.

3   Q.  So isn't it so that when given a choice between lying and

4   telling the truth, you'd do whichever one you think is going to

5   work best for you?

6   A.  What do you mean?  I do not understand.

7   Q.  You didn't understand my question, sir?

8   A.  I'm just confused by your question, about what two things

9   that I choose.

10  Q.  I'm asking you --

11          THE COURT:  I think at this point you should move to

12  something else.  You can come back later.

13  Q.  How many meetings have you had with the government to

14  prepare for your testimony here today, approximately?

15  A.  Seven to eight times.

16  Q.  And how many of those meetings were arranged by Cash, by

17  Dan Jian?

18  A.  Six to seven times.

19  Q.  And you testified that in March, you went to an immigration

20  office in -- I think you said in Philadelphia or in New Jersey?

21  A.  New Jersey.

22  Q.  Okay.  And what was the purpose of you going there that

23  day?

24  A.  Immigration asylum interview.

25  Q.  And that was based on the second application that you

D4FVLIN5                              C. H. Guang - cross

1   filed; correct?

2   A.  Yes.

3   Q.  What happened when you got there?

4   A.  I got there, I went in, and immigration officers show me

5   the 2002 application and told me that I had been ordered

6   deported.

7   Q.  And what was the next thing that happened?

8   A.  And then I was arrested and taken to immigration detention

9   facility.

10  Q.  They put handcuffs on you, right?

11  A.  Yes.

12  Q.  They said you're not going home, you're coming with us, and

13  you're going to be deported, right?

14  A.  No, they just told me to follow them.  That agent told me

15  that I should not worry about it, that they would not send me

16  back by plane.

17  Q.  That they wouldn't send you back by plane?

18  A.  That's what he told me.

19  Q.  Were you able to communicate with this agent?

20  A.  There was an interpreter during the interview.

21  Q.  And during the interview was when they told you that you

22  had a removal order, and you were taken into custody.  Is that

23  when you told them that you needed to call Agent Tim?

24  A.  They handcuffed me and took me to the immigration detention

25  facility, when I was signing and fingerprinting.  And I asked

D4FVLIN5                         C. H. Guang – cross

1   them to let me make a phone call.

2   Q.  And who did you call?

3   A.  I gave the officer -- the agents a business card.  I told

4   them that if they could make a phone call for me to the agent.

5   So immigration officer there made the phone call to the agent.

6   Q.  And you told them, didn't you, that you were going to

7   testify for the government in a criminal trial in New York,

8   right?

9   A.  He did not seem like that, but later the agent told them.

10  I did not know what he was saying.  After a while, I signed it,

11  and then they gave me three pieces of paper and told me to

12  report on April 22nd to Building No. 26.

13  Q.  Did you tell them that you were going to be a witness in a

14  federal criminal trial on April 8th?

15  A.  No, I did not.  I did not understand it.

16  Q.  Didn't you say there was an interpreter there?

17  A.  Interpreter had left.  I was taken somewhere else.

18          MR. COHEN:  Judge, can I take a moment?

19          THE COURT:  Yes.

20          MR. COHEN:  Thank you.

21          Judge, would this be an appropriate time to take a

22  brief recess, and I can get some things organized?

23          THE COURT:  Very well.  We'll take the mid-afternoon

24  break at this time.

25          (Jury excused)

1                THE COURT:  You may step down.

2                (Witness excused)

3                THE COURT:  How much more do you have, Mr. Cohen?

4                MR. COHEN:  I would say less than half an hour,

5     depending on the answers.

6                THE COURT:  Very well.

7                We'll all take a five-minute recess.

8                (Recess)

9                THE COURT:  Okay.  Let's get the jury.

10               MR. SKINNER:  Your Honor, may I ask, outside the

11    presence of the jury --

12               THE COURT:  Yes.

13               MR. SKINNER:  -- if we're going to be permitted on

14    redirect to get any questions about the witness's subjective

15    state of mind?

16               THE COURT:  I haven't had an opportunity to read the

17    pounds of paper you gave me.

