D4g6lin1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                         11 CR 114 (MGC)

 5   XING LIN,

 6              Defendant.                 JURY TRIAL

 7   ------------------------------x

 8                                         New York, N.Y.
                                           April 16, 2013
 9                                         10:15 a.m.

10
     Before:
11
                    HON. MIRIAM GOLDMAN CEDARBAUM,
12
                                           District Judge
13

14                            APPEARANCES

15
     PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17   PETER M. SKINNER
     JENNIFER E. BURNS
18       Assistant United States Attorneys

19   JOEL S. COHEN
         Attorney for Defendant
20
     ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
21                   DANIEL YANG, Fuchow Interpreter
                     LILY LAU, Fuchow Interpreter
22                   DANIEL CHAN, Fuchow Interpreter
                     JESSICA CHACE, Paralegal
23                   TIMOTHY VARIAN, Special Agent, HSI
                     JIAYING WANG, Legal Assistant
24

25
```

D4g6lin1

```
 1              (Trial resumed)

 2              (In open court; jury not present)

 3              MR. COHEN:  Before the jury comes in, your Honor, I

 4    had indicated yesterday that I had completed my

 5    cross-examination.  In reviewing my notes and getting a copy of

 6    the transcript last night, I realized there are five or six

 7    questions that I neglected to ask.

 8              THE COURT:  Very well.  You may proceed.  The

 9    government may redirect.

10              MR. COHEN:  Of course.

11              THE COURT:  Actually, before the jury comes in, I will

12    also talk to counsel for minute.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25
```

D4g6lin1

1           (At the side bar)

2           THE COURT:  I will permit one question about how did

3     you feel about one of those things.

4           MR. SKINNER:  I am sorry, your Honor?

5           THE COURT:  That is what you asked me to consider.

6           MR. SKINNER:  Yes.

7           THE COURT:  That is what you gave me material on.  I

8     don't think anything you gave me is really dispositive, but it

9     doesn't matter.  I will permit him to ask him how he felt,

10    which is the question I sustained an objection on.

11          MR. SKINNER:  I think I asked a question about how he

12    felt about a couple different things that happened.

13          THE COURT:  That may be.  I need to know what they

14    are.

15          MR. SKINNER:  The first was how he felt when he

16    received the phone call from Ding Pa insisting on another

17    10 percent of the company.  The second is how he felt when he

18    was at Corona Park, Queens, and the individual touched his

19    shirt.  He didn't see a gun, but he touched his shirt.

20          THE COURT:  I think you can ask it once.

21          MR. SKINNER:  Okay.

22          THE COURT:  The rest of it is not so difficult for the

23    jury to deduct because the real problem is whether the things

24    that were said were done instill fear.  That is not an esoteric

25    concept.

D4g6lin1

1          MR. SKINNER:  No.  We do not dispute that defense will

2     be able to argue at the end of the day that if this wasn't a

3     reasonable fear, he wasn't extorted.  As we indicated we think

4     the case law is clear that the subjective state of mind is

5     relevant.

6          THE COURT:  I don't think the defendant is going to

7     argue that.  I think he has better things to try.

8          MR. SKINNER:  He can, which would address the issue of

9     the Court's concern that a victim might be particularly

10    sensitive.

11         THE COURT:  I would be very surprised if the closings

12    turned on whether this man was really worried.

13         MR. COHEN:  My secret is out, Judge.

14         MR. SKINNER:  I think the most important thing for us

15    is the Corona Park incident so we'll focus on that.

16         THE COURT:  Why don't you use that then.

17              (Continued on next page)

18

19

20

21

22

23

24

25

D4g6lin1

1              (In open court; jury present)

2              THE COURT:  Good morning, members of the jury.  We're

3       going to continue to hear a little bit more from the witness

4       that you listened to yesterday afternoon.  You may be seated.

5              You may proceed, Mr. Cohen.

6              MR. COHEN:  Thank you, your Honor.

7        HUO GUANG CHEN, resumed.

8       CROSS-EXAMINATION (continued)

9       BY MR. COHEN:

10      Q.  Good morning.  You testified yesterday that prior to coming

11      to court over the last number of months that you had meetings

12      with the government; correct?

13      A.  Yes.

14      Q.  At some of those meetings you told them things that you

15      said happened; right?

16      A.  About what things happened?

17      Q.  In some of those meetings, sir, you gave them information

18      about things you say you had heard or seen or done; correct?

19              THE COURT:  He is talking about the government.

20      A.  What things are you referring to?  About the case?

21      Q.  About the case.

22      A.  Yes.

23      Q.  And in some of those meetings you talked about with the

24      prosecutors what questions they would be asking you, correct,

25      in court?

D4g6lin1                         Chen - cross

1    A.  Yes.

2    Q.  They reviewed the questions they would ask you in court;

3    correct?

4    A.  You are asking about when the government asked me

5    questions?

6    Q.  I am asking you, sir, whether when you were meeting with

7    the government before this trial the prosecutors reviewed with

8    you the questions they would ask you in this courtroom, yes or

9    no?

10   A.  Yes.

11   Q.  Did they also review with you questions that they thought

12   that I might ask you?

13   A.  Not that many questions.  So whatever this lawyer asks,

14   that's his problem.

15   Q.  That's what they told you, whatever I ask you, that's my

16   problem?

17   A.  That's how I feel.  That is the lawyer's problem.

18            THE COURT:  He is giving you his state of mind.

19            MR. COHEN:  I accept it, Judge.  I believe it.

20   Q.  You testified that you had gone to a restaurant recently

21   during this trial and I think that you had called Cash to meet

22   you at the restaurant?

23   A.  On April 10th or 11th or on the 10th.

24   Q.  Whatever date it was, whether it was the 10th or the 11th,

25   there was a day when you were waiting to testify that you went

D4g6lin1                    Chen - cross

1   to eat in Chinatown and called Cash also called Dong Jain and

2   asked him to meet you there; correct?

3   A.  Yes.  I wanted to talk to him.

4   Q.  And that restaurant was at 20 East Broadway?

5   A.  I don't remember what number the restaurant is, but I know

6   it is located on East Broadway.  It is called -- the name of

7   the restaurant is called Number Three Snack Shop.

8   Q.  Had you been there before?

9   A.  I always had my lunch there.

10  Q.  And had you been there with Cash before?

11  A.  I was eating there a lot.

12  Q.  Had you been there with Cash before?

13  A.  Very often.

14  Q.  Had you been there with Yi Pei before?

15  A.  Who is Yi Pei.

16  Q.  You said that when you testified that another person came

17  and joined you at the table; correct?

18  A.  Yes.

19  Q.  What was that person's name?

20  A.  Yi Pei.

21  Q.  30 seconds ago when I asked you if you had been there with

22  Yi Pei, you asked me who Yi Pei was; correct?

23  A.  Yi Pei and Yi Ped is a little different.  I thought it was

24  two different people.

25  Q.  You misunderstood the interpreter?

D4g6lin1                    Chen - cross

1   A.  Yes.

2   Q.  Had you been there with Yi Pei before?

3   A.  No.

4   Q.  Never?

5   A.  No.

6   Q.  You said that you didn't call Yi Pei that day to meet you

7   at the restaurant; correct?

8   A.  No.

9   Q.  Do you know whether after you called Dong Jain before he

10  called Yi Pei to meet you at the restaurant?

11  A.  I do not know.  I do not know.

12  Q.  As far as you know it was just a coincidence that Yi Pei

13  happened to walk into the restaurant during the trial and sit

14  down with you; correct?

15  A.  Let me explain to you how did it happen on that day, how Yi

16  Pei entered.

17  Q.  I am not asking for an explanation.  I am asking you to

18  answer my question.

19          Do you think it was a coincidence that he just

20  happened to appear that day?

21  A.  I do not know.  I did not call Yi Pei.  You have to ask Yi

22  Pei about it.  I did not know he would be there.

23  Q.  You said by the way when he came you invited him to sit at

24  your table and he had already eaten; correct?

25  A.  Yes.

D4g6lin1                        Chen - cross

1    Q.  When you asked Mr. Lin to assist your company because you

2    were afraid that someone was going to compete with you, do you

3    recall that decision and the conversation you had about it?

4    A.  Yes.  The person was about to have -- to begin the

5    conversation.

6    Q.  Had that person competed with you, what would it have meant

7    to you financially?

8    A.  Probably perhaps my company was a smaller -- very small

9    company, could be run out of business.

10   Q.  In fact, you and Ding Cheng your partner made a decision

11   that it would be more economically good for you to have Mr. Lin

12   be a part of the company than to risk losing it; correct?

13   A.  Yes.

14   Q.  Now, you are from Fuchow province; right?

15            THE COURT:  Fujian.

16            MR. COHEN:  Fujian.  Thank you, your Honor.

17   Q.  Fujian province; correct?

18   A.  Yes.

19   Q.  Is it true that Fujian province is in the southern most

20   province of China?

21   A.  Yes.

22   Q.  Have you ever heard people from Fuchow refer to other

23   people from China as northerners before?

24   A.  People from northern part of China is called northerners.

25   Q.  When you say the northern part of China, are you referring

D4g6lin1                        Chen - cross

1   to provinces other than Fujian that are to the north of Fujian

2   province?

3   A.   More north, Beijing is also more north.  It divides from

4   the Yangtze River north and south.

5   Q.   Would somebody for instance who was from Beijing be

6   considered a northerner by people from Fujian?

7   A.   Person from Beijing?

8   Q.   Yes.

9            THE COURT:  You are being asked if a person from

10  Beijing is a northerner.

11  A.   No.  Personally I would call this person just a person from

12  Beijing.

13  Q.   I understand that is what you would personally call them,

14  but is Beijing north of Fujian?

15  A.   Yes.  According to geographic location in China.

16  Q.   And how long would it take to travel by car or by train

17  from Fujian province to Beijing?

18  A.   I don't know.  I never tried that.

19  Q.   It is a long trip though; correct?

20  A.   Yes.  But as far as I understand this -- as far as I

21  understand, 10 years ago that may be the case but now with the

22  high speed train about five to six hours.

23  Q.   But even though there is a high speed train that has cut

24  the travel time, Beijing is still north of Fujian; right?

25           MR. SKINNER:  Objection, relevance.

D4g6lin1                    Chen - cross

1          THE COURT:  Overruled.  This is cross-examination.  I
2     have no idea of the relevance.
3          MR. SKINNER:  Shouldn't we have some idea of the
4     relevance before it is permitted?
5          THE COURT:  Not if we move on.
6          MR. COHEN:  It's my last question.
7          THE COURT:  In any event is Beijing north of the
8     Yangtze River?
9          THE WITNESS:  Yes.
10         MR. COHEN:  Thank you, your Honor.
11         THE WITNESS:  To the north.
12    REDIRECT EXAMINATION
13    BY MR. SKINNER:
14    Q.  Good morning, Mr. Chen.
15         Do you remember during the questioning from Mr. Cohen,
16    the defendant's lawyer, being asked a number of questions about