18               MR. SKINNER:  Very well, your Honor.

19               THE COURT:  You'll have to put that over till the

20    morning.

21               MR. SKINNER:  That's fine.

22               (Jury present)

23               THE COURT:  You may proceed, Mr. Cohen.

24               MR. COHEN:  Thank you, your Honor.

25    BY MR. COHEN:

D4FVLIN5                         C. H. Guang - cross

1    Q.  Mr. Chen, I'd like to draw your attention to March 21st,

2    when you were at the immigration office.

3         After you were taken into custody, did you advise the

4    agents who arrested you that you needed to be a witness here

5    and asked them to call Agent Varian?

6    A.  I only gave the agent -- the agent's business card.  I

7    asked him to help me call him to tell him that I got arrested.

8    I couldn't really speak very much English, but he understood.

9    Q.  Did you say there was a translator there or the translator

10   left already?

11   A.  The interpreter was at the court appearance.  And as soon

12   as I was taken by immigration agents and put in the vehicle,

13   that interpreter left.

14   Q.  So you were actually brought before an immigration judge on

15   that day and appeared in court?

16        THE INTERPRETER:  I'm sorry, can you repeat the

17   question?

18   Q.  So you were actually brought before an immigration judge

19   that day and appeared in court?

20   A.  I did not see the immigration judge.  I was at the

21   immigration detention center, I believe.

22   Q.  Didn't you just tell us that you were in immigration court?

23   A.  Well, the first time when I went in to make an appearance

24   for an interview, then I was handcuffed right away.

25   Q.  I'm sorry, were you finished?

D4FVLIN5                          C. H. Guang – cross

1   A.   Then I was taken to another place which I understood it to

2   be a detention center, but I don't really know.

3   Q.   Okay.  So at which of those places was the interpreter?

4   A.   At the first place for the interview.

5   Q.   And was it at the interview that you were taken into

6   custody?

7   A.   Yes.

8   Q.   And was it as soon as you were taken into custody that you

9   gave Agent Varian's card to the agents that took you into

10  custody?

11  A.   At another place I gave it to the agent who took me to

12  custody, at the second place.

13  Q.   And there was no interpreter there?

14  A.   No interpreter.

15  Q.   So, to your knowledge -- well, did they ask you any

16  questions in English about why you had a special agent's card

17  from the Customs and Immigration Service?

18  A.   Based on my understanding, he probably did.  But I gave him

19  my -- I'm sorry, I gave him the business card and told him to

20  call the agent.  He called, but I didn't really understand what

21  they said to each other.

22  Q.   So after he called Agent Varian, what happened?

23  A.   He said he would help me type up three pieces of papers.

24  He photographed me, took my photograph, fingerprinted me, and

25  then gave me three pieces of paper, and told me to report to

D4FVLIN5                         C. H. Guang - cross

1   immigration on April 22nd.

2   Q.  And then what happened?

3   A.  And then he called a taxi for me to -- he told me to call a

4   taxi myself and told me to go home.

5   Q.  So after this agent had a conversation with Agent Varian,

6   you were released from custody, right?

7   A.  Yes.

8   Q.  You didn't have to see a judge, did you?

9   A.  I did not.

10  Q.  You didn't have to post bail to be released, did you?

11  A.  No.

12  Q.  There was just a phone call between the agent and Varian,

13  you filled out some papers, and told you to come back, and sent

14  you off in a taxi; is that your testimony?

15          THE COURT:  I think you can move on.  We've all heard

16  the testimony.

17  Q.  You testified that no promises had been made to you about

18  your immigration status; correct?

19  A.  There was none.

20  Q.  Nobody has promised you that in return for your testimony

21  here, you'd be able to stay in the United States; correct?

22  A.  No one.

23  Q.  But you know that you're never going to get political

24  asylum in this country; correct?

25  A.  Yes.

D4FVLIN5                         C. H. Guang – cross

1    Q.  You know that you're not going to get it because you've

2    submitted two fraudulent applications for asylum; correct?