17    the initial asylum application you put in this 2002.
18    A.  Yes.
19    Q.  Do you recall being asked whether on that asylum
20    application you used the name Hao Min Wu?
21    A.  No.
22    Q.  Did you sign that application with your own name, Huo Guang
23    Chen?
24    A.  Yes.
25    Q.  Did you affix a photograph of yourself to that application?

1   A.  Yes.

2   Q.  You were asked yesterday about the chances that you can

3   remain in the United States going forward.  Do you remember

4   that?

5   A.  Very slim.

6   Q.  And you have to go back to 26 Federal Plaza on April 22nd;

7   is that correct?

8   A.  Yes.

9        MR. COHEN:  Your Honor, I know this is redirect, but I

10  do have an objection to the constant leading.

11       THE COURT:  Let it come from the witness.

12  Q.  Do you know what is going to happen when you go back to 26

13  Federal Plaza on April 22nd?

14  A.  I do not know what will happen, but I must report to that

15  place.

16  Q.  Could you be removed from the country after that?

17  A.  There was such possibility.

18  Q.  Mr. Chen, you are testifying here today pursuant to an

19  immunity order; correct?

20  A.  Yes.

21  Q.  Did anyone promise you anything in exchange for that

22  immunity order?

23  A.  No one.

24  Q.  Did anyone say if you testify a certain way, you will get

25  immunity?

D4g6lin1                      Chen - redirect

1   A.  No.  No one.

2   Q.  Do you have any kind of contract or written agreement with

3   the government in connection with --

4            THE COURT:  I think you should move on.

5   Q.  Mr. Chen, you testified about a meeting that you had with

6   the defendant in Corona Park.  Do you remember that?

7   A.  Yes.

8   Q.  At this meeting what, if anything, did the defendant ask of

9   you?

10  A.  Asked me to give him an answer.  Whether I would agree to

11  that additional 10 percent share.  Otherwise he wouldn't -- he

12  would not have a face in front of his followers.

13  Q.  At this meeting what, if anything, did the defendant say

14  about guns?

15           MR. COHEN:  Objection.  This was asked and answered

16  yesterday.

17           THE COURT:  I agree but I will permit as a foundation

18  for what follows.  Very well.  You may proceed.

19  Q.  At the meeting what, if anything, did the defendant say

20  about guns?

21  A.  He said in those few days his followers always had guns

22  with themselves and his follower pressed in this area and I

23  thought he might have a gun on him.

24  Q.  How did you feel at this meeting, Mr. Chen?

25  A.  I was scared.  If I was not scared, then I did not need to

D4g6lin1                        Chen - redirect

1   call my partner to have a discussion with him about --

2            MR. COHEN:  Objection.  Move to strike.

3            THE COURT:  That's enough.  Let's move on.

4   Q.  Just so we're clear as to some portion of the answer --

5            THE COURT:  The answer is very clear.  The witness

6   said he was scared and if he hadn't been scared he wouldn't

7   have called his partner.

8            MR. SKINNER:  Is that still part of the record, your

9   Honor?

10           THE COURT:  Everything is part of the record.

11           MR. SKINNER:  As long as it is not stricken.

12           No further questions, your Honor.

13           THE COURT:  Very well.  You may step down.

14           MR. COHEN:  Your Honor, I have a little bit of

15   recross.

16           THE COURT:  Okay.  This means you have to ask

17   questions about redirect.

18           MR. COHEN:  Thank you, Judge.  I think I remember

19   that.

20   RECROSS-EXAMINATION

21   BY MR. COHEN:

22   Q.  Now, you have to report to 26 Federal Plaza on April 22nd;

23   correct?

24   A.  Yes.

25   Q.  And you've said that nobody has promised you anything about

D4g6lin1                         Chen - recross

1    whether you can stay here or not; correct?

2    A.  No one.

3    Q.  Do you intend on April 22nd to make the people that you

4    meet with aware of the fact that you cooperated with the

5    government and testified at this trial?

6              MR. SKINNER:  Objection to form.

7              THE COURT:  Overruled.  This is recross.

8              MR. SKINNER:  I object to the "cooperate with the

9    government," your Honor.

10             MR. COHEN:  I will change the word, Judge.

11   Q.  Do you intend to make the people that you meet with on

12   April 22nd aware of the fact that you testified on behalf of

13   the government at this trial?

14   A.  I do not know what I would be saying at the time.

15   Q.  When you were taken into immigration custody on March 21st

16   you gave Special Agent Varian's; correct?

17   A.  Yes.

18   Q.  And a telephone call was made and the handcuffs came off;

19   correct?

20             MR. SKINNER:  Objection.  Beyond the scope of

21   redirect.

22             MR. COHEN:  It is well within the last question that I

23   asked that I didn't get a straight answer to.

24             THE COURT:  We're not going to have speeches.  You may

25   proceed.

D4g6lin1                          Chen - recross

1   A.   Even when I was I switched to another location, even before

2   the phone call was made they already took off the handcuffs.

3   Q.   A phone call was made while you were in immigration

4   detention; correct?

5   A.   Yes.

6   Q.   That phone was made by the agent who had you in custody to

7   Agent Varian because he gave them his card; right?

8   A.   Yes.

9   Q.   After that phone call you were released from immigration

10  detention, correct, without seeing a judge?

11  A.   No.

12  Q.   That is what happened; right?

13  A.   Yes.  I was given three pieces of paper and I was told to

14  report on April 22nd.

15  Q.   But you were released; right?

16  A.   Yes.

17  Q.   And you were released after you had Agent Varian's card and

18  gave it to the agents that had you in custody; right?

19  A.   He made a phone call.

20  Q.   So is it your understanding that even though you have an

21  order to be removed from the United States that agents have the

22  ability to release you if they want to?

23          MR. SKINNER:  Objection, your Honor.

24          THE COURT:  Overruled.

25  A.   I do not know.

D4g6lin1                          Chen - recross

1   Q.  Isn't that what happened?

2            THE COURT:  Please.  We're not going to have an

3   argument.  The witness has answered.  Let's move on.

4   Q.  You said that in this meeting in Corona Park that Mr. Lin

5   told you that the people with him had guns?

6   A.  Yes.

7   Q.  And in relation to when Mr. Lin was stabbed by Yi Feng's

8   followers, was that meeting in Corona Park before that or after

9   that?

10  A.  Before the meeting.

11  Q.  Didn't Mr. Lin tell you at that meeting, did he say

12  anything about the fact that people with him had guns because

13  he was fearful of being attacked by Yi Feng?

14  A.  I did not say that.

15  Q.  You didn't say that?

16  A.  As far as I remember he did not say that.

17  Q.  When you said a few moments ago on redirect, I think your

18  words were, These past few days these kids are carrying guns;

19  right?

20  A.  He said every day when they go out, they have guns on

21  themselves.

22  Q.  Is that what you said before?

23  A.  What do you mean "before"?

24  Q.  Five minutes ago when you were being asked questions by

25  Mr. Skinner is that what you said?

D4g6lin1                    Chen - recross

1                MR. SKINNER:  Objection.  There is a record.

2                THE COURT:  I will permit the examiner to plumb the

3     witness's recollection.

4                THE INTERPRETER:  Counsel, can you repeat the

5     question?

6                THE COURT:  Yes.

7                MR. COHEN:  Can I ask the reporter to read it back?

8                (Record read)

9     A.  I said whenever his followers went out, they had -- every

10    day they had guns with themselves.

11               MR. COHEN:  Your Honor, I will let the record stand

12    and I would offer in evidence Mr. Chen's first asylum

13    application.  It contains the name Hao Win Wu.

14               THE COURT:  Sorry.

15               MR. COHEN:  I would like to offer in evidence the

16    document that the government referred to which was Mr. Chen's

17    first immigration asylum application.

18               THE COURT:  What is the exhibit number?

19               MR. COHEN:  It would be Defendant's Exhibit A and it

20    was 3510.

21               MR. SKINNER:  3503-11.

22               MR. COHEN:  3503-11.

23               THE COURT:  I would like to see it, please.

24               MR. SKINNER:  I have a copy, your Honor.  May I

25    approach?

D4g6lin1                          Chen - recross

1              THE COURT:  Thank you.  Please.

2              Very well, I will receive Defendant's Exhibit A in

3    evidence.

4              MR. SKINNER:  Your Honor, can the record please note

5    our objection?

6              THE COURT:  Yes.

7              MR. COHEN:  No further questions, your Honor.  Thank

8    you.

9              THE COURT:  I think you should put a sticker on it.

10             MR. COHEN:  Of course.

11             (Defendant's Exhibit A received in evidence)

12             THE COURT:  All of this is part of it?

13             MR. COHEN:  It is all part of it, yes.

14             MR. SKINNER:  Your Honor, now that this document is in

15    evidence, I regret we have one more further question.

16             THE COURT:  Is this now re, redirect?

17             MR. SKINNER:  I think that is correct, your Honor.

18    REDIRECT EXAMINATION

19    BY MR. SKINNER:

20    Q.  Mr. Chen, I am going to show you a document that has been

21    marked as Defense Exhibit A.  Do you see a handwritten section

22    on that front of that piece of paper?

23    A.  Yes.

24    Q.  Am I correct that the rest of the front of that paper is

25    typed?

D4g6lin1                         Chen - redirect

1    A.   This one is handwritten and that one is typed up.

2    Q.   The handwriting at line six, is that your handwriting?

3    A.   No.

4            MR. SKINNER:  No further questions, your Honor.

5            MR. COHEN:  One.

6            THE COURT:  I didn't look all the way through it.  Is

7    there any other handwriting?

8            MR. COHEN:  That is what I wanted to take a look at.

9    RECROSS-EXAMINATION

10   BY MR. COHEN:

11   Q.   The handwriting over here --

12           THE COURT:  You have to identify what "here" is.

13           MR. COHEN:  The pages are not actually numbered,

14   Judge.

15           MR. SKINNER:  I believe he is referring to the fifth

16   page of the document, which is the signature page.

17           MR. COHEN:  Right.

18   Q.   The fifth page of the document, that handwriting, is that

19   your handwriting?

20   A.   Yes.

21   Q.   Your signature?

22   A.   Yes.

23           MR. COHEN:  I am done.  Thank you, Judge.

24           MR. SKINNER:  We have nothing further.

25           THE COURT:  Very well.  You may step down.

434

D4g6lin1                    Chen - recross

1              (Witness excused)

2              THE COURT:  Who is next?

3              MS. BURNS:  Your Honor, the government calls Qun Li.

4              THE DEPUTY CLERK:  Raise your right hand.

5    QUN LI,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. BURNS:

10   Q.  Good morning, sir.  Where were you born?

11   A.  China, Fuchow.

12   Q.  When did you come to the United States?

13   A.  1993.

14   Q.  Did you come here legally or illegally?

15   A.  Illegally.

16   Q.  Can you describe how it is you came to the United States at

17   that time?

18   A.  I entered Miami using a fraudulent passport.

19   Q.  What mode of transportation did you use?

20   A.  Plane.

21   Q.  How did you obtain the fraudulent passport?

22   A.  It was arranged by snakehead.

23   Q.  What is a snakehead?

24   A.  People who specialize in smuggling people.

25   Q.  Did you pay this person for this passport?

D4g6lin1                        Li  - direct