3    A.  I do not know what the results will be.  I do not know what

4    the reason will be.  But I feel that the chance of getting

5    legal status here would be very, very low.

6    Q.  Well, I'm not talking about political asylum now; I'm

7    asking you whether you believe that there is some way you might

8    be able to remain in the United States.

9    A.  Right now there isn't very much that I can do to stay in

10   the U.S.

11   Q.  Well, do you know which agency of the United States

12   government decides who stays in the United States and who

13   doesn't stay?

14   A.  Immigration?

15   Q.  Yeah.  And do you know which agency Agent Tim Varian works

16   for?

17   A.  Federal FBI?

18   Q.  Do you really believe that?

19   A.  I really cannot answer this question.

20   Q.  You don't know that he's an immigration agent?

21   A.  I did not.

22   Q.  You know though that all of your meetings with him and with

23   the government were arranged by your boss, right?

24   A.  When you say "my boss," who do you mean?  The government's

25   meeting -- what government's meeting?  I don't understand.

D4FVLIN5                           C. H. Guang – cross

1   Q.  You met with the prosecutors and with Agent Varian numerous

2   times, right?

3   A.  Yes.

4   Q.  And you told us that most of those meetings were set up by

5   Cash, by Dan Jian.

6   A.  Yes.

7   Q.  And you also told us that after you were put in handcuffs

8   and taken to a detention center because you were ordered

9   removed, one phone call to Agent Varian got you released;

10  correct?

11  A.  Yes.

12  Q.  Now, when you first asked Mr. Lin to join your bus company,

13  you then were partners with somebody you called Ding Chuan?

14  A.  Yes.

15  Q.  And Ding Chuan was somebody that you knew for a while;

16  correct?

17  A.  Yes.

18  Q.  And, to your knowledge, did Ding Chuan know Mr. Lin?

19  A.  Yes, he knew him.

20  Q.  Were they from the same village?

21  A.  They had a pretty good relationship, too.

22  Q.  They had a good relationship, right?

23  A.  Yes.

24  Q.  And were they from the same village?

25  A.  No.

D4FVLIN5                              C. H. Guang – cross

1   Q.  Okay.  But besides having a good relationship with Ding

2   Chuan, did you understand that Mr. Lin had a good relationship

3   with the person that wanted to compete with you on your route?

4           THE INTERPRETER:  I'm sorry, can you repeat the

5   question again?  I'm sorry.

6   Q.  Besides knowing that Mr. Lin had a good relationship with

7   Ding Chuan, did you also know that Mr. Lin had a good

8   relationship with the person who wanted to compete with you on

9   your bus route?

10  A.  Yes.

11  Q.  In fact, I think you testified the other day that your

12  understanding was that the owner of the other company and

13  Mr. Lin were good friends; correct?

14  A.  Yes.

15  Q.  And the reason that you selected Mr. Lin to mediate this

16  dispute or this potential dispute was because he and the owner

17  of the other company were good friends; correct?  They gave

18  each other face.

19  A.  Yes.

20  Q.  Now, Mr. Skinner asked you some questions earlier about

21  whether Mr. Lin had ever performed any other service for your

22  company besides dealing with this competitor; correct?

23  A.  No.

24  Q.  Well, do you remember that the prosecutor asked you that

25  question?

D4FVLIN5                              C. H. Guang – cross

1    A.  He did ask.

2    Q.  Okay.  And do you remember saying that no, Mr. Lin never

3    performed any other service?

4    A.  I answer that.

5    Q.  Okay.  And let me ask you this:  Did you ever ask Mr. Lin

6    to perform another service for the company other than that

7    which you asked him to do?

8    A.  No.

9    Q.  You said that when you became partners, you and Ding Chuan

10   and Mr. Lin, that there was no written contract, right?

11   A.  Correct.

12   Q.  You remember going to a lawyer's office in Chinatown with

13   Ding Chuan and yourself and Mr. Lin's wife and signing a

14   partnership agreement or a contract about that company?