```
 1   A.  Yes.

 2   Q.  How much did you pay?

 3   A.  A little over 10,000.

 4   Q.  What, if anything, did you do with this fraudulent

 5   passport?

 6   A.  This fraudulent passport after I got on the plane and

 7   snakehead told me to tear it up.

 8   Q.  Did you tear it up?

 9   A.  I tore it up and flushed it down the toilet.

10   Q.  When did you do that?

11   A.  1993.

12   Q.  What happened when you arrived in Miami?

13            THE COURT:  When was that?

14   Q.  When exactly did you arrive in Miami?

15   A.  1993, but I do not remember the month.

16   Q.  What happened when you arrived?

17   A.  When I arrived I was arrested by the immigration at the

18   airport.

19   Q.  Were you then placed in immigration custody?

20   A.  Yes.

21   Q.  How long did you spend in immigration custody at that time?

22   A.  About five to six months.

23   Q.  How were you released?

24   A.  When I apply for political asylum, I was bonded out with

25   $10,000.
```

D4g6lin1                      Li  – direct

1   Q.  After you were released, where did you go?

2   A.  I came to New York.

3   Q.  When did you file the application for political asylum you

    just mentioned?

4

5   A.  I applied for it when I was in immigration jail.

6   Q.  What was the basis of your asylum application?

7   A.  For political asylum for the June 4th movement.

8           MR. COHEN:  I am sorry.  For the what?

9           THE INTERPRETER:  June 4th movement.

10  Q.  What did you say about the June 4th movement in that

    application?

11

12  A.  I said that I was listening to the Voice of America.

13  Q.  Are those statements true?

14  A.  No.

15  Q.  Did you understand that you were required to be truthful on

    that application?

16

17  A.  Yes.

18  Q.  Did you ever obtain asylum?

19  A.  No.

20  Q.  Have you been convicted of a crime?

21  A.  Yes.

22  Q.  Did you plead guilty or go to trial?

23  A.  I pled guilty.

24  Q.  What crime or crimes did you plead guilty to?

25  A.  Extortion and jumping bail.

D4g6lin1                        Li  - direct

1    Q.  Was that in federal court or state court?

2    A.  In the federal court.

3    Q.  In this court?

4    A.  Yes.

5    Q.  Turning first to the extortion offense.  When did you first

6    commit extortion?

7    A.  That was in '05, '06.

8    Q.  Did you commit that extortion alone or with others?

9    A.  With others.

10   Q.  Who were you extorting?

11   A.  The drivers of -- the mini bus driver that drives from

12   Manhattan, Chinatown to Brooklyn.

13   Q.  What is it that you were demanding from those bus drivers?

14   A.  I demanded $400 of protection money from them every month.

15   Q.  For how many months did you make these demands?

16   A.  I got it for over one year.

17   Q.  Did you make threats in collecting this money?

18   A.  Yes.

19   Q.  Did you use physical violence to collect this money?

20   A.  Yes.

21   Q.  Do you yourself or other people use physical violence?

22   A.  Other people.

23   Q.  You testified that you also pled guilty to bail jumping.

24   What did you do that made you guilty of bail jumping?

25   A.  After I was bailed out from court I fled.

D4g6lin1                         Li  - direct

1    Q.  Did you understand that you were required to come to court

2    after you were arrested?

3    A.  I did.

4    Q.  You didn't do so?

5    A.  Correct.

6    Q.  Where did you go?

7    A.  I went to Canada.

8    Q.  When was that?

9    A.  '06.

10   Q.  While you were in Canada, did you file any applications for

11   status there?

12   A.  Yes.

13   Q.  What kind of application did you file?

14   A.  Applied for political asylum based on religion.

15   Q.  What was the nature of your religion claim?

16   A.  I said that I was a Christian in China and I was persecuted

17   by the government.

18   Q.  Was that true?

19   A.  No.

20   Q.  Did you obtain any legal status while you were in Canada?

21   A.  No.

22   Q.  Other than the passport that you had when you arrived in

23   Miami, have you ever had any false identification documents?

24   A.  Yes.  I was using a fake -- fake ones in Canada.

25   Q.  Fake what?

D4g6lin1                           Li  - direct

1    A.  I used fake documents to apply for political asylum with

2    fake names.

3    Q.  Before you pled guilty, did you meet with representatives

4    of the government?

5    A.  Yes.

6    Q.  When did those meetings take place?

7    A.  In '09.

8    Q.  Approximately how many meetings did you have with

9    representatives of the government before you pled guilty?

10   A.  I met with them about 10 times.

11   Q.  What happened generally at those meetings?

12   A.  I was asked questions, to give statements.

13   Q.  Did you continue to meet with representatives of the

14   government after you pled guilty?

15   A.  Yes.

16   Q.  Did you meet with representatives of the government

17   including prosecutors before testifying here today?

18   A.  Yes.

19   Q.  During all of those meetings did you see people taking

20   notes?

21   A.  Yes.

22   Q.  Have you ever reviewed those notes?

23   A.  No.

24   Q.  Did you plead guilty pursuant to a written agreement

25   between yourself and the government?

D4g6lin1                    Li  - direct

1    A.  Yes.

2    Q.  What kind of agreement did you plead guilty to?

3    A.  I pled to bail jumping and extortion.

4    Q.  Is your plea agreement what we call a cooperation

5    agreement?

6    A.  Yes.

7    Q.  What is your understanding of your obligations under that

8    agreement?

9            MR. COHEN:  Your Honor, I have an objection.  That

10   cooperation agreement, the terms of it were fulfilled.  He

11   received what he received and I don't believe that it any

12   longer exists.

13           MS. BURNS:  I think it is relevant to why he is

14   testifying here today, your Honor.  We can discuss it at side

15   bar if you like.

16           THE COURT:  No.  I think it is relevant.

17   Q.  What was your understanding of what you were obligated to

18   do under that agreement?

19   A.  I have to be honest and tell the truth about everything

20   that I did.

21   Q.  Are you required to meet with the government when asked?

22   A.  Yes.

23   Q.  What did the government do as part of that agreement?

24   A.  The government didn't do anything for me.

25   Q.  Did the government write a letter on your behalf prior to

D4g6lin1                    Li  - direct

1   your sentencing?

2   A.  Oh, yes.  They wrote a letter for me to ask for leniency.

3   Q.  Who did that letter go to?

4   A.  It was given to the judge.

5   Q.  The judge who sentenced you?

6   A.  Yes.

7   Q.  When were you sentenced, sir?

8   A.  It was February of 2012.

9   Q.  Before your sentencing what was your understanding of the

10  maximum sentence that you faced?

11  A.  I pled to three different counts.  It came out to 70.

12          MR. COHEN:  It came out to what?

13          THE INTERPRETER:  70.

14  Q.  70 years?

15  A.  Yes.

16  Q.  What sentence did you receive?

17  A.  When I was sentenced, I was sentenced to time served.

18  Q.  How long had you been in jail at that time?

19  A.  I had served four years approximately.

20  Q.  You were also sentenced to a term of supervised release?

21  A.  Yes.  Three years supervised release.

22  Q.  Are you still on supervised release?

23  A.  Yes.

24  Q.  When were you released from custody?

25  A.  After I was given a federal sentence, I went to

D4g6lin1                     Li  - direct

1    immigration.

2    Q.   Immigration custody?

3    A.   Yes.

4    Q.   Are you still in immigration custody?

5    A.   No.

6    Q.   How were you released from immigration custody?

7    A.   FBI agent wrote a letter for me to get out.

8    Q.   So you were released from immigration with the assistance

9    of law enforcement?

10   A.   Yes.

11   Q.   Do you currently have legal status here?

12   A.   Yes.  It is a one-year card for me to work.

13   Q.   How did you obtain this one-year card?

14   A.   It was also through a federal agent.

15   Q.   Through the FBI?

16   A.   Yes.

17   Q.   What is your understanding of what you have to do with the

18   FBI, if anything, now?

19   A.   Yes.  I have to help them with whatever they ask me to do

20   for them.

21   Q.   You said this was a one-year card.  So does it need to be

22   renewed?

23   A.   Yes.

24   Q.   Other than the bail jumping, extortion that you already

25   told us about, have you committed other crimes?

D4g6lin1                            Li  - direct

 1   A.  Yes.

 2   Q.  What crimes have you committed?

 3   A.  I went to out of state.  I went to Virginia to someone's

 4   house to steal money.

 5   Q.  Did you in fact steal money there?

 6   A.  Yes.

 7   Q.  How much did you take?

 8   A.  I did not get any money.  My friend did.  But he ran away

 9   first and I got arrested.

10   Q.  When did that take place?

11   A.  I think it was either in '99 or 2000.

12   Q.  You said it was in a house.  Did you go inside that house?

13   A.  Yes.

14   Q.  Was anyone home?

15   A.  No one.

16   Q.  What other crimes have you committed?

17   A.  Nothing else.

18   Q.  Have you been involved in drug dealing, different drug

19   distribution?

20   A.  Yes.

21   Q.  When was that?

22   A.  In 2000 and 2001.

23   Q.  What drugs were you involved with at that time?

24   A.  Marijuana and Ecstasy pills.

25   Q.  Basically what did you do?

D4g6lin1                         Li  - direct

1    A.  Basically it was the Dai Lo from my gang that was doing

2    this.

3    Q.  What was your involvement on behalf of your Dai Lo?

4    A.  I sold Ecstasy pills for him at these places.

5    Q.  What is a Dai Lo?

6    A.  Dai Lo is like the boss in a gang.

7    Q.  You said that you had a Dai Lo; is that right?

8    A.  Yes.

9    Q.  Who was that?

10   A.  Ahzhong.

11          MR. COHEN:  I am sorry.

12          THE INTERPRETER:  Ahzhong, A-h-z-h-o-n-g.

13          MR. COHEN:  Thank you.

14   Q.  What does the term "follower" or "kid" mean?

15   A.  These are kids that work by following the Dai Lo.

16   Q.  Were you a follower of Ahzhong?

17   A.  Yes.

18   Q.  When was that?

19   A.  It was in 2000 when I followed him.

20   Q.  At that time were other people following Ahzhong?

21   A.  Yes.  More than 10 people.

22   Q.  At that time were those 10 people always the same or did

23   they change?

24   A.  There was changes.

25   Q.  Did you receive anything, any benefits for being a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4g6lin1                         Li  - direct

1  follower?

2  A.  Yes.

3  Q.  What did you receive?

4  A.  He paid for my rent, food, and gave me spending money.

5  Q.  For how long did you follow Ahzhong?

6  A.  For about three years.

7  Q.  Did you work for him in any capacity?

8  A.  Yes.

9  Q.  What did you do?

10 A.  I helped him collect money when he was running the mini

11 bus.

12 Q.  How did you help him collect money?

13 A.  I threatened the drivers for him.

14 Q.  How did you threaten them?

15 A.  I would go over to the drivers, kick the door and say, "How

16 come you haven't paid the money yet?  It's been so late."

17 Q.  Were you doing this at the direction of anyone?

18 A.  Yes.

19 Q.  Who is that?

20 A.  My Dai Lo, Ahzhong.

21 Q.  As a follower what were your responsibilities and

22 obligations to Ahzhong?

23 A.  I had to listen to him and do what he asked me to do.

24 Q.  What things did he ask you to do?

25 A.  He would ask me to go get money from people or if anything

D4g6lin1                              Li  - direct

1    comes up to go out and fight for him.

2    Q.  Did you in fact get into fights on behalf of the Dai Lo?

3    A.  Yes.

4    Q.  Were these physical fights?

5    A.  Yes.

6    Q.  How often did you get into physical fights on behalf of

7    your Dai Lo?

8    A.  I helped him with it three times.

9    Q.  Did you ever bring weapons to those fights?

10   A.  Yes.

11   Q.  What weapons did you bring?

12   A.  I brought gun.

13   Q.  Did you ever use that gun in the fight on behalf of your

14   Dai Lo?

15   A.  No.

16   Q.  Did you ever get into a fight that your Dai Lo didn't

17   approve of?

18   A.  No.

19   Q.  Why not?

20   A.  Because if anything happened without my Dai Lo being aware

21   of it, I could cause a lot of problems.

22          (Continued on next page)

23

24

25

D4GVLIN2                       L. Qin - direct

1    Q.   How would that cause problems?

2    A.   Because if I get involved with a fight with other gang or

3    other high-ranking people from the gang, that fight could

4    become a really big one.

5    Q.   While you were a follower, were you aware of other dailos

6    in Chinatown?

7    A.   Yes.

8    Q.   Who were they?

9    A.   Ah Feng Loban.

10   Q.   Any others?

11   A.   Ah Zhong.

12   Q.   Did you see each of those dailos you mentioned with

13   followers?

14   A.   Yes.

15   Q.   Have you ever been a dailo?

16   A.   Yes.

17   Q.   When was that?

18   A.   In '05.

19   Q.   For how long were you a dailo?

20   A.   For one to two years.

21   Q.   Did you have followers?

22   A.   Yes.

23   Q.   How many did you have?

24   A.   I had four to five.

25   Q.   What types of things did your followers do on your behalf?

D4GVLIN2                           L. Qin - direct

1   A.  When I was doing the bus, I had the followers collect

2   money, threaten drivers, and beat up drivers.

3   Q.  Are you familiar with the term face?

4   A.  Yes, I do.

5   Q.  What does that mean to you?

6   A.  Respect.

7   Q.  As a dailo, was it important for you to have face?

8   A.  Yes.

9   Q.  When you followed Ah Zhong, was it important for him to

10  have face?

11  A.  Yes.

12  Q.  What happens if a dailo loses face?

13         MR. COHEN:  Objection.

14  Q.  In your experience.

15         MR. COHEN:  Form.

16         THE COURT:  Well, have you ever known a dailo who lost

17  face?

18         THE WITNESS:  No.

19         THE COURT:  Then let's move on.

20         MS. BURNS:  Yes, Judge.

21  Q.  To be clear, you said that you would not get into a fight

22  unless your dailo approved it?

23         MR. COHEN:  Asked and answered.

24  Q.  Would you ever refuse to do anything -- let me just

25  rephrase.  Would you ever refuse to do something a dailo asked

1   you to?

2   A.  No.

3   Q.  Why not?

4   A.  Because I have to follow him to hang out with him, to make

5   a living with him.

6   Q.  As a follower, would you ever do anything a dailo didn't

7   approve of?

8   A.  No.

9   Q.  Why not?

10  A.  Because if I don't listen to the dailo, then I would not be

11  able to hang out with him.

12  Q.  You mentioned an individual named Ding Pa as one of the

13  dailos you knew in Chinatown; is that right?

14  A.  Yes.

15  Q.  Do you see that person in court today?

16  A.  Yes.

17  Q.  Can you describe where he is and something he's wearing?

18  A.  He is sitting on the second row in the middle.

19          MS. BURNS:  Let the record reflect that he's

20  identified the defendant, your Honor.

21          THE COURT:  The record may so reflect.

22          MS. BURNS:  Thank you.

23  Q.  And do you know him as Ding Pa?  Is that a true name or a

24  nickname?

25  A.  No, nickname.

D4GVLIN2                              L. Qin - direct

1    Q.  When did you first meet the defendant?

2    A.  In 1996.

3    Q.  Where did you meet him?

4    A.  I met him in the restaurant located on 8th Avenue and 36th

5    Street, midtown Manhattan.

6    Q.  What happened, if anything, at that restaurant?

7    A.  Three or four friends that were there having lunch.

8    Q.  What happened next?

9    A.  And Ding Pa and three of them came in, and we ran into each

10   other.

11   Q.  What happened when you ran into Ding Pa?

12   A.  As soon as he saw me there, he came over to my table and

13   picked up a soy sauce bottle and wanted to hit me with it, and

14   said, I'm going to kill you today.

15   Q.  What happened next?

16   A.  And my friend stood up and pulled him away.

17   Q.  And what happened after your friends pulled him away?

18   A.  So I left first.

19   Q.  What did Ding Pa say other than, I'm going to kill you

20   today?

21   A.  Nothing else.  And other people broke it up and I left

22   first.

23   Q.  What was your understanding of why he said that to you at

24   the time?

25           MR. COHEN:  Objection.

D4GVLIN2                          L. Qin – direct

1          THE COURT:  Objection sustained.

2   Q.  Did there come another time that you had an encounter with

3   Ding Pa?

4   A.  Yes.

5   Q.  When was that?

6   A.  In 2000.

7   Q.  Where was that?

8   A.  In Flushing, Chi Chong Tin or Seventh Heaven Karaoke Bar.

9   Q.  Were you there alone or with other people?

10  A.  It was my dailo's birthday party, so I was over there.

11  Q.  And what happened there?

12  A.  I was hanging out in my individual room, about 10 to 20

13  people hanging out in that room.  And we saw Ding Pa came in

14  and talking to a friend.  And I did not know what they were

15  talking about, but they did not look too happy.

16          MR. COHEN:  Objection.  Move to strike.

17  Q.  Who was Ding Pa speaking to?

18          MR. COHEN:  Your Honor.

19          THE COURT:  Just a moment.  Just a moment.

20          When was this?

21          THE WITNESS:  Around 2000.

22          THE COURT:  Objection sustained.  Let's move on.

23  Q.  What did you see Ding Pa do when he came into the room?

24  A.  He came in alone, and he was talking to a friend that he

25  knew.

D4GVLIN2                      L. Qin - direct

1   Q.   What happened after that?

2   A.   Whatever they were talking to each other, but didn't look

3   too happy.

4            MR. COHEN:  Judge.

5            THE COURT:  Objection sustained.  That's stricken.

6            MS. BURNS:  Understood.

7   Q.   What did you see Ding Pa do while in that room?

8   A.   Ding Pa went out.

9   Q.   What happened next?

10  A.   And then he brought two people in.

11  Q.   Who is "he," just to be clear?

12  A.   Ding Pa.

13  Q.   What happened when Ding Pa and the other two people came

14  in?  What did you see and hear?

15  A.   He was pointing at the person who he had a conversation

16  earlier and said, Beat him up for me.

17  Q.   What happened once Ding Pa said, Beat him up for me?

18  A.   When I saw Ding Pa and two people walking in, my friends

19  and I were there trying to break it up.

20  Q.   What were you trying to break up?

21  A.   When they were about to engage in a fight, and I tried to

22  break it up.  And I said, Today's my dailo's birthday.  Do not

23  cause any trouble here.

24  Q.   Who was trying to get into the fight?

25  A.   Ding Pa.

D4GVLIN2                          L. Qin - direct

1    Q.  What were the people that he had brought into the room

2    doing?

3    A.  Ding Pa came in and was trying to beat him up.

4             MR. COHEN:  Objection.  Move to strike.

5             THE COURT:  Counsel, it's just too vague.

6             Objection sustained.

7    Q.  Once Ding Pa said, Beat him up, what did the men who had

8    come into the room with him do?

9    A.  He wanted to charge over and to beat him up.

10            MR. COHEN:  Objection.  I move to strike.

11            THE COURT:  Objection sustained.

12            What did he do?

13   Q.  Could you just say what the men did.

14   A.  He came in, Ding Pa pointed and said, Beat him up for me.

15            THE COURT:  We've been through that.

16   Q.  And did this fight end?

17            MR. COHEN:  Objection.

18            There was no testimony there was a fight.

19            THE COURT:  Yes, I think at this point we're going to

20   take the mid-morning recess.  You may all be excused for ten

21   minutes.

22            (Jury excused)

23            THE COURT:  You may step down.

24            (Witness excused)

25            THE COURT:  I would just like to point out that the

D4GVLIN2                              L. Qin - direct