15   A.  I did not go to sign it.

16   Q.  Who did go?

17   A.  I do not remember.  There wasn't any application of a

18   company.  From what I remember, there wasn't an application for

19   a company.

20   Q.  I'm not talking about an application for a company.  I'm

21   talking about a partnership agreement or a shareholders'

22   agreement.

23   A.  No, I did not go.

24   Q.  Did your wife go to sign such a contract, since her name

25   was the one that was on the company?

1    A.  No.

2    Q.  When you asked Mr. Lin to become a one-third shareholder of

3    the company, did you ask him to make a financial contribution

4    or to invest money in the company?

5    A.  At that time there was talk about that, but I did not take

6    any money.

7    Q.  Did you ask him for money?

8    A.  No.

9    Q.  When you say there was talk about it, did he, in fact,

10   offer to invest money in the company?

11   A.  I don't remember.  I just know that I did not take any

12   money.

13   Q.  When you went to visit him in the hospital after he had

14   been stabbed, do you know how long he had been in the hospital?

15   A.  I think he was there for two, three days already.

16   Q.  And after those two or three days, do you know how much

17   longer he stayed there?

18   A.  Approximately three, four days.  I don't know exactly how

19   many days.

20   Q.  How did he look?

21          THE INTERPRETER:  I'm sorry?

22   Q.  How did he look?

23   A.  His mind was clear; he was able to talk.

24   Q.  How did he look?

25   A.  His face was very pale, and he was lying in bed wearing a

D4FVLIN5                         C. H. Guang – cross

1    patient's outfit.

2    Q.  Was he in the intensive care unit?

3    A.  I don't remember.

4    Q.  Did he appear to be in significant pain?

5    A.  He looked like he was in pain, why wouldn't he be?

6    Q.  Do you know that he was stabbed many times in that

7    incident?

8    A.  I think two, three times.

9    Q.  And that was by somebody named Yi Feng?

10   A.  Someone that's follow Yi Feng.

11   Q.  Yi Feng was a dailo?

12   A.  Yes.

13   Q.  Now, eventually there came a time that you invited Yiqun to

14   join your company by you and Ding Chuan each selling him some

15   shares; correct?

16   A.  Yes.

17   Q.  And did he pay you for those shares or did you just give

18   them to him?

19   A.  He paid me.

20   Q.  And Yiqun, I think you've told the government, had helped

21   other bus companies in the past with their competitors;

22   correct?

23   A.  I did not say that.

24   Q.  You don't recall saying that?

25   A.  I definitely didn't tell you.

D4FVLIN5                          C. H. Guang - cross

1   Q.  I'm sorry?

2   A.  I definitely did not tell you.

3   Q.  I know you didn't tell me.  I'm talking about what you told

4   them.

5   A.  Told who?

6   Q.  The prosecutors.

7   A.  I said he has face, and that people in Chinatown listen to

8   him.  And he could mediate.

9   Q.  Why did he have face?

10  A.  Because he treats people very nice, and people like to be

11  his friends and like to hang out with him.

12  Q.  During the time that you knew him, was he ever in prison?

13  A.  I do not remember.  I don't know.

14  Q.  During the time you knew him, did he ever associate with

15  members of the Tung Lung gang?

16  A.  I do not know.  That has to do with him and a long, long

17  time ago.

18  Q.  So a long, long time ago he associated with people in the

19  Tung Lung gang?

20  A.  I do not know.

21  Q.  You just said it was a long time ago.  Was it a long time

22  ago that he associated with members of the Tung Lung?

23  A.  No, I do not know whether he associate with the Tung Lung.

24  I don't understand the question you asking me.

25  Q.  Well, when you just said that was a long time ago, what

D4FVLIN5                          C. H. Guang - cross

1  were you referring to?

2  A.  You asked me if he hung out with the Tung Lung people from

3  the time that I met Yiqun.  I know that he was very nice and

4  friendly to his friends.