```
 1   testimony should come from the witness, not from the lawyer.
 2   There is a great deal of leading.  And I think you're tempted,
 3   because it's being translated into a foreign language, and
 4   people are tempted to lead when the witness is speaking a
 5   foreign language.  But you should resist that temptation.
 6              MS. BURNS:  I will do my best going forward, your
 7   Honor.
 8              THE COURT:  Very well.
 9              We will all take a ten-minute recess.
10              MR. SKINNER:  Thank you, your Honor.
11              (Recess)
12              (Jury present)
13              THE COURT:  All right.  You may proceed.
14              MS. BURNS:  Thank you, your Honor.
15   BY MS. BURNS:
16   Q.  Mr. Li, after you saw Ding Pa in Flushing, did you see him
17   again?
18   A.  Yes.
19   Q.  When was that?
20   A.  I see him also in 2000.
21   Q.  Where was that?
22   A.  The restaurant located --
23              THE COURT:  That was 13 years ago, right?
24              THE WITNESS:  Yes.
25   Q.  Where did you see him?
```

D4GVLIN2                          L. Qin - direct

1   A.  In a restaurant located on 8th Avenue in Brooklyn.

2   Q.  Were you alone there or with other people?

3   A.  I was with my friends, my dailo, and we're having dinner

4   there.

5   Q.  What happened when you saw Ding Pa?

6   A.  Ding Pa came and saw me there.

7   Q.  Was he alone or with other people?

8   A.  About three people.

9   Q.  What happened after he came in?

10  A.  He came in and saw me there and went back out.

11  Q.  Did there come a time that he spoke to you?

12         THE COURT:  I thought he left the restaurant is what

13  was said.

14  Q.  Did he come back into the restaurant after that?

15  A.  No, he was at the door.  And a friend of mine came in and

16  told me to leave right away.

17         MR. COHEN:  Objection.

18         THE COURT:  Objection sustained.  That's stricken.

19  Q.  After Ding Pa left, what did you do?

20         THE COURT:  When I strike something, members of the

21  jury, it means you ought to totally wipe it out of your mind.

22  Forget it.  It is not part of the evidence in this case.

23         What is the question?

24  Q.  Yes.  After Ding Pa left, what did you do?

25  A.  A friend of mine came in and told me --

D4GVLIN2                       L. Qin - direct

1   Q.  Sir --

2            THE COURT:  He may not say that.

3            MS. BURNS:  I understand that.

4            THE COURT:  That's not the question.

5   Q.  What did you do?  Just tell us what you did after Ding Pa

6   left.

7   A.  I don't understand.

8            THE COURT:  Did you do anything?

9            THE WITNESS:  Yes.

10  Q.  What did you do?  Just describe what you did.

11  A.  I went to the door.

12  Q.  Where did you go?

13  A.  And when I got to the door of the restaurant, Ding Pa told

14  me don't leave yet, don't leave.

15  Q.  What happened after Ding Pa said that to you?

16           THE COURT:  That is, you followed him to the door?

17           THE WITNESS:  No, he was at the door.  Later, a friend

18  of mine told me to leave, so I went to the door.

19  Q.  Sir, don't describe what other people said unless you're

20  asked.

21           I think, to clarify, what the judge was asking is when

22  Ding Pa went to the door, did you go to the door at the same

23  time or at another time?

24  A.  About two to three minutes later.

25  Q.  And what happened once you went to the door?

D4GVLIN2                        L. Qin – direct

1    A.  He told me not to leave.

2    Q.  Ding Pa said that?

3    A.  Yes.

4    Q.  Did he say anything else at that time?

5    A.  He said don't leave.  Don't leave -- don't leave tonight.

6    Q.  What did you do next?

7    A.  And I asked him why.

8    Q.  What did he say to you?

9    A.  I said, You're a dick.

10            And so he punched me.  I punched him back.

11   Q.  What happened next?

12   A.  And then my friends and my dailo pull me away.

13   Q.  Did you see Ding Pa after this encounter in Brooklyn?

14   A.  Yes.

15   Q.  Where was that?

16   A.  In Chinatown.

17   Q.  When was that?

18   A.  Around 2000 or 2001.

19   Q.  How long after you saw him in Brooklyn did you see him in

20   Chinatown this day?

21   A.  About a day or two.

22   Q.  What happened when you encountered Ding Pa?

23   A.  I was walking on Eldridge Street, and --

24            THE COURT:  On what street?

25            THE INTERPRETER:  Eldridge Street.

D4GVLIN2                          L. Qin - direct

1    A.   And just passed a door.

2    Q.   What happened next?

3    A.   I was at the entrance to the barbershop.

4    Q.   What happened at that entrance?

5    A.   I don't know when, Ding Pa just grabbed me from behind on

6    my shoulder and wanted to pull me into the barbershop.

7    Q.   What, if anything, did he say to you at that time?

8    A.   He said to people inside, Yiqun is here.

9    Q.   What happened once the defendant said that?

10   A.   So I hang onto the door.  I wanted to go out, to run out.

11   I could not, because he grabbed my clothes.  I saw a

12   screwdriver stuck in the door.

13   Q.   What did you do with that screwdriver?

14   A.   I pulled it out and stabbed him.

15   Q.   You stabbed Ding Pa?

16   A.   Yes.

17   Q.   What did you do once you stabbed him?

18   A.   He released his grasp, so I ran away.

19        THE COURT:  What do you mean you saw a screwdriver in

20   the door?

21        THE WITNESS:  Because a lot of people smoked in the

22   barbershop, so they had to leave the door open.  So they stuck

23   the screwdriver at the door so it would be opened.

24   Q.   While you were in Canada, did you see Ding Pa?

25   A.   Yes.

D4GVLIN2                          L. Qin - direct

1    Q.  Where did you see him?

2    A.  In July 2006, when I got there, it was the first day when I

3    got there.

4    Q.  While you're in Canada, did you work with Ding Pa?

5    A.  Yes, when I first got there, snakeheads picked me up.

6    Q.  While you were in Canada, did you at any time work with

7    Ding Pa?

8    A.  Yes.

9    Q.  And where did you work?

10   A.  At a gambling parlor.

11           MS. BURNS:  No further questions, your Honor.

12           THE COURT:  Very well.  You may cross-examine.

13           MR. COHEN:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. COHEN:

16   Q.  Mr. Li, you and I have never met, have we?

17   A.  What?

18   Q.  Have you and I ever met?

19   A.  No.

20   Q.  Have we ever had any conversations about your testimony,

21   about what you've told the jury?

22   A.  No.

23   Q.  When you were arrested in 2006, you were charged with

24   extortion initially?

25   A.  Yes.

460

D4GVLIN2                          L. Qin - cross

1    Q.  And that's because you and other people were forcing

2    drivers at a minivan company to pay you protection money every

3    month; correct?

4    A.  Yes.

5    Q.  And at the time you were doing that, in fact, other people

6    had just been arrested before you began extorting the bus

7    drivers for doing the same thing to the same bus drivers;

8    correct?

9    A.  Yes.

10   Q.  And you and your dailo and your friends decided that you

11   would just step into the shoes of the people who had just been

12   locked up because the drivers were afraid; correct?

13   A.  Yes.

14   Q.  And when you got arrested, you were arrested with other

15   people, true?

16   A.  Yes.

17   Q.  Were you related to any of the people that you were

18   arrested with?

19   A.  Some were my friends and some followed me.

20   Q.  Were any of them members of your actual family?

21   A.  No.

22   Q.  How many people altogether were arrested besides yourself

23   at the same time as you?

24   A.  As far as I know, five.

25   Q.  So it was altogether five or five plus you?

D4GVLIN2                          L. Qin - cross

1   A.  No, in total five.

2   Q.  And how many drivers were you collecting money from every

3   month?

4   A.  At first, 250; later, increased, raised slowly to 400.

5   Q.  How many drivers were you collecting money from?  Not how

6   much money were you collecting, but how many drivers were you

7   collecting money from?

8   A.  At the peak?  Around a little over 40 people.

9   Q.  And besides this money that you were collecting from

10  drivers, were you making any other illegal money at that time?

11  A.  I was making around over 3,000 to 4,000.

12  Q.  Besides the money that you were extorting from the drivers,

13  were you making any other illegal money?

14  A.  No.

15  Q.  So it's your testimony that you were making between three

16  and $4,000 a month?

17  A.  Yes.

18  Q.  But that was at a different time from when you were selling

19  ecstasy and marijuana?

20  A.  Different time.

21  Q.  Okay.  Now, when you were arrested, you were brought to

22  this courthouse; correct?

23  A.  Yes.

24  Q.  And one of the first things that happened after you got to

25  this courthouse is that you appeared before a magistrate judge,

D4GVLIN2                        L. Qin - cross

1    right, to determine whether you could be released on bail?

2    A.  Yes.

3    Q.  And you were asked to fill out a piece of paper to disclose

4    your financial assets in order to see whether you qualify to

5    get a free lawyer from the court; correct?

6    A.  I don't really remember.  It seems I did.

7    Q.  Well, do you remember having to fill out a piece of paper

8    with blue and white lettering on it that asked where you

9    worked, how much money you made, where you lived, and things

10   like that?  Do you remember that?

11   A.  I don't really remember.

12   Q.  Well, did you tell the Court that you couldn't afford to

13   hire your own attorney?

14   A.  Yes.

15   Q.  Do you remember one of the first things that happened when

16   you appeared before the magistrate was they asked you to raise

17   your right hand and swear that the assets that you put down on

18   this piece of paper were the only assets you had, and you were

19   swearing to telling the truth?

20   A.  Yes.

21   Q.  And had you disclosed on this document and you had

22   disclosed to the Court you were earning about $52,000 a year?

23   A.  No.

24   Q.  So is it a fair statement that within a couple of hours of

25   arriving in this courthouse, one of the first things you did

D4GVLIN2                    L. Qin - cross

1   was take an oath to tell the truth, and you lied?

2   A.  No.  When I was first arrested, I was in there and the

3   lawyer came to see me.

4   Q.  Right.  And you were asked could you afford to hire your

5   own attorney; correct?

6   A.  Yes.

7   Q.  And you were asked to disclose what your income was;

8   correct?

9   A.  No, he just came in and said he or she will be my lawyer,

10  representing me.  He or she said that if I could afford it,

11  then I could hire one myself.

12  Q.  And, in fact, the court appointed an attorney for you,

13  right?

14  A.  Yes.

15  Q.  And that attorney was Winston Lee?

16  A.  Yes.

17  Q.  And you never had to pay for Mr. Lee's services; correct?

18  A.  Yes.

19  Q.  And he continued to represent you from that day that you

20  appeared in court until February of 2012, when you got

21  sentenced; correct?

22  A.  Yes.

23  Q.  And you never had to pay Mr. Lee for his services because

24  the Court paid him; correct?

25  A.  Yes.

D4GVLIN2                          L. Qin - cross

1    Q.  Now, at the hearing that you first appeared at, where you

2    first met Mr. Lee, did the judge set bail conditions for you?

3    A.  Yes.

4    Q.  What were your bail conditions?

5    A.  Cash, $5,000, and 75,000 bond.

6    Q.  And in order for you to be released, what did you have to

7    do?

8    A.  $5,000 cash, and also with three people or sponsors who

9    have legal status.

10   Q.  And were you released?

11   A.  Yes.

12   Q.  Who put up the $5,000 in cash?

13   A.  My friend and my younger sister.

14   Q.  And who are the three people that signed the bond?

15   A.  My friend of friends, and also my sister-in-law.

16   Q.  And these were people that were close to you; correct?

17   A.  Yes.

18   Q.  People that cared about you, right?

19   A.  Yes.

20   Q.  And people that trusted that if they put themselves on the

21   line for $75,000, that you would come back to court when you

22   were supposed to; correct?

23   A.  Yes.

24   Q.  Now, you said there came a time that you decided that you

25   would no longer come to court in this case, right?

D4GVLIN2                        L. Qin - cross

1    A.  Yes.

2    Q.  And that's because you were afraid, once you started to see

3    what some of the evidence was against you, that if you went to

4    trial, you would lose and go to prison; correct?

5    A.  Yes.

6    Q.  And when you got released, there was a bond that you had to

7    sign before you got out.  Remember that?

8    A.  Yes.

9    Q.  And in the bond when you signed it, you promised the Court

10   that you would come back to court when you were supposed to;

11   correct?

12   A.  Yes.

13   Q.  But, instead, you decided to leave the country, right?

14   A.  Yes.

15   Q.  You decided that you would betray the trust of the people

16   that signed your bond, and leave them on the hook for $75,000;

17   correct?

18   A.  No, but they didn't have to pay 75,000.

19   Q.  Sir, was it your understanding that by signing that bond,

20   those people agree that they would owe the government $75,000

21   if you didn't come back to court.  Did you understand that?

22   A.  I did not understand that at the time.

23   Q.  What did you understand it meant for people to sign a bond

24   guaranteeing 75,000 to the Court that you would return?  What

25   did you understand it to be?

D4GVLIN2                         L. Qin - cross

1   A.  My understanding at that time was just the $5,000 bond.

2   Q.  Well, when you were released on bond, was there an

3   interpreter in court?

4   A.  Yes.

5   Q.  And did you have any difficulty understanding the

6   interpreter?

7   A.  No.

8   Q.  And did the interpreter translate for you that the judge

9   was telling you and the other people that signed that if you

10  failed to appear, you and those people would owe the government

11  $75,000.

12          THE INTERPRETER:  Counsel, could you repeat the

13  question?

14          MR. COHEN:  Yes.  I'll try.

15  Q.  Did the interpreter at your bail hearing translate for you

16  that the judge said that if you did not appear in court, you

17  would and the other people that signed the bond would owe the

18  government $75,000?

19  A.  I don't really remember.

20  Q.  And when you signed the bond at the clerk's office, was

21  there an interpreter there?

22  A.  Yes, I remember.

23  Q.  And did you understand that interpreter?

24  A.  I don't really remember whether he or she told me

25  everything, but it was very brief.

D4GVLIN2                           L. Qin - cross

1    Q.  Well, didn't the clerk tell you and didn't the translator

2    translate that by signing this bond and being released, you

3    were agreeing that if you failed to come back to court, you and

4    the cosigners owed the government $75,000?

5    A.  Yes.

6    Q.  So you knew that?

7    A.  I knew.

8    Q.  And you decided that rather than face going to prison

9    possibly, you would betray the trust of the people that signed

10   for you and run away to Canada; correct?

11   A.  At that time when I was trying to run away, but regarding

12   to the government, I told my wife that, if necessary, we had to

13   sell our house to pay the government.

14   Q.  You owned a house?

15   A.  In China.

16   Q.  Did you disclose when you were telling the Court that you

17   couldn't afford a lawyer you owned a house in China?

18   A.  Yes.  Who doesn't have house in China.

19   Q.  Did you tell the Court when you were asked about your

20   assets that you owned a house in China?

21   A.  Yes.

22   Q.  You did.

23   A.  Yes.

24   Q.  And you told your wife that you could pay the people back

25   the $75,000 by selling that house in China?

D4GVLIN2                          L. Qin - cross

1    A.  Yes.

2    Q.  And then you managed to make arrangements to get yourself

3    smuggled from the United States into Canada; correct?

4    A.  Yes.

5    Q.  And you did that by going to some alien smuggler and paying

6    a fee to get smuggled into Canada?

7    A.  Yes.

8    Q.  How much was the fee?

9    A.  3,500.

10   Q.  $3500?

11   A.  Yes.

12   Q.  And is it a fair statement then that you somehow illegally

13   entered Canada?

14   A.  Yes.

15   Q.  And when you illegally entered Canada, there came a time

16   that you applied for political asylum, right?

17   A.  Yes.

18   Q.  But you didn't tell them my name is Qin Li, and I'm wanted

19   in the United States, did you?

20   A.  Yes.

21   Q.  What name did you give them?

22   A.  Xu Li.

23   Q.  And is there a person that you know with that name?

24   A.  Yes.

25   Q.  Who is that person?

D4GVLIN2                          L. Qin - cross

1   A.  My younger brother.

2   Q.  And did you have some documents belonging to your younger

3   brother that you used to try to fool the government in Canada?

4   A.  Yes.

5   Q.  How did you get them?

6   A.  I asked someone to send it to me.

7   Q.  You asked your mother to send them to you; correct?

8   A.  Yes.

9   Q.  And you explained to your mother that you had jumped bail

10  in the United States, snuck into Canada, and needed those

11  documents to try to fool the Canadian government; correct?

12  A.  Yes.

13  Q.  And, in fact, your mom sent you in Canada the

14  identification documents belonging to your brother, right?

15  A.  Yes.

16  Q.  And what did you do once you received those documents?

17  What did you do with them?

18  A.  I handed it over to the attorney.

19  Q.  What attorney was that?

20  A.  I do not remember the name of the attorney.

21  Q.  Well, this was an attorney that you hired in Canada?

22  A.  Yes.

23  Q.  And you hired the attorney in order to seek political

24  asylum in Canada; correct?

25  A.  Yes.

470

D4GVLIN2                          L. Qin – cross

1   Q.  And, by the way, you had to pay that attorney, right?  You

2   didn't get that attorney by lying to a court; correct?

3           MS. BURNS:  Objection to the form, your Honor.

4           THE COURT:  Let's move on.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4G6LIN3                         Li - cross

1    BY MR. COHEN:

2    Q.  Did you pay that attorney?

3    A.  No.

4    Q.  How did you get the services of that attorney for free?

5    A.  Because when I applied for political asylum, I applied as a

6    refugee.

7    Q.  So you told them you were a poor refugee and you got the

8    Canadian government to give you a free lawyer too, correct?

9    A.  Yes.

10   Q.  When did you tell them that you had left China?

11   A.  I say it was 2006.

12   Q.  That was actually the same year that you ran away from the

13   United States; correct?

14   A.  Yes.

15   Q.  And did you tell them how it was that you entered Canada?

16   A.  Yes.  I said I flew on a plane from Beijing.

17   Q.  That was a lie; right?

18   A.  Yes.

19   Q.  Then you told them the story about being a persecuted

20   Christian; right?

21   A.  Yes.

22   Q.  What did you tell them about the nature of your persecution

23   as a Christian?

24   A.  I said that the Chinese government did not permit

25   underground churches.

D4G6LIN3                          Li - cross

```
 1   Q.  Did you tell them that you belonged to an underground

 2   church?

 3   A.  Yes.

 4   Q.  Did you tell them that because you participated in this

 5   underground church that you had been arrested by the Chinese

 6   authorities?

 7   A.  That the authorities wanted to arrest me so I fled and came

 8   here.

 9   Q.  And you told them that the authorities wanted to arrest you

10   because you belonged to an underground church; correct?

11   A.  Yes.

12   Q.  And those were all lies, weren't they?

13   A.  Yes.

14   Q.  Did you obtain any financial benefits from the Canadian

15   government?

16   A.  Yes.  They issue refugee funds.

17   Q.  What are refugee funds?

18   A.  Canada takes in all these refugees.

19   Q.  Does it do something to provide for the welfare of these

20   refugees so that they don't go hungry?

21   A.  Yes.

22   Q.  And the funds that you referred to as refugee funds is that

23   money that you received from the Canadian government because

24   you had convinced them that you were a poor refugee?