5  Q.  You didn't answer my question about whether or not you knew

6  him to associate with the Tung Lung.

7  A.  I do not know.  I don't know who are considered the Tung

8  Lung people and whatnot.

9  Q.  Did he hang out with gangsters?

10 A.  He hangs out with a lot of people.  Some people gamble in

11 the gambling parlor, and some people he had dinner with

12 outside.

13 Q.  Did he hang out with gangsters?

14 A.  He and Yi Feng were friends.  Does that consider them

15 hanging out with one another?

16 Q.  I don't know.  I don't know Yi Feng.  But besides Yi Feng,

17 was he friendly with other dailos?

18 A.  When you ask me about other dailo, I don't know who else is

19 qualified to be a dailo.

20 Q.  Was Yiqun a loan shark?

21 A.  I heard that he did some loan-sharking, but that's his

22 lifestyle.  That is a very common way of making a living in

23 Chinatown for these people that hang out.

24 Q.  Loaning money at loan-shark rates is a common way to make a

25 living, is that what you're telling us?

1    A.  Yes.

2    Q.  Now, did you ever see any tattoos that he couldn't have?

3    A.  I don't remember whether I did or not.

4    Q.  Do you recall that he had a very large pirate tattoo?

5    A.  I do not remember.

6    Q.  Do you recall that he had a tattoo of jaggy barbed wire

7    around his bicep?

8    A.  I do not remember.

9    Q.  Now, you said -- I think you testified earlier that there

10   came a time that after Yiqun joined the company, that he said

11   stop paying Mr. Lin an extra $2,000 a month.

12   A.  It was about one year after he joined the company.

13   Q.  Okay.  And what happened one year after he joined the

14   company?

15   A.  Nothing happened, except in June of 2004, he asked me how

16   much money was set aside for the company.

17   Q.  And eventually, Yiqun said, Don't pay Mr. Lin the extra

18   $2,000; correct?

19   A.  He wouldn't agree to pay.  He said there's no reason to

20   pay.

21   Q.  Okay.  And did you communicate that to Mr. Lin in some way?

22   A.  Yes, I called him to tell him.

23   Q.  Okay.  And was he angry?

24   A.  He was angry.

25   Q.  Did he say that he would beat up Yiqun the next time he saw

1  him?

2  A.  He didn't say that.  At that time this is what he said:  I

3  know which person did not agree to pay this money.  He said

4  that since he doesn't give me face, and I won't be courteous of

5  him the next time.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4F6LIN6                          Chen - cross

1    BY MR. COHEN:

2    Q.   You don't recall telling the government at a meeting, and

3    this is 3503-4, on July 23rd of 2012 that Ding Pa was upset and

4    said that Yi Qun thinks he is just a big shot, I will beat him

5    up the next time I see him?  You don't remember telling the

6    government that?

7    A.   He did curse out someone.  But when he said the next time I

8    see him, I will not be courteous to him, it is more, less that

9    is what it means.

10   Q.   Now, I am now asking what it means.  I am asking you

11   whether on July 23rd you told the government that Ding Pa was

12   upset, said he thinks is he just a big shot, I will beat him up

13   the next time I see him?  Do you remember telling the

14   government that?

15   A.   Are you saying that Ding Pa was saying this about Yi Qun or

16   Yi Qun saying this about Ding Pa?

17   Q.   I am asking you, sir, whether you told the government that

18   Ding Pa was upset after you told him that you weren't going to

19   give him the extra $2,000 a month and that Ding Pa said that Yi

20   Qun thinks is he a big shot I will beat him up the next time I

21   see him?

22   A.   I only said that Ding Pa was upset and he said why if he

23   thinks he is a big shot.  He didn't state the name.  Next time

24   I see him, I will give him problems.  He did not tell me Yi

25   Qun's name.

D4F6LIN6                        Chen - cross

1   Q.  I want to show you a document.  I am going to ask the

2   interpreter to translate a very small portion of it, and ask

3   you, sir, if it refreshes your memory about exactly what you

4   told the government.