25   A.  When you apply, you have to apply as a refugee and anyone
```

D4G6LIN3                          Li - cross

1     that apply for political asylum would get that.

2     Q.   And because you applied for political asylum, you got money

3     from the Canadian government; right?

4     A.   Yes.

5     Q.   Based on the lies that you put in your application?

6     A.   Yes.

7     Q.   And how much money did you get from the Canadian

8     government?

9     A.   I got 530-something a month.

10    Q.   For how long?

11    A.   I got it for over a year.

12    Q.   So did you ever tell them by the way I don't need this

13    money because I am working at a gambling parlor so give it to

14    someone who really deserves it?

15    A.   No.

16    Q.   When you submitted this application to the Canadian

17    government for political asylum, you had to swear everything in

18    it was true; correct?

19    A.   Yes.

20    Q.   Just like you had to swear when you got released from

21    custody that you would come back to court in this building;

22    right?

23    A.   Yes.

24    Q.   Just like you swore to tell the truth an hour ago in this

25    courtroom; correct?

D4G6LIN3                          Li - cross

1   A.  Yes.

2   Q.  How did you wind up back in the United States?

3   A.  I got arrested by the government in Canada.

4   Q.  Did you get arrested there for committing a crime in

5   Canada?

6   A.  No.

7   Q.  What did you get arrested for?

8   A.  I was arrested because I jumped bail.  I was arrested for a

9   case here in the U.S.

10  Q.  That was the extortion case that you were released from

11  this courthouse in; correct?

12  A.  Yes.

13  Q.  You were arrested by Canadian police; correct?

14  A.  Yes.

15  Q.  Do you know how it is that the Canadian police knew who you

16  were and that you were wanted in the United States?

17  A.  There was a photo from the U.S.

18  Q.  Well, is it true, sir, that one of the people you left on

19  the hook for $75,000 snitched you out and told the government

20  where you were and where you could be found?

21  A.  I do not know about that.

22  Q.  Did you ever sell your house in China to pay back those

23  people so they wouldn't have to owe the government $75,000?

24  A.  No.

25  Q.  Did you ever make any payments to those people for money

D4G6LIN3                         Li - cross

1    that they owed the government?

2    A.  No.  They did not tell my wife so my wife did not tell me.

3    Q.  The question was whether or not you ever paid any of them

4    any of the money that they wound up owing the government?

5    A.  No.

6    Q.  You spent some time in custody in Canada before coming back

7    to the U.S., correct?

8    A.  Yes.

9    Q.  How long were you in custody in Canada?

10   A.  Almost 11 months.

11   Q.  During those 11 months, did you learn anything about what

12   had happened to the people who were arrested with you?

13   A.  No one was arrested with me.

14   Q.  I am talking about the people that were arrested with you

15   in New York?

16   A.  No.

17   Q.  You didn't know what had happened to those people, whether

18   they had been convicted or acquitted or anything like that?

19   A.  There had not been a trial when I was arrested.

20   Q.  How long was it from the time that you got to Canada until

21   you were arrested in Canada?

22   A.  I think it was over a year.

23   Q.  And then you spent another 11 months or so in custody in

24   Canada before being returned to the U.S.?

25   A.  Yes.

476

D4G6LIN3                    Li - cross

1    Q.  So altogether from the time that you jumped bail until the

2    time that you came back to the United States, it was almost two

3    years, correct?

4    A.  Yes.

5    Q.  And at any time during those two years did you learn what

6    had happened to the people who you were arrested with in New

7    York and charged with extortion?

8    A.  I didn't hear about it.

9    Q.  So you had no clue as to what happened to them?

10   A.  Correct.

11   Q.  These were your close friends?

12   A.  Those that were arrested?

13   Q.  Yes.

14   A.  Yes.

15   Q.  While you were in Canada did you speak to people in the

16   United States from time to time?

17   A.  I spoke to my wife.

18   Q.  Besides your wife did you speak to other people?

19   A.  My younger sister and others.

20   Q.  And you never had any conversations with your wife or your

21   younger sister about what had happened to the people that you

22   were arrested with?

23            MS. BURNS:  Objection.  Asked and answered, your

24   Honor.

25            THE COURT:  I will permit it once more.

D4G6LIN3                      Li - cross

1    A.  I rarely asked.

2    Q.  But you did ask?

3    A.  In the beginning I asked.  I did not ask toward the end.

4    Q.  During the time you were in custody in Canada, did you have

5    any contact with Winston Lee your court appointed attorney?

6    A.  Yes.  I asked a friend to contact him.

7    Q.  Did you personally have contact with Mr. Lee?

8    A.  No.

9    Q.  Did you speak to him on the phone?

10   A.  I called him once.  People in the office answered.

11   Q.  And the friend that you asked to contact him, did you give

12   that friend any message for Mr. Lee?

13   A.  Yes.

14   Q.  Did you tell that friend to tell Mr. Lee to let the

15   government know that when you came back you wanted to make a

16   deal with them and cooperate?

17   A.  Yes.

18   Q.  By the way when you got arrested in New York initially and

19   charged with extortion, did they bring you to the 5th precinct?

20   A.  No.  I was arrested in the 5th precinct.

21   Q.  In the precinct house, the station house, the 5th precinct?

22   A.  Yes.

23   Q.  What were you doing there?

24   A.  TLC notified the mini bus for a meeting.

25   Q.  And you went to the 5th precinct, correct?

D4G6LIN3                    Li - cross

1    A.   Yes.

2    Q.   And the meeting turned out to be the place that you got

3    arrested?

4    A.   Yes.

5    Q.   And when you got arrested, you made a statement to a

6    detective or to an FBI agent; right?

7    A.   Yes.

8    Q.   Was it a truthful statement?

9    A.   Yes.

10   Q.   Did you leave anything out important?

11   A.   No.

12   Q.   So eventually you were brought back to the United States;

13   right?

14   A.   Yes.

15   Q.   And were you brought before a judge or magistrate judge in

16   this courthouse when you came back?

17   A.   Yes.

18   Q.   And at that time you were not released on bail, correct?

19   A.   Yes.

20   Q.   You went into custody; right?

21   A.   Yes.

22   Q.   And you stayed in custody for about four years you said?

23   A.   Yes.

24   Q.   And during those four years you met many, many times with

25   the prosecutors; right?

D4G6LIN3                          Li - cross

1    A.  Yes.

2    Q.  You said there was a time when you went to Virginia to rob

3    someone's house?

4    A.  Yes.

5    Q.  And when was that?

6    A.  That was in '99 or 2000.

7    Q.  And you went with another person?

8    A.  Yes.

9    Q.  You drove from New York to Virginia to commit this

10   burglary?

11   A.  Yes.

12   Q.  And when you got to this person's home, how did you get in?

13   A.  We could open the door to get in.

14   Q.  Say it again.

15   A.  We could open the door to get?

16   Q.  The door was unlocked?

17   A.  Yes.  The front door was not locked.

18   Q.  You didn't have permission from the person to go in and

19   take their property, did you?

20   A.  Correct.

21   Q.  Did you know whose house it was?

22   A.  I did.  It was a house that belonged to Fuchownese person.

23   Q.  Did you know who the Fuchownese person was?

24   A.  No.  I do not know.

25   Q.  Did you have any personal dispute with this Fuchownese

D4G6LIN3                    Li - cross

1   person whose house you were robbing?

2   A.  No.

3   Q.  How long were you in the house?

4   A.  Only for a few minutes.

5   Q.  What did you take?

6   A.  I didn't take anything.  I don't know what he took, but he

7   got in the car, drove away first.  And then I went out, waited

8   for a long time and then I got arrested.

9   Q.  You got arrested and charged with braking and entering into

10  this person's home?

11  A.  Yes.

12  Q.  You didn't take anything while you were there?

13  A.  There was nothing worth taking.  There was nothing of

14  value.

15  Q.  So is it your testimony then that neither of you took

16  anything and you left the house?

17  A.  No.  I do not know what my friend took because the two of

18  us weren't together.

19  Q.  The two of you went out together or were not together?

20          THE INTERPRETER:  Were not together.

21  Q.  Who left first?

22  A.  My friend left first.

23  Q.  What did you do after your friend left?

24  A.  I was looking and searching around in the room and I call

25  out his name.  He didn't make any noises.

D4G6LIN3                    Li - cross

1   Q.  He being the friend that you broke into the house with?

2   A.  Yes.

3   Q.  Now, eventually that day you were arrested; right?

4   A.  Yes.

5   Q.  And was your friend arrested as well?

6   A.  No.

7   Q.  Were you taken to jail?

8   A.  Yes.

9   Q.  And were you released on bail immediately?

10  A.  Yes.

11  Q.  How long did you stay in jail before you were released on

12  bail?

13  A.  I didn't get bailed out, but I went to court and then the

14  judge let me out.

15  Q.  How long did you spend in jail from the time you got

16  arrested until the time you were released on bail in Virginia?

17  A.  About over a month.

18  Q.  And when you were released on bail, who paid the bail?

19  A.  There was no bail.  I didn't have to pay money.

20  Q.  Was the case dismissed?

21  A.  Yes.

22          THE COURT:  At a convenient point we're going to stop

23  for the lunch recess.

24          MR. COHEN:  This will be fine, your Honor.

25          THE COURT:  Very well.  We'll stop now and reconvene

482

D4G6LIN3                         Li – cross

1    at 2:15.  Have a pleasant lunch.

2              (Jury excused)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4G6LIN3                         Li – cross

1              (In open court; jury not present)

2              THE COURT:  You may step down.

3              MS. BURNS:  Judge, will you instruct the witness to be

4    back before 2:15 so we're ready to go?

5              THE COURT:  Yes.

6              MS. BURNS:  Thank you.

7              THE COURT:  Very well.  How much more

8    cross-examination do you have?

9              MR. COHEN:  Half an hour maybe.

10             THE COURT:  Very well.  We have a long recess for

11   lunch.

12             MS. BURNS:  Thank you, Judge.

13             (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

D4G6LIN3                        Li - cross

1                    A F T E R N O O N    S E S S I O N

2                               2:30 p.m.

3              THE COURT:  Good afternoon.  Let's get the jury.

4              (In open court; jury present)

5              THE COURT:  Good afternoon, members of the jury.

6    Let's all be seated.  We're going to proceed.

7    BY MR. COHEN:

8    Q.  Mr. Li, this morning I asked you some questions about

9    whether you had signed a statement declaring what your assets

10   were in order to obtain a free lawyer from the court when you

11   were arrested back in '06.

12             Do you remember my asking you that?

13   A.  Yes.

14   Q.  You said you didn't remember signing it, correct?

15   A.  I don't remember it because when I went in and when I first

16   got to jail and a lawyer came to me and spoke to me.

17             MR. COHEN:  Judge, may I approach the witness?

18             THE COURT:  Yes.

19             MR. COHEN:  I have shown these to the government, your

20   Honor.  It is going to be marked Defendant Exhibit B.

21   Q.  Mr. Li, please take a look at this document particularly at

22   the bottom line where it has the signature.  Do you recognize

23   that signature?

24   A.  I do.

25   Q.  Whose signature is it?

D4G6LIN3                           Li - cross

1    A.  I signed it.

2    Q.  And do you recall what date you signed it?

3    A.  I don't.

4    Q.  I will draw your attention to the date right over there.

5    Take a look at it.  Does that refresh your recollection that

6    you signed it on May 3, 2006?

7    A.  I do.

8    Q.  That is the date that you were arrested and brought to this

9    court for extortion along with other people; correct?

10   A.  Yes.

11   Q.  And I know the document is in English.  You don't read

12   English, do you?

13   A.  I can't.

14   Q.  Do you recall your attorney or one of the clerks asking you

15   with the interpreter where you worked and what your income was

16   and you giving them answers that you wrote down?

17   A.  I do.

18   Q.  And you told them that you worked at the Kessle Car

19   Service?

20   A.  Yes.

21   Q.  And actually Kessler Car Service was the company whose

22   drivers you were extorting, right?

23   A.  Yes.

24             MR. COHEN:  Judge, I would like to offer this as

25   Defendant's Exhibit B.

D4G6LIN3                    Li - cross

1                  MS. BURNS:  No objection.

2                  THE COURT:  Very well.  Defendant's Exhibit B is

3       received in evidence without objection.

4                  (Defendant's Exhibit B received in evidence)

5       BY MR. COHEN:

6       Q.  You testified this morning the government asked you I think

7       when you first met Mr. Lin, correct?

8       A.  Yes.

9       Q.  And your answer was that you met him at a restaurant in the

10      West 30s when he and some kids came in and spoke harshly to

11      you?

12      A.  Yes.

13      Q.  But that wasn't the first time you met him, was it?

14      A.  Yes.

15      Q.  It was the first time you met him, or you had met him

16      before?

17      A.  That was my first time meeting him.

18      Q.  Didn't you and he work in the same garment factory?

19      A.  Work in the garment factory.  I don't remember whether I

20      worked in the garment factory.

21      Q.  Did you ever work in the garment factory?

22      A.  Yes.

23      Q.  Did Mr. Lin work in the same garment factory?

24      A.  Garment factory, I don't know.  I don't remember.

25      Q.  Did your wife work at the garment factory?

D4G6LIN3                          Li - cross

1   A.  Yes.

2   Q.  Did Mr. Lin's wife work at the garment factory?

3   A.  Yes.

4   Q.  And didn't you tell the government that there was some sort

5   of dispute between your wife and Mr. Lin's wife about your

6   children and his children?

7   A.  I just did not know what they were saying.  Just that my

8   wife came home crying.

9   Q.  Didn't you tell the government that there was some sort of

10  dispute between your wife and Mr. Lin's wife?

11  A.  It seems like.

12          THE INTERPRETER:  Your Honor, may the interpreter

13  clarify with the witness?

14          THE COURT:  You are not sure what he said?

15          THE INTERPRETER:  Yes.

16          THE COURT:  You may ask him again.

17          THE WITNESS:  It had something to do because at that

18  time my wife still did not give birth.  Probably something to

19  do with that.

20          THE COURT:  With what?

21          THE INTERPRETER:  Something to do with that.

22          THE COURT:  With what?

23          THE WITNESS:  That my wife at that time still did not

24  give birth.

25          THE COURT:  Oh, you had no children.  Is that what you

D4G6LIN3                        Li - cross

1    are saying?

2              THE WITNESS:  Yes.

3    BY MR. COHEN:

4    Q.  You met with the government on July 26th of 2012.  Do you

5    remember that?

6    A.  Yes.

7    Q.  On that date there was an interpreter there; right?

8    A.  Yes.

9    Q.  Agent Varian, Ms. Burns, Mr. Skinner; right?

10   A.  Yes.

11   Q.  And do you remember telling them at that meeting that you

12   first met Ding Pa in 1995 or 1996 at a gambling parlor?

13   A.  No.

14   Q.  Do you remember telling them that the gambling parlor was

15   in midtown on 31st Street?

16   A.  Yes.

17   Q.  Do you remember telling them that your wives were involved

18   in a disagreement, they had met at work, it was something about

19   the children didn't get along although they were friendly at

20   first; do you remember that?

21   A.  Yes.

22   Q.  And that you called Ding Pa's house?

23   A.  Yes.

24   Q.  And that he got angry at you and scolded you?

25   A.  Yes.

D4G6LIN3                          Li - cross

1    Q.  So the first time that you met Mr. Lin is not at a

2    restaurant when he came in and started yelling at you, it was

3    earlier than that; correct?

4    A.  Prior to that I did not know that Ding Pa and his wife were

5    husband and wife relationship.

6    Q.  That is not what I asked you.  I asked you if when this

7    morning the government asked when you first met Ding Pa and you

8    described that incident with the soy sauce model, actually that

9    was not the first time you had met him; correct?

10   A.  That was my first time meeting him and regarding contact.

11   Q.  You entered into a cooperation agreement with the

12   government after you were brought back from Canada, correct?

13   A.  Yes.