5            MR. COHEN:  May I, Judge?

6            THE COURT:  Go ahead.

7   Q.  So, have you had a chance to listen to the interpreter

8   translate that?

9   A.  Yes.

10  Q.  Does that refresh your recollection as to what you told the

11  government on July the 23rd when you met with them regarding

12  what Ding Pa said about Yi Qun?

13  A.  I think what I've said today and when I said it on

14  July 23rd is almost the same meaning.  But if you want to be

15  that exact every time when I speak to the government, there

16  will always be something a little different.  It is almost

17  impossible for me to remember everything that I said.

18  Q.  Is that because it is harder to remember a story than it is

19  to remember the truth, sir?

20           MR. SKINNER:  Objection, Judge.

21           THE COURT:  Overruled.

22  A.  About this, the story from the truth I think has nothing to

23  do with each other.

24           THE COURT:  Let's move on.

25  Q.  You say that after the shooting of Yi Qun you heard about

D4F6LIN6                          Chen - cross

1   it, right?

2   A.  Yes.

3   Q.  And that at some point you had a conversation with Mr. Lin

4   about it?

5   A.  In about a few days.  Four, five days.  In a week.

6   Q.  And that was when you say Mr. Lin called you?

7   A.  Yes.

8   Q.  Now, at that point you had already heard that Yi Qun was

9   dead, right?

10  A.  Yes.

11  Q.  And there were rumors and stories going on around the

12  community or out in Chinatown about what had happened?

13  A.  Yes.

14  Q.  And you say that you asked Mr. Lin what happened and

15  basically he told you that this kid from the north

16  misunderstood something that he said, correct?

17  A.  Yes.

18  Q.  And that he didn't mean for this kid from the north to kill

19  Yi Qun or anybody else, correct?

20  A.  Oh, he meant to shoot Yi Qun in his arms or legs.

21  Q.  So in other words he was telling you that he did not intend

22  that Yi Qun would be killed, correct?

23  A.  That's what he told me.  But whatever he was thinking

24  himself -- that is what he meant, that is what he told me.

25  Q.  We can believe your testimony here word for word because

D4F6LIN6                          Chen - cross

1    you've been so truthful with the government in the past,

2    correct?

3              THE COURT:  Objection sustained.

4              What is the next question?

5              MR. COHEN:  I have no further questions, Judge.

6              THE COURT:  This is a good time to recess for the day.

7    We will reconvene tomorrow morning at the same time, 10:00.

8    Those you who do come at 9:30 will have coffee and muffins.

9    You have all been very prompt and I commend you for it.  So I

10   will see you tomorrow morning at 10:00.  Have a pleasant

11   evening.  Please do not be tempted to look at anything that

12   reference to this trial if you should come upon such a thing.

13   Very well.

14             (Jury excused)

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury not present).

2            THE COURT:  You may step down.

3            How long do you anticipate redirect will take?

4            MR. SKINNER:  Five to 10 minutes, your Honor.

5            THE COURT:  Very well.  Who is your next witness?

6            MR. SKINNER:  Qun Li.

7            THE COURT:  Thank you.

8            MR. SKINNER:  Your Honor, I should add that if you

9    review the cases and you are going to give us leeway --

10           THE COURT:  Of course.  I understand that.

11           MR. SKINNER:  Even then it will not be particularly

12   long.

13           THE COURT:  Very well.

14           MS. BURNS:  Thank you, your Honor.

15           THE COURT:  You are all excused.

16           MR. SKINNER:  Thank you, your Honor.

17           THE COURT:  Case is adjourned until tomorrow morning.

18           (Adjourned to April 16, 2013 at 10:00 a.m.)

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

CHEN HUO GUANG

Direct By Mr. Skinner  . . . . . . . . . . . 309

Cross By Mr. Cohen . . . . . . . . . . . . . 354

                    GOVERNMENT EXHIBITS

Exhibit No.                                   Received

 104 and 20   . . . . . . . . . . . . . . . 346