14   Q.  And you met with them I think you said about 10 time before

15   they entered into an agreement with you?

16   A.  Yes.

17   Q.  And in the agreement you were obligated to do certain

18   things; right?

19   A.  Yes.

20   Q.  You told us you're obligated to testify, to be truthful, to

21   meet with them; right?

22   A.  Yes.

23   Q.  And in return they would write a letter to the judge to ask

24   for leniency; right?

25   A.  I signed this agreement hoping that I could reduce my

D4G6LIN3                    Li - cross

1    sentence.

2    Q.  And in fact the sentence that you faced, the maximum

3    sentence you faced when you pled guilty was 70 years in prison;

4    correct?

5    A.  Yes.

6    Q.  In fact you testified at a trial in this courthouse before

7    today in a different trial at a different time; correct?

8    A.  I do not understand.

9    Q.  This is not the first time that you have sat in the witness

10   stand in this courthouse; correct?

11   A.  Yes.

12   Q.  You testified against other people; correct?

13   A.  Yes.

14   Q.  And after you testified against those people there came a

15   time that you yourself had to be sentenced by the judge who was

16   assigned to your case; right?

17   A.  Yes.

18   Q.  At trial when you were asked questions about your

19   cooperation agreement, you told the jury that you were facing

20   70 years in prison; right?

21   A.  I pled guilty to 70 years.

22   Q.  When you testified at the trial and were asked questions

23   about your cooperation agreement, you told the jury that you

24   were facing a sentence of 70 years; correct?

25   A.  Yes.

D4G6LIN3                         Li - cross

1    Q.  And then there came a time that you were sentenced; right?

2    A.  Yes.

3    Q.  And the government did write a letter as you said under

4    their obligations under the agreement to the judge who

5    sentenced you; right?

6    A.  Yes.

7    Q.  And you didn't get 70 years, did you?

8    A.  No.

9    Q.  You got released that day; right?

10   A.  Yes.

11   Q.  Now, the government in the agreement said, We're not making

12   you any promises about what your sentence is going to be;

13   correct?

14   A.  Yes.

15   Q.  But the sentence you got was time served?

16   A.  Yes.

17   Q.  And then because you had been convicted of a felony and

18   because you had been illegally in the United States, you were

19   sent to immigration custody; right?

20   A.  Yes.

21   Q.  Had you ever applied for political asylum in the United

22   States?

23   A.  Yes.

24   Q.  And what was the basis for your asylum application here?

25   A.  Based on political persecution.

D4G6LIN3                    Li - cross

1   Q.  Political persecution?

2   A.  Yes.

3   Q.  Not because you were a persecuted Christian like you told

4   them in Canada, here it was political persecution?

5   A.  Political persecution refers to June 4th persecution.

6   Q.  Oh, and none of that was true; correct?

7   A.  Yes.

8   Q.  And you were denied asylum in the United States; correct?

9   A.  Yes.

10  Q.  And because you had been denied asylum and because you were

11  convicted of a felony, you went to immigration jail when you

12  got released from MCC; right?

13  A.  MCC, what is that?

14  Q.  What jail were you in before you went to immigration

15  custody?

16  A.  Before I went to immigration I was at this federal prison

17  in Chinatown.

18  Q.  That is MCC, correct, Metropolitan Correction Center?

19  A.  Yes.

20  Q.  You were there for four years?

21  A.  No.  I was not there for four years.  According to Canada

22  that is four years.

23  Q.  So how much time did you spend at the MCC?

24  A.  A little over two years.

25  Q.  You knew that place was called the MCC, correct?

D4G6LIN3                          Li - cross

1    A.  Yes.

2    Q.  So why did you ask me what is MCC when I asked you how long

3    you were there?

4              MS. BURNS:  Objection.

5              THE COURT:  Overruled.

6    A.  Because I thought you were talking about the immigration

7    custody.  I thought it was name of the immigration detention.

8              THE COURT:  Let's move on.

9              MR. COHEN:  I am moving on, Judge.

10   Q.  What I am asking you, sir, is eventually after spending a

11   couple years at the MCC, you went to an immigration detention

12   center; right?

13             MS. BURNS:  Asked and answered.

14             MR. COHEN:  It is a foundation question.

15             MS. BURNS:  I think we established that he went into

16   immigration custody.

17             THE COURT:  We don't have speeches.  We just object.

18             After you were released on sentence of time served,

19   where did you go?

20             THE WITNESS:  I was sent to New Jersey immigration

21   detention facility.

22   BY MR. COHEN:

23   Q.  Was it your understanding that the reason you went to an

24   immigration detention center in New Jersey is because you were

25   going to be removed from the United States?

494

1    A.  Yes.  That is what I thought.

2    Q.  In fact, one of the conditions of your sentence was that

3    you cooperate with the immigration authorities of the United

4    States; correct?

5    A.  No.

6    Q.  The judge who sentenced you is Judge Chin; correct?

7    A.  Yes.

8    Q.  And when he sentenced you, he sentenced you to time served

9    plus three years' supervised release, true?

10   A.  Yes.

11   Q.  One of the conditions of your supervised release was that

12   you have to report to a Probation officer, true?

13   A.  Yes.

14   Q.  And when you were sentenced by Judge Chin after you were

15   sentenced, do you recall being given a list of the conditions

16   of your supervised release?

17   A.  After I was sentenced I was not given any documents and I

18   just went out.

19   Q.  You didn't sign a document indicating that your conditions

20   of sentence were explained to you?

21   A.  Yes.

22   Q.  You did?

23   A.  Yes.

24   Q.  One of those conditions was you cooperate with the U.S.

25   immigration authorities; correct?

D4G6LIN3                        Li – cross

1    A.  Cooperate with the U.S. immigration?  I do not understand

2    about cooperation with U.S. immigration.

3    Q.  In any event you went to an immigration detention center in

4    New Jersey; correct?

5    A.  Yes.

6    Q.  How long did you stay the at immigration center?

7    A.  About five months.

8    Q.  And during those five months was it your understanding that

9    you were awaiting removal to China?

10   A.  Yes.

11   Q.  And how was it that you were not removed to China?

12   A.  Later an FBI agent came in and wrote me a letter on my

13   behalf and he brought me up.

14   Q.  So even though you had been ordered removed from the United

15   States by an immigration Judge, an FBI agent was able to get

16   you released; right?

17   A.  He wrote a letter on my behalf, but I do not know what it

18   was and I was able to get out.

19              (Continued on next page)

20

21

22

23

24

25

D4GVLIN4                         L. Qin - cross

1   Q.  Was that Agent Brian Wittenberg?

2   A.  No, not Agent Wittenberg.

3   Q.  Was it Agent O'Brien?

4   A.  I don't really know the name of the agent.

5   Q.  But you do know that an agent wrote a letter for you;

6   correct?

7   A.  Yes.

8   Q.  Now, had you had meetings with that agent between the time

9   that you were sentenced and the time that he wrote a letter for

10  you?

11  A.  No.

12  Q.  Had you had meetings with any representative of the FBI or

13  federal law enforcement between the time you got sentenced and

14  the time you got released?

15  A.  Yes.

16  Q.  And at those meetings, did you reach an understanding that

17  if the FBI got you released from immigration custody, that you

18  would do some things that they wanted you to do?

19  A.  Yes.

20  Q.  And, in fact, you testified that you now have legal status

21  in the United States; correct?

22  A.  Yes, I worked one-year card.

23  Q.  And that work authorization was something that you got

24  because the FBI helped you get it; correct?

25  A.  Yes.

1    Q.  And without that assistance from the FBI, you would not

2    have been released from custody; correct?

3    A.  Yes.

4    Q.  And without continuing to do what the FBI wants you to do,

5    you wouldn't be able to continue to renew the card that allows

6    you to work legally in the United States; correct?

7    A.  Yes.

8    Q.  When does that come up for renewal?

9           THE INTERPRETER:  I'm sorry?

10          MR. COHEN:  When does that card come up for renewal?

11   A.  July 21.

12   Q.  You said there was a time that you stabbed Mr. Lin;

13   correct?

14   A.  Yes.

15   Q.  Do you remember what month that was in?

16   A.  Don't remember.

17   Q.  Remember if the weather was warm or cold?

18   A.  Don't remember.

19   Q.  And was that after the incident at -- the incident that you

20   described earlier when you said that you called him a dick and

21   he punched you?

22   A.  I did not say anything about dick.

23   Q.  Do you remember testifying this morning?

24   A.  No.

25   Q.  You don't remember testifying this morning?

D4GVLIN4                        L. Qin - cross

1   A.  No.

2   Q.  Did I mishear you or did you say this morning that when

3   Mr. Lin said don't leave tonight, and you said why, you called

4   him a dick?

5            THE INTERPRETER:  Call him a dick?

6            MR. COHEN:  Yeah.

7            THE INTERPRETER:  Okay.

8   A.  I said why.

9   Q.  You didn't call him any name?

10  A.  I said Ding Pa, what happened?

11  Q.  You said Ding Pa, what happened?

12  A.  Yes.

13  Q.  So the incident where you stabbed him, was that within a

14  couple of days after that?

15  A.  Yes, after one to two days later.

16  Q.  And did you know that he hung out on Eldridge Street?

17  A.  Did not know.

18           MR. COHEN:  I have no further questions, your Honor.

19           THE COURT:  Very well.

20           MS. BURNS:  Just briefly, your Honor.

21  REDIRECT EXAMINATION

22  BY MS. BURNS:

23  Q.  The incident where you ended up stabbing Ding Pa, where did

24  that take place?

25  A.  It was at 20-something Eldridge Street, next to the

D4GVLIN4                    L. Qin - redirect

1   barbershop.

2   Q.  What did Ding Pa do once he came up behind you?

3   A.  He grabbed my shoulder and pulled me into the gambling

4   parlor.  The gambling parlor was behind the barbershop.

5   Q.  Were there other people inside?

6   A.  I couldn't see clearly, but there were a lot of people

7   sitting inside.

8   Q.  What did Ding Pa say to those people, if anything?

9   A.  He said, Qin Li is here.

10  Q.  And what did you do when he was trying to pull you into the

11  gambling parlor?

12  A.  I was planning to run away.

13  Q.  Why?

14  A.  Because I saw him there all of a sudden.  I got scared.

15  Q.  And where on Ding Pa's body did you hit him with that

16  screwdriver?

17  A.  I don't know.  I didn't look.  I just went like this and

18  stabbed him.

19          MR. COHEN:  I'm sorry, I didn't see the gesture.

20  A.  I grabbed and I stabbed like that.

21  Q.  Moving toward his lower body?

22  A.  Yes.

23          MS. BURNS:  No further questions.

24          Thank you.

25          THE COURT:  Very well.

D4GVLIN4                        L. Qin – redirect

1    RECROSS EXAMINATION

2    BY MR. COHEN:

3    Q.  Did you leave the screwdriver stuck in his leg?

4    A.  No.

5    Q.  Did you take it with you?

6    A.  I stabbed him, I then held in my hand, and then I went to

7    the front and threw it out.

8    Q.  You said that there was a gambling parlor there at the

9    barbershop?

10   A.  I heard later on that the gambling parlor was inside.

11   Q.  But you didn't know that before?

12   A.  I did not.

13   Q.  Thanks.

14           THE COURT:  All right.  You may step down.

15           (Witness excused)

16           MR. COHEN:  Judge, could we approach for a moment?

17           THE COURT:  Very well.  But who's the next witness?

18           MR. COHEN:  That's what we're approaching about.

19           THE COURT:  I see.

20           (Continued on next page)

21

22

23

24

25

1              (At the side bar)

2              MR. COHEN:  Judge, the government advised me after

3    lunch that they are actually calling a witness out of turn.

4              MR. SKINNER:  That's not right.

5              MS. BURNS:  That's not accurate.  We're still

6    continuing to go with Mr. --

7              THE COURT:  Please don't interrupt.  You'll have your

8    opportunity.

9              MS. BURNS:  Okay.  Thanks, Judge.

10             THE COURT:  I listen to everybody.

11             MS. BURNS:  We're eager.  I apologize.

12             MR. COHEN:  The next witness was supposed to be

13   somebody named Cai Xiang, who is somebody that would have taken

14   us through the day and into tomorrow.

15             The government advised me after lunch that Mr. Xiang

16   is in Philadelphia attending the funeral of his brother.  I

17   don't have an objection to them calling somebody other than

18   Mr. Xiang, who would be a lengthy witness, but I'm not prepared

19   to cross-examine any other witness today, because I clearly

20   thought that between this guy and Cai Xiang, we would be into

21   tomorrow.  So I'm saying I'm not prepared to go forward with

22   cross-examination.

23             THE COURT:  How lengthy is this direct?

24             MR. SKINNER:  First of all -- and there very well may

25   have been a misunderstanding between us and Mr. Cohen in the

D4GVLIN4                     L. Qin - recross

1    benefit of the doubt.  But we've been saying -- we've been

2    trying to give him crucial witnesses.  We've been telling him

3    that we can't make any promises, but this is our best

4    expectation, what we've been saying consistently.  The next

5    group of witnesses included Allen Chen, Song Di Xiang, Cai

6    Xiang, and a fourth witness.

7             We have intended to call Mr. Allen next for the

8    duration.  We never intended to call Cai Xiang immediately

9    after Mr. Qin.  And I don't think that this really is a

10   surprise to Mr. Cohen that Mr. Allen is coming up next.  If

11   he's not prepared to cross these witnesses, I don't really know

12   what to say.  We've been telling him as much as we can and

13   giving him as much notice as we can.  And he's had the 3500

14   since January.

15            THE COURT:  I understand.  The question is this:

16   Since he let you take some witness out of turn --

17            MR. SKINNER:  It's not out of --

18            THE COURT:  Suppose -- no, no.  I'm not suggesting

19   that you can't put the witness on.  But maybe you can make an

20   arrangement that he will cross-examine tomorrow, or do you not

21   have anybody after this?

22            MR. SKINNER:  Well, he's right that we had we thought

23   Cai Xiang was going to go after Mr. Chen.  But we learned

24   during lunch that Mr. Xiang's brother passed away, and he's in

25   Philadelphia as a result.  And I think we have two other people

D4GVLIN4                        L. Qin - recross

1    who are going to be here.

2           I mean if Mr. Cohen wants to do it that way,

3    efficiently use the jury's time, we're prepared to go direct,

4    direct, direct, I guess, but that sounds kind of unorthodox.

5           THE COURT:  Well, but I think the two of them anyhow,

6    you could go direct, direct and have the two cross-examined

7    tomorrow.

8           MR. SKINNER:  Mr. Cohen, are you now prepared to cross

9    Allen Chen?

10          THE COURT:  Everybody is willing to cooperate.

11          MR. COHEN:  As I said, I thought Cai Xiang was next.

12   It's true that the government has told me, generally speaking,

13   who they intended to call.  I thought my last email exchange

14   they indicated that after Mr. Li, it would be Mr. Xiang.

15          THE COURT:  All right.  Well, we know that.  That's

16   water over the damn.

17          MR. COHEN:  Pardon, Judge?

18          THE COURT:  That's water over the damn.

19          MR. SKINNER:  Exactly.

20          THE COURT:  The question is what is the best way to

21   proceed.

22          MR. SKINNER:  Are you now prepared to cross him?

23          THE COURT:  And if you are not prepared to

24   cross-examine this witness coming up next, you can do it

25   tomorrow.

D4GVLIN4                         L. Qin - recross

1          MR. COHEN:  That was going to be my request, Judge.

2     Either that we do the whole thing tomorrow, or that they could

3     do their direct today and I would do the cross tomorrow.

4          THE COURT:  Fine.

5          MR. SKINNER:  Let's at least do the direct today.

6          THE COURT:  Excuse me?

7          MR. SKINNER:  Let's please do the direct today; he's

8     been here for a long time.

9          THE COURT:  Yes, that's what we're going to do.

10         MR. SKINNER:  And then hopefully after that, these

11    other people will be here.  And we'll see what we do with that.

12         MR. COHEN:  Great.

13         THE COURT:  That's fine.  It's always worth looking

14    for constructive solutions to problems.

15         MR. SKINNER:  Thanks, Judge.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

D4GVLIN4                          L. Qin – recross

1              (In open court)

2              THE COURT:  Who is your next witness?

3              MR. SKINNER:  Allen Chen.

4    ALLEN HUI CHEN,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7              THE DEPUTY CLERK:  Please be seated.

8              Please state your full name for the record, and spell

9    your last name slowly.

10             THE WITNESS:  Allen Hui Chen.  A-L-L-E-N, H-U-I,

11   C-H-E-N.

12             THE DEPUTY CLERK:  Thank you.

13   DIRECT EXAMINATION

14   BY MR. SKINNER:

15   Q.  Good afternoon, Mr. Chen.

16   A.  Yes.

17   Q.  Where are you from?

18   A.  From Toronto, Canada.

19   Q.  Where were you born originally?

20   A.  From China.

21   Q.  Where do you have citizenship?

22   A.  I'm a Canadian citizen.

23   Q.  Where do you live now?

24   A.  China.  Most of my time spent in China, sometimes in

25   Canada.

D4GVLIN4                        A. H. Chen - direct

1    Q.  And when did you first go to Canada?

2    A.  2004.

3    Q.  When did you become a Canadian citizen?

4    A.  April of '08.

5    Q.  Mr. Chen, prior to testifying today, have you met with

6    prosecutors and agents who work for the United States

7    government?

8    A.  Yes, I met with them twice.

9    Q.  And how did you know where to go and what time to be there?

10   A.  My cousin contacted me.

11   Q.  What's your cousin's name?

12   A.  Ah Qian.

13   Q.  Does he also go by the name Cash?

14   A.  Yes.

15   Q.  Now --

16          THE COURT:  Is that a nickname?

17          THE WITNESS:  I believe that is his English name, but

18   I'm not really sure.

19   Q.  When you say he's your cousin, do you mean you're part of

20   the same family?

21   A.  Yes, he is my paternal aunt's son.

22   Q.  Mr. Chen, do you know a man who goes by the nickname Ding

23   Pa?

24   A.  I do.

25   Q.  Do you know his true name?

1    A.  I do not know.

2    Q.  When did you first meet Ding Pa?

3    A.  There's an English name that some people call him by, name

4    Ah Mark.

5    Q.  When did you first meet Ding Pa?

6    A.  2005.

7    Q.  Where did you meet him?

8    A.  At one of my relatives' home.

9    Q.  How did you come to meet him at your relative's home?

10   A.  He was having dinner there, and I saw him when I walked in.

11   Q.  Were you introduced?

12   A.  Not really.  We sat at the same table for dinner, and then

13   we chitchatted.

14   Q.  And after that initial night, were there other occasions

15   where you ran into Ding Pa or saw him?

16   A.  Yes, once in a while when I went out, I saw him.

17   Q.  Do you see --

18   A.  But we did not talk.

19   Q.  Do you see Ding Pa here in court today?

20   A.  Is that the one sitting over there?

21   Q.  I'm asking you, do you see him?  Do you recognize him or

22   not?

23   A.  Oh, the one inside wearing a suit?  Yes, the one sitting in

24   the middle.

25   Q.  Can you describe what table he's sitting at and what he's

D4GVLIN4                         A. H. Chen - direct

1    wearing?

2    A.  He's at the second table.  He's sitting next to the man

3    wearing glasses.

4            MR. SKINNER:  Your Honor, can the record reflect that

5    the witness has identified the defendant.

6            THE COURT:  It may.

7    Q.  Now, Mr. Chen, during the time you lived in Canada, did you

8    ever run a gambling parlor?

9    A.  Yes.

10   Q.  How many gambling parlors did you run?

11   A.  I had one in '07.

12   Q.  And how many others did you have?

13   A.  That was closed.  And then I opened another one July 2010.

14   Q.  So there are a total of two?

15   A.  Yes.

16   Q.  Let's talk about the first one.  Where was that one

17   located?

18   A.  It was in Scarborough, in Toronto, Scarborough.

19   Q.  Are you saying Scarborough?

20   A.  Yes.

21   Q.  Is that part of Toronto?

22   A.  Yes, it's in Toronto.

23   Q.  And this first gambling parlor, that was in 2007, did I

24   hear you right before?

25   A.  Yes, it was '07.

D4GVLIN4                          A. H. Chen - direct

1  Q.  What kind of gambling took place there?

2  A.  It was mahjong and card games.

3  Q.  How many people gamble there at a time?

4  A.  Ten to 20 people.

5  Q.  And did you or anybody else who worked there have a permit

6  from the Canadian government to run that gambling parlor?

7  A.  Yes, it was an organized -- it was an association.  We had

8  made an application for an association, and a few of us got

9  together to do this.

10 Q.  And did you earn any income from running this gambling

11 parlor or helping run the gambling parlor?

12 A.  I do not -- I did not rely on this income, because these

13 are people from my village that hang out in that place.

14 Q.  Did you earn some money from it?

15 A.  Yes, just a salary.

16 Q.  Was that your primary source of income back in 2007?

17 A.  I have my own business in China.

18 Q.  So you had other sources of income in addition to the

19 gambling parlor?

20 A.  Yes.

21        THE COURT:  Did you not own the gambling casino in

22 Canada?  Because you said you got a salary.

23        THE WITNESS:  A lot of my friends got together to do

24 this.

25 Q.  So were there multiple owners of the gambling parlor?

D4GVLIN4                          A. H. Chen - direct

1   A.  Yes, there were workers that had nothing to do after work,

2   so they would all hang out over there.  And these were people

3   from my village.

4            THE COURT:  Your village in China?

5            THE WITNESS:  Yes, those people that were in Canada.

6   Q.  Let's turn to the second gambling parlor.

7            THE COURT:  Excuse me.  What was your village?

8            THE WITNESS:  In Changle, Fuzhou.

9   Q.  Mr. Chen, let's turn now to the second gambling parlor.

10  Where was this located?

11  A.  It was also in Scarborough, Toronto.  The street name is

12  Finch and Midland.

13  Q.  Finch and Midland?

14  A.  Yes.

15  Q.  And what kind of gambling took place at this gambling

16  parlor?

17  A.  The same as the previous one.

18  Q.  That's mahjong and cards?

19  A.  Yes.

20  Q.  How big was this one?

21  A.  This one was a little bit bigger than the original one.

22  Q.  How many people would gamble there at a time?

23  A.  When there was a lot of people, it was between 20 to 30.

24  Q.  Who owned this one?

25  A.  It was also my friend and a few of my friends and I, we got

D4GVLIN4                          A. H. Chen - direct

1   together to do it.

2   Q.  Did you have a permit for this one?

3   A.  Yes.

4   Q.  Did you earn any money from running this gambling parlor?

5   A.  Yes, I earned some salary.

6   Q.  Did you have other sources of income, as well?

7   A.  I had family business in China.

8   Q.  And you said -- correct me if I'm wrong, I think you said

9   this one started in about July 2010?

10  A.  I didn't hear it clearly.

11  Q.  When did you start this second gambling parlor?

12  A.  It was end of July 2010.

13  Q.  Did Ding Pa own or operate any gambling parlors in Toronto?

14  A.  Yes.

15  Q.  And where was Ding Pa's gambling parlor located?

16  A.  It was also near Finch and Midland.

17  Q.  So near the second gambling parlor that you started?

18  A.  It was about 100 meters away.

19  Q.  When did you first learn that Ding Pa had a gambling parlor

20  on Midland and Finch?

21  A.  I do not remember exactly when, but it was open for a long

22  time.

23  Q.  Was it open before you started your gambling parlor in July

24  2010 in the same area?

25  A.  Yes.

D4GVLIN4                         A. H. Chen – direct

1  Q.  Did you ever go into Ding Pa's gambling parlor on Midland

2  and Finch?

3  A.  Yes.

4  Q.  What kind of gambling took place there?

5  A.  Gambling pai gao.

6  Q.  Pai gao?

7  A.  Pai gao.

8  Q.  Anything else?

9  A.  And poker.

10  Q.  Poker?

11  A.  Yes.

12  Q.  Now, how do you know that this was Ding Pa's gambling

13  parlor?

14  A.  My friend gambled and we went in together.

15  Q.  What did you see, if anything, that gave you the impression

16  that Ding Pa had some position of authority there?

17  A.  He gave money to other people, he was directing other

18  people what to do verbally.  They were gambling using the chip.

19  He was giving them, other people, chips.

20  Q.  Mr. Chen, let me direct your attention back to the second

21  gambling parlor, the one on Midland and Finch that you and your

22  friends operated.

23       Did Ding Pa ever come into this gambling parlor after

24  you opened it in July of 2010?

25  A.  Yes.  It was approximately one month later he came in.

513

D4GVLIN4                        A. H. Chen - direct

D4GVLIN4                         A. H. Chen - direct

1   Q.  During the period of time that he was there, did he say

2   anything to you?

3   A.  He didn't say anything until he left.  He was about to

4   leave.

5   Q.  When he was about to leave, what did he say?

6   A.  He said, you know, do your business.  But his tone was not

7   very good.

8   Q.  And then he left after that?

9   A.  Yes.

10  Q.  Did he come back in again after that night?

11  A.  Yes, he came back in after 10 to 20 days later.

12  Q.  And what happened the next time he came in?

13  A.  The second time he came in, he came in with like 10 to 20

14  people.

15  Q.  What time of day was it?

16  A.  It was about 10 o'clock at night.

17  Q.  Were there other people in the gambling parlor other than

18  yourself when he came in?

19  A.  Yes, there were people playing cards.

20  Q.  And what did Ding Pa do after he came in?

21  A.  When he came in, he did the same thing he did last time.

22  He start moving things around.

23  Q.  What about the people he was with, what did they do?

24  A.  They all followed him and did the same thing.

25  Q.  And when you say "moving things around," can you just

D4GVLIN4                        A. H. Chen - direct

1   describe for us what they were moving and how they were moving

2   it?

3   A.  For example, they pretend to drop things on the floor.

4   They were causing trouble.

5           THE COURT:  Who is that causing trouble?

6           THE WITNESS:  Some of the stuff they were taking,

7   smash it up for me.

8   Q.  What kinds of things did they smash?

9   A.  Like sometimes there was stuff on the table, they would

10  take -- or push it to the side.

11  Q.  What kinds of things?  Glasses or...

12  A.  Sometimes they were cups on the table.  Sometimes when

13  people were playing cards, he would start moving the tables and

14  people would then get up and walk away.

15  Q.  And what were the people that were with him doing while he

16  was doing these things?

17  A.  They were all doing the same thing.  They would come in and

18  slam the doors.

19  Q.  And how long were they there?

20  A.  Around 40 minutes.

21  Q.  Did Ding Pa ever ask for anything from you from that night?

22  A.  Yes.

23  Q.  What did he ask for?

24  A.  He said, I have to let him become a shareholder.

25  Q.  How did he say that?  What did he say?

A. H. Chen - direct

1    A.  He said, I want to become part of -- or want to become one

2    of the share.

3    Q.  And what did you say after he asked to become a

4    shareholder?

5    A.  I said, I have a lot of shareholders already, and this is

6    not my focus.  I said, There are a lot of people playing here,

7    but I'm not trying to make money from these people.  I said,

8    You might see a lot of people here, but we don't charge a lot

9    of money.  It's just a little bit -- just to play.

10   Q.  Did he ask for anything else after you said that you

11   weren't going to make him a shareholder?

12   A.  Then, after a while, he came over and said, Then you got to

13   pay me $20,000.

14   Q.  What did you say after he demanded $20,000?

15   A.  What did I say?

16   Q.  Yes.

17   A.  I said I did not even make that much in a given month, and

18   just basically making basic salary.

19   Q.  What did Ding Pa say to that?

20   A.  He didn't say anything.  He just came over and smashed

21   things, and he said in a threatening way --

22            MR. COHEN:  Objection.

23            THE COURT:  What did he say?

24            THE WITNESS:  In a very bad tone --

25            THE COURT:  No, no.  First say what did he say.

D4GVLIN4                        A. H. Chen - direct

1              THE WITNESS:  What?

2              You just do your business.

3    Q.  What happened after that?

4    A.  After that, just hit a door, and then ten people left.

5    Q.  Now, after that night, did you see Ding Pa again after

6    that?

7    A.  Yes.

8    Q.  And when is the next time you saw him after that?

9    A.  December 19, 2010, in the morning.

10   Q.  Where did you see him that night?

11             THE COURT:  Morning.

12             MR. SKINNER:  Sorry, your Honor.  Morning.

13   A.  In this club.

14             THE COURT:  Do people gamble there in the morning?

15             THE WITNESS:  Around 12 o'clock on the morning of the

16   19th.

17   Q.  So the early morning hours of the 19th.

18   A.  Yes.

19   Q.  And you were in a club?

20   A.  Yes.

21   Q.  And where was this club located?

22   A.  In downtown.

23   Q.  Downtown Toronto?

24   A.  Yes.

25   Q.  How long --

1              THE COURT:  Is this a different club?

2              THE WITNESS:  This is a big dancing place.  People

3     drink.

4     Q.  Was this your gambling parlor or was this a different

5     place?

6     A.  No, this is for people to hang out, a place for people to

7     hang out.

8     Q.  And how long had you been there before you saw Ding Pa?

9     A.  He was there first.

10    Q.  How long after you got there was it before you saw him?

11    A.  When I first went in, I went to the smoking zone or area.

12    Q.  What did you see in the smoke area?

13    A.  As soon as I walked in to the smoking area, I saw more than

14    ten people over there smoking.

15    Q.  Did you see Ding Pa at some point?

16    A.  Yes, I saw him at the smoking area.

17    Q.  So this is the smoking area that you went to when you first

18    went into the club?

19    A.  Yes.

20    Q.  Now, at that point, when you first saw Ding Pa, had you had

21    any alcohol to drink at any point that night?

22    A.  No, I did not.  When I first went in there, I went straight

23    to the smoking area.

24    Q.  What happened when you saw Ding Pa in the smoking area?

25    A.  I went to the center where people were dancing.

D4GVLIN4                          A. H. Chen - direct

1   Q.  What happened after that?

2   A.  As soon as I went in, more than 10 to 20 people follow me.

3   Q.  Was Ding Pa one of those people?

4   A.  Yes, and surrounded me.

5   Q.  If I'm understanding you right, they followed you onto the

6   dance floor of the club?

7   A.  Because the dancing place was very close to the smoking

8   area.

9   Q.  Is that where they followed you, onto the dance floor?

10  A.  As soon as I left the smoking area, they started following

11  me.

12  Q.  Where did you go, Mr. Chen, to the dance floor or someplace

13  else?

14  A.  Dancing floor.

15  Q.  And what happened after Ding Pa and these other people and

16  you all got onto the dance floor?

17  A.  People surrounded me.

18  Q.  What happened after you were surrounded?

19  A.  And from the back, my head was struck.

20  Q.  What happened after that?

21  A.  After I was struck on my head, I started becoming dizzy,

22  and then more people came over, started beating me.

23  Q.  All the people that were around you, is that --

24  A.  I was on the ground, and then they started kicking me.

25  Q.  Who was kicking you?

D4GVLIN4                         A. H. Chen - direct

1   A.  I was semi-conscious.  I did not know.  Then I had a cut in
2   my eye.
3   Q.  What, if anything, did you hear Ding Pa say either before
4   or during this beating?
5   A.  I could hear a very loud, "Beat him to death."
6   Q.  How long were you beat?
7   A.  I do not know how long.  At the time it was pretty long.
8   Q.  How did the beatings stop?
9   A.  Security came in.
10  Q.  What happened after security came in?
11  A.  And took me to security office.
12  Q.  What happened to the people that were on the dance floor
13  that were beating you?
14  A.  Nothing happened to them.  They just left.
15  Q.  What happened after you went into that security office?
16  A.  My eye was bleeding, and blood was all over my body, and I
17  was injured.
18  Q.  Did you stay there or did you go someplace else?
19  A.  Security used alcohol and washed my eye.
20  Q.  And where did you go after that?
21  A.  At the time a friend of mine drove a car from the garage
22  and picked me up.
23  Q.  So you got into your friend's car?
24  A.  Yes.
25  Q.  Did you see Ding Pa that night?

D4GVLIN4                          A. H. Chen - direct

1   A.  Before the car engine started, he came over and pointed me

2   with his hand.

3   Q.  Did you say anything?

4   A.  And said, "I want you dead."

5   Q.  What happened after that?

6   A.  So my friend just drove away, and took me to the hospital.

7   Q.  What happened at the hospital?

8   A.  They checked out my brain, CT, and I suffered a cut inside

9   of my eye, and about 45 stitches were needed.

10  Q.  Did you have any other injuries other than that?

11  A.  My brain and my head was swollen, also my back.  My face

12  was swollen.  And also they check brain with CT.

13  Q.  Were you checked into the hospital or were you released

14  that night?

15  A.  I was there for a few hours.  And then a friend of mine

16  drove me home.

17  Q.  Now, after that night at the club, did you keep running

18  that gambling parlor on Midland and Finch?

19  A.  No, after, when I recovered, fully recovered, I went to

20  China.

21          MR. SKINNER:  Nothing further, your Honor.

22          THE COURT:  Very well.

23          We're going to postpone cross-examination until

24  tomorrow.  So who is your next witness?

25          MR. SKINNER:  Your Honor, the next witness I believe

522

1     is going to be Song Di Xiang.

2              This might be a good time for a break, if that's okay

3     with the Court.

4              THE COURT:  Very well.  We will take a ten-minute

5     recess.

6              (Jury excused)

7              THE COURT:  You may step down.

8              (Witness excused)

9              THE COURT:  We will take a ten-minute recess.

10             MR. SKINNER:  Thank you, your Honor.

11             (Recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D4GVLIN4

1              (In open court; jury present)

2              MR. SKINNER:  Your Honor, the government calls Song Di

3    Xiang.  He is already in the witness stand.

4              THE DEPUTY CLERK:  Please stand and raise your right

5    hand.

6     SONG DI XIANG,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10             THE INTERPRETER:  Your Honor, his name is Song Di

11   Xiang.  He didn't spell it.  I will spell for phonetically.

12             THE COURT:  What is the English that the prosecution

13   reads as the name?

14             MR. SKINNER:  First name S-o-n-g.  Middle name, D-i.

15   Last name, X-i-a-n-g.

16             THE COURT:  Very well.

17   BY MR. SKINNER:

18   Q.  Good afternoon, Mr. Xiang.

19   A.  Good afternoon.

20   Q.  Mr. Xiang, where are you from?

21   A.  From China.

22   Q.  When did you first come to the United States?

23   A.  I came into the United States in '94.

24   Q.  Are you a citizen of the United States?

25   A.  No.  I don't have any status here.

D4G6LIN5                         Xiang – direct

1    Q.  Are you here legally?

2    A.  I was smuggled in and then I got bonded out there.

3    Q.  So you have no legal status here in the United States?

4    A.  I do not.

5    Q.  Does your legal status in the United States depend on your

6    testimony in this trial?

7    A.  No.

8    Q.  Have you been promised any kind of immigration benefit for

9    your testimony at this trial?

10   A.  No.  No.

11   Q.  Mr. Xiang, have you ever been stabbed?

12   A.  I don't have any legal status so I am afraid of getting

13   beaten up.

14          MR. COHEN:  Afraid of what?

15          THE INTERPRETER:  Afraid of getting beaten up.

16   Q.  Well, the next question I had asked is whether you had ever

17   been stabbed?

18   A.  Yes.  I was stabbed.

19   Q.  Where were you at the time that you got stabbed?

20   A.  It was in a restaurant in Manhattan.

21   Q.  Was that restaurant on Division Street?

22          THE COURT:  Try not to lead.

23   A.  Yes.

24   Q.  Do you know what year it was?

25   A.  I do not remember what year it was.

1              THE COURT:  About how long ago?

2              THE WITNESS:  Around nine to 10 years ago.

3    Q.  What time of day was it?

4    A.  It was 9:00 something, 10:00.

5              MR. SKINNER:  Your Honor, may I approach?

6              THE COURT:  Yes.

7              Is that in the evening or the morning, 9:00 or 10:00?

8              THE WITNESS:  Nighttime.

9    Q.  Mr. Xiang, I have placed in front of you a document marked

10   as Government Exhibit 33.  I am going to ask you to take a

11   moment to look at that?

12   A.  That is a door going inside.

13   Q.  Let me ask you first do you recognize what you are looking

14   at?

15   A.  I do.

16   Q.  What is it?

17   A.  That is the restaurant and this is the common area.

18   Q.  Is this a diagram of the restaurant?

19   A.  Yes.

20   Q.  Is this the restaurant that you were in when you were

21   stabbed?

22   A.  Yes, it is.

23   Q.  Does this diagram accurately reflect how the restaurant was

24   laid out at the time of your stabbing?

25   A.  Yes.  This is what it looked like.

D4G6LIN5                          Xiang - direct

1            MR. SKINNER:  Your Honor, the government offers

2     Exhibit 33.

3            THE COURT:  I think you should delve a little more.

4     It is too hard to tell from the blank lines what the restaurant

5     looked like.

6     Q.  Mr. Xiang, can you describe for us how the restaurant was

7     laid out?

8     A.  This is what it looks like.

9            THE COURT:  Where did you go into the restaurant?

10           THE WITNESS:  I walk in from here.

11           THE COURT:  Where is "here"?

12           THE WITNESS:  There is a door here.  That is the

13     counter.

14           THE COURT:  I see.  There is a counter inside the

15     restaurant after you get in?

16           THE WITNESS:  Yes.  I went into buy rice.

17           THE COURT:  I see.  They sell food as well as serve at

18     tables; is that right?  Did you sit down and order rice or did

19     you go to the counter?

20           THE WITNESS:  I was intending to go in to buy rice and

21     then I saw Guo Li.

22           THE COURT:  Wait just a minute.  You have to

23     concentrate on the question.  Did you sit down at a table to

24     order rice or did you go to the counter to order rice?

25           THE WITNESS:  To the counter.

D4G6LIN5                         Xiang - direct

1           THE COURT:  They sell rice without your sitting down?

2           THE WITNESS:  Yes.

3    BY MR. SKINNER:

4    Q.  In this restaurant when you first walk in, what kind of

5    room do you go into?

6    A.  Well, when I walked in I saw Guo Li at the opening when I

7    went into buy rice.

8    Q.  When you walk in, do you walk into the dining room?

9    A.  Yes.  I walked into the dining room.

10   Q.  Are there tables in this dining room?

11   A.  Yes.

12   Q.  Is that what the round circles are on the diagram?

13   A.  Yes.  These are all tables.

14   Q.  Is there a back room behind a dining room?

15   A.  Yes.

16   Q.  How do you get to the back room to that dining room?

17   A.  I went to the counter to buy rice and then I ran into him.

18   So I went into the back to have a drink.

19          THE COURT:  This is nonresponsive to the question.

20          MR. SKINNER:  I am trying, your Honor.

21   Q.  Mr. Xiang, before we get to actually what you did, let's

22   just talk about the layout of the restaurant.  Putting aside

23   what you did that night, how would one get to the back room in

24   the restaurant?

25   A.  Well, I was walking down the street and then I got to the

1    restaurant.  I was hungry.  I was going to go into the

2    restaurant to buy rice.

3    Q.  So Mr. Xiang, after you got into the restaurant, what did

4    you do?

5    A.  I got to the restaurant.  I was going to buy rice.

6    Q.  Where did you go inside the restaurant?

7    A.  There was a long line at the restaurant so he just gestured

8    for me to go inside.

9    Q.  Who is he?

10   A.  Li was standing over there and I saw him.

11   Q.  At this point were you standing in the dining room?

12   A.  Yes.

13   Q.  Where was Guo Li standing?

14   A.  Guo Li was standing here by the door.

15           THE COURT:  Who is Guo Li?

16           THE WITNESS:  Guo Li was someone that cut hairs, a

17   barber.

18           THE COURT:  He was a barber.

19   Q.  Is that someone you knew before you went into the

20   restaurant that night?

21   A.  I knew him before, yes, from getting haircuts.

22   Q.  What did you do after you saw Guo Li?

23   A.  Guo Li called to me and said, "Come in.  Come in.  Get

24   something to eat."

25   Q.  So where did you go if anywhere?

D4G6LIN5                          Xiang - direct

1    A.  They were all Chinese people so I went over to get a drink.

2    I got a glass and I saw this person.  Din Pa.  Din Pa.

3    Q.  Before we get there, just tell us where in the restaurant

4    you went, if you stay in the dining room or if you went

5    someplace else?

6    A.  I didn't go anywhere else.  I was standing here and then he

7    gestured for me to go to the door.

8    Q.  Did you leave the dining room and go into a back room?

9    A.  I was at -- there was a lot of people outside so I went

10   over there by the opening.  He told me to come and get

11   something to eat, but I didn't get anything to eat.

12   Q.  Mr. Xiang, let me ask you for the time being to ignore the

13   diagram that is in front of you.  Describe for us where you

14   went with Guo Li before he gestured to you?

15   A.  I went to the opening -- I went to the restaurant and he

16   told me to go over there to have something to eat.

17   Q.  Did you go with Guo Li someplace?

18   A.  No.  He said have a drink and then I said, Oh, this guy

19   looked like a thug.

20          MR. COHEN:  Objection.  Move to strike that.

21          THE COURT:  The answer is totally unresponsive.

22   Q.  Did you have a drink?

23          MR. COHEN:  Is it stricken, your Honor?

24          THE COURT:  It is stricken.

25   Q.  Did you have a drink with Guo Li in the restaurant?

D4G6LIN5                           Xiang - direct

1    A.  No.

2    Q.  Did you get something to eat in the restaurant?

3    A.  There were a lot of plates of food on the table.  When I

4    walked in, they were almost finished and some people had

5    already left.

6    Q.  When you walked in where?

7    A.  When I get into the back, the first table by the door.

8    Q.  So there was another room in the restaurant that was in the

9    back of the restaurant?

10   A.  Yes.  Two tables.

11   Q.  Is it this back room that you went into with Guo Li?

12   A.  He was at the door at the second room in the restaurant.

13   Q.  Listen to the question.  The question was:  Is it the back

14   room that you went into with Guo Li?

15   A.  I did not walk in with him.  He called to me and say, "Come

16   in.  Come in.  Let's have a drink."

17   Q.  After he called to you, did you go into the back room?

18   A.  Yes.  I went over there.

19   Q.  Looking at Government Exhibit 33, is that the portion of

20   the diagram at the top that has the two circles?

21   A.  Yes.  This one with the two tables.

22   Q.  Is the back room separated from the front room by a

23   staircase?

24   A.  Yes.  That is the stairwell.

25        MR. SKINNER:  Your Honor, the government offers

1    Government Exhibit 33.

2              MR. COHEN:  No objection.

3              THE COURT:  If there is no objection, I will take it.

4              (Government's Exhibit 33 received in evidence)

5              THE COURT:  Let me explain to the witness it is not

6    easy to be a witness.  You have to listen to the question.  You

7    cannot just say what you think you are supposed to say.  You

8    have to listen to the words and then think about what those

9    words are and answer those words.

10             What is the question?

11             MR. SKINNER:  Can we put Government Exhibit 33 up to

12   show the jury?

13             THE COURT:  If you are going to ask the witness

14   questions that will help the jury see what we are talking

15   about.

16             MR. SKINNER:  That is what we're hoping to do.

17             THE COURT:  Well you haven't been very successful.

18             MR. SKINNER:  Well, we just got the chart in.  Let's

19   see where it goes from here.

20             THE COURT:  My purpose is to assist the tryers of fact

21   in hearing the facts.

22             MR. SKINNER:  Can we turn that chart around?

23             THE COURT:  You should stand it in the perpendicular

24   fashion.

25             MR. SKINNER:  We can use this.

D4G6LIN5                         Xiang – direct

1          THE COURT:  You should really put it with the entrance

2    on the front with front at the bottom.  That's it.

3    BY MR. SKINNER:

4    Q.  Mr. Xiang, can I you ask you to look up at the screen,

5    please.  Do you see the diagram that is up on the screen that

6    is marked as Government Exhibit 33, yes or no?

7    A.  Yes.  That's the one, yes.  With the two tables in the

8    back.

9    Q.  Do you see where I am indicting with the little green dot?

10         THE COURT:  Try not to lead.  Ask what is that.

11   Q.  What is that?

12   A.  That's the dining room.

13   Q.  What part of the dining room is this?

14   A.  That's the entrance going in.  That's the side.

15   Q.  What part of the dining room is this right here?

16   A.  The door.

17   Q.  What is right here where the dot is?

18   A.  That's the counter.

19   Q.  What are these right here that I am pointing to now?

20   A.  These are tables.

21   Q.  What is out here on the other side of the dining room?

22   A.  Where you are shining?

23   Q.  Yes.

24   A.  That's the street.

25   Q.  What is back here where I am pointing now?

1    A.  Tables.

2    Q.  Is this the back room?

3    A.  Yes.

4    Q.  What is this right here?

5    A.  That's the stairs.

6    Q.  Now, if you use this pointer and if you push this bottom,

7    can you show us where you went when you first went into the

8    restaurant?  You may need to stand up.

9    A.  I walked in here to get to here to buy things.

10   Q.  Is this where you were standing when you said earlier you

11   were going to buy rice?

12   A.  I was standing there and then I saw that the line was very

13   long so then I went in there.

14   Q.  Let's take it one step at a time.  You testified a little

15   earlier that after you went to the counter, you saw a man named

16   Guo Li.  Can you show us where Guo Li was standing when you

17   first saw him?

18   A.  He was here.  He was here and this is the door going in.

19   Q.  Where did you go if you can show us with the pointer after

20   Guo Li gestured to you?

21   A.  I walked into this table.  These were three Fuchownese

22   people and they said, "Let's have a drink."

23   Q.  You can put the pointer down, Mr. Xiang.

24   A.  And that person was sitting here.  Sitting here.  He was

25   sitting here and he wouldn't let me leave and then he picked up

D4G6LIN5                          Xiang – direct

1   the telephone.

2   Q.  We're going to take this one step at a time?

3           THE COURT:  We're getting close to the end of the

4   afternoon.

5           MR. SKINNER:  Your Honor, this shouldn't take too

6   long.  We'll try.  If we don't wrap up, we'll start up again

7   tomorrow morning.  I don't think there is much more left.

8   Q.  You can put the pointer down, Mr. Xiang.

9           After you got into that back room, describe for us

10  what you saw when you got in there?

11  A.  I went into the room, right.

12  Q.  Tell us what you saw.

13  A.  The back room.

14  Q.  Who was in there?

15  A.  There was only that room in the back and when I went inside

16  Guo Li told me to have a drink.  I was here.

17  Q.  Were there people in the back room when you got into the

18  back room?

19  A.  Yes.  There were people.  They were eating there.  I don't

20  know these people.

21  Q.  Did you say anything to these people?

22  A.  No.  No, I didn't say anything.

23  Q.  Did any of them say anything to you?

24  A.  No.  I said have a drink and then I said he looked like a

25  thug and then I didn't eat.

D4G6LIN5                          Xiang – direct

1   Q.  Who did you say he looks like a thug?

2              THE COURT:  Whom did he say it too?  Are we having a

3   freestyle speaking?

4              Whom did you see that you spoke to?

5              THE WITNESS:  I didn't speak to anyone.  I went in to

6   have a drink.

7              THE COURT:  How could you say something?  I think

8   we're going to adjourn at this point and we'll continue in the

9   morning.  I would like to see counsel briefly.

10             Members of the jury, we will reconvene tomorrow at

11  10:00 in the morning.

12             (Jury excused)

13             (Adjourned to April 17, 2013 at 10:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2       Examination of:                              Page

3       HUO GUANG CHEN

4       Cross By Mr. Cohen . . . . . . . . . . . . . 418

5       Redirect By Mr. Skinner  . . . . . . . . . . 424

6       Recross By Mr. Cohen . . . . . . . . . . . .427.

7       Redirect By Mr. Skinner  . . . . . . . . . . 432

8       Recross By Mr. Cohen . . . . . . . . . . . . 433

9       QUN LI

10      Direct By Ms. Burns  . . . . . . . . . . . . 434

11      Cross By Mr. Cohen . . . . . . . . . . . . . 459

12      Redirect By Ms. Burns  . . . . . . . . . . . 498

13      Recross By Mr. Cohen . . . . . . . . . . . . 500

14      ALLEN HUI CHEN

15      Direct By Mr. Skinner  . . . . . . . . . . . 505

16      SONG DI XIANG

17      Direct The Interpreter . . . . . . . . . . . 523

18                        GOVERNMENT EXHIBITS

19      Exhibit No.                              Received

20       33   . . . . . . . . . . . . . . . . . . . 531

21                         DEFENDANT EXHIBITS

22      Exhibit No.                              Received

23       A  . . . . . . . . . . . . . . . . . . . . 432

24       B  . . . . . . . . . . . . . . . . . . . . 486

